

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 5 2024

**TAMMY H. DOWNS, CLERK**
By:_____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

RUTHIE WALLS; JENNIFER REYNOLDS, on her
own behalf and as Next Friend of SADIE
ANNABELLA REYNOLDS; and CHANDRA
WILLIAMS DAVIS, on her own behalf and as Next
Friend of GISELE DAVIS,

       **Plaintiffs,**

v.

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of Arkansas;
and JACOB OLIVA, in his official capacity as
Secretary of the Arkansas Department of Education,
and individually,

       **Defendants.**

Case No.: **4:24-cv-270-KGB**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

***JURY TRIAL DEMANDED***

   NOW COME Plaintiffs, RUTHIE WALLS, JENNIFER REYNOLDS, SADIE

ANNABELLA REYNOLDS, CHANDRA WILLIAMS DAVIS and GISELE DAVIS

("PLAINTIFFS"), by and through their attorneys, LAUX LAW GROUP and PORTER LAW

FIRM, and respectfully bring this legal challenge to the Arkansas LEARNS Act (Act 237 of 2023)

("LEARNS Act"), an unconstitutional law that violates PLAINTIFFS' First Amendment and

Fourteenth Amendment rights, *inter alia*.

   PLAINTIFFS submit to this Honorable Court this complaint requesting a declaratory

judgment and preliminary and permanent injunctive relief, as well as compensatory damages

relief, against HON. SARAH HUCKABEE SANDERS and JACOB OLIVA (collectively

"DEFENDANTS"), their employees, agents and successors in office.

     This case assigned to District Judge __**Baker**__
     and to Magistrate Judge__**Kearney**__

Contemporaneously with this Complaint, PLAINTIFFS submit a Motion for Preliminary

Injunction with Brief and Declarations. In support of their Complaint and Motion for Preliminary

Injunction, PLAINTIFFS respectfully state the following:

## **PRELIMINARY STATEMENT**

> Our Nation is deeply committed to safeguarding academic freedom,
> which is of transcendent value to all of us and not merely to the
> teachers concerned. That freedom is therefore a special concern of
> the First Amendment, which does not tolerate laws that cast a pall
> of orthodoxy over the classroom. *Keyishian v. Board of Regents*,
> 385 U.S. 589 (1967).

1.      PLAINTIFFS are: one (1) high school teacher of Advanced Placement African

American Studies (AP AAS) at historical Central High School ("Central High") in Little Rock,

Arkansas; three (3) Central High students enrolled in AP AAS for the 2023-24 school year; and

three (3) parents of those students.

2.      On March 8, 2023, HON. SARAH HUCKABEE SANDERS ("GOV. SANDERS")

signed the LEARNS Act[1] into law. The LEARNS Act contains largely education-related

provisions, including its Section 16 ("Section 16") which purports to protect Arkansas high school

students from "indoctrination" and expressly bans Critical Race Theory (CRT). Prior to its

enactment, GOV. SANDERS explained the purpose the LEARNS Act: to prevent a "left-wing

political agenda" from "brainwashing our children" with "political indoctrination."

3.      DEFENDANTS revoked state approval of AP AAS on August 11, 2023—the

Friday before the start of the 2023-24 school year—because they claim it violates Section 16.

DEFENDANTS' last minute ambush of Central High caused tremendous anxiety, stress and

consternation for teacher, parent and student alike and, ultimately, resulted in the deletion of AP

---

[1] The LEARNS Act is an acronym which stands for Literacy, Empowerment, Accountability,
Readiness, Networking and School Safety.

AAS' course code.  This stripped AP AAS of its full AP status and made it ineligible for multiple benefits to which it was previously entitled.  This attack on AP AAS started a chain reaction of constitutional, economic and even physical harms.

4.      As written, Section 16 puts teachers, faculty members, guest speakers—even students—at risk of criminal and/or civil penalty without adequate notice of what conduct or speech is prohibited.  It absolutely chills free speech.  Section 16 discriminates on the basis of race. It stigmatizes AP AAS as inferior and dissuades prospective AP AAS students from registering because of perceived diminishment of the class and natural concerns about its uncertain future.

5.      PLAINTIFFS challenge Section 16 as unconstitutional in a variety of respects. First, Section 16 violates the First Amendment because—as evidenced by GOV. SANDERS' public statements on the LEARNS Act—it impermissibly regulates classroom free speech on the basis on the speech content.  Second, the regulations imposed by Section 16 are also viewpoint-based because they authorized DEFENDANTS to remove fact-based state educational resources which they find disagreeable and replace them with information more to their liking.

6.      Third, Section 16 is unconstitutional and void because it fails to define operative terms and contains redundant and confusing terms.  Section 16 is unworkably vague and overly broad to the point where it fails to give reasonable notice of the conduct and speech it prohibits.

7.      Finally, Section 16 violates the Equal Protection Clause of the Fourteenth Amendment because—by restricting AP AAS curriculum due to certain subject matter but not restricting the curriculum of similar AP courses covering the same subject matter—it creates two different classes along racial lines.

8.      As a result of the acts and omissions committed by DEFENDANTS as described herein, PLAINTIFFS have suffered physical injury, economic damages and significant emotional

damages, including but not limited to, stress, anxiety, fear, confusion, stigmatization and consternation.

9.     This case presents an actual and justiciable controversy existing between PLAINTIFFS and DEFENDANTS regarding the constitutionality of legislation passed by the State of Arkansas, signed into law by GOV. SANDERS and implemented by OLIVA.

## JURISDICTION AND VENUE

10.     This Honorable Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988 and seeks to secure equitable relief.

11.     This Court has personal jurisdiction over DEFENDANTS because each of them are domiciled in the State of Arkansas and the deprivation of PLAINTIFFS' rights arise out of, and relate to, DEFENDANTS' official duties in the State of Arkansas.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

12.     RUTHIE WALLS ("MS. WALLS") is a U.S. citizen entitled to all legal and constitutional rights afforded U.S. citizens.  MS. WALLS is a high school teacher who, at all relevant times, including the 2023-24 school year, served as the teacher of the AP AAS course offered at Central High since 2022.  MS. WALLS is of African American (or black) descent.

13.     SADIE ANNABELLA REYNOLDS ("SADIE BELLE"), a minor, is a U.S. citizen entitled to all legal and constitutional rights afforded U.S. citizens.  At all relevant times, including the 2023-24 school year, her freshman year, SADIE BELLE is a Central High AP AAS student of Caucasian (or white) descent who is taught by MS. WALLS.

14.     GISELE DAVIS ("GISELE"), a minor, is a U.S. citizen entitled to all legal and constitutional rights afforded U.S. citizens.  At all relevant times, including the 2023-24 school year, her senior year, GISELE is a Central High AP AAS student of African American (or black) descent who is taught by MS. WALLS.

15.     SADIE BELLE and GISELE are referred to collectively herein as the "STUDENT PLAINTIFFS."

16.     JENNIFER REYNOLDS ("MS. REYNOLDS") is a U.S. citizen entitled to all legal and constitutional rights afforded U.S. citizens.  At all relevant times, including the 2023-24 school year, MS. REYNOLDS is the parent of SADIE BELLE.  MS. REYNOLDS brings this suit on behalf of herself and also as Next Friend to SADIE BELLE.  MS. REYNOLDS is of Caucasian (or white) descent.

17.     CHANDRA WILLIAMS DAVIS ("MS. DAVIS") is a U.S. citizen entitled to all legal and constitutional rights afforded U.S. citizens.  At all relevant times, including the 2023-24 school year, MS. DAVIS is the parent of GISELE.  MS. DAVIS brings this suit on behalf of herself and also as Next Friend to GISELE.  MS. DAVIS is of African American (or black) descent.

18.     MS. REYNOLDS and MS. DAVIS are referred to collectively herein as the "PARENT PLAINTIFFS."

19.     GOV. SANDERS is the duly elected Governor of the State of Arkansas and Chief Executive for the state, responsible for ensuring the enforcement of the state's educational statutes. GOV. SANDERS conceived and advanced the prohibitions contained in Section 16 which became law when GOV. SANDERS signed the LEARNS Act into law.  GOV. SANDERS is sued in her official capacity as Governor of the State of Arkansas.

20.     JACOB OLIVA ("OLIVA") is the Secretary of the Arkansas Department of Education (ADE) and is responsible for its acts and omissions.  OLIVA, through ADE, is responsible for enforcing Section 16 by, *inter alia*, investigating school districts—like the Little Rock School District (hereafter "LRSD")—for compliance with Section 16.  OLIVA is sued in his official capacity as ADE secretary.

21.     DEFENDANTS are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

## HISTORICAL AND FACTUAL BACKGROUND

### Little Rock Central High School and its Forced Integration in 1957

22.     Central High opened its doors to Little Rock students in 1927.  See Image No. 1.



Image No. 1: Central High School in Little Rock, Arkansas. Credit: NPS

23.     Central High opened during Jim Crow, when the law allowed racial segregation in public facilities, including schools, so long as separate accommodations for whites and blacks were the same—the so-called "separate but equal" standard derived from *Plessy v. Ferguson* in 1896. Central High admitted only white students during its first three decades of operation.

24.     Following *Brown v. Board of Education*—the 1957 landmark U.S. Supreme Court decision outlawing segregation in schools—nine black students enrolled at Central High.  On

September 4, 1957, the first day of class, these students—soon christened "The Little Rock 9"—were the targets of violent white mobs, as depicted in the iconic image of 15-year-old Elizabeth Eckford navigating her way to class through the hate, threats and jeers. See Image No. 2.



Image No. 2: Central High student Elizabeth Eckford of the Little Rock 9 is taunted and threatened on her way to class on the first day of the 1957 school year. Credit: Bettmann Archive.

25.     The violence experienced by the Litte Rock 9 forced President Dwight Eisenhower to deploy the National Guard to Central High to enforce *Brown* and protect the students. "Mob rule cannot be allowed to override the decisions of our courts," he said of the white resistance to the integration of Central High. Federal troops escorted the Little Rock 9 to school for the first three weeks of class and remained on guard through the year.

26.     The courage, resilience and personal sacrifice of the Little Rock 9 embody the American Civil Rights Movement, and this not only occurred in Little Rock but, specifically, at Central High, a national historic site since November 1998. The cultural significance of Central High and its history cannot be overstated.

27.     Today, Central High is minority-majority educational institution, with a minority enrollment of 67.7%. In 2023, about 2,200 students were enrolled at Central High, instructed and

served by 252 faculty and staff members.  Recent school statistics reveal the following percentages

on race: 52.7% Black; 32.3% White; 8.1% Asian; 5.5% Latino; and 0.9% two or more races.

28.     Since its integration, Central High has enjoyed decades of academic success and

honors.  The majority of its graduates enter four-year colleges and universities across the country,

with students accepted to the most selective institutions in America.

29.     Central High's 2023 senior class had a 90% graduation rate, and the school also

boasted 19 National Merit semifinalists and commended scholars that year.  Undoubtedly, these

achievements are the result of many factors, including the rich diversity of the student body.[2][3]

**The Advanced Placement (AP) Program, an Initiative of the College Board**

30.     For over 70 years, the AP Program has allowed high school students—including

those in Arkansas—to pursue college-level studies in nearly 40 subjects.  The AP Program is an

initiative of the College Board, a not-for-profit organization founded in 1900 to expand access to

higher education.

31.     At the end of each school year, AP students take a national AP examination and are

eligible to earn college credit with an exam score of 3 or higher (out of 5).  A major academic

benefit of AP studies is that a student can distinguish themselves during the college admissions

process by demonstrating a desire to take challenge themselves with college-level courses while

still in high school.

---

[2] Gomez, L.E., Bernet, P.  *Diversity improves performance and outcomes.* J. Natl. Med. Assoc. v.111, No. 4, August 2019.
[3] Pitts, D.W. (2005). *Diversity, representation and performance: evidence about race and ethnicity in public organizations.* J. Publ Adm Res Theor: J-PART, 4, 615.

32.     On its website[4], LRSD touts the AP Program, telling students "[y]our AP score could earn you college credits before you even set foot on campus [and] most AP students who enroll in four-year colleges start school with some credit."

**Critical Race Theory, An Academic and Legal Framework Dating Back to the 1970s**

33.     Critical Race Theory ("CRT") is a 50-year old academic approach that studies race and how systemic racism is embedded in society and its institutions.  The NAACP Legal Defense Fund describes CRT as:

> …an academic and legal framework that denotes that systemic racism is part of American society—from education and housing to employment and healthcare. Critical race theory recognizes that racism is more than the result of individual bias and prejudice. It is embedded in laws, policies and institutions that uphold and reproduce racial inequalities. According to CRT, societal issues like Black Americans' higher mortality rate, outsized exposure to police violence, the school-to-prison pipeline, denial of affordable housing, and the rates of the death of Black women in childbirth are not unrelated anomalies.

34.     CRT acknowledges the progress the U.S. has been made towards racial equity but, with a focus on laws, policies and systems, it explains how and why racial injustice persists despite this progress.

35.     In 2021, the National Association of School Psychologists (NASP)—a professional association representing more than 25,000 school psychologists, graduate students, and related professionals throughout the U.S.—published an article, *The Importance of Addressing Equity, Diversity, and Inclusion in Schools: Dispelling Myths About Critical Race Theory*[5], which was intended "to provide a general overview of CRT, dispel myths and correct misinformation, and

---

[4] Website found at: https://www.lrsd.org/Page/3003,
[5] *The Importance of Addressing Equity, Diversity, and Inclusion in Schools: Dispelling Myths About Critical Race Theory*, Vaillancourt Strobach, K., Desai, S., and Cowan, K. © 2021, National Association of School Psychologists, 4340 East West Highway, Suite 402, Bethesda, MD 20814.

provide school psychologists with guidance on how to navigate related conversations in local schools and communities."

36.     In the article, NASP explained right-wing ideologues have successfully stoked racial tensions and created a hot-button political issue by falsely representing that CRT is something it is not.

37.     NASP directly rebutted this misinformation campaign, explaining that CRT: does not teach that one race is superior or inferior to another; does not teach that all whites are racist and all racial minorities are oppressed; does not teach that racism and discrimination should be waged against whites; and does not teach that any people should feel bad about their race.

**Critically Acclaimed *The 1619 Project* Presents Another View of U.S. History, One Consistent with Critical Race Theory**

38.     In 2019, the New York Times published *The 1619 Project*, a series of academic articles commemorating the 400th anniversary of the arrival of the first enslaved Africans on the shores of present-day Virginia: the beginning of American slavery. *The 1619 Project* presented another view of U.S. history by placing the consequences of slavery and the contributions of black Americans at the center of the national narrative.

39.     *The 1619 Project* does not instruct on CRT outright. However, as it would with any serious, unflinching examination of race in America, the concepts which comprise CRT—the philosophical foundation upon which it sits—are deeply woven into *The 1619 Project*'s impressive and well-researched scholarship.

40.     *The 1619 Project* was extremely well-received by educators and teachers, which led to the availability of curricular resources from the project in scores of high schools across the country. Tens of thousands of students—in over 3,500 classrooms, in all 50 states—utilized these resources, which included reading guides. Five school systems adopted the project district-wide:

Buffalo, New York; Chicago, Illinois; Washington, DC; Wilmington, Delaware; and Winston-Salem, North Carolina.

41.     *The 1619 Project* was also lauded by historians, social scientists and school administrators.  For instance, Dr. Janice K. Jackson, CEO of Chicago Public Schools at the time, praised *The 1619 Project*'s academic, history-based approach, stating "[i]t's clear that The 1619 Project will resonate with our students for years to come."

**Success and Acclaim of *The 1619 Project* Draws Attention of Right-Wing Ideologues Who Then Wage a Culture War Against Critical Race Theory and Educators**

42.     Donald Trump began to openly target CRT in late 2020, issuing social media threats to defund any school using *The 1619 Project* to teach students.  See Image No. 3 below.



Image No. 3: Donald Trump's September 6, 2020 "Tweet" Threatening to Defund Public Schools Using The 1619 Project as a Teaching Aid.

43.     In September 2020, Donald Trump directed all federal agencies to cease training on "'*critical race theory*,' 'white privilege,' or any other training or *propaganda effort*" and, days later, he announced the formation of the "1776 Commission," which he charged with the ostensible task of assessing the educational value of *The 1619 Project*.  (emphasis added).  He stated that the commission was necessary because "*critical race theory*, The 1619 Project, and the crusade against American history *is toxic propaganda*."  (emphasis added).

44.     On January 18, 2021—Dr. Martin Luther King Jr. Day—less than two weeks after his supporters raided and defiled the U.S. Capitol, Donald Trump publicly unveiled the 1776 Commission's final report which concluded that CRT "ignore[s] historical context, and tell[s]

11

America's story solely as one of oppression and victimhood." He proudly described the report as "a dispositive rebuttal of reckless 're-education' attempts that seek to reframe American history around the idea that the United States is not an exceptional country *but an evil one*." (emphasis added).

45.     In a 2021 *Washington Post* article, Brown University Professor Seth Rockman addressed right-wing attacks on *The 1619 Project*, explaining that "[u]ltimately, the deep concern about the 1619 Project's truth-telling concerning the American past is not that it puts patriotism at risk, but rather that it jeopardizes particular versions of the American future.  Such fear informs…[demands from the right wing] for the exclusion of 1619 Project curricular materials from the classroom."

### Gov. Ron DeSantis of Florida Bans AP African American Studies and AP Psychology Claiming they Violate State Law

46.     In January 2023, the campaign against education continued as Gov. Ron DeSantis of Florida banned AP AAS, claiming it violated state law restricting the instruction of race and was "not historically accurate."  OLIVA was the Florida Board of Education commissioner at the time, and he was deeply involved in Gov. DeSantis' efforts to bar AP AAS there.  Prior to Gov. DeSantis and OLIVA in Florida, no state had ever banned an AP course.

47.     Gov. DeSantis continued his culture war on Florida classrooms and expanded the Parental Rights in Education law—called the "Don't Say Gay" law—which illegalized teaching gender identity and sexual orientation in high schools.  Gov. DeSantis demanded the College Board remove those topics from the AP Psychology curriculum or he would eliminate the course.

48.     The College Board initially refused Gov. DeSantis' demands, stating that it "do[es] not remove material at the request of states" but later that year, it issued a "Statement on AP

Psychology and Florida," acknowledging the damage caused by his political ultimatum "just days

from the start of school":

> We are sad to have learned that today the Florida Department of
> Education has effectively banned AP Psychology in the state by
> instructing Florida superintendents that teaching foundational
> content on sexual orientation and gender identity is illegal under
> state law.   The state has said districts are free to teach AP
> Psychology only if it excludes any mention of these essential topics.
>
> To be clear, any AP Psychology course taught in Florida will violate
> either Florida law or college requirements.   Therefore, we advise
> Florida districts not to offer AP Psychology until Florida reverses
> their decision and allows parents and students to choose to take the
> full course.

49.     Gov. DeSantis' abrupt elimination of AP Psychology for the 2023-24 school year

affected an estimated 28,000 Florida high school students.   Prior to Gov. DeSantis in Florida, the

College Board had never been told by a state to edit AP course content or get axed.

**GOV. SANDERS Conceives Section 16 and Targets Critical Race Theory, Labeling It a Brainwashing, Left-Wing Political Agenda which is Antithetical to the Traditional American Values of Neutrality, Equality and Fairness**

50.     On January 10, 2023, during her inauguration speech, GOV. SANDERS stated:

> Today I will also sign an executive order *preventing the political \**
> *indoctrination of Arkansas's schoolchildren*. As long as I am
> governor, our schools will focus on the skills our children need to
> get ahead in the modern world—*not brainwashing our children with*
> *a left-wing political agenda*.  (emphasis added).

51.     That day, GOV. SANDERS appointed OLIVA as ADE secretary and, a few hours

later, she issued her executive order "TO PROHIBIT INDOCTRINATION AND CRITICAL

RACE THEORY IN SCHOOLS," in which she proclaimed that schools must not indoctrinate

students, and that teachers and school administrators should not teach students what to think.

GOV. SANDERS declared that:

- *CRT is antithetical to the traditional American values of neutrality, equality and fairness.* It emphasizes skin color as a person's primary characteristic, thereby resurrecting segregationist values, which American has fought so hard to reject; and

- It is the policy of her administration that *CRT, discrimination and indoctrination have no place in Arkansas classrooms.* (emphasis added)

52.     At the time of GOV. SANDERS' executive order, DEFENDANTS were unaware of any direct evidence to support that CRT was harmful to students or that anyone had been indoctrinated with CRT in Arkansas public schools. "I don't think critical race theory is a problem in schools in Arkansas," State Rep. Tippi McCullough of Little Rock, the House Democratic Leader, said in January 2023.

53.     And yet, around that time, GOV. SANDERS and OLIVA ordered the ADE to begin removing educational materials from its recommended social studies resources accessible to Arkansas teachers because they were in violation of GOV. SANDERS' executive order and, therefore, would be in violation of the LEARNS Act she envisioned. Specifically, DEFENDANTS began purging state educational materials and resources celebrating the hard fought achievements won by African Americans because they included context of historical suffering—generations of slavery, decades of Jim Crow, ever present social bigotry and pervasive institutional oppression.

54.     During this surreptitious purge of black accomplishments, DEFENDANTS ordered state educational resources now include materials from a conservative project called "1776 Unites" which downplays blacks' historical challenges and whose declaration reads:

> 1776 Unites maintains a special focus on voices in the black community who celebrate black excellence, *discourage victimhood culture* and showcases the millions of black Americans *who have prospered by embracing the founding ideals of America*. (emphasis added).

55.     On February 8, 2023, in the GOP response to President Joe Biden's State of the Union address, GOV. SANDERS said the president is "the first man to surrender his presidency *to a woke mob that can't even tell you what a woman is*….*The America we love is in danger*." She continued: "The dividing line in America is no longer between right and left—*it's between normal or crazy*." She then vowed that her administration "*will educate, not indoctrinate, our kids, and put students on a path to success*."

### GOV. SANDERS and OLIVA Push the LEARNS Act Through the State Legislature and GOV. SANDERS Signs It Into Law on March 8, 2023

56.     On February 20, 2023, the LEARNS Act was introduced as SB 294 and, within days, OLIVA began laying the groundwork for DEFENDANTS' attack on AP AAS with testimony given at a special Senate Education Committee meeting on the controversial new law.

57.     During the meeting, State Sen. Linda Chesterfield requested that OLIVA define CRT as used in Section 16 and asked him why CRT should be banned in Arkansas. OLIVA refused and said "[n]ot only should we teach those topics that are factual in history, it should be required. And if those topics aren't reflected in our standards, then that's an opportunity for us as a state agency to ensure that every child is taught those topics when it's in the appropriate course."

58.     With this public statement, OLIVA implied that CRT and AP AAS curriculum are not based in historical fact.

59.     Section 16 of the LEARNS Act reads in pertinent part as follows:

6-16-156. Indoctrination.

(a) (1) The Secretary of the Department of Education shall take established steps to ensure that the Department of Education, its employees, contractors, *guest speakers, and lecturers* are in compliance with Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352.

(2) Steps required under subdivision (a)(1) of this section shall include the review of the rules, policies, *materials, and communications* of the Department of Education to identify any items that may, purposely or otherwise, *promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as "CRT"*, that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color…race…or any other characteristic protected by federal or state law.

(3) *The secretary shall amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination* and that conflict with the principle of equal protection under the law.

(b) As used in this section, *"prohibited indoctrination" means communication by a* public school employee, public school representative, or *guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964,* Pub. L. 10 No. 88-352, including that:

(1) People of one color…race…or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color…race…or any other characteristic protected by federal or state law; or

(2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color…race…or any other characteristic protected by federal or state law.

\*\*\*\*\*

(d) As it relates to employees, contractors, and *guest speakers or lecturers* of the department, *the secretary shall review and enhance the policies that prevent prohibited indoctrination, including Critical Race Theory*.

(e) *The secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory.*

See Ark. Code Ann. § 6-16-156 (emphases added).

60.     As expressly written, Section 16 permits OLIVA to review school courses, materials and communications and unilaterally amend or annul those which he subjectively believes "indoctrinate" students with CRT.

61.     The LEARNS Act creates the potential for criminal penalty, as determined by OLIVA. It creates the potential for civil liability, as determined by OLIVA. It creates the potential for the revocation of professional licenses, employment suspension and other forms of professional discipline, as determined by OLIVA.

**AP African American Studies, Begun at Central High in the 2022-23 School Year, Becomes a Successful and Popular Course**

62.     As established by the College Board, AP AAS curriculum has four units: (1) Origins of the African Diaspora (covering ancient Africa); (2) Freedom, Enslavement and Resistance (slavery and emancipation); (3) The Practice of Freedom (Reconstruction and Black politics); and (4) Movements and Debates (civil rights movement, culture and identity).

63.     AP AAS was piloted nationwide in 60 schools for the school year 2022-23. The inaugural AP AAS pilot course at Central High, which commenced during the 2022-23 school year, had 28 students. MS. WALLS—a highly qualified and trusted educator who had already taught African American History at the school for many years—was chosen to be the AP AAS instructor.

64.     While CRT is not an AP AAS curriculum unit, the concept at its heart—that racism is embedded in laws, policies and institutions which uphold and reproduce racial inequalities— undergirds nearly all aspects of AP AAS. This unfortunate truth is a recurring theme which permeates nearly every AP AAS topic in direct and indirect ways.

65.     The AP AAS course at Central High requires students to give classroom lectures and speeches on certain topics which are connected to AP AAS curriculum. Specifically, starting

17

on April 19, 2024, AP AAS students will give oral presentations in the form of an academic thesis and then defend their thesis before a faculty panel.

66.     In 2022-23, AP national exams—including the AP AAS exam—cost $98.  Like in all other AP courses offered at Central High, an AP exam was given to the students in MS. WALLS' AP AAS class for the 2022-23school year.

67.     Student enrollment in MS. WALLS' 2023-24 AP AAS course nearly quadrupled for its second year, causing Central High to expand the course to four (4) classes to accommodate the approximately 100 racially diverse students who wanted to participate.

68.     Following the 2022-23 school year, MS. WALLS received well-earned praise— emails, teacher appreciation notes, etc.—from educators, students and parents alike.

69.     In fact, MS. WALLS is an award-winning[6] educator, most recently a recipient of the 2023 Bessie B. Moore award bestowed by Economics Arkansas for her academic work "From Ninth Street to Now," which chronicles the race-based destruction of Little Rock's thriving black downtown community during a 1960s "urban renewal" project that forced blacks out of their homes and businesses by eminent domain and coercion.  Ultimately, Little Rock blacks were segregated to the south via a new highway, I-630, which became the city's new *de facto* racial boundary marker.

70.     With the 2023-24 school year approaching, PLAINTIFFS had no reason to believe that AP AAS for the school year 2023-24 would be any different than the 2022-23 school year in terms of state approval.  Central High teachers, students and parents had every reason to believe that AP AAS would continue without issue or restriction.

---

[6] In January 2024, MS. WALLS was named Central High "Teacher of the Year" for the 2023-24 school year.

**Central High Students Quickly Identify the Threat Posed by the LEARNS Act and
Exercise Their First Amendment Rights by Protesting It**

71.     On March 3, 2023, scores of racially diverse Central High students held a mass

"walk-out" in protest of the LEARNS Act legislation and governmental attempts to stifle their

First Amendment rights, an event which captured local, regional and national attention.  See Image

No. 4 below.



Image No. 4: Central High students protest GOV. SANDERS' LEARNS
bill on March 3, 2023. Photo: Daniel Breen/KUAR News

72.     Following the protest, Central High students issued a scathing public letter calling

on members of the Central High community to reject GOV. SANDERS' "hateful agenda" and

noted that "her crusade against what she claims to be Critical Race Theory [] would likely erase"

the "renowned history" of Central High  The students told GOV. SANDERS that the definition of

CRT found in Section 16 "is a complete perversion of the reality of CRT."

73.     The students correctly explained to GOV. SANDERS that CRT is "not about

demonizing individuals or discriminating based on race" but rather about acknowledging that

despite significant progress toward racial equality in the U.S., African Americans still experience

serious social and economic harms caused by racism deeply woven in our national institutions and

reflected in laws and policies. The students' protest and public letter critical of GOV. SANDERS are classic examples of activities protected by the First Amendment.

74.    On March 8, 2023, GOV. SANDERS signed the LEARNS Act—including Section 16—into law, at an ostentatious State Capitol ceremony and, afterward, Central High students again protested the legislation and this time hand-delivered a letter to GOV. SANDERS' office, voicing their continued opposition to the LEARNS Act.

75.    Shortly after the student protests, OLIVA contacted Central High principal, Nancy Rousseau, and quickly arranged for a personal visit to MS. WALLS' classroom. Within a day of his call, OLIVA sat in on MS. WALLS' AP AAS class and observed as she instructed her students using lessons from the 2022-23 AP AAS curriculum which had been approved by the state five (5) months earlier.

76.    Toward the end of class, as OLIVA was leaving, MS. WALLS paused her instruction, approached OLIVA and, after introducing herself, handed him his own copy of the 2023-24 AP AAS curriculum for review.

77.    The next day, Principal Rousseau called MS. WALLS to relay OLIVA's comments about her class which were uniformly positive. Principal Rousseau told MS. WALLS that OLIVA was "very complimentary" of her instruction. OLIVA told Principal Rousseau that MS. WALLS "is not teaching African American Studies. She's really teaching African American History, and I don't have a problem with that." OLIVA made no mention of AP AAS violating Section 16 or any aspect of the LEARNS Act at that time.

**Three (3) Days Before the Start of the 2023-24 School Year, ADE Revokes State Approval of AP AAS and OLIVA Gives False, Inconsistent Reasons for the Decision**

78.    On Friday, August 11, 2023—five months after OLIVA's visit to MS. WALLS' classroom and three (3) days before the start of the new school year—Central High teaching staff

was learned that Arkansas had revoked its approval of AP AAS and its course code would be deleted, meaning the AP AAS would not be recognized by the State for the 2023-24 school year. Further, the State now refused to cover the $98 end-of-year national exam for AP AAS students.

79.     Later that day, in a discussion with LRSD Superintendent, Dr. Jermall Wright, OLIVA explained that the reason the State revoked 2023-24 AP AAS was because it was still being piloted and the College Board was unable to confirm with colleges and universities which college course would be its equivalent for crediting purposes.  Arkansas was unable to offer AP AAS as an approved course until the College Board resolved the issue, OLIVA said.

80.     OLIVA told Dr. Wright that problems also stemmed from the title of the course, "AP African American Studies."  OLIVA said that there was already an approved non-AP course titled "African American History," and the College Board's decision to create AP AAS course versus AP African American History complicated state approval of AP AAS.

81.     However, OLIVA's statements to Dr. Wright were false because, by that time, "[m]ore than 200 colleges and universities nationally [had] signed on to provide college credit, advanced placement, or both to students who have satisfactory performance on the AP African American Studies Exam," according to the College Board.  Indeed, at the time of OLIVA's representation to Dr. Wright, the University of Arkansas-Fayetteville, the state's flagship school, planned to accept 2023-24 AP AAS course credit for qualifying AP students who passed the AP exam, just as it does with other AP courses.

82.     A day or two later, OLIVA told the LRSD that state approval for AP AAS was revoked because its course code "was listed in error last year."  OLIVA advised LRSD that it is "common practice" for ADE to review and edit the state's course catalog, and Arkansas typically considers factors like usage or redundancies when deciding which codes to delete.

83.    However, OLIVA's statement that Arkansas' code management system listed AP AAS in error for the 2022-23 school year was false because ADE actually approved the AP AAS pilot course code in October 2022 without issue in accordance with the State's course code assignment process which is methodical and involves multiple levels of review.[7]

84.    Switching gears, on August 14, 2023, OLIVA claimed the reason for the AP AAS' course code deletion was that the high schools where the course was to be offered had not undergone an AP course audit[8] as required by the State of Arkansas.

85.    However, OLIVA's statement about the lack of an AP AAS course audit was false because the State of Arkansas has never required an audit for any course nor involved itself with the AP course audit process in any way.  It is a fact that the only audits administered for AP courses in the State of Arkansas are the ones administered by the College Board.

86.    His prior statements easily debunked, OLIVA next claimed State approval for AP AAS was pulled because ADE "can't offer a course or we can't assign a course code to a teacher to teach an AP course to give a student AP credit that would transfer on their transcript unless the teacher does the course audit requirement.  Because [AP AAS is] still a pilot and not a course, that's not available until the 24-25 school year."

87.    However, OLIVA's statement that the decision to deny AP AAS accreditation and funding was due to the unavailability of the audit process until the 2024-25 school year was false because the College Board completed the audit for AP AAS for the 2023-24 school year prior to the course being offered, like it does with all other AP courses.

---

[7] Central High received the course code for AP AAS (574700) from the State on April 19, 2023.
[8] The purpose of AP course audits—which are administered by the College Board and not the State—is to determine whether the AP teacher can demonstrate an awareness and understanding of the proffered curriculum, a process where teachers of AP courses submit a syllabus that explains how course requirements are met.

88.    Finally, in the waning hours of August 14, now out of excuses, OLIVA gave Arkansas students, teachers and parents the real reason the State revoked approval of AP AAS: <u>to protect Arkansas students from indoctrination in the form of a left-wing political agenda brainwashing found in AP AAS as repeatedly publicly stated by GOV. SANDERS.</u>

89.    Soon after OLIVA's delayed admission, ADE issued a statement claiming that the AP AAS course likely violated provisions contained in the LEARNS Act which guard against the "indoctrination" of students by teaching "prohibited topics," and that educators who continued teaching the course risked violating state law and whatever penalties would flow therefrom.

90.    GOV. SANDERS' office echoed ADE's admonishment, stating "The AP African American Studies pilot course is not a history course and is a pilot that is still undergoing major revisions.  Arkansas law contains provisions regarding prohibited topics…*Without clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law.*" (emphasis added).

91.    OLIVA's fourth and final reason for eliminating AP AAS reflected its basis in GOV. SANDERS' antipathy toward CRT and "propaganda leftist agenda," which she openly expressed for months, including at her inauguration and during countless media appearances.

92.    ADE spokeswoman Kimberly Mundell echoed GOV. SANDERS' undermining of AP AAS, explaining that its state approval must be revoked because the course constitutes indoctrination, and ADE "supports rigorous courses not based on opinions or indoctrination."

93.    The College Board responded to GOV. SANDERS' attack on AP AAS in Arkansas:

> *College Board is committed to providing an unflinching encounter with the facts of African American history and culture*, and rejects the notion that the AP African American Studies course is indoctrination in any form.

*This pilot of a college-level course is rooted in the work of 300 scholars and includes facts of African-American experiences in the United States through primary sources that incorporate a combination of history, English, music, and more.*

*****

College Board has had an excellent working relationship with [ADE] for many years which has resulted in expanding access to AP across the state. Six schools were slated to participate in this second year of the pilot of this transformative course. *Among them is Central High School, a site vital to the country's civil rights movement, and its Little Rock 9 and their role in public school desegregation efforts are covered in the class.*

On this first day of school, we share in their surprise, confusion, and disappointment at this new guidance that the course won't count toward graduation credits or weighted the same as other AP courses offered in the state.

*Throughout the first pilot year, we heard countless stories from the classroom about how this course opened minds, changed lives, and provided a much richer understanding of the country.* Arkansas teachers and students have done extraordinary classroom work in AP African American Studies that has been celebrated in local, regional and national media, and their excellent work should be allowed to continue this school year. (emphasis added).

94.    On August 17, 2023, in a nationally televised interview with FOX News, GOV. SANDERS continued her public attack on CRT, calling it "propaganda leftist agenda, teaching our kids to hate America and hate one another" and suggesting AP AAS runs counter to a quality education and explaining why the LEARNS Act became law. GOV SANDERS then sharpened her attack:

We've got to get back to the basics of teaching math, of teaching, reading, writing and American history. And *we cannot perpetuate a lie to our students and push this propaganda leftist agenda, teaching our kids to hate America and hate one another. It's one of the reasons that we put into law banning things like indoctrination and CRT. We want our kids to receive a quality education...* (emphasis added).

24

95.     With this national public statement, GOV. SANDERS implied that CRT and AP AAS curriculum do not constitute a quality education.

96.     On August 21, 2023, in a letter to school superintendents, OLIVA confirm defunding of AP AAS and the denying of its accreditation was due to Section 16, writing:

> Given some of the themes included in the pilot, ***including 'intersections of identity' and 'resistance and resilience,'*** the Department is concerned the pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory.  (emphasis added)

97.     OLIVA added that ADE "has not been provided the necessary materials and resources needed to enable [it] to support districts in complying with the law and rules."

98.     However—like his excuses for revoking AP AAS a week prior—OLIVA's statement here is false because he was given a copy the AP AAS curriculum by MS. WALLS in her classroom in early March 2023.

99.     Nonetheless, in his August 21 letter, OLIVA ordered LRSD superintendents to "submit all materials, including but not limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and training materials, to the Department by 12:00 pm on September 8, 2023." OLIVA demanded from each of the superintendents a signed "statement of assurance that the teaching of [AP AAS] materials will not violate Arkansas law or rule."

100.    As the captain of his ship, for the benefit of his students and to assure AP AAS would continue at Central High in any form, Dr. Wright provided a statement to OLIVA. According to the College Board, prior to Arkansas, no state department of education has ever required the submission of course materials or an educator oath.

**Arkansas Legislators and Educators Voice Major Criticism about Section 16 and the Damage Caused by the LEARNS Act**

101.    Almost immediately, reputable voices arose in strong opposition to GOV. SANDERS' elimination of AP AAS in Arkansas.  State Rep. Jay Richardson, chairman of the Arkansas Legislative Black Caucus, condemned the LEARNS Act, warning it "has far-reaching implications on the educational and professional success of all Arkansas youth, and we must not allow this type of inequality to persist."

102.    In a statement to *The Guardian*, Arkansas NAACP president Derrick Johnson decried Section 16's attack on AP AAS, calling it an "attempt to strip high school students of an opportunity to get a jumpstart on their college degree," and adding that attempts by the state to cancel African American history are "undemocratic and regressive."

103.    Since February 2023, state legislators loudly criticized the unworkable and unconstitutional vagueness of Section 16 and its potential harm to anyone involved in high school education.  State Sen. Clarke Tucker and other legislators pressed GOV. SANDERS and OLIVA "for *objective standards and metrics that teachers and schools and parents can use to know whether they're violating the law or not*."  Another senator repeatedly requested GOV. SANDERS and OLIVA define "indoctrination" but received no answer.

104.    Among the "points of vigorous discussion" during this meeting was the lack of definition for terms within the LEARNS Act like "indoctrination," as well as the lack of a definable basis for outlawing CRT in Arkansas schools.  Thus, if DEFENDANTS were not already aware of these constitutional infirmities, the vigorous discussion served as actual notice to GOV. SANDERS and OLIVA that Section 16 had major vagueness issues.

105.    DEFENDANTS made no modifications to the LEARNS Act following the special meeting.

**Section 16 Bans What GOV. SANDERS Purportedly Celebrates and This Demonstrates
Section 16's Unworkable and Unconstitutional Vagueness**

106.    On January 10, 2024, GOV. SANDERS issued a press release containing her

"Proclamation for 'Dr. Martin Luther King Jr. Day' in Arkansas," which read in part:

> **WHEREAS:** Dr. King united his faith and his passion for racial
> equality to bring down racism in the United States and was
> instrumental in the passage of much of the civil rights legislation of
> the 1960s, which granted equality to blacks and other minorities.
> *His work had a profound impact on Arkansas and other states in the
> American South.*
>
> **WHEREAS:** Though Dr. King was killed at only 39, his words and
> actions continue to impact our lives today, nearly 100 years after his
> birth.
>
> **\*\*\*\*\***
>
> **WHEREAS:** This holiday embodies Dr. King's legacy of service
> and reminds all of us that *the fight for equality, in Arkansas and
> across the United States, is not done yet.* (emphasis added).

107.    In her proclamation, GOV. SANDERS stated that "*the fight for equality, in

Arkansas and across the United States, is not done yet.*" (emphasis added).

108.    This position taken by GOV. SANDERS—that racism still exists today in state and

federal institutions despite major progress towards racial equality—is a central theme of CRT

which, therefore, would make it a violation of Section 16 to read GOV. SANDERS' proclamation

at Central High or any other Arkansas high school.

**PLAINTIFFS' Damages**

109.    The express words and actions of DEFENDANTS serve as direct evidence that the

restrictions on free speech and expression imposed by Section 16 are content- and viewpoint-based

and, thus, unconstitutional.  The implementation of Section 16 has deeply harmed and continues

to deeply harm PLAINTIFFS' bedrock constitutional rights under the First and Fourteenth Amendments. This harm is not theorical as reflected in the actions of DEFENDANTS to date.

110.    As a result of DEFENDANTS' free speech restrictions and denial of equal protection of the laws, PLAINTIFFS have suffered damage to their liberty interests entitling them to monetary relief.

MS. WALLS' Damages

111.    DEFENDANTS' unnecessary, 11th hour "code red" situation caused MS. WALLS significant injury. To accommodate this last minute state-sanctioned sandbagging, she was forced within a matter of hours to implement a comprehensive grading system overhaul which included the changing and transferring of AP AAS student grades. During school hours and well beyond, MS. WALLS had to manually change and re-enter nearly twenty assignments for about 100 students—assignments which had already been entered into the system with the original AP course title and AP code—to an interim title and new course code. She was forced to scramble and print out all prior assignments before they became erased or otherwise irretrievable.

112.    Because of the revocation of AP AAS' AP credits, MS. WALLS could not apply for monetary funding for her AP AAS class which resulted in a loss of between $1000-2000 in financial grants. MS. WALLS and her students were deprived of certain books and materials essential to the course as a result of the AP credit revocation.

113.    Moreover, MS. WALLS was forced to miss work and seek medical treatment due to declining health, stress and anxiety caused by DEFENDANTS' conduct.

114.    Because of AP AAS' credit revocation, MS. WALLS' course is less appealing and therefore threatens its existence and in turn MS. WALLS' professional reputation and livelihood.

## STUDENT PLAINTIFFS' Damages

115.    STUDENT PLAINTIFFS and other AP AAS students are confused, frustrated and feel targeted by the State of Arkansas.  They have suffered and will suffer emotional and economic harm.  JORDAN and GISELLE, among other African American AP AAS students identify with AP AAS uniquely when compared to their equally dedicated student peers enrolled in other AP courses.  JORDAN and GISELE feel under attack specifically because of their race.

116.    STUDENT PLAINTIFFS and other AP AAS students worried that their assignments would not be submitted correctly or timely in order for them to be graded and for their grades to be properly attributed to them in the system.

117.    Portions of STUDENT PLAINTIFFS' work disappeared or was inadvertently deleted/lost in cyberspace due to changing/re-entering assignments due to the code situation.

118.    Unlike other AP students, STUDENT PLAINTIFFS will suffer financial harm in the form of paying out-of-pocket the $98 fee for the 2023-24 AP AAS exam because the code situation removed AP AAS' course code and the State does not cover non-AP exams.

119.    Unlike other AP students, STUDENT PLAINTIFFS will be denied the heavier and thus more advantageous AP course weight for their high school GPA because the credits earned by AP AAS have been moved to Social Sciences where they lack the AP enhancer.

120.    To the extent that a desired college or university does not allow honor or recognize AP AAS because of the course code situation, STUDENT PLAINTIFFS will suffer financial harm in the form of a more costly college education and suffer an increased likelihood of student debt when compared to other Central High AP students.

121.    Students enrolled in AP courses enjoy a higher success rate than their non-AP counterparts and research shows that diversity in educational settings benefits.  Removing AP AAS

harms the educational potential of all Central High students, and puts them at a disadvantage when compared to students in states where AP AAS is not banned.

122.     Removing AP AAS causes economic harm because it reduces the overall number of AP classroom seats which decreases opportunity for any Central High student planning to enroll in other AP courses and increases the likelihood of student debt when compared to students in states where AP AAS is not banned.

PARENT PLAINTIFFS' Damages

123.     Parents' role and investment in their children's education cannot be overstated. PARENT PLAINTIFFS have suffered liberty interest damages along with STUDENT PLAINTIFFS.

**Conclusion**

124.     While it is established that mob rule cannot be allowed to override the decisions of our courts, neither can culture war politics.  Section 16 is clearly a legislative instrument wielded by DEFENDANTS to realize GOV. SANDERS' expressed goal of ending the "brainwashing" of Arkansas children "with a left-wing political agenda."

125.     Indeed, DEFENDANTS' brazen attack on full classroom participation for all students in 2024 is reminiscent of the State's brazen attack on full classroom participation for all students in 1957.  This presents a truly ironic situation because if PLAINTIFFS were merely to discuss these unconstitutional attacks by GOV. SANDERS in their AP AAS classroom, or liken the motivation of the attacks to the oppressive institutional racism faced by the Little Rock 9, PLAINTIFFS would find themselves in violation of Section 16 and subject to criminal penalty imposed by the State.

30

## COUNT I
**Deprivation of Freedom of Speech and Expression Violation of First Amendment**
**MS. WALLS, JORDAN, SADIE BELLE and GISELE**

> If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Texas v. Johnson*, 491 U.S. 397 (1989).

126.   PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

127.   MS. WALLS and STUDENT PLAINTIFFS state this claim against DEFENDANTS.

128.   The First Amendment, applicable to the State of Arkansas by the Fourteenth Amendment, provides in part that the government "shall make no law…abridging the freedom of speech."

129.   Discrimination against speech based on its content or its viewpoint or both is a violation of the First Amendment.  Efforts to suppress speech based on the government's opposition to the speaker's views or beliefs are unconstitutional absent narrow tailoring in service of a compelling interest.

130.   On its face and as the public record shows, Section 16 is a façade for content and viewpoint discrimination.  By design, the portion of Section 16 which prohibits CRT and related concepts—including, but not limited to, intersectionality, identity, resistance to social injustice and resilience in the face of social injustice—is meant to suppress speech on the basis of viewpoint and content.

131.   Section 16 deprives MS. WALLS, STUDENT PLAINTIFFS and other Arkansas students of state-provided resources to which they would otherwise be entitled.  For instance, as part of their purge of CRT "indoctrination," DEFENDANTS have removed from state websites

access to information on civil rights from the National Education Association and Martin Luther King, Jr. Research and Education Institute.

132.   DEFENDANTS have removed access to Selma Online, a civil rights project led by the Hutchins Center for African and African American Research at Harvard University, which provides a visual history of the Civil Rights Movement leading to the Voting Rights Act of 1965. Selma Online's teaching guide—now purged—states that teaching on racial injustice and civil rights requires discussing race and racism "as real forces operating today."

133.   Speech and expression relating to CRT and related concepts, is protected First Amendment activity.  Section 16 is facially unconstitutional under the First Amendment.

134.   DEFENDANTS have implemented—and unless enjoined will continue to implement—Section 16 in a way that explicitly and impermissibly censors CRT and related concepts essential to full learning.  Section 16 therefore is unconstitutional as applied under the First Amendment.

135.   The First Amendment guarantees Arkansas students the right to speak, express themselves and associate with other like-minded students, including in schools.  These rights include the right to speak about CRT and related concepts—including, but limited to, intersectionality, identity, resistance to social injustice and resilience in the face of social injustice—and to otherwise engage in conduct expressing views on race and history.

136.   Where the practice or pursuit against which the act is leveled does not of itself injuriously affect the public, measures designed to prohibit it is unconstitutional.

137.   Here, there is absolutely no evidence to suggest that teaching CRT is harmful to students, their parents or society in general.

138.   Section 16 on its face, in its intent and purpose, as applied, and in effect impermissibly infringes upon students' expressive rights based upon the viewpoint of the expression, the message they wish to convey and the ideas and subject matter expressed individually or as groups associated for that purpose, and on its face, infringes upon said rights based upon the viewpoint of the speaker.

139.   Section 16 on its face and in the manner in which DEFENDANTS are implementing it impermissibly chills MS. WALLS and STUDENT PLAINTIFFS' and other students' speech and expression and causes them to self-censor.

140.   DEFENDANTS cannot deny that Section 16 is viewpoint-based.  Not only does it remove educational resources which reflect and describe the oppressive social and political path blacks were forced to sojourn throughout American history, but it replaces these facts with self-serving "feel good" writings provided by GOP-friendly "1776 Unites," a "bootstraps"-themed organization dedicated to whitewashing and sanitizing that same history by downplaying the fierce historical impediments to black equality.

141.   Indeed, days prior to the instant filing, in an *Arkansas Democrat-Gazette* opinion piece entitled "'Indoctrination'? Depends Who Does It," DEFENDANTS' viewpoint-based regulation was publicly called out:

> The first obvious conclusion from all that is that Sanders is not telling the truth, but being entirely hypocritical, when she crows that she opposes indoctrination.   She endorses indoctrination—champions it—if she agrees with that which is being imparted for indoctrination.
>
> Indoctrination, to her, means educating our children in theories and outright facts she doesn't like.

**\*\*\*\*\***

33

Education, if done well, encourages thinking rather than resenting. It instills the ability to see parts of two or more sides rather than one's pre-set immovable and emotion-driven side.

American is a great country, but not always a good one. The American concept and aim are great; the American practice has been flawed in minor and major ways.

You can't bring the American practice closer to the idea—which ought to be what a great nation is all about—unless you've been educated on varied hard truths rather than indoctrinated only on sweet political spin.

142. By prohibiting speech regarding CRT and related concepts, the law communicates to all students that black history is academically inferior and stigmatizes black faculty and black students. Section 16 interferes with black students' personal and academic development and complicates their sense of self.

143. Section 16 is not narrowly tailored to service a compelling governmental interest.

144. As a content- and viewpoint-based regulation that is neither justified by a compelling government interest nor narrowly tailored to achieve any arguable interest, Section 16 violates MS. WALLS and STUDENT PLAINTIFFS' First Amendment rights.

145. On its face and in its intent, purpose and effect, Section 16 attempts to prescribe what shall be orthodox in politics, nationalism or other matters of opinion, such as the present day effects of historical racial bias in U.S. institutions and policies and thus violates MS. WALLS and STUDENT PLAINTIFFS' First Amendment rights.

146. On its face and in its intent, purpose and effect, Section 16 infringes upon PLAINTIFFS' expressive rights without any reasonable relation to legitimate educational concerns and is thus unconstitutional.

147. In the past, PLAINTIFFS have engaged in protected speech and expression concerning CRT and related concepts, such as institutional racism. They wish to continue to do

34

so. However, because of Section 16, PLAINTIFFS have been chilled and/or forced to self-censor by taking care not to mention these concepts or topics or otherwise engage in related speech and expression in school contexts when they otherwise would do so.

148.    PLAINTIFFS' speech is presently being chilled and it will continue to be affected as DEFENDANTS seek to enforce the LEARNS Act. Section 16 objectively chills protected expression. PLAINTIFFS are entitled to prospective relief from DEFENDANTS to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

149.    Furthermore, DEFENDANTS have violated the First Amendment because they have imposed financial burdens on PLAINTIFFS based on the content of their expression. See *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S. Ct. 501 (1991).

150.    DEFENDANTS' decision to revoke state approval for AP AAS and eliminate its course code will force AP AAS students—including STUDENT PLAINTIFFS—to pay for the AP AAS exam out-of-pocket.

151.    The revocation of the AP course code eliminated AP AAS' eligibility for financial grants allocated for AP courses, and the resulting lack of funds often forced MS. WALLS to personally cover these costs out-of-pocket.

152.    DEFENDANTS have therefore imposed a financial burden on MS. WALLS and STUDENT PLAINTIFFS based on the content of MS. WALLS' academic expression.

153.    AP EH teachers and students do not bear such a financial burden despite freely expressing their distinct or different opinions within curricular content similar to AP AAS curricular content.

154.    PLAINTIFFS are entitled to declaratory relief that Section 16 is unconstitutional and unenforceable.

155.    PLAINTIFFS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16 and that this Court order DEFENDANTS to restore the AP AAS course code and reverse any and all revocations, changes and/or modifications of any kind experienced by AP AAS since the implementation of the LEARNS Act, and to revert any changes to school policy made to comply with Section 16.

156.    PLAINTIFFS will suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement and threat of enforcement of Section 16.  PLAINTIFFS have no plain, adequate or speedy remedy at law.

## COUNT II
### Content and Viewpoint Based Discrimination in Violation of First Amendment Right to Receive Information
### MS. WALLS and STUDENT PLAINTIFFS

157.    PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

158.    MS. WALLS and STUDENT PLAINTIFFS state this claim against DEFENDANTS.

159.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S. § 1983, provides in part that the government "shall make no law…abridging the freedom of speech."  Ideologically driven attempts by the government to suppress a particular point of view are presumptively unconstitutional.

160.    A regulation is content-discriminatory—and thus unconstitutional—if the regulation cannot be justified without reference to the content of the regulated speech or was enacted due to disagreement with the message the speech conveys.

36

161.     As stated by the Supreme Court in *Healy v. James*, 408 U.S. 169, 180-181 (1972), "[t]he first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and, if so, for the State to classify them.  The second, and corollary, danger is to speech from the chilling of individual thought and expression."

162.     These First Amendment protections, applied in light of the special characteristics of the school environment, are available to teachers and students.   *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1967).

163.     PLAINTIFFS submit Section 16 on its face and as implemented by OLIVA perpetuates content-based discrimination and is a façade for viewpoint-based discrimination and therefore is facially unconstitutional under the First Amendment.

164.     Section 16 does not define within the body of its text the prohibited "materials...communications" or "items" which violate the law.  See § 6-15-156(a)(2) and (3)(b).

165.     Without specificity, a reasonable interpretation of "materials...communications" and "items" applying to an educational setting such as Central High could include textbooks, novels and other works of fiction and non-fiction, and the content contained within those materials.

166.     Thus, Section 16 would seem to create authority to ban textbooks, novels and other works of fiction and non-fiction based on CRT-related content or any content which DEFENDANTS find subjectively disagreeable or offensive.  Section 16 censors these materials based on their content and viewpoint and, therefore, Section 16 is unconstitutional on its face and as applied to PLAINTIFFS under the First Amendment.

167.     Indeed, DEFENDANTS have already began the purge by removing state resources which support, or even are consistent with, CRT.

37

168.    AP AAS students have the right under the First Amendment as applied to the State of Arkansas by the Fourteenth Amendment to receive information and ideas.

169.    Because Section 16 conceivably permits the regulating and/or banning of books it necessarily invokes First Amendment concerns and protections.

170.    A student's constitutional right to receive information is violated when the state bans books and the ideas within those books for a purpose not reasonably related to a legitimate educational concern.  Students also have a right under the First Amendment to be free from official conduct in school—such as the restriction of textbooks, novels and other works of fiction and non-fiction—that is intended to suppress ideas based on disapproval of their content.

171.    Students' right to receive information and ideas includes the right to access and read books available through school that is entitled to unique protection in the school environment under the U.S. Constitution.

172.    Under the *Pico* standard, the government's motive for the removal of books is unconstitutional under the First Amendment if it is based on simply disliking ideas contained in books and on seeking to prescribe what shall be orthodox in matters of opinion. *ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009), cert. denied, 558 U.S. 1023, 130 S. Ct. 659 (2009).

173.    In its purpose and effect, Section 16 is an impermissible infringement upon students' right to receive information and ideas from textbooks, novels and other fiction and non-fiction works used in AP AAS based upon the views expressed therein in that it was enacted with the intent to and has been applied to remove books and materials related to CRT, as the express language and legislative history of the LEARNS Act reveals.

174.    On its face, in its intent, purpose and effect, Section 16 attempts to prescribe what shall be orthodox in politics, nationalism or other matters of opinion in Arkansas schools—such as the position that information chronicling the black struggle in America has no place in the classroom—without any legitimate reason.

175.    GOV. SANDERS made the intent, purpose and effect of Section 16 clear when she criticized "woke mobs" and publicly announced her goal stop "brainwashing our children with a left-wing political agenda" by teaching CRT which she called "antithetical to the traditional American values."

176.    OLIVA made the intent, purpose and effect of Section 16 clear when he singled out subject areas involving CRT, intersectionality, identity, resistance to social injustice and resilience in the face of social injustice as violating Section 16 and, therefore, a basis to revoke state approval of AP AAS.

177.    Section 16, on its face and as applied to PLAINTIFFS, is a content- and viewpoint-based regulation that is not justified by a compelling government interest or narrowly-tailored to achieve any arguable interest and as such violates PLAINTIFFS' First Amendment rights on its face and as applied.

178.    PLAINTIFFS are entitled to prospective relief from DEFENDANTS to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

179.    PLAINTIFFS are entitled to declaratory relief that Section 16 is unconstitutional and unenforceable in that it regulates, restricts and forbids free speech solely on the basis of content.

180.    PLAINTIFFS are entitled to injunctive relief and request this Court enjoin DEFENDANTS: a) from enforcing Section 16; b) from removing state educational resources

solely on the basis they contain CRT or CRT related concepts; c) from investigating school districts, employees of school districts or students for potential violations of Section 16; d) from subjecting educators to hearings that may result in disciplinary action because of a violation of Section 16; and e) whatever other relief the Court deems appropriate.

181.    PLAINTIFFS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16 and that this Court order DEFENDANTS to restore the AP AAS course code and reverse any and all revocations, changes and/or modifications of any kind experienced by AP AAS since the implementation of the LEARNS Act, and to revert any changes to school policy made to comply with Section 16.

182.    PLAINTIFFS will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement and threat of enforcement of Section 16.  PLAINTIFFS have no plain, adequate or speedy remedy at law.

### COUNT III
**Void for Vagueness under the First and Fourteenth Amendments**
**MS. WALLS and STUDENT PLAINTIFFS**

183.    PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

184.    MS. WALLS and STUDENT PLAINTIFFS state this claim against DEFENDANTS.

185.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[no] state shall…deprive any person of life, liberty, or property, without due process of law."

40

186.    Under the Fourteenth Amendment, a governmental enactment like the LEARNS Act is unconstitutionally vague if it fails to provide persons of ordinary intelligence fair notice of what is prohibited, or if it is so standardless that it authorizes or encourages seriously discriminatory enforcement.  In other words, laws are unconstitutionally void for vagueness when their prohibitions are not clearly defined.  See *Connally v. General Construction Co.*, 269 U.S. 385 (1926).

187.    The LEARNS Act is void for vagueness in violation of the Fourteenth Amendment both on its face and as applied to specific forms of expression in which MS. WALLS and STUDENT PLAINTIFFS wish to engage.

188.    Section 16 prohibits certain categories of speech, and it subjects MS. WALLS and STUDENT PLAINTIFFS to criminal penalty and/or civil liability.  Additionally, Section 16 threatens MS. WALLS' employment, including the possible revocation of her teaching license, employment suspension and other forms of professional discipline.

<u>Section 16's Vaguely Defined Subject Matter</u>

189.    Section 16 fails to define several operative terms within the body of its text, and it also contains operative terms so vague as to fail to provide adequate notice of what conduct or material is prohibited by law.

190.    For instance, Section 16 does not define "Critical Race Theory" or explain how CRT "conflict[s] with the principle of equal protection under the law or encourage[s] students to discriminate against someone based on the individual's color…race…or any other characteristic protected by federal or state law."  Section 16 contains no data or evidence which supports the position that CRT or AP AAS is harmful to Arkansas students.

191.    Section 16 prohibits materials and communications, *inter alia*, "that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as 'CRT'…" but, again, it fails to define CRT.

192.    Does Section 16's prohibition on CRT apply solely to communications pertaining to the academic origins of CRT, i.e., the history of CRT as an analytical framework and its originators? Must the magic words "critical race theory" or "CRT" be spoken in the classroom for Section 16 to apply? Are students permitted to discuss an opinion supported by CRT—that racism is embedded in laws, policies and institutions that uphold and reproduce racial inequalities, for instance—so long as they do not utter the phrase "critical race theory?"

193.    The failure to properly outline the contours of the speech comprising CRT and to clarify what it means to "promote teaching that would indoctrinate students with ideologies, such as [CRT]" equates to a failure to provide adequate notice of what speech is prohibited.

194.    Further, the LEARNS Act does not define "communications." Section 16 forbids "public school representatives," "lecturers" and "guest speakers" from communicating ideas that "compel[] a person to adopt, affirm or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964" but does not define the terms "public school representative," "lecturer," "guest speaker" or "compel."

195.    Section 16 refers to indoctrination—indeed, it is entitled Indoctrination—but the term is not defined within the body of the text. The Cambridge Dictionary defines indoctrination as: the process of repeating an idea or belief to someone until they accept it without criticism or question. Is this what is meant in Section 16?

196.    Section 16 does define the term "prohibited indoctrination," identifying it as "communication by a public school employee, public school representative, or guest speaker that

compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964."

197.    However, because "ideas" in violation of educational opportunities discrimination (Title IV) and race discrimination (Title VI) are fairly limitless, this provision of Section 16 is overly broad.  Moreover, short of a Stockholm Syndrome-like hostage situation, how could the state ever demonstrate that an individual was "compelled" to adopt an idea?  What does it mean to "compel" a person in this context?

198.    Moreover, by expressly referencing both indoctrination and prohibited indoctrination in the same passage, Section 16 is confusing, redundant and possibly contradictory. Section 16 implies that some types of indoctrination are not prohibited but it does not define what may be the subject of indoctrination and what may not, i.e., prohibited indoctrination.

199.    In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning common language. *JPMorgan Chase Bank, N.A. v. Johnson*, 719 F.3d 1010, 1015 (8th Cir. 2013).  Arkansas courts construe statutes so that no word is left void, superfluous or insignificant, and meaning and effect are given to every word in the statute if possible. *Id.*

200.    For instance, does teaching AP AAS students about present-day effects of Jim Crow—where the U.S. enacted discriminatory policies and tolerated racist customs which suppressed blacks' rights via threats and acts of physical violence—constitute prohibited indoctrination because it is CRT-related or is it permissible under Section 16's clause (c)(2) which allows discuss public policy issues of the day and related ideas that individuals—like GOV. SANDERS and OLIVA—may find unwelcome, disagreeable, or offensive?

201.    The LEARNS Act gives no answers or guidance to the myriad questions regarding prohibited subject matter and thus leaves PLAINTIFFS and countless others in jeopardy of criminal penalty and/or civil liability.

<u>Section 16's Vague, Undefined Scope</u>

202.    Further, even if the applicable subject matter was properly defined and constitutionally sound, Section 16 is still unworkably vague in terms of its scope, i.e., specifically what and who it covers.

203.    Operative terms "lecturer" and "guest speaker" are not defined in the text of Section 16 and, without clarity, these terms conceivably encompass students who give an oral presentation or speech to their AP AAS class, making them subject to Section 16, even without reaching the age of majority.

204.    Operative phrase "materials and communications" is not defined in the text of Section 16 and, without clarity, the phrase conceivably encompasses textbooks, novels and other fiction and non-fiction works used or consulted in the AP AAS classroom, making Section 16 tantamount to a book ban.

205.    For example, in 1965, Eugene D. Genovese wrote a history textbook, *The Political Economy of Slavery: Studies in the Economy and Society of the Slave South*, which, among other things, advances the position that the antebellum South—an economy founded on slave labor— shifted capital from slave to slave owner for generations by barring slaves from renting their labor on the market.

206.    If, during an oral presentation to her class, GISELE quoted a portion from Mr. Genovese's book—that "slavery provided the foundation on which the South rose and grew"—in support of an academic position based on CRT, is GISELE a "lecturer" under Section 16?  And, if

44

JORDAN is a "lecturer," has she "purposely or otherwise, promote[d] teaching that would indoctrinate students with [prohibited] ideologies" because her conclusion is one reflected in, and supported by, CRT?

207. Continuing the hypothetical, has Mr. Genovese, the author, violated Section 16 because, though not physically present during GISELE's speech, he nonetheless wrote the book— the "materials and communications"—which contains the CRT-related prohibited message?  Is Wesleyan University Press—Mr. Genovese's publisher—potentially liable because it "promoted" the prohibited teaching within GISELE's communication?

208. And yet, the harm caused by Section 16's vagueness is not hypothetical.  As pled in PLAINTIFFS' contemporaneously filed TRO motion, starting on April 19, 2024, an AP AAS class assignment culminates in an oral classroom presentation given by each of MS. WALLS' students, including STUDENT PLAINTIFFS, during which they defend a central thesis before a faculty panel.

209. SADIE BELLE has completed her AP AAS thesis which will examine slave codes—a set of rules and court decisions in each slave state based on the concept that enslaved persons were property and not persons—in the antebellum south.

210. If SADIE BELLE's presentation were to include speech wherein she concludes, for instance, that an aspect of modern-day U.S. penal system—the school-to-prison pipeline for black males—is rooted in the institutional enforcement of antebellum slave codes, has SADIE BELLE "purposely or otherwise, promote[d] teaching that would indoctrinate students with [prohibited] ideologies" because her conclusion is one reflected in, and supported by, CRT?  Is she a "lecturer" or "guest speaker" per Section 16?

211.    If a student brings materials previously removed by DEFENDANTS, is that a *per se* Section 16 violation?

212.    By failing to provide clear boundaries on the targeted speech, conduct and materials prohibited, Section 16 invites, and has resulted in, arbitrary and discriminatory enforcement.

213.    Section 16 includes vague and subjective terms that lend themselves to conflicting or unclear interpretations and fails to provide adequate notice as to which information, concepts, speech and expression may or may not be discussed or allowed in school settings by MS. WALLS and STUDENT PLAINTIFFS.  Despite Section 16's vagueness, it includes criminal penalty for those who fail to comply.

214.    Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted and choose not to exercise their rights for fear of the consequences.

215.    Section 16 impermissibly delegates standardless discretionary power to GOV. SANDERS and OLIVA for resolution on an arbitrary and subjective basis.

216.    Therefore, MS. WALLS and STUDENT PLAINTIFFS do not know which of their activities, speech or expression are prohibited by Section 16 and are justifiably fearful of engaging in any speech or conduct that DEFENDANTS could penalize.  MS. WALLS and STUDENT PLAINTIFFS self-censor as a result.

217.    Indeed, because of impermissible vagueness of Section 16, every day that MS. WALLS instructs her AP AAS students presents another day of potential criminal, civil and/or professional jeopardy because at any time her instruction could be deemed "communication…that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies" such as CRT.

218.    Section 16 violates the Due Process Clause of the Fourteenth Amendment and is void for vagueness because it infringes on MS. WALLS and STUDENT PLAINTIFFS' constitutionally protected right to free speech and provides inadequate notice of the conduct it purports to prohibit.

219.    MS. WALLS and STUDENT PLAINTIFFS are entitled to prospective relief from DEFENDANTS to remedy the deprivations suffered as a result of the violations of their First and Fourteenth Amendment rights.

220.    MS. WALLS and STUDENT PLAINTIFFS are entitled to declaratory relief that Section 16 is unconstitutional and unenforceable in that it fails to provide adequate notice as to which information, concepts, speech and expression may or may not be discussed or allowed in school settings.

221.    MS. WALLS and STUDENT PLAINTIFFS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16.

222.    PLAINTIFFS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16 and that this Court order DEFENDANTS to restore the AP AAS course code and reverse any and all revocations, changes and/or modifications of any kind experienced by AP AAS since the implementation of the LEARNS Act, and to revert any changes to school policy made to comply with Section 16.

223.    PLAINTIFFS will suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement and threat of enforcement of Section 16. PLAINTIFFS have no plain, adequate or speedy remedy at law.

**COUNT IV**
**Discrimination on the Basis of Race in Violation of the Equal Protection Guarantee of the Fourteenth Amendment**
**MS. WALLS, GISELE and MS. DAVIS**

> As in all equal protection cases...the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment. *Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972).

224.    PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

225.    MS. WALLS, GISELE and MS. DAVIS state this claim against DEFENDANTS.

226.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall...deny to any person within its jurisdiction the equal protection of the laws."

227.    Equal protection does not require that all persons be dealt with identically but it does require that a distinction made have some relevance to the purpose for which the classification is made. *Baxstrom v. Herold*, 383 U.S. 107 (1966).

228.    Section 16 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against MS. WALLS, GISELE and MS. DAVIS, and other African American faculty, students and parents based on race, both facially and as applied.

229.    Application of Section 16 denies MS. WALLS, GISELE and MS. DAVIS —who are black and therefore members of a protected class—equal protection because it treats a high school class covering black history and drawing predominately black students differently than a similar high school class covering Caucasian history and drawing predominantly white students.

230.    The LEARNS Act was enacted with the purpose to discriminate and has the effect of discriminating against African American faculty, students and parents, subjecting them to differential and adverse treatment on the basis of their race.

231.   Discrimination against African American faculty, students and parents was a motivating factor behind the passage of the LEARNS Act. As written and applied, the Section 16 bears more heavily on African American faculty, students and parents than on white faculty, students and parents, and the history, context and process of the law's passage illustrate its discriminatory motives.

232.   Section 16 shames and stigmatizes these black faculty and black students and invites school officials, teachers and classmates to view them as inferior. It harms their long-term health and well-being and denies them equal educational and/or employment opportunities on the basis of their race.

233.   The LEARNS Act has contributed to the creation of a discriminatory climate in the schools that DEFENDANTS operate and the public at large. It fosters a culture of inequality and discourages school officials from complying with their obligations to treat all members of the Central High community equally, as evidenced by comparing AP AAS with AP European History.

### A Comparison of AP AAS and AP European History Shows that the Classes are Treated Differently Without any Legitimate Basis

234.   Again, according to OLIVA, Section 16 bars the instruction of concepts related to two themes contained in AP AAS curriculum because the themes constitute "Indoctrination" in violation of the LEARNS Act. Those themes are: "Intersections of Identity" and "Resistance and Resilience."

235.   The 2023-24 AP AAS curriculum describes the substance of Intersections of Identity (Image No. 5) as follows:

**INTERSECTIONS OF IDENTITY:**

AP African American Studies examines the interplay of distinct categories of identity (such as race, ethnicity, class, nationality, gender, region, religion, and ability) with each other and within society. African Americans and Black communities throughout the African diaspora are not a monolith, and the course emphasizes the various ways categories of identity operate together to shape individuals' experiences and perspectives. In line with the discipline of African American Studies, students should develop the skill of considering how the intersections of identity impact the sources, debates, and historical processes they explore.

Image No. 5—Intersections of Identity from AP African American Studies Operational Course Framework, Project and Exam Overview at p. 13.

236.   At all relevant times, AP European History (AP EH) was offered at Central High as an AP course. AP EH instructs students on aspects of national European identity, including themes of national belonging, a common cultural identity and European intersectionality. Regarding European identities, the AP EH curriculum reads:

> Meanwhile, the intellectual movement of the Enlightenment, coupled with French revolutionary ideals, offered a different vision of European identity based on a shared belief in reason, citizenship, and other Enlightenment values.

> In the 19th century, countries like *Germany, Italy, and the Kingdom of the Netherlands were unified* through wars, political negotiations, *and the promotion of intense feelings of national belonging.* At the same time, Romantic writers and artists fostered and built upon feelings of loyalty to the nation, *producing works appealing to a common language or cultural identity.*

> \*\*\*\*\*

> *European identities since 1450 have been a fluid concept*, with overlapping and non-competing identities enduring even in the age of nation-states. As new national entities form, merge, and in some instances disappear, *these developments help shape popular understanding of what it means to be European.*

237.   The 2023-24 AP AAS curriculum under fire by LEARNS Act describes the substance of Resistance and Resilience (Image No. 6) as follows:

**RESISTANCE AND RESILIENCE:**
The themes of resistance and resilience spiral throughout the AP African American Studies course. Each unit highlights a range of methods that African Americans have innovated to resist oppression and assert agency and authenticity politically, economically, culturally, and artistically. These methods often emerged from distinct experiences, perspectives, and approaches for resisting oppression, finding joy, and building community. Students examine examples such as resistance to slavery and the slave trade, the formation of clubs and businesses that advocated for women's rights and economic empowerment, and movements to preserve and celebrate Black history and cultural traditions. Throughout the course, students are encouraged to identify how various forms of resistance and resilience evolve within Black communities in the United States, and in connection to the broader African diaspora.

Image No. 6—Resistance and Resilience from AP African American Studies Operational Course Framework, Project and Exam Overview at p. 13.

238.    Based on its curriculum, AP EH instructs on historical attempts to justify the colonial slave system and organized resistance to the system:

> The use of "race" as a primary category for differentiating people coincided with the expansion of slavery, as Europeans sought a workforce for overseas plantations; *this categorization helped Europeans justify the slave system.* From the 16th to the 19th century, the transatlantic slave trade became a central feature of the world economy, and millions of Africans were transported via the notorious Middle Passage to labor on plantations in the Americas. *The vast and cruel slave system led to various forms of resistance by enslaved peoples and began to generate opposition in Europe beginning in the late 18th century.*

> \*\*\*\*\*

> In conquered territories, Europeans established new administrative, legal, and cultural institutions, and restructured colonial economies to meet European needs, *actions that often led to resistance and opposition in colonial areas.*

> \*\*\*\*\*

> By 1914, most of Africa and Asia were under the domination of Great Britain, France, Portugal, Germany, Belgium, and the Netherlands. *Notwithstanding the power of colonial administrations, some groups in the colonial societies resisted European imperialism, and by 1914, anticolonial movements had taken root within the non-European world and in Europe itself.*

51

239.   Based on their respective curricula, both AP AAS and AP EH discuss themes of identity exploration, both distinct and overlapping.  They both discuss the notion of identity being a fluid concept.

240.   Based on their respective curricula, both AP AAS and AP EH discuss the tension between ethnic or racial identity and national belonging.

241.   Based on their respective curricula, both AP AAS and AP EH acknowledge that historically some nation-states used race as a means to differentiate people so as to justify a slave system designed and enforced for the state's enrichment.

242.   Based on their respective curricula, both AP AAS and AP EH instruct on the indispensable role of various forms of resistance and opposition to systemic oppression imposed by powerful institutional forces.

243.   And yet, DEFENDANTS do not complain that AP EH promotes "prohibited indoctrination" in violation of Section 16.  Nor have DEFENDANTS revoked state approval of AP EH because of CRT.  DEFENDANTS do not deny AP EH students reimbursement for the AP national exam.

244.   DEFENDANTS have not publicly challenged the academic worth of AP EH in statements to the press.  DEFENDANTS do not publicly complain that AP EH classroom discussions on the vast and cruel European slave system teach white students they should be ashamed to be white.

245.   Because Section 16 treats two similar groups differently, it creates two classes of unequal groups.  Section 16 divides along racial lines.

246.   Discrimination based on race warrants strict scrutiny.

247.    Section 16 does not serve any legitimate educational purpose and is instead rooted in animus toward and moral disapproval of African American history and culture.

248.    Section 16 lacks adequate tailoring in service of any such government purpose.

249.    As a direct and proximate result of DEFENDANTS' authority and conduct, which includes the implementation and enforcement of Section 16, MS. WALLS, GISELE and MS. DAVIS have suffered and continue to suffer irreparable harm.

250.    DEFENDANTS are government officials with sufficient connection to the state.

251.    DEFENDANTS knew or should have known about the discriminatory policy/custom and its potential harm.  Despite this, DEFENDANTS did not take adequate corrective measures to correct the problem after learning of the problem.

252.    MS. WALLS, GISELE and MS. DAVIS are African American and, therefore, members of a group protected under the Equal Protection Clause.

253.    MS. WALLS, GISELE and MS. DAVIS have been victims of disparate treatment on account of their race, when DEFENDANTS revoked state approval for AP AAS and deleted its course code.

254.    DEFENDANTS' actions against MS. WALLS, GISELE and MS. DAVIS constitute a violation of their constitutional right to equal protection under the law.

255.    MS. WALLS, GISELE and MS. DAVIS are entitled to prospective relief from DEFENDANTS to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

256.    MS. WALLS and STUDENT PLAINTIFFS are entitled to declaratory relief that Section 16 is unconstitutional and unenforceable in that it violates the Equal Protection Clause of the Fourteenth Amendment.

257.    MS. WALLS, GISELE and MS. DAVIS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16.

258.    MS. WALLS, GISELE and MS. DAVIS are entitled to injunctive relief and request this Court enjoin DEFENDANTS from enforcing Section 16 and that this Court order DEFENDANTS to restore the AP AAS course code and reverse any and all revocations, changes and/or modifications of any kind experienced by AP AAS since the implementation of the LEARNS Act, and to revert any changes to school policy made to comply with Section 16.

259.    MS. WALLS, GISELE and MS. DAVIS will suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement and threat of enforcement of Section 16. PLAINTIFFS have no plain, adequate or speedy remedy at law.

### COUNT V
**Violation of Substantive Due Process Protections Guaranteed
by the Fourteenth Amendment
MS. WALLS, STUDENT PLAINTIFFS and PARENT PLAINTIFFS**

> Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto. The calling always has been regarded as useful and honorable, essential, indeed, to the public welfare. *Meyer v. Nebraska*, 262 U.S. at 400.

260.    PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

261.    MS. WALLS, STUDENT PLAINTIFFS and PARENT PLAINTIFFS state this claim against DEFENDANTS.

262.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[no] state shall...deprive any person of life, liberty, or property, without due process of law."

263.    The liberties guaranteed under the Fourteenth Amendment may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of a state to effect.

264.    A teacher's right to engage in the practice of her chosen profession is a liberty guaranteed by the Fourteenth Amendment.  A parent's right to engage the teacher to instruct their children as they choose is a liberty guaranteed by the Fourteenth Amendment.  A student's right to education and to acquire knowledge is a liberty guaranteed by the Fourteenth Amendment. *Myer v. Nebraska*, 262 U.S. 390, 400 (1923).

265.    Section 16 unconstitutionally restricts the exercise of PLAINTIFFS' fundamental liberty interests—including vocation, education and parenting—without due process of the law.

266.    Where, as here, the practice or pursuit against which the act is leveled does not of itself injuriously affect the public, measures designed to prohibit it is unconstitutional.

267.    <u>Because the prohibited acts are not harmful, the LEARNS Act, insofar as it exposes teachers to criminal penalty for teaching on CRT, is violative of their constitutional right to engage in the practice of their chosen profession or calling.</u>

### DECLARATORY JUDGMENT
### 28 U.S.C. § 2201

268.    PLAINTIFFS hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

269.    PLAINTIFFS seek a declaratory judgment as provided in 28 U.S.C. § 2201, *et seq.* which declares Section 16 of the LEARNS Act unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray:

1. That the Court declare Section 16 of the LEARNS Act unconstitutional on its face and as applied to PLAINTIFFS unenforceable;

2. That DEFENDANTS, including their officers, directors, agents, employees, attorneys and all persons in active concert or participation, be permanently enjoined from enforcing Section 16;

3. That DEFENDANTS be ordered to restore the AP AAS course code and reverse any and all changes and/or modifications experienced by AP AAS since the implementation of the LEARNS Act, and to revert any changes to school policy made to comply with Section 16;

4. That PLAINTIFFS be awarded their attorneys' fees and costs;

5. That PLAINTIFFS be awarded all other relief that this Court deems just and proper under the circumstances.

Respectfully submitted,

Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFFS
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, Arkansas 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
Email: mlaux@lauxlawgroup.com
         mikelaux@icloud.com

and

Austin Porter, Jr.
E. Dist. Arkansas Bar No. 86145
One of the Attorneys for PLAINTIFFS
PORTER LAW FIRM
The Tower Building
323 Center Street, Suite 1035
Little Rock, AR 72201
Telephone: (501) 224-8200
Email: aporte5640@aol.com