IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 1 2 2024

TAMMY H. DOWNS, CLERK

By:_____

DEP CLERK

| | |
|---|---|
| RUTHIE WALLS; COLTON GILBERT; JENNIFER REYNOLDS, as Next Friend of SADIE ANNABELLA REYNOLDS; CHANDRA WILLIAMS DAVIS, as Next Friend of GISELE DAVIS; and ARKANSAS STATE CONFERENCE OF THE NAACP,<br><br>Plaintiffs,<br><br>v.<br><br>HON. SARAH HUCKABEE SANDERS, in her official capacity as Governor of the State of Arkansas; and JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education, Arkansas State Board Members in their official capacity: SARAH MOORE, KATHY MCFETRIDGE-ROLLINS, ADRIENNE WOODS, RANDY HENDERSON, LISA HUNTER, JEFF WOOD, KEN BRAGG, and LEIGH S. KEENER,<br><br>Defendants. | Case No.: 4:24-cv-00270-LPR<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>*JURY TRIAL DEMANDED* |

NOW COME Plaintiffs, Ruthie Walls, Colton Gilbert, Jennifer Reynolds, Sadie Annabella Reynolds, Chandra Williams Davis, Gisele Davis, and the Arkansas State Conference of the NAACP ("NAACP-AR") (collectively, "Plaintiffs"), by and through their attorneys, Laux Law Group, Porter Law Firm, and Lawyers' Committee for Civil Rights Under Law, who respectfully bring this legal challenge to Section 16 of the Arkansas LEARNS Act (Act 237 of 2023) ("LEARNS Act"), an unconstitutional law that violates Plaintiffs' First Amendment and Fourteenth Amendment rights.

Plaintiffs submit to this Honorable Court this Amended Complaint requesting a declaratory judgment and preliminary and permanent injunctive relief, as well as compensatory damages,

against Defendants Hon. Sarah Huckabee Sanders, Secretary Jacob Oliva, and Arkansas State Board Members Sarah Moore, Kathy McFetridge-Rollins, Adrienne Woods, Randy Henderson, Lisa Hunter, Jeff Wood, Ken Bragg, and Leigh S. Keener, their employees, agents, and successors in office (collectively, "Defendants").

In support of their Amended Complaint, Plaintiffs respectfully state the following:

## PRELIMINARY STATEMENT

1.      The Nation's future depends upon leaders trained through wide exposure to robust exchange of ideas that discover truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (alteration in original) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)). Consequently, a state does not have unchecked power to "impose upon the teachers in its schools any conditions that it chooses" and cannot prohibit teaching a "theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Epperson v. State of Arkansas*, 393 U.S. 97, 107 (1968). Afterall, "education . . . is the very foundation of good citizenship." *Brown v. Board of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954).

2.      Plaintiffs are two high school teachers at historic Central High School ("Central High") in Little Rock, Arkansas—one a teacher of Advanced Placement African American Studies ("AP AAS"[1]) and the other a Debate I and Oral Communication Skills teacher and debate coach; two Central High students enrolled in AP AAS for the 2023-24 school year, and their parents who

---

[1] As discussed below, Defendants removed the AP African American Studies course from the AP-approved courses and its benefits.  For simplicity's sake, and because different school districts that continued to teach a version of the course may have re-labeled the course differently following the removal, we refer to the course as "AP AAS."

file the suit on behalf of their minor children; and the Arkansas State Conference of the NAACP whose members include teachers and students of color in the Arkansas public school systems.

3.     On March 8, 2023, Hon. Sarah Huckabee Sanders ("Gov. Sanders") signed the LEARNS Act[2] into law.   The LEARNS Act contains largely education-related provisions, including Section 16 ("Section 16") codified at Ark. Code Ann. § 6-16-156, which purports to protect Arkansas high school students from "indoctrination" and expressly bans Critical Race Theory ("CRT") and Section 42, the Arkansas Children's Educational Freedom Account Program, which expands the use of public monies for private school tuition, among other expenses.   The LEARNS Act also repeals the Teacher Fair Dismissal Act, which significantly reduces due process protections for teachers.   Collectively, these provisions of the LEARNS Act, among others, are designed to undermine the public's confidence and trust in public schools and to encourage parents to send their children to private school.   Christopher Rufo, the purported architect of the "banned concepts" of which Section 16 adopts in part, has admitted as much, reportedly stating, "[t]o get to universal school choice, you really need to operate from a premise of universal public school distrust."[3]

4.     Prior to its enactment, Gov. Sanders explained the purpose of the LEARNS Act:  to prevent a "left-wing political agenda" from "brainwashing our children" with "political indoctrination."

5.     In reality, however, Section 16 is Defendants' own unprecedented attempt to quash any idea that does not conform to their views of not just *what* teachers may teach, but *how* they

---

[2] The LEARNS Act is an acronym which stands for Literacy, Empowerment, Accountability, Readiness, Networking and School Safety.
[3] *See, e.g.*, Dale Russakoff, *Is School Choice Destroying Public Education?*, The New York Times (Sept. 11, 2023), https://www.nytimes.com/2023/09/11/books/review/cara-fitzpatrick-death-of-public-school.html.

may teach.  Teachers, especially high school teachers, have long enjoyed, by policy and practice, the freedom to use their specialized training to teach the academic standards of their respective subjects to ensure students are widely exposed "to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker*, 393 U.S. at 512 (internal quotation omitted).  Section 16 has largely disrupted that custom with vague, overly broad, contradictory, and proscriptive language that seeks to intimidate teachers and, in turn, prohibit students from becoming critical, engaged thinkers and learners.  Teachers are at a loss for what they can and cannot teach, especially when it comes to the history of racism and ongoing racial inequalities and injustice in present-day America.

6.      Following the effective date of the LEARNS Act on August 1, 2024, Teacher Plaintiffs, among others, immediately began reviewing and revising their lesson plans and materials that would, in turn, censor their students from hearing or discussing "controversial" topics that may run afoul of the law, including the role of colonialism in America, excerpts of "Warriors Don't Cry: A Searing Memoir of the Battle to Integrate Little Rock's Central High School," and competing ideas about potential causes for lasting inequalities in society.  Teachers also began self-censoring their lessons, like Plaintiff Ruthie Walls who does not delve deeply into topics in her AP AAS classes like the consequences of *Brown v. Board of Education* for Black teachers or how Jim Crow laws are similar to laws being passed today for fear of either violating Section 16 or giving opponents of deep learning ammunition to target Ms. Walls and her students.

7.      At the direction of Defendants, the State of Arkansas and the Arkansas Department of Education ("ADE") had already purged several publicly available educational resources based on their content, like Selma Online, while simultaneously making available whitewashed materials like the 1776 Unites curriculum.

8.      Although Defendants offered no guidance on how to implement the law, Secretary Oliva revoked state approval of AP AAS on August 11, 2023—the Friday before the start of the 2023-24 school year.   He claimed the course violated Section 16 by including topics that he disagreed with, including "intersectionality" and "resilience and resistance."   Defendants' last-minute ambush caused tremendous anxiety, stress, and consternation for teachers, parents, and students alike across Arkansas.   Ultimately, Oliva's actions as Secretary of Education resulted in the deletion of the AP AAS course code from the state course catalog as an AP course.   This stripped AP AAS of its full AP status and made students, including Student Plaintiffs, ineligible for multiple benefits for which students taking the course were previously entitled.   Secretary Oliva warned teachers against violating the law and required superintendents to sign a statement assuring the ADE that the district's employees were complying with state laws, including Section 16..

9.      This attack on AP AAS, justified by Section 16, started a chain reaction of constitutional, economic, and even physical harms.   The attack on AP AAS impacted how teachers teach other courses as well, such as debate classes and communication skills classes.   Teachers, including Plaintiff Colton Gilbert, were unclear what materials and information might be related to AP AAS under Oliva's interpretationnd what was permissible.   Both in class and in debate competitions, Plaintiff Gilbert feels compelled by Section 16 to mute students' presentation of certain arguments and has stopped guiding and supporting students on subjects that may run afoul of the law.   As Mr. Gilbert sees it, Defendants and Section 16 force him to toe the line but he does not know where that line lies and, thus, probably overcorrects out of fear of reprisal from Defendants.

10.      As written, Section 16 puts teachers, faculty members, lecturers, guest speakers, and school representatives—which could even be students—at risk of sanction or penalty without

adequate notice of what conduct or speech is prohibited.  It absolutely chills speech.  Section 16 discriminates on the basis of race by targeting and stigmatizing the AP AAS as inferior—a course where the majority of students enrolled and the majority of teachers who teach the course are Black—and dissuades prospective AP AAS students from registering because of perceived diminishment of the class and natural concerns about its uncertain future.

11.     Plaintiffs challenge Section 16 as unconstitutional on its face and as-applied under the First and Fourteenth Amendments.  First, Section 16 is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause, because it fails to provide Teacher Plaintiffs a reasonable opportunity to understand what conduct and speech it prohibits and authorizes and encourages arbitrary and discriminatory enforcement.  *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 732 (2002).  Section 16 also fails to define operative terms and contains redundant, confusing, and contradictory terms, contributing to the vagueness.

12.     Second, Section 16 violates Student Plaintiffs' right to receive information and ideas by enacting Section 16 "in a narrowly partisan or political manner," and making decisions motivated by "racial animus," or with the purpose of denying students access to ideas and information with which the State and Defendants disagree.  *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No 26 v. Pico*, 457 U.S. 853, 870-72 (1982) (plurality opinion).  Defendants do not have unfettered rights to ban materials from the curriculum and are precluded from imposing a "pall of orthodoxy" on classroom instruction that implicates the state in the propagation of a particular ideological viewpoint.  *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 776 (8th Cir. 1982).

13.     Third, Section 16 violates the First Amendment because—as evidenced by Defendants' public statements on the LEARNS Act and purging of publicly available resources—

it impermissibly regulates speech based on viewpoint discrimination.  Teacher Plaintiffs have a responsibility to foster "habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. . . . They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them."  *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring).

14.     Finally, Section 16 violates the rights of Black Teacher and Student Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment.  Though neutral on its face, Section 16 and the application of Section 16 to the AP AAS was created, in part, to target Black students and educators on the basis of race.  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

15.     As a result of the acts and omissions committed by Defendants as described herein, Plaintiffs have suffered physical injury, economic damages, and significant emotional damages.

16.     This case presents an actual and justiciable controversy existing between Plaintiffs and Defendants regarding the constitutionality of legislation passed by the State of Arkansas, signed into law by Gov. Sanders, and implemented and enforced by Secretary Oliva and Defendant Arkansas Board of Education.

## JURISDICTION AND VENUE

17.     This Honorable Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988 and seeks to secure equitable and compensatory relief.

18.     This Court has personal jurisdiction over Defendants because each of them are domiciled in the State of Arkansas and the deprivation of Plaintiffs' rights arise out of, and relate to, Defendants' official duties in the State of Arkansas.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

19.     Plaintiff Ruthie Walls ("Ms. Walls") is a high school teacher who, at all relevant times, including the 2023-24 school year, served as the teacher of the AP AAS course offered at Central High School in the Little Rock School District, Arkansas ("LRSD") since 2022.  Ms. Walls identifies as African American and Black.  Ms. Walls is an award-winning educator and was named Central High "Teacher of the Year" for the 2023-24 school year.  Ms. Walls also is a recipient of the 2023 Bessie B. Moore Award bestowed by Economics Arkansas for her academic work, "From Ninth Street to Now."  This work chronicles the race-based destruction of Little Rock's thriving Black downtown community during a 1960s "urban renewal" project that forced Black people out of their homes and businesses by eminent domain and coercion.  Ultimately, Black residents in Little Rock were segregated to the south via a new highway, I-630, which became the city's new *de facto* racial boundary marker.

20.     Plaintiff Colton Gilbert ("Mr. Gilbert") is a high school teacher who, at all relevant times including the 2023-24 school year, served as a teacher of Debate I and Oral Communication Skills offered at Central High School in LRSD since 2018.  Mr. Gilbert identifies as African American and Black.  Mr. Gilbert is also well-regarded as a teacher and in his field and was awarded the Marian G. Lacy Award as top educator in LRSD.  He was the first Black person to chair the Policy Debate Topic Selection Meeting sponsored by the National Federation of High

Schools and sits on the debate-style Lincoln Douglas Advisory Committee for the Tournament of Champions.

21.     Plaintiffs Walls and Gilbert and teacher members of the Arkansas State Conference of the NAACP are referred to collectively herein as "Teacher Plaintiffs."

22.     Jennifer Reynolds ("Ms. Reynolds") is the parent of Sadie Annabella Reynolds. Ms. Reynolds brings this suit as Next Friend to Annabella Reynolds.  Plaintiff Sadie Annabella Reynolds ("Sadie Belle"), a minor, is in her freshman year at Central High School in LRSD.  Sadie Belle is an AP AAS student in the 2023-24 school year who is taught by Ms. Walls and identifies as White.  Sadie Belle is a cheerleader at Central High and a member of the Spanish Honors Society.  Sadie expects to go to college and aspires to become a civil rights attorney or to serve in another role where she can help advance equal rights and opportunity in America.

23.     Chandra Williams Davis ("Ms. Davis") is the parent of Gisele Davis.  Ms. Davis brings this suit as Next Friend to Gisele Davis.  Plaintiff Gisele Davis ("Gisele"), a minor, is in her senior year at Central High School in LRSD.  Gisele is an AP AAS student in the 2023-24 school year who is taught by Ms. Walls and identifies as African American and Black.  Gisele is a member of the Technical Theatre, the NAACP Youth Chapter at Central High, and XINOS, a guidance group for young ladies in grades 9 through 12.  Gisele plans to attend Philander Smith University to major in Digital and Performing Arts and aspires to become a professional costume designer for theatre and film.

24.     Sadie Belle, Gisele, and student members of the Arkansas State Conference of the NAACP are referred to collectively herein as the "Student Plaintiffs."

25.     The Arkansas State Conference of the NAACP ("NAACP-AR"), suing on its behalf and on behalf of its members, serves as the umbrella organization for local branch units throughout

9

the state and includes more than 2,500 members in several counties of Arkansas. Founded in 1945, NAACP-AR's mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. To advance its mission, NAACP-AR's key goals include educational advocacy to ensure that all students have access to quality, integrated public education. The majority of NAACP-AR's members identifies as African American or Black. A substantial number of NAACP-AR's members include high school students, their parents, and their teachers in several Arkansas school districts, including LRSD. Today, as part of its Youth & College Division, the NAACP-Arkansas has 15 active Youth Chapters, whose members are under 25 and pay dues. Such chapters receive support from their communities, universities, and schools. These chapters include Francis County, North Little Rock Youth, Little Rock Youth Council, Pine Bluff Youth Council, Sebastian County Youth Council, Central High School, Drew Co. Youth Council, and Southwest Little Rock Youth Council.

26.     Defendant Governor Sarah Huckabee Sanders is the duly elected Governor of the State of Arkansas and Chief Executive. Gov. Sanders conceived of and advanced the prohibitions contained in Section 16, which became law when Gov. Sanders signed the LEARNS Act into law. Gov. Sanders and Secretary Oliva were responsible for the purge of publicly available materials described in this Complaint. Gov. Sanders is sued in her official capacity as Governor of the State of Arkansas.

27.     Defendant Jacob Oliva ("Oliva") is the Secretary of the Arkansas Department of Education ("ADE") and is responsible for its acts and omissions. Secretary Oliva, through ADE, oversees the enforcement of Section 16 by, for example, investigating school districts—like "LRSD"—for compliance with Section 16. Oliva also has authority over course approval. Oliva is sued in his official capacity as ADE secretary.

28.     Defendants Sarah Moore, Kathy McFetridge-Rollins, Adrienne Woods, Randy Henderson, Lisa Hunter, Jeff Wood, Ken Bragg, and Leigh S. Keener are members of the Arkansas State Board of Education (collectively, "Defendant State Board Members") and are sued in their official capacity.   The Arkansas State Board of Education is responsible for investigating complaints regarding teacher conduct, including but not limited to ethics complaints which could involve violations of Section 16, and issuing appropriate sanctions for violations found.   In addition, they have rulemaking authority under Section 16.

29.     Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the First and Fourteenth Amendments.

## HISTORICAL AND FACTUAL BACKGROUND

### Little Rock Central High School and its Forced Integration in 1957

30.     Central High opened its doors to Little Rock students in 1927.  See Image No. 1.



Image No. 1: Central High School in Little Rock, Arkansas. Credit: NPS.

31.     Central High opened during Jim Crow, when the law allowed racial segregation in public facilities, including schools, so long as separate accommodations for White and Black students were the same—the so-called "separate but equal" standard derived from *Plessy v.*

11

*Ferguson* in 1896. Central High admitted only White students during its first three decades of operation.

32.     Three years following *Brown v. Board of Education*, nine Black students were finally allowed to enroll at Central High. On September 4, 1957, the first day of class, these students—soon christened "The Little Rock 9"—were the targets of violent White mobs, as depicted in the iconic image of 15-year-old Elizabeth Eckford navigating her way to class through the hate, threats, and jeers. See Image No. 2.



Image No. 2: Central High student Elizabeth Eckford of the Little Rock 9 is taunted and threatened on her way to class on the first day of the 1957 school year. Credit: Bettmann Archive.

33.     The violence experienced by the Little Rock 9 forced President Dwight Eisenhower to deploy the National Guard to Central High to enforce *Brown* and protect the students. "Mob rule cannot be allowed to override the decisions of our courts," he said of the White resistance to the integration of Central High. Federal troops escorted the Little Rock 9 to school for the first three weeks of class and remained on guard through the year.

34.     The courage, resilience, and personal sacrifice of the Little Rock 9 embody the American Civil Rights Movement, and this not only occurred in Little Rock but, specifically, at

Central High, a national historic site since November 1998. The cultural significance of Central High and its history cannot be overstated.

35.    Today, Central High is a minority-majority educational institution, enrolling two-thirds of students of color. In 2023, about 2,200 students were enrolled at Central High, instructed and served by 252 faculty and staff members. Recent school statistics reveal the following percentages on racial demographics of the school's population: 52.7% Black; 32.3% White; 8.1% Asian; 5.5% Latino; and 0.9% two or more races.

36.    Since its integration, Central High has enjoyed decades of academic success and honors. The majority of its graduates enters four-year colleges and universities across the country, with students accepted to the most selective institutions in America.

37.    Central High's 2023 senior class had a 90% graduation rate, and the school boasted 19 National Merit semifinalists and commended scholars that year. Undoubtedly, these achievements are the result of many factors, including the rich diversity of the student body, excellent teaching, and access to rigorous, challenging course work.[4]

**The Advanced Placement (AP) Program, an Initiative of the College Board**

38.    For over 70 years, the AP Program has allowed high school students—including those in Arkansas—to pursue college-level studies in nearly forty subjects. The AP Program is an initiative of the College Board, a nonprofit organization founded in 1900 to expand access to higher education.

---

[4] *See, e.g.*, Lee Gomez & Patrick Bernet, *Diversity Improves Performance and Outcomes*, 111 J. Natl. Med. Ass'n 383 (Aug. 2019); David W. Pitts, *Diversity, Representation and Performance: Evidence About Race and Ethnicity in Public Organizations*, 15 J. Pub. Admin. Rsch. & Theory 615 (2005).

39.     At the end of each school year, AP students take a national AP examination and, pursuant to Arkansas' policy, students are eligible to earn college credit with an exam score of 3 or higher (out of 5).  A major academic benefit of AP studies is that a student can distinguish themselves during the college admissions and scholarship processes by demonstrating a desire to challenge themselves with college-level courses while still in high school.  College credits can translate directly into financial benefits if students are able to leverage their earned credits into a reduced course load.

40.     On its website,[5] LRSD touts the AP Program, telling students "[y]our AP score could earn you college credits before you even set foot on campus [and] most AP students who enroll in four-year colleges start school with some credit."

41.     In addition, according to College Board, participation in AP exams qualifies students for AP Scholar Awards and the AP Capstone Diploma, which can make students' college applications even more attractive.

42.     Students participating in the AP program experience many benefits, including a weighted GPA,[6] increased likelihood of enrollment in a four-year college,[7] and increased college readiness, performance,[8] and success.[9]  Moreover, students who first score a 1 or 2 on an AP exam will often take more AP classes and score higher, leading to a snowball effect.[10]

---

[5] *Advanced Academics*, Little Rock School District, https://www.lrsd.org/page/advanced-academics (last visited Apr. 11, 2024).

[6] To understand the impact of AP courses on a high school student's GPA, see, e.g., *How to Calculate Your GPA*, The Princeton Review, https://www.princetonreview.com/college-advice/gpa-college-admissions (last visited Apr. 11, 2024).

[7] *See, e.g., New Analyses of AP Scores of 1 and 2*, The College Board, *available at* https://research.collegeboard.org/media/pdf/new-analyses-ap-scores-1-and-2.pdf (last visited Apr. 9, 2024).

[8] *See id.*

[9] *See id.*

[10] *See id.*

43.     Despite these major benefits, Black students have consistently been underrepresented in College Board's AP program.  According to 2020-2021 data from the U.S. Department of Education, only 9.5% of students enrolled in the AP program identify as Black or African American, compared to 49.4% of their White counterparts.[11]  In Arkansas specifically, that number rises to a mere 12.7% Black or African American enrollment.  Roughly 66% of the students in Arkansas who have the opportunity to experience the benefits of the AP program are White.

44.     Recognizing this disparity, College Board specifically designed AP AAS to inspire more Black students to take AP classes.[12]

45.     On information and belief, Black student enrollment in AP AAS at the six Arkansas schools that offered the course is much higher than the average Black student enrollment in AP classes overall.

**Critical Race Theory, An Academic and Legal Framework Dating Back to the 1970s**

46.     Critical Race Theory ("CRT") is a 50-year old academic approach that studies race and how systemic racism is embedded in society and its institutions.

47.     In 2021, the National Association of School Psychologists ("NASP")—a professional association representing more than 25,000 school psychologists, graduate students, and related professionals throughout the U.S.—published an article, *The Importance of Addressing*

---

[11] Civil Rights Data Collection Office for Civil Rights, *Summary of National Data,* U.S. Department of Education, https://civilrightsdata.ed.gov/profile/us?surveyYear=2020 (last visited April 11, 2024).
[12] Michelle Garcia, *A Course Meant to Inspire More African American Students Sparked a Culture War*, NBC News (Mar. 22, 2023), https://www.nbcnews.com/news/nbcblk/fight-ap-african-american-studies-black-students-are-left-rcna74175.

*Equity, Diversity, and Inclusion in Schools: Dispelling Myths About Critical Race Theory.*[13]  This article was intended "to provide a general overview of CRT, dispel myths and correct misinformation, and provide school psychologists with guidance on how to navigate related conversations in local schools and communities."

48.     NASP defines CRT as "a theoretical framework for examining American society with a belief that racism is embedded in U.S. laws and institutions and not just the result of individual prejudices or biases."  NASP emphasizes that CRT is a collection of ideas, contributed to by many scholars, rather than a single doctrine.  It is frequently applied in higher education and policy to examine inequities in existing structures, policies, and laws and understand how racism "may or may not" be shaping them, with a focus on improving their function for all people.

49.     CRT acknowledges the progress the U.S. has made towards racial equity but, with a focus on laws, policies, and systems, it examines potential root causes for how and why racial injustice may still persist despite this progress.

50.     NASP notes in its 2021 article that CRT has become highly politicized and purposefully misrepresented, leading to the demonization of not only the theory itself, but also many related topics and ideas.

51.     NASP directly rebutted this misinformation campaign, explaining that CRT does *not* teach that one race is superior or inferior to another; does *not* teach that all Whites are racist and all racial minorities are oppressed; does *not* teach that racism and discrimination should be waged against Whites; and does *not* teach that any people should feel bad about their race.

---

[13] Kelly Vaillancourt Strobach et al., *The Importance of Addressing Equity, Diversity, and Inclusion in Schools: Dispelling Myths About Critical Race Theory*, Nat'l Ass'n of Sch. Psychs. (2021) (handout).

**Trump's War Against Critical Race Theory and Educators**

52.     The year 2020 was a tumultuous, tragic, painful, challenging, and yet, hopeful year for Arkansas and America.  The murders of George Floyd and Breonna Taylor, among too many others, at the hands of law enforcement were unfortunately the wake up call for America to respond to ongoing racial inequalities, individual and systemic.  Americans across race, ethnicity, and background took to the streets to protest.  Many governmental entities including school districts and universities, and private corporations, among others, answered the call by beginning to examine their own role in carrying forward racial inequalities and instituting fair and just reforms. As then-University of Arkansas Chancellor Joe Steinmetz stated, "[p]olicing, though, is only one touch point where bias and systemic inequality may appear.  We can make a difference by working even harder at the University of Arkansas to promote an inclusive environment where equity, opportunity, representation and civility are not just valued, but practiced and rewarded.  That takes more than observation.  It takes leading by example and action." [14]

53.     Unfortunately, this hope for unity and justice was quickly disrupted and short-lived. Within months of the nation's reckoning with injustice against Black people in 2020, then-President Donald Trump began to openly target speech he disagreed with, including CRT, anti-bias training, and discussions of systemic racism, sexism, and genderism.

54.     President Trump hosted a White House Conference on American History, where he maligned critical race theory and efforts to reckon with the nation's struggle with enslavement and continuing racial inequalities as a "crusade against American history," "toxic propaganda,"

---

[14] *See, e.g.*, Joe Steinmetz, Chancellor, *Message to the Campus Community from the Chancellor: Everyone Has a Role to Play*, Univ. of Arkansas News (Jun. 2, 2020), https://tinyurl.com/nh9dmn9m.

and "ideological poison, that, if not removed [would] . . . destroy our country."[15]   He also announced that he would soon establish the 1776 Commission by Executive Order to "promote patriotic education."

55.     Just days later on September 22, 2020, President Trump issued Executive Order 13950, which targeted objectionable speech and viewpoints by directing all federal agencies and contractors to cease training on "'*critical race theory*,' 'intersectionality,' systemic racism, Black Lives Matter, 'white privilege,' or any other training or *propaganda effort*."   Like Gov. Sanders, President Trump attacked such viewpoints as "leftist" and anti-American, among other choice words.

56.     EO 13950 included certain prohibited topics ("banned concepts"), two of which are very similar to those in Section 16: "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;" and "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex."

57.     A federal court preliminarily enjoined EO 13950, finding the banned concepts "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).   That ruling was not appealed and President Biden withdrew EO 13950.

58.     On January 18, 2021—Dr. Martin Luther King Jr. Day—less than two weeks after his supporters and others raided and defiled the U.S. Capitol, President Trump publicly unveiled the 1776 Commission's final report.   The report concluded, in part, that CRT "ignore[s] historical

---

[15] Remarks by President Trump at White House Conference on American History, National Archives Museum (Sept. 17, 2020), https://tinyurl.com/3vvkrkx5.

context, and tell[s] America's story solely as one of oppression and victimhood." He proudly described the report as "a dispositive rebuttal of reckless 're-education' attempts that seek to reframe American history around the idea that the United States is not an exceptional country *but an evil one*." (emphasis added).

### Gov. Sanders Conceives Section 16 and Targets Critical Race Theory, Labeling It a Brainwashing, Left-Wing Political Agenda

59.     On January 10, 2023, during her inauguration speech, Gov. Sanders stated:

> Today I will also sign an executive order *preventing the political indoctrination of Arkansas's schoolchildren*. As long as I am governor, our schools will focus on the skills our children need to get ahead in the modern world—*not brainwashing our children with a left-wing political agenda*. (emphasis added).

60.     That day, Gov. Sanders appointed Defendant Oliva as Secretary of the Arkansas Department of Education. Prior to his tenure as Secretary, Oliva served as the Interim Commissioner of Florida's Department of Education under Governor Rick DeSantis. On information and belief, during his tenure, he worked closely with Governor DeSantis and his administration to ban AP AAS in Florida.[16] As Governor DeSantis claimed, the course violated the state's Stop W.O.K.E. Act (later amended to the "Individual Freedom Act"), which restricted instruction on systemic racism, intersectionality, and was, purportedly, "not historically accurate." Prior to Gov. DeSantis's actions in Florida, no state had ever banned an AP course.

61.     The same day as her inauguration, Gov. Sanders issued her "Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools," in which she proclaimed that schools must not indoctrinate students, and teachers and school administrators should not teach students what to think. Gov. Sanders declared that:

---

[16] At the time DeSantis announced the ban on AP AAS, Secretary Oliva had since departed. On information and belief, however, he oversaw the Florida Department of Education's interactions with College Board in the months leading up to the ban.

*Critical Race Theory (CRT) is antithetical to the traditional American values of neutrality, equality, and fairness.* It emphasizes skin color as a person's primary characteristic, thereby resurrecting segregationist values, which America has fought so hard to reject; [and]

. . . It is the policy of [her] administration that *CRT, discrimination, and indoctrination have no place in Arkansas classrooms.* (emphasis added).

62.     At the time of Gov. Sanders' Executive Order, Defendants were unaware of any direct evidence to support that the claim that CRT was harmful to students or that anyone had been indoctrinated with CRT in Arkansas public schools. "I don't think critical race theory is a problem in schools in Arkansas," State Rep. Tippi McCullough of Little Rock, the House Democratic Leader, said in January 2023.  Indeed, despite concluding that "CRT is antithetical to traditional American values of neutrality, equality, and fairness," the executive order does not define CRT or indoctrination and provides no guidance for how to identify it in schools.

63.     The ADE's actions following the issuance of Gov. Sanders' Executive Order highlight its inability to accurately and consistently apply its working definition of prohibited indoctrination to the realities of Arkansas schools.  The administration's preliminary investigations into "indoctrination" also belie the discriminatory intent of their proposed ban.  For example, the ADE disseminated a document entitled "Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions."[17]   In this document, the ADE found that materials from Code.org, used to train teachers for the AP Computer Principles courses, were improper under Gov. Sanders' Executive Order because they asked teachers to explore any potential "unconscious biases" and to "craft an equity framework."  The ADE subjectively concluded that these materials

---

[17] *Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions*, https://arkansasadvocate.com/wp-content/uploads/2023/08/CRT-Admin-Action.pdf.

encouraged teachers to look at students through the lens of race and needed to be adapted to reflect Arkansas' ban on indoctrination.

64.     For each of the issues highlighted by the ADE, their response was to contact the offending parties, inform them that they were in violation of the Executive Order's ban on indoctrination and CRT, and seek assurances that the materials would be reviewed and removed or revised.

65.     Gov. Sanders and Secretary Oliva also ordered the ADE to begin removing educational materials from the ADE's recommended social studies resources accessible to Arkansas teachers, because they were in violation of Gov. Sanders' Executive Order.  Defendants began purging state educational materials and resources that celebrated the hard-fought achievements won by African Americans because they included context of historical suffering—generations of slavery, decades of Jim Crow, ever present social bigotry, and pervasive institutional oppression.

66.     During this surreptitious purge of Black accomplishments, Defendants ordered state educational resources now include materials from a conservative project called "1776 Unites" which downplays the historical challenges faced by Black Americans and whose declaration reads: 1776 Unites maintains a special focus on voices in the black community who celebrate black excellence, *discourage victimhood culture*, and showcase the millions of black Americans *who have prospered by embracing the founding ideals of America.*  (emphasis added).

**Gov. Sanders and Secretary Oliva Push the LEARNS Act Through the State Legislature and Gov. Sanders Signs It into Law on March 8, 2023**

67.     On February 20, 2023, the LEARNS Act was introduced as SB 294 and, within days, Oliva began laying the groundwork for Defendants' attack on AP AAS with testimony presented at a special Senate Education Committee meeting on the controversial new law.  Despite

the bill's 144-page length, comprehensive set of provisions addressing widely varied aspects of education policy from private school neo-vouchers (Education Freedom Accounts) to accountability to purported indoctrination, and immediate pushback from Democrats and educators, Republican legislators immediately planned a vote in the Senate Committee for Education for February 22, 2023.

68.     During the meeting, State Sen. Linda Chesterfield requested that Secretary Oliva define CRT as used in Section 16 and asked him why CRT should be banned in Arkansas.  Oliva conceded that he could not define CRT and that CRT itself was a theory, stating in response:

> coming up with a simple definition for critical race theory it's actually really challenging and it is something that is debated amongst even the scholars that have wrote different theories because it is just that, it is just a theory. I've been told examples of trying to put everybody into a room with history scholars and say define socialism.  Everybody has a little bit different answer of what that looks like in practice and how you come up with that definition. But the language in this bill, it mirrors the language that was signed by Governor Sanders in the executive order.

69.     Despite Secretary Oliva's inability or unwillingness to define CRT in his testimony, the bill quickly passed through the committee on February 22, 2023, and proceeded to a full vote in the Senate on February 23, 2023, where it passed 25-7 along partisan lines.   The bill moved on to pass the House Education Committee on March 1, 2023, before proceeding to a full House vote on March 2, 2023, where it passed 78-21, again along partisan lines.[18]  High school students attempted to testify against the law when the Senate reconvened to vote on House amendment but were denied due to procedural objections raised by Republican sponsors.  Governor Sanders signed the bill into law on March 8, 2023.

---

[18] Senate Bill 294, To Create the LEARNS Act, Arkansas State Legislature (Reg. Session 2023), https://www.arkleg.state.ar.us/Bills/Detail?id=sb294&ddBienniumSession=2023/2023R.

70.    Section 16 of the LEARNS Act reads in pertinent part as follows:

6-16-156. Indoctrination.

(a) (1) The Secretary of the Department of Education shall take established steps to ensure that the Department of Education, its employees, contractors, *guest speakers, and lecturers* are in compliance with Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352.

(2) Steps required under subdivision (a)(1) of this section shall include the review of the rules, policies, *materials, and communications* of the Department of Education to identify any items that may, purposely or otherwise, *promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as "CRT"*, that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color, . . . race, . . . or any other characteristic protected by federal or state law.

(3) *The secretary shall amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination* and that conflict with the principle of equal protection under the law.

(b) As used in this section, *"prohibited indoctrination" means communication by a* public school employee, public school representative, or *guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964,* Pub. L. 10 No. 88-352, including that:

(1) People of one color, . . . race, . . . or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, . . . race, . . . or any other characteristic protected by federal or state law; or

(2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, . . . race, . . . or any other characteristic protected by federal or state law.

*****

(d) As it relates to employees, contractors, and *guest speakers or lecturers* of the department, *the secretary shall review and enhance*

23

*the policies that prevent prohibited indoctrination, including Critical Race Theory.*

*(e) The secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory.*

(f) The State Board of Education may promulgate rules to implement this section.

Ark. Code Ann. § 6-16-156 (emphases added).

71.     Following passage of the LEARNS Act, one of the Act's co-sponsors, Rep. Aaron Pilkington, cited "concerning comments" from the College Board describing the APAAS and intimated that the course violated the LEARNS Act.[19]   Rep. Pilkington's comments illustrate the discriminatory bias and viewpoint discrimination underlying these unfounded accusations. Arguing that he was not opposed to students learning about African American history, Rep. Pilkington said that "[w]e just want to make sure [students are] learning [African American history] in the right context and that it's not being taught in a way where you should hate democracy, you should hate the Western traditions, you should hate the things that put us here, where we are and that we need a complete dumping of the past."[20]   Pilkington's misinformed comments show that his preferred juxtaposition of "Western traditions" with AP AAS has nothing to do with course content and instead reflects his intent to use the law to whitewash the instruction of a course that reflects a critical lens of America's history and struggles with race.

---

[19] Brenda Lepenski, *Legality of AP African American Studies is in question, legislators weigh in*, KATV (Aug. 24, 2023), https://katv.com/news/local/the-legality-of-the-advanced-placement-african-american-studies-pilot-course-is-in-question-in-arkansas-college-board-aaron-pilkington-intersectionality-jacob-oliva-clarke-tucker-ap-african-american-studies.
[20] *Id.*

**Section 16 and its Vague, Confusing Terms and Discriminatory Intent**

72.      Section 16 is wrought with vague, undefined, and ill-defined terms and scope of who and what it covers.

73.      Section 16, for example, defines the term "prohibited indoctrination," identifying it as "communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964."

74.      However, because "ideas" in violation of equal discrimination Title IV and Title VI are undefined and fairly limitless, this provision of Section 16 is vague and overbroad.  Indeed, the U.S. Department of Education, which is responsible for enforcing Title VI in schools, issued a Fact Sheet in 2023 stating that Title VI does not categorically prohibit activities solely on topics, including instruction in or training on the impact of racism or systemic racism, among other issues.[21]  It is therefore unclear what Section 16 is meant to cover.

75.      Moreover, it is unclear how merely "professing" an idea of race discrimination, for example, can be violative of Title VI.  In Mr. Gilbert's debate classes and competitions, the very nature of students' work is to learn and research both sides of an issue, including controversial issues, and then assert and defend a position.  Asking or directing students to adopt or profess an idea that could include topics such as affirmative action, legacy admissions, or criminal justice reform could conceivably run afoul of Section 16.  Consequently, Mr. Gilbert has censored such discussions and assignments.

76.      The lack of a scienter requirement further adds to the danger of failing to provide adequate and sufficient what speech is prohibited.

---

[21] *Fact Sheet: Diversity & Inclusion Activities Under Title VI*, U.S. Dep't of Education, Office for Civil Rights (Jan. 2023), https://tinyurl.com/bdhcznhe.

77.     Additionally, by expressly referencing both indoctrination and prohibited indoctrination in the same passage, Section 16 is confusing, redundant, and contradictory. Section 16 implies that some types of indoctrination are not prohibited but it does not define what may be the subject of indoctrination and what may not, i.e., prohibited indoctrination. The concept that some materials are acceptable for indoctrination further conflicts with the State's pronouncement of the law, which suggests it was banning all indoctrination.

78.     Ms. Walls now glosses over topics like the consequences of *Brown v. Board of Education* and Jim Crow laws because of the public statements and threats made by Secretary Oliva regarding Section 16 enforcement. Another teacher, who is a member of the NAACP-AR, no longer teaches *The Color Purple* by Alice Walker and relies less on using films or additional media materials related to current events, such as excerpts of speeches by Roland Martin, because she is not sure whether those materials would violate Section 16.

79.     Section 16 also does not define "Critical Race Theory" or explain how CRT "conflict[s] with the principle of equal protection under the law or encourage[s] students to discriminate against someone based on the individual's color . . .race . . . or any other characteristic protected by federal or state law." Moreover, nothing in CRT requires that people discriminate against others or violate equal protection. As such, whatever CRT might mean to the state—much less what "related" ideologies are intended to apply to—is clearly in conflict with the very foundation it is premised on. And CRT is not described as a component in the AP AAS curriculum for 2023-24, making it even more difficult for educators to determine whether they are complying or not complying with the law.

80.     Section 16 also does not define prohibited materials and communications. For example, it is unclear whether Section 16's prohibition applies solely to communications

pertaining to the academic origins of CRT, i.e., the history of CRT as an analytical framework and its originators; whether the magic words "critical race theory" or "CRT" must be spoken in the classroom for Section 16 to apply; or whether students are permitted to discuss an opinion that may be supported by CRT so long as they do not utter the phrase "critical race theory." Finally, there is no definition or guidance on what "related ideologies" pertain to and how those must not be communicated or presented in materials. This is important because CRT itself is not an ideology, but instead a framework for examining root causes. Consequently, what "related ideologies" is intended to mean is even more confusing and contradictory.

81.     The operative phrase "materials and communications" is not defined in the text of Section 16 and, without clarity, the phrase conceivably encompasses textbooks, novels and other fiction and non-fiction works used or consulted in the AP AAS classroom, and other coursework, making Section 16 tantamount to a book ban.

82.     Operative terms "lecturer," "guest speaker," and "public school representative" are not defined in the text of Section 16 and, without clarity, these terms conceivably encompass Student Plaintiffs who make oral presentations and speeches in their AP AAS classes, making them subject to Section 16, even without reaching the age of majority.

83.     Gisele is researching, writing, and presenting her year-end thesis for her AP AAS class on Black women's leadership in the civil rights movement but Section 16 obstructs her preparation. First, the vague terms identifying who is a "lecturer" or "public representative" under Section 16 draw fear into her on whether she may be violating the law as a "lecturer" or "public representative." Second, she will be examining the role of systemic barriers, including laws and policies, confronting Black women at the relevant time based on the intersection of race and gender. Section 16 places Gisele and Ms. Walls, when Ms. Walls assists with guidance and

27

support, at risk of violating the law by "purposely or otherwise, promot[ing] teaching that would indoctrinate students with [prohibited] ideologies," because Gisele's analysis and conclusion could be interpreted as one that is reflected in, and supported by, CRT or related ideologies or other prohibited indoctrination.

84.     Teacher Plaintiffs have struck or substantially revised prior lesson plans and materials aligned with the academic standards of their respective subjects as a result of Section 16. They have censored their instruction to avoid running afoul of the law, though they cannot determine what is compliant and what is not because of the vagueness of the law.  Instead, they tend to overcorrect, further prohibiting students from learning about important historical events. Ms. Walls and Mr. Gilbert have upcoming year-end assignments where students are presenting on subjects that may run afoul of the law.  Ms. Walls has pushed her AP AAS student assignment, where Student Plaintiffs will defend a central thesis before a faculty panel, to April 25, 2024, and Mr. Gilbert's classes will present their "Student Congress" presentations on draft bills in May.

85.     Sadie Belle is completing her AP AAS thesis project, which will examine slave codes—a set of rules and court decisions in each slave state based on the concept that enslaved persons were property and not persons—in the antebellum South.  Sadie Belle will be examining whether the codes enacted to further the subjugation of Black people in America, even after the Civil War, continue to systematically perpetuate injustices today.

86.     It is unclear if, by doing so, Sadie Belle has "purposely or otherwise, promote[d] teaching that would indoctrinate students with [prohibited] ideologies" because her analysis and conclusion is one that could be perceived as one supported by CRT and related ideologies.  It is also unclear whether she qualifies as a "lecturer," "guest speaker," or "public school representative" under Section 16.  For example, Section 16 suggests that if she, as a student, brings

materials related to her classwork that were previously removed by Defendants, or are intended to be barred, that she has committed a *per se* Section 16 violation. Likewise, if Ms. Walls makes herself available to assist and support Sadie Belle in Sadie Belle's research and analysis on topics, such assistance could be construed as supporting CRT or related ideologies. Section 16 suggests that both could be accused of violating Section 16.

87. In addition, the AP AAS exam from the College Board is scheduled to take place on May 14. Ms. Walls has not been able to teach as she normally would to fully prepare her students because of Defendants' application of Section 16 to the AP AAS course, due to fear of violating Section 16's vague, inconsistent terms. As noted previously, Ms. Walls does not delve as deeply into parts of the curriculum, particularly by drawing connections between the material and instruction, for fear of either violating Section 16 or giving opponents of deep learning ammunition to target her and her students. For example, when discussing the effects of *Brown v. Board of Education*, she does not describe the effects on Black teachers because she fears that raising that consequence is too divisive and could therefore violate Section 16. This is also why Ms. Walls no longer makes connections between Jim Crow laws and laws passed today. This is also true for materials that make similar connections. For example, although the New York Times' "The 1619 Project" would be an invaluable resource in teaching various academic standards of the AP AAS, Ms. Walls keeps at her copy at home for the same fears.

88. Section 16 permits Oliva and the ADE to review school courses, materials, and communications and unilaterally amend or annul those that they subjectively believe "indoctrinate" students with CRT or related ideologies. The Act provides no guidance or standards for identifying indoctrination and neither the ADE nor Defendant Board Members have issued any guidance.

89.     Violations of the LEARNS Act could result in potential sanctions, including letters of reprimand, employment suspensions, nonrenewal of employment, and even revocation of professional licenses for repeated offenses, as determined by their superintendent, Secretary Oliva, or the State Board.

90.     The threat of sanctions is even greater now as the LEARNS Act repealed the Teacher Fair Dismissal Act (TDFA), granting even greater discretion to review the conduct of teachers and subject them to a range of consequences, including termination or nonrenewal of their licenses to teach in Arkansas.  The TDFA, expanding on rights enshrined as far back as 1970, previously established that teachers could only be fired, non-renewed, or suspended for "just and reasonable cause," and ensured certain due process rights before such disciplinary action.  In their profile of the LEARNS Act, the *Arkansas Times* reported that after the enactment of the LEARNS Act, teachers are unclear about the process for firing and non-renewal, and many are fearful for their job security.  With the due process protections of the TDFA gone, "what remains is a culture of fear" that "is only heightened by vague provisions in LEARNS that ban 'indoctrination.'"[22] Teacher Plaintiffs can affirm that statement.

### Central High Students Identify the Threat Posed by the LEARNS Act and Protest It; Secretary Oliva Responds by Making a Class Visit

91.     On March 3, 2023, scores of racially diverse Central High students held a mass "walk-out" in protest of the LEARNS Act legislation and governmental attempts to stifle their First Amendment rights, an event which captured local, regional, and national attention.  See Image No. 3 below.

---

[22] David Ramsey, *How does Arkansas LEARNS impact teachers? We have answers (Part 2)*, Arkansas Times (Jan. 8, 2024), https://tinyurl.com/2fe3yauk.



Image No. 3: Central High students protest Gov. Sanders' LEARNS
bill on March 3, 2023. Photo: Daniel Breen/KUAR News.

92.     Following the protest, Central High students issued a scathing public letter calling

on members of the Central High community to reject Gov. Sanders' "hateful agenda" and noted

that "her crusade against what she claims to be Critical Race Theory [] would likely erase" the

"renowned history" of Central High.  The students told Gov. Sanders that the definition of CRT

found in Section 16 "is a complete perversion of the reality of CRT."

93.     The students explained to Gov. Sanders that CRT is "not about demonizing

individuals or discriminating based on race" but rather about examining whether African

Americans' experience with serious social and economic harms may be caused by racism deeply

woven in our national institutions and reflected in laws and policies.

94.     On March 8, 2023, Gov. Sanders signed the LEARNS Act—including Section 16—

into law, at a State Capitol ceremony.  Afterward, Central High students again protested the

legislation and this time hand-delivered a letter to Gov. Sanders' office, voicing their continued

opposition to the LEARNS Act.

95.     Shortly after the students exercised their First Amendment rights to protest and

called upon the Governor to not sign the LEARNS Act, Secretary Oliva contacted Central High

principal, Nancy Rousseau, and quickly arranged for a personal visit to Ms. Walls' classroom.

Within a day of his call, Oliva sat in on Ms. Walls' AP AAS class and observed as she instructed her students using lessons from the 2022-23 AP AAS curriculum, which had been approved by the state five months earlier.

96.     Toward the end of class, as Oliva was leaving, Ms. Walls paused her instruction, approached him, and, after introducing herself, handed him his own copy of the 2023-24 AP AAS curriculum for review.

97.     The next day, Principal Rousseau called Ms. Walls to relay Secretary Oliva's comments about her class which were uniformly positive. Principal Rousseau told Ms. Walls that Oliva was "very complimentary" of her instruction. Oliva also shared with Principal Rousseau that Ms. Walls "is not teaching African American Studies. She's really teaching African American History, and I don't have a problem with that." Oliva made no mention of AP AAS violating Section 16 or any aspect of the LEARNS Act at that time.

**AP African American Studies, Begun at Central High in the 2022-23 School Year, Becomes a Successful and Popular Course**

98.     As established by the College Board, AP AAS curriculum has four units: (1) Origins of the African Diaspora (covering ancient Africa); (2) Freedom, Enslavement and Resistance (slavery and emancipation); (3) The Practice of Freedom (Reconstruction and Black politics); and (4) Movements and Debates (civil rights movement, culture, and identity).

99.     AP AAS was first piloted nationwide in 60 schools for the school year 2022-23, including Arkansas' own The Academies at Jonesboro High School and Little Rock Central High, without incident. The inaugural AP AAS pilot course at Central High enrolled 28 students. Ms. Walls—a highly qualified and trusted educator who had already taught African American History at the school for many years—was chosen to be the AP AAS instructor.

32

100.   The AP AAS course at Central High requires students to give classroom lectures and speeches on certain topics, which are connected to the AP AAS curriculum. Starting on April 25, 2024, AP AAS students in Ms. Walls' class will begin oral presentations in the form of an academic thesis and defend their thesis before a faculty panel.

101.   Student enrollment in Ms. Walls' 2023-24 AP AAS course nearly quadrupled for its second year, causing Central High to expand the course to four (4) classes to accommodate approximately 100 racially diverse students who wanted to participate.

102.   Following the 2022-23 school year, Ms. Walls received well-earned praise—emails, teacher appreciation notes, etc.,—from educators, students, and parents, alike.

103.   With the 2023-24 school year approaching, Plaintiffs had no reason to believe that AP AAS for the 2023-24 school year would be any different than 2022-23 in terms of state approval. In fact, the pilot program had expanded to four other Arkansas high schools, including North Little Rock High School (two schools), Jacksonville High School, North Little Rock Center for Excellence, and eStem High School. Teachers, students, and parents across these schools had every reason to believe that AP AAS would continue without issue.

104.   Accordingly, during the summer of 2023, teachers from all six schools participated in College Board's annual AP Summer Institute, completing 30 hours of teacher training on the instruction of the course. An estimated 200 students across the state enrolled in the AP course, eager to learn its curriculum in preparation for the fully operational AP exam set to be offered in spring 2024.

**Three (3) Days Before the Start of the 2023-24 School Year, ADE Revokes State Approval of AP AAS and Secretary Oliva Gives Inconsistent Reasons for the Decision**

105.   On Friday, August 11, 2023—five months after Secretary Oliva's visit to Ms. Walls' classroom and three (3) days before the start of the new school year—Central High teaching

33

staff and faculty at the other five schools in Arkansas scheduled to offer the AP AAS course learned that Oliva had revoked the ADE's approval of AP AAS and that its course code would be deleted.  State officials *called* educators at the six Arkansas high schools and informed them that the ADE would not count AP African American Studies toward graduation requirements, would not cover the $98 exam fee for the course, and that the course would not be graded on the standard 5.0 scale, in contrast to every other AP course offered.  The ADE provided no immediate written communication, explanation, or guidance, leaving educators scrambling to adjust student schedules and course offerings the weekend before the first day of school.

106.    Later, in a discussion with LRSD Superintendent Dr. Jermall Wright, Secretary Oliva explained that the ADE revoked 2023-24 AP AAS because it was still being piloted, and the College Board was unable to confirm with colleges and universities which college course would be its equivalent for crediting purposes.  Arkansas was unable to offer AP AAS as an approved course until the College Board resolved the issue, Oliva averred.

107.    Secretary Oliva also told Dr. Wright that problems also stemmed from the title of the course, "AP African American Studies."  Oliva said that there was already an approved non-AP course titled "African American History," and the College Board's decision to create AP AAS course versus African American History complicated state approval of AP AAS—even though the course was already approved.

108.    However, Secretary Oliva's statements to Dr. Wright were inaccurate.  By that time, "[m]ore than 200 colleges and universities nationally [had] signed on to provide college credit, advanced placement, or both to students who have satisfactory performance on the AP African American Studies Exam," according to the College Board.  Indeed, at the time of Oliva's representation to Dr. Wright, the University of Arkansas-Fayetteville, the state's flagship school,

planned to accept 2023-24 AP AAS course credit for qualifying AP students who passed the AP exam, just as it does with other AP courses.

109.    Secretary Oliva then pivoted and told LRSD that state approval for AP AAS was revoked because its course code "was listed in error last year." Oliva advised LRSD that it is "common practice" for ADE to review and edit the state's course catalog, and Arkansas typically considers factors like usage or redundancies when deciding which codes to delete.

110.    However, Oliva's statement that Arkansas' code management system listed AP AAS in error for the 2022-23 school year was untrue. In 2022, College Board completed ADE's approval process for AP AAS's inclusion in the state's course directory, and ADE approved the AP AAS pilot course code in October 2022 without issue and in accordance with the State's course code assignment process, which is methodical and involves multiple levels of review.[23]

111.    Switching gears again, on August 14, 2023, Oliva claimed the reason the AP AAS course code was deleted was because the high schools set to offer the course had not undergone an AP course audit[24] as required by the State of Arkansas.

112.    However, that statement was also inaccurate because the State of Arkansas has never required an audit for any course nor involved itself with the AP course audit process in any way. The only audits administered for AP courses in the State of Arkansas are the ones administered by College Board. College Board confirmed that teachers can participate in the AP Course audit process, with the same deadline of January 31, 2024, that governs all other AP courses.

---

[23] Central High received the course code for AP AAS (574700) from the State on April 19, 2023.
[24] The purpose of AP course audits—which are administered by the College Board and not the State—is to determine whether the AP teacher can demonstrate an awareness and understanding of the proffered curriculum, a process where teachers of AP courses submit a syllabus that explains how course requirements are met.

113.    Secretary Oliva then pivoted yet again, claiming State approval for AP AAS was pulled because ADE "can't offer a course or we can't assign a course code to a teacher to teach an AP course to give a student AP credit that would transfer on their transcript unless the teacher does the course audit requirement.  Because [AP AAS is] still a pilot and not a course, that's not available until the 24-25 school year."  But, as noted above, the audits for AP courses are performed by the College Board.

114.    Finally, in the waning hours of August 14, now out of excuses, Secretary Oliva gave Arkansas students, teachers, and parents the real reason the State revoked approval of AP AAS: *to protect Arkansas students from indoctrination in the form of a left-wing political agenda brainwashing found in AP AAS, as repeatedly publicly stated by Gov. Sanders.*

115.    Soon after Oliva's delayed admission, ADE issued a statement claiming that the AP AAS course likely violated provisions contained in the LEARNS Act that guard against the "indoctrination" of students by teaching "prohibited topics."  The ADE further warned educators who continued teaching the course that they risked violating state law and whatever penalties would flow therefrom.

116.    Gov. Sanders' office echoed ADE's admonishment, stating "[t]he AP African American Studies pilot course is not a history course and is a pilot that is still undergoing major revisions.  Arkansas law contains provisions regarding prohibited topics . . . . *Without clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law.*" (emphasis added).

117.    Oliva's final reason for eliminating AP AAS reflected its basis in Gov. Sanders' antipathy toward CRT and "propaganda leftist agenda," which she openly expressed for months, including at her inauguration and during countless media appearances.

36

118.    ADE spokeswoman Kimberly Mundell echoed Gov. Sanders' undermining of AP AAS, explaining that its state approval must be revoked because the course constitutes indoctrination, and ADE "supports rigorous courses not based on opinions or indoctrination."

119.    The College Board responded to Gov. Sanders' and Secretary Oliva's attack on AP AAS in Arkansas:

> *College Board is committed to providing an unflinching encounter with the facts of African American history and culture*, and rejects the notion that the AP African American Studies course is indoctrination in any form.
>
> *This pilot of a college-level course is rooted in the work of 300 scholars and includes facts of African-American experiences in the United States through primary sources that incorporate a combination of history, English, music, and more.*
>
> *****
>
> College Board has had an excellent working relationship with [ADE] for many years which has resulted in expanding access to AP across the state.  Six schools were slated to participate in this second year of the pilot of this transformative course. *Among them is Central High School, a site vital to the country's civil rights movement, and its Little Rock 9 and their role in public school desegregation efforts are covered in the class.*
>
> On this first day of school, we share in their surprise, confusion, and disappointment at this new guidance that the course won't count toward graduation credits or weighted the same as other AP courses offered in the state.
>
> *Throughout the first pilot year, we heard countless stories from the classroom about how this course opened minds, changed lives, and provided a much richer understanding of the country.*  Arkansas teachers and students have done extraordinary classroom work in AP African American Studies that has been celebrated in local, regional and national media, and their excellent work should be allowed to continue this school year.  (emphasis added).[25]

120.    On August 17, 2023, in a nationally televised interview with FOX News, Gov. Sanders continued her public attack on CRT, calling it "propaganda leftist agenda, teaching our

---

[25] Austin Gelder, *College Board and others push back on Arkansas's last-minute ditching of AP African American Studies*, Arkansas Times (Aug. 14, 2023), https://tinyurl.com/yyf4p47j.

kids to hate America and hate one another," suggesting AP AAS runs counter to a quality education

and explaining why the LEARNS Act became law.  Gov. Sanders then sharpened her attack:

> We've got to get back to the basics of teaching math, of teaching, reading, writing
> and American history.  And *we cannot perpetuate a lie to our students and push*
> *this propaganda leftist agenda, teaching our kids to hate America and hate one*
> *another.  It's one of the reasons that we put into law banning things like*
> *indoctrination and CRT.  We want our kids to receive a quality education* . . . .
> (emphasis added).

121.    With this national public statement, Gov. Sanders implied that CRT and AP AAS

curriculum do not constitute a quality education.

122.    On August 21, 2023, in a letter to school superintendents, Oliva confirmed that the

defunding of AP AAS and the revocation of its accreditation was due to Section 16, writing,

"Given some of the themes included in the pilot, *including 'intersections of identity' and*

*'resistance and resilience,'* the Department is concerned the pilot may not comply with Arkansas

law, which does not permit teaching that would indoctrinate students with ideologies, such as

Critical Race Theory."  (emphasis added).

**A Comparison of Defendants' Treatment of the AP AAS and AP European History Reveals**
**Arbitrary Enforcement of the Vague Provisions of Section 16 and Further Demonstrates an**
**Intent to Discriminate Against Black Students and Black Teachers on the Basis of Race**

123.    Secretary Oliva's contention that the inclusion of two themes contained in the AP

AAS curriculum ("Intersections of Identity" and "Resistance and Resilience") constitutes

"Indoctrination" in violation of the LEARNS Act demonstrates the vagueness of the statute's

terms, the exercise of arbitrary enforcement of the Act, and Defendants' intent to target Black

students and teachers on the basis of race through the curriculum.

124.    On information and belief, the AP AAS course is taught by a majority of Black

teachers across the six schools offering the course.  By comparison, on information and belief, the

majority of teachers of other AP courses is White.  In addition, on information and belief, Black

students comprise a majority of students enrolled in the AP AAS courses in Arkansas.  By comparison, in 2023, Black students comprised only 8.9% of students enrolled in all AP courses in Arkansas and White students comprised about 59%, according to the College Board's publicly available data.  Defendants have not attacked those other AP courses.

125.    A comparison of AP AAS and the AP European History courses demonstrates the differing treatment between the students and courses.  Although each course includes similar, purportedly prohibited curriculum themes, Defendants only denigrated AP AAS as "prohibited indoctrination" under Section 16.

126.    The 2023-24 AP AAS curriculum describes the substance of Intersections of Identity as follows:

> AP African American Studies examines the interplay of distinct categories of identity (such as race, ethnicity, class, nationality, gender, region, religion, and ability) with each other and within society. African Americans and Black communities throughout the African diaspora are not a monolith, and the course emphasizes the various ways categories of identity operate together to shape individuals' experiences and perspectives. In line with the discipline of African American studies, students should develop the skill of considering how the intersections of identity impact the sources, debates, and historical processes they explore.

127.    At all relevant times, AP European History (AP EH) was offered at Central High and across Arkansas as an AP course.  AP EH instructs students on aspects of national European identity, including themes of national belonging, a common cultural identity and European intersectionality.  Regarding European identities, the AP EH curriculum reads:

> Meanwhile, the intellectual movement of the Enlightenment, coupled with French revolutionary ideals, offered a different vision of European identity based on a shared belief in reason, citizenship, and other Enlightenment values.

> In the 19th century, countries like *Germany, Italy, and the Kingdom of the Netherlands were unified* through wars, political negotiations, *and the promotion of intense feelings of national belonging.*  At the same time, Romantic writers and artists fostered and built upon feelings of loyalty to the nation, *producing works appealing to a common language or cultural identity.*

*****

*European identities since 1450 have been a fluid concept*, with overlapping and non-competing identities enduring even in the age of nation-states. As new national entities form, merge, and in some instances disappear, *these developments help shape popular understanding of what it means to be European.*

128.    The 2023-24 AP AAS curriculum under fire by Defendants describes the substance

of Resistance and Resilience as follows:

> The themes of resistance and resilience spiral throughout the AP African American Studies course. Each unit highlights a range of methods that African Americans have innovated to resist oppression and assert agency and authenticity politically, economically, culturally, and artistically. These methods often emerged from distinct experiences, perspectives, and approaches for resisting oppression, finding joy, and building community. Students examine examples such as resistance to slavery and the slave trade, the formation of clubs and businesses that advocated for women's rights and economic empowerment, and movements to preserve and celebrate Black history and cultural traditions. Throughout the course, students are encouraged to identify how various forms of resistance and resilience evolve within Black communities in the United States, and in connection to the broader African diaspora.

129.    Based on its curriculum, AP EH instructs on historical attempts to justify the

colonial slave system and organized resistance to the system:

> The use of "race" as a primary category for differentiating people coincided with the expansion of slavery, as Europeans sought a workforce for overseas plantations; *this categorization helped Europeans justify the slave system.* From the 16th to the 19th century, the transatlantic slave trade became a central feature of the world economy, and millions of Africans were transported via the notorious Middle Passage to labor on plantations in the Americas. *The vast and cruel slave system led to various forms of resistance by enslaved peoples and began to generate opposition in Europe beginning in the late 18th century.*

*****

> In conquered territories, Europeans established new administrative, legal, and cultural institutions, and restructured colonial economies to meet European needs, *actions that often led to resistance and opposition in colonial areas.*

*****

> By 1914, most of Africa and Asia were under the domination of Great Britain, France, Portugal, Germany, Belgium, and the Netherlands. *Notwithstanding the*

*power of colonial administrations, some groups in the colonial societies resisted European imperialism, and by 1914, anticolonial movements had taken root within the non-European world and in Europe itself.*

130.    Based on their respective curricula, both AP AAS and AP EH ask students to examine the impact of themes of identity exploration, both distinct and overlapping.  They both ask students to examine the notion of identity being a fluid concept.

131.    Based on their respective curricula, both AP AAS and AP EH ask students to examine the tension between ethnic or racial identity and national belonging.

132.    Based on their respective curricula, both AP AAS and AP EH acknowledge that historically some nation-states used race as a means to differentiate people so as to justify a slave system designed and enforced for the state's enrichment.

133.    Based on their respective curricula, both AP AAS and AP EH ask students to examine the role of various forms of resistance and opposition to systemic oppression imposed by powerful institutional forces.

134.    The description of these topics appropriately asks students to engage critically in the respective subject, as all good college-level courses should do.  They do not constitute any form of indoctrination, much less prohibited indoctrination—whatever that is meant to be.

135.    Yet, Defendants only complain of the AP AAS.  They do not complain that the majority-White student-enrolled AP EH promotes "prohibited indoctrination" in violation of Section 16.  Nor have Defendants revoked state approval of AP EH because of CRT.  Defendants do not deny AP EH students payment or reimbursement for the AP national exam.

136.    Defendants have not publicly challenged the academic worth of AP EH in statements to the press.  Defendants do not publicly complain that AP EH classroom discussions on the vast and cruel European slave system teach White students that they should be ashamed to be White.

137.   In revoking the AP AAS course, Oliva added that ADE "has not been provided the necessary materials and resources needed to enable [it] to support districts in complying with the law and rules."

138.   However—like his excuses for revoking AP AAS a week prior—Oliva's statement here is inaccurate because Ms. Walls gave him a copy of the AP AAS curriculum in her classroom in March 2023.

139.   Nonetheless, in his August 21 letter, Secretary Oliva ordered LRSD superintendents to "submit all materials, including but not limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and training materials, to the Department by 12:00 pm on September 8, 2023." Secretary Oliva also specifically demanded from each of the superintendents a signed statement of assurance that they would not violate any law, including Section 16.

140.   For the benefit of his students and to ensure AP AAS would continue at Central High in any form, Dr. Wright provided a statement of assurance to Oliva. According to the College Board, prior to Arkansas, no state department of education has ever required the submission of course materials or an educator oath. The College Board provided all requested instructional materials on behalf of the superintendents.

141.   To date, neither the ADE nor Defendants have advised Ms. Walls or LRSD whether the review of the AP AAS for the 2023-24 school year was complete, and the course has not been reinstated as an AP AAS course with full benefits for this school year.[26]

---

[26] Curiously, like the 2023-24 school year, the AP AAS is listed in the course catalog for 2024-25, but Plaintiffs have not seen any public statements by Defendant or the ADE regarding the approval of the course. *See* Arkansas Dep't of Education, *ADE Course Catalog SY 2024-2025*, https://tinyurl.com/3uu8r5xf. Last year, the course was in the same catalog until it was pulled

**Arkansas Legislators and Educators Voice Major Criticism about Section 16 and
the Damage Caused by the LEARNS Act**

142.    Almost immediately, reputable voices arose in strong opposition to Gov. Sanders'

elimination of AP AAS in Arkansas.  State Rep. Jay Richardson, chairman of the Arkansas

Legislative Black Caucus, condemned the LEARNS Act, warning it "has far-reaching implications

on the educational and professional success of all Arkansas youth, and we must not allow this type

of inequality to persist."

143.    In a statement to *The Guardian*, NAACP President Derrick Johnson decried Section

16's attack on AP AAS, calling it an "abhorrent" attempt to "strip high school students of an

opportunity to get a jumpstart on their college degree," and adding that attempts by the state to

cancel African American history are "undemocratic and regressive."

144.    Plaintiff NAACP-AR also released a statement calling the decision a hasteful and

reprehensible attack on civil rights.  They continued, "dismissal of an AP African American

Studies course is not only a dereliction of duty to ensure equitable education for all Arkansans, but

shows clear disdain for the lives and experiences that form part of our history."

145.    Since February 2023, state legislators loudly criticized the unworkable and

unconstitutional vagueness of Section 16 and its potential harm to anyone involved in high school

education.  For example, in August 2023, State Sen. Clarke Tucker and other legislators pressed

Gov. Sanders and Secretary Oliva "for *objective standards and metrics that teachers and schools*

_____

down just days before the start of the school year. Defendants could do that again this year.  Also,
unlike the other AP courses, including AP EH, AP AAS is not described as follows:  This is a
College Board Advanced Placement course.  It is unclear whether another version of the course is
expected to be offered.  The AP EH course is also listed as "Graduation Requirement for Career
Focus," which is the type of diploma track, but the AP AAS is listed as "Career-Focused Elective."
Regardless of any asserted justification for the continuing differing treatment, Section 16 remains
in effect and is impacting several other teachings and courses and must be enjoined.

*and parents can use to know whether they're violating the law or not.*"[27]   Another senator repeatedly requested Gov. Sanders and Oliva to define "indoctrination" and "Critical Race Theory" but received no answer.

146.   Among the "points of vigorous discussion" during this meeting was the absence of defined terms within the LEARNS Act like "indoctrination," as well as the lack of a reasoned basis for outlawing CRT and related ideologies in Arkansas schools.   Thus, if Defendants were not already aware of these constitutional infirmities, the vigorous discussion served as actual notice to Gov. Sanders and Secretary Oliva that Section 16 had major vagueness issues.   Defendants made no modifications to the LEARNS Act following the meeting.

### Section 16 Bans What Gov. Sanders Purportedly Celebrates and This Demonstrates Section 16's Unworkable and Unconstitutional Vagueness

147.   On January 10, 2024, Gov. Sanders issued a press release containing her "Proclamation for 'Dr. Martin Luther King Jr. Day' in Arkansas," which read in part:

> **WHEREAS:** This holiday embodies Dr. King's legacy of service and reminds all of us that *the fight for equality, in Arkansas and across the United States, is not done yet.*  (emphasis added).

148.   This position taken by Gov. Sanders—that racism still exists today in state and federal institutions despite major progress towards racial equality—is a central theme of CRT. This would, therefore, make it a violation of Section 16 to read Gov. Sanders' proclamation at Central High or any other Arkansas high school.

---

[27] Antoinette Grajeda, *Arkansas state officials, lawmakers search for common ground on AP African American Studies*, Arkansas Advocate (Aug. 23, 2023), https://tinyurl.com/yc2wfwmp.

## Plaintiffs' Damages

### Ms. Walls' Damages

149.    Defendants' unnecessary, 11th hour "code red" situation caused Ms. Walls significant injury.  To accommodate this last-minute state-sanctioned action, she was forced within a matter of hours to implement a comprehensive grading system overhaul, which included the changing and transferring of AP AAS student grades.  During school hours and well beyond, Ms. Walls had to manually change and re-enter nearly twenty assignments for about 100 students—assignments which had already been entered into the system with the original AP course title and AP code—to an interim title and new course code.  She was forced to scramble and print out all prior assignments before they became erased or otherwise irretrievable.

150.    Because of the revocation of AP AAS' AP credits, Ms. Walls could not apply for monetary funding for her AP AAS class, which resulted in a loss of between $1,000-$2,000 in financial grants.  Ms. Walls and her students were deprived of certain books and materials essential to the course as a result of the AP credit revocation.

151.    Moreover, Ms. Walls was forced to miss work and seek medical treatment due to declining health, and increased stress and anxiety caused by Defendants' conduct.

152.    Because of AP AAS' credit revocation, Ms. Walls' course has been stigmatized and therefore threatens Ms. Walls' professional reputation and livelihood.

### Student Plaintiffs' Damages

153.    Student Plaintiffs and other AP AAS students are confused, frustrated, and feel targeted by the State of Arkansas.  They have suffered and will suffer emotional and economic harm.  Gisele, among other African American AP AAS students, identify with AP AAS uniquely when compared to their equally dedicated student peers enrolled in other AP courses.  Gisele feels under attack specifically because of her race.

45

154.    Student Plaintiffs and other AP AAS students worried that their assignments would not be submitted correctly or timely in order for them to be graded and for their grades to be properly attributed to them in the system.

155.    Portions of Student Plaintiffs' work disappeared or were inadvertently deleted/lost in cyberspace due to changing/re-entering assignments as a result of the code situation.

156.    Unlike other AP students, Student Plaintiffs and/or their school districts will suffer financial harm in the form of paying out-of-pocket the $98 fee for the 2023-24 AP AAS exam because the code situation removed AP AAS' course code and the State will not pay the cost for the AP exam for this course.

157.    Unlike other AP students, Student Plaintiffs will be denied the heavier and thus more advantageous AP course weight for their high school GPA, because the credits earned by AP AAS have been moved to Social Sciences where they lack the AP enhancer.

158.    To the extent that a desired college or university does not allow, honor, or recognize AP AAS because of the course code situation, Student Plaintiffs will suffer financial harm in the form of a more costly college education and suffer an increased likelihood of student debt when compared to other Central High AP students.

159.    Research also shows students enrolled in AP courses enjoy a higher success rate than their non-AP counterparts.  Removing AP AAS harms the educational potential of Student Plaintiffs and other Central High students taking the course, and puts them at a disadvantage when compared to students in states where AP AAS is not banned.

160.    Removing AP AAS causes economic harm to Student Plaintiffs because it reduces the overall number of AP classroom seats, which decreases opportunity for any Central High

student planning to enroll in other AP courses and increases the likelihood of student debt when compared to students in states where AP AAS is not banned.

**COUNT I**
**Void for Vagueness under the First and Fourteenth Amendments**
**Ms. Walls, Mr. Gilbert, and NAACP-AR**

161.    Plaintiffs hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

162.    Teacher Plaintiffs and the NAACP-AR state this claim against Defendants.

163.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[no] state shall…deprive any person of life, liberty, or property, without due process of law." The due process clause incorporates the void-for-vagueness doctrine. *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997).

164.    Under the Fourteenth Amendment, a governmental enactment like Section 16 of the LEARNS Act is unconstitutionally vague if it fails to provide persons of ordinary intelligence fair notice of what is prohibited, or if it is so standardless that it authorizes or encourages seriously discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2002). In other words, laws are unconstitutionally void for vagueness when their prohibitions are not clearly defined. *See Connally v. General Construction Co.*, 269 U.S. 385 (1926).

165.    Where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976).

166.    Section 16 is void for vagueness in violation of the Fourteenth Amendment both on its face and as applied because it fails to provide Teacher Plaintiffs and other educators with fair notice of what curriculum, discussions, assignments, and materials they can and cannot include in the courses. Section 16 also invites arbitrary enforcement and already has led to the purging of

47

wide-ranging race-related educational resources that examine racial equity and historical events and to the cancelation of the AP AAS.

167.    Section 16 fails to define several operative terms within the body of its text, and it also contains operative terms so vague as to fail to provide adequate notice of what conduct or material is prohibited by law.

168.    For example, the failure to properly outline the contours of the prohibited speech and to clarify what it means to "promote teaching that would indoctrinate students," to "compel a person to adopt, affirm or profess and idea in violation of Title IV and Title VI of the Civil Rights Act of 1964," among so many other terms, and the lack of a scienter requirement equates to a failure to provide adequate notice of what speech is prohibited.

169.    The term "Indoctrination"—the very title of Section 16—is not defined in the text. The Cambridge Dictionary defines indoctrination as: the process of repeating an idea or belief to someone until they accept it without criticism or question.  This definition, however, seems to conflict with the rest of the statute, and its application to AP AAS, where Section 16 suggests that indoctrination does not require repetition, but simply "communication."  Nor does it appear that indoctrination, in the State's eyes, requires students to accept ideas *without criticism*, but simply affirming, or even professing, such ideas suggests indoctrination.

170.    The LEARNS Act gives no answers or guidance to the myriad questions regarding prohibited subject matter and thus leaves Teacher Plaintiffs and other teachers across the state in jeopardy of liability, including sanctions and penalties.

171.    This fear is compounded with the State's repeal of the Teacher Fair Dismissal Act, which previously provided teachers with far greater due process protections.  Now, with no clear standards for evaluating potential violations of this vague law, educators like Ms. Walls, Mr.

Gilbert, and teacher members of NAACP-AR face real risks of disciplinary action, up to and including suspension, revocation of license, and dismissal for violating of Section 16.

172.    By failing to provide clear boundaries on the targeted speech, conduct, and materials prohibited, Section 16 invites, and has already resulted in, arbitrary and discriminatory enforcement regarding the purge of materials and the application to the AP AAS.

173.    Indeed, because of impermissible vagueness of Section 16, every day that Ms. Walls, Mr. Gilbert, and teachers across the state instruct their respective students presents another day of potential liability and consequences because at any time their instruction could be subjectively deemed "communication . . . that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies," such as CRT or related ideologies.

## COUNT II

### Content and Viewpoint Based Discrimination in Violation of First Amendment Right to Receive Information and Ideas Student Plaintiffs and NAACP-AR

174.    Plaintiffs  hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

175.    Student Plaintiffs and the NAACP-AR state this claim against Defendants.

176.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech."

177.    It is "well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 773 (8th Cir. 1982).   As America's "nurseries of democracy," K–12 public schools must protect this "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. __, 141 S. Ct. 2038, 2046 (2021).

178.   "At the very least, the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Pratt*, 670 F.2d at 776 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

179.   A state's restriction on students' access to information and ideas must be "reasonably related to a legitimate pedagogical interest." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).   But even if restrictions are reasonably related to legitimate pedagogical interests, they are unconstitutional if driven by illegitimate motives, including "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the government actor disagree[s]." *Pico*, 457 U.S. at 870-72.

180.   Both on its face and as applied, Section 16 violates the First Amendment because it prohibits educators from teaching about a range of specific topics and ideas related especially to race and denies students exposure to that information and ideas.

181.   This information and these ideas include but are not limited to access to CRT and related ideologies (which remain undefined and confusing), topics and perspectives in the AP AAS curriculum, and the educational resources purged by Defendants and ADE.   This also includes several related topics that educators have censored themselves out of an abundance of caution due to the vague, undefined, and overbroad terms of Section 16 and Defendants' arbitrary enforcement of the law.   Section 16 has cast a 'pall of orthodoxy' on classroom instruction and is not related to any legitimate pedagogical interests.

182.   As further described above and below concerning the passage of Section 16 and facts underlying the Equal Protection claim, Section 16 and its application was contrived on

narrowly partisan and political interests, racial animus, and a desire to deny students access to ideas with which Defendants and the majority of state Republican legislators disagrees.

**COUNT III**
**Viewpoint Discrimination, Violation of First Amendment**
**Ms. Walls, Mr. Gilbert, and NAACP-AR**

183.   Plaintiffs hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

184.   Teacher Plaintiffs state this claim against Defendants.

185.   The First Amendment, applicable to the State of Arkansas by the Fourteenth Amendment, provides in part that the government "shall make no law . . . abridging the freedom of speech."

186.   If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Texas v. Johnson*, 491 U.S. 397 (1989).

187.   Discrimination against speech based on its content or its viewpoint, or both, is a violation of the First Amendment. The First Amendment of the Constitution severely limits the government's ability to enact content-based restrictions on speech and forbids the government from dictating how citizens should speak regarding matters of public opinion. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). Efforts to suppress speech based on the government's opposition to content or viewpoint are unconstitutional absent narrow tailoring in service of a compelling interest.

51

188.    Educators enjoy First Amendment rights to classroom speech, and restrictions on content and viewpoint cannot be upheld unless the discussions clearly over-balance their usefulness as an instructor. *See Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1113–14 (5th Cir. 1980).  Such protections are especially critical for high school educators and educators teaching college-preparatory and college-level courses like Ms. Walls and Mr. Gilbert, who bear the responsibility developing the minds of future leaders "through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker*, 393 U.S. at 512.

189.    Alternatively, restrictions on content and viewpoint in the classroom must be reasonably related to legitimate pedagogical concerns and such far-sweeping, overbroad, and vague restrictions are not related to any legitimate pedagogical concerns.

190.    On its face and as applied, Section 16 is a façade for content and viewpoint discrimination.  By design, the portion of Section 16 that prohibits CRT and related concepts—including, but not limited to, intersectionality, identity, resistance to social injustice and resilience in the face of social injustice—is meant to suppress speech on the basis of viewpoint and content.

191.    Defendants have also deprived Teacher Plaintiffs and educators of state-provided resources that they ordinarily would use in their instruction.  For instance, as part of their purge of CRT "indoctrination," Defendants have removed from state websites access to information on civil rights from the National Education Association and the Martin Luther King, Jr. Research and Education Institute based on the content and viewpoint.  Defendants also removed access to Selma Online, a civil rights project led by the Hutchins Center for African and African American Research at Harvard University, which provides a visual history of the Civil Rights Movement leading to the Voting Rights Act of 1965. Educators, including Teacher Plaintiffs, have seen these

state actions as instructive of what they are no longer allowed to discuss or reference in their own classrooms. This has resulted in teachers, including Teacher Plaintiffs, self-censoring similar materials and topics in the classroom for fear of violating Section 16.

192. Speech and expression relating to CRT and related concepts is protected First Amendment activity.

193. Defendants have implemented—and unless enjoined will continue to implement—Section 16 in a way that explicitly and impermissibly censors CRT and related concepts essential to full learning. Section 16 therefore is unconstitutional as applied under the First Amendment.

194. Defendants cannot deny that Section 16 is viewpoint-based. Not only does it exclude and censor classroom discussions and remove educational resources used by teachers that reflect and describe the oppressive social and political path that Black people were forced to sojourn throughout American history, but the State's replacement of these facts with self-serving "feel good" writings provided by GOP-friendly "1776 Unites," a bootstraps-themed organization dedicated to whitewashing and sanitizing that same history by downplaying the truth and fierce historical impediments to Black equality on their website, highlight how they are only looking to prevent speech on certain viewpoints regarding these issues and topics.

195. On its face and in its intent, purpose, and effect, Section 16 attempts to prescribe what shall be orthodox in politics, nationalism, or other matters of opinion, such as the present-day effects of historical racial bias in U.S. institutions and policies, and thus violates Teacher Plaintiffs' First Amendment rights.

196. As a content- and viewpoint-based regulation that is neither justified by a compelling government interest nor narrowly tailored to achieve any arguable interest, much less a legitimate pedagogical interest, Section 16 violates Teacher Plaintiffs' First Amendment rights.

<u>COUNT IV</u>

**Discrimination on the Basis of Race in Violation of the Equal Protection Guarantee of the
Fourteenth Amendment
Ms. Walls, Mr. Gilbert, Gisele Davis, and NAACP-AR**

197.    Plaintiffs hereby restate and reallege all preceding paragraphs as if fully set forth again in this paragraph.

198.    Teacher Plaintiffs, Gisele Davis, and NAACP-AR state this claim against Defendants.

199.    The Fourteenth Amendment, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall. . . deny to any person within its jurisdiction the equal protection of the laws."

200.    Section 16 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by intentionally discriminating against Ms. Walls, Mr. Gilbert, Gisele, and other African American faculty and student members of NAACP-AR based on race and subjecting them to adverse treatment on the basis of their race.

201.    In an intentional discrimination claim, discriminatory intent need not be the only motive.  A violation occurs when the evidence shows that the actor adopted a policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

202.    The *Arlington Heights* framework applies to claims of intentional discrimination in cases involving race-neutral policies. *See Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).  Factors include disparate impact on the protected class, the historical background of the decision and sequence of events leading up to the decision, the relevant legislative or administrative history, and procedural and substantive departures. *Id.*

203.   The enactment of Section 16 was intended, at least in part, to treat Teacher Plaintiffs, Gisele, and Black teacher and student members of the NAACP-AR differently on the basis of their race.

204.   As detailed above, the historical background of the decision evidences how Defendants targeted "CRT" and related "woke" ideologies and discussions in classrooms, with an intent to discriminate against Black students and Black faculty.  The terms "CRT" and "woke" are not defined in Section 16, yet they are used as code words to sweep in any potentially controversial discussions around systemic racism and race-conscious issues frequently considered as critical for the Black community, including bias, privilege, and stereotypes—no matter how relevant to the studies.   Gov. Sanders and statements by bill sponsors and others further demonstrate discriminatory intent.  Attacking specifically CRT, "related" ideologies, and teachings that are especially impactful for Black students in broad sweeping forms has stigmatized such learning by Black students and teaching for Black faculty.

205.   Section 16 places a target on the backs of Black teachers, creating additional anxiety and mental fatigue. Mr. Gilbert and other teachers have shared that as a Black teacher, he knows and senses that he must be very careful in what he teaches and how he teaches because of the state's targeted enforcement toward teaching in ways and on subjects that he has taught over the past 11 years without incident.

206.   As further described above, the legislative history, sequence of events, and procedural departures leading up to the passage of Section 16, as part of the LEARNS Act, and its application to the AP AAS further demonstrate evidence of intentional discrimination.  From Defendant Gov. Sanders' Anti-CRT Executive Order and her highly politicized, rhetorical, misleading, inaccurate, and racially-animated provocation of the issues to the state legislature's

rapid action to push forward a massive comprehensive bill in a matter of weeks through procedural exceptions and exclusion of critical testimony from educators and students, the state's actions and actions of Defendants demonstrate a process wrought with deception and ill intent.

207.    Furthermore, and as discussed above, Section 16's usurpation of substantive areas of educational policy and practice typically reserved for school districts and educators further supports intentional discrimination by Defendants. Among other ways noted, through its vague and overbroad terms targeting not just *what* teachers teach but *how* teachers teach, Section 16 has departed from its normal substantive process where school district administrators, principals, and educators are routinely responsible for instructing students in the most impactful manner. Indeed, Section 16, as-applied, is inconsistent with academic standards developed by educators and experts.

208.    Additionally, Section 16 attempts to couch its need for prohibiting indoctrination under Titles IV and VI of the Civil Rights Act. However, teaching the concepts and ideas of CRT and related ideologies, as well as allowing students or teachers to "profess" an idea related to one of the two banned concepts does not, standing alone, violate Title IV or Title VI of the Civil Rights Act. Title IV and Title VI already prohibit intentional discrimination, including racial harassment and racially hostile environments. Defendants' attempt to appropriate Titles IV and VI for their own bad intentions is another substantive departure as the state has rarely, if ever, attempted to reconstruct Titles IV and VI in such a manner. In fact, the U.S. Department of Education which, in part, is responsible for enforcing Title VI has stated that valid Title VI claims require evidence of differing treatment by race, but it does not categorically prohibit activities, including instruction

in or training on the impact of racism or systemic racism, among other events, which do not constitute differing treatment.[28]

209.    In addition, Defendants' application of Section 16 to the AP AAS is further intended, at least in part, to treat Ms. Walls, Gisele, and NAACP-AR members differently on the basis of their race.  Defendants' targeting of the AP AAS where the majority of students and teachers is Black evidences how the effect of Defendants' decision will be borne greater by Black students.

210.    Moreover, as further described above, the historical background, sequence of events, and substantive and procedural departures related to Defendants' last-minute decision to pull the plug on the AP AAS and the manner that they carried out their decision further supports intentional racial discrimination.  The ADE authorized the AP AAS for the first year of the pilot in the 2022-23 school year, and it was taught at two schools without incident.  The course was on the registry for approved courses for 2023-24 until Secretary Oliva and the Arkansas Department of Education notified AP AAS teachers—by phone—that the course was being removed as an approved AP course.  Defendants then shifted excuses for removing the course and depriving teachers and students of the course's benefits.

211.    Ultimately, Defendants admitted that they canceled the Advanced Placement credential for the course because they believed it violated Section 16.  Defendants, including Gov. Sanders, took to the airwaves using proclaiming the course violated Section 16 and constituted left-wing 'propaganda' that teaches children to "hate America and hate one another."[29]  They then

---

[28] *Fact Sheet: Diversity & Inclusion Activities Under Title VI*, U.S. Dep't of Education, Office for Civil Rights (Jan. 2023), https://tinyurl.com/bdhcznhe.
[29] *Huckabee Sanders Pushes Back on Criticism After Arkansas Removes AP African American Studies Course*, Fox News (Aug. 17, 2023), https://tinyurl.com/3fdrve8a.

only required superintendents of the school districts offering the revised AP AAS course to sign a statement of assurance that the district and its employees would abide by the laws of the state, but did not require the same of other superintendents offering other AP courses.  Secretary Oliva advised the school districts that the ADE would review the course but to date, they have not advised the teachers of the status of the course for the 2023-24 school year.

212.   The LEARNS Act has contributed to the creation of a discriminatory climate in the schools that Defendants operate and in the public at large.  It fosters a culture of racial inequality and discourages school officials from complying with their obligations to treat all members of the Central High community equally, as evidenced, for example, by comparing AP AAS (a course with a majority Black student population taught largely by Black teachers) with AP European History (a course with a majority White student population taught largely by White teachers).

213.   As a direct and proximate result of Defendants' authority and conduct, which includes the implementation and enforcement of Section 16, Ms. Walls, Mr. Gilbert, Gisele, and NAACP-AR have suffered and continue to suffer irreparable harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

1.   The Court declare, under 28 U.S.C. § 2201, *et seq.*, and other federal statutes cited above, Section 16 of the LEARNS Act unconstitutional on its face and as applied to Plaintiffs;

2.   Defendants, including their officers, directors, agents, employees, attorneys and all persons in active concert or participation, be permanently enjoined from enforcing Section 16;

3.   Defendants be ordered to restore the AP AAS course code with full benefits, reverse any and all changes and/or modifications experienced by AP AAS since the implementation of the LEARNS Act, and reverse any changes to school policy made to comply with Section 16;

4.      Plaintiffs be awarded compensatory damages for injuries suffered;

5.      Plaintiffs be awarded their attorneys' fees and costs; and

6.      Plaintiffs be awarded all other relief that this Court deems just and proper under the

circumstances.


Dated: April 12, 2024                          Respectfully submitted,


                                               /s/ Michael J. Laux
                                               Michael J. Laux
                                               E. Dist. Arkansas Bar No. 6278834
                                               LAUX LAW GROUP
                                               400 W. Capitol Avenue, Suite 1700
                                               Little Rock, Arkansas 72201
                                               Telephone: (501) 242-0750
                                               Facsimile: (501) 372-3482
                                               Email: mlaux@lauxlawgroup.com
                                                     mikelaux@icloud.com
                                               /s/ Austin Porter Jr.
                                               Austin Porter, Jr.
                                               E. Dist. Arkansas Bar No. 86145
                                               PORTER LAW FIRM
                                               The Tower Building
                                               323 Center Street, Suite 1035
                                               Little Rock, AR 72201
                                               Telephone: (501) 224-8200
                                               Email: aporte5640@aol.com


                                               David Hinojosa *
                                               D.C. Bar No. 1722329
                                               Email: dhinojosa@lawyerscommittee.org
                                               Maya Brodziak *
                                               N.Y. Bar No. 5495114
                                               Email: mbrodziak@lawyerscommittee.org
                                               Chavis Jones *
                                               D.C. Bar No. 1739219
                                               Email: cjones@lawyerscommittee.org
                                               Zakiya Lewis *
                                               D.C. Bar No. 90020187
                                               Email: zlewis@lawyerscommittee.org
                                               LAWYERS' COMMITTEE FOR CIVIL
                                               RIGHTS UNDER LAW

1500 K St. NW, Suite 900
Washington, DC 20016
Telephone: (202) 662-8600

*Counsel for Plaintiffs*
**\*Pro Hac Vice applications pending**

**CERTIFICATE OF SERVICE**

I certify that on April 12th, 2024, the foregoing was filed through the Court's CM/ECF system and served on all parties of record via hand-delivery:

Hon. Sarah Huckabee Sanders
Governor of the State of Arkansas
500 Woodlane St.
Little Rock, AR 72201
(501) 682-2345

Jacob Oliva
Secretary of the Arkansas Department
of Education
Four Capitol Mall, Room 304-A
Little Rock, AR 72201
(501) 682-4203
Jacob.Oliva@ade.arkansas.gov

Kathy McFetridge-Rollins
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Kathy.Rollins@ade.arkansas.gov

Randy Henderson
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Randy.Henderson@ade.arkansas.gov

Jeff Wood
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Jeff.Wood@ade.arkansas.gov

Leigh S. Keener
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Leigh.Keener@ade.arkansas.gov

Timothy Griffin
Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
oag@arkansasag.gov

Sarah Moore
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Sarah.B.Moore@ade.arkansas.gov

Adrienne Woods
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Adrienne.Woods@ade.arkansas.gov

Lisa Hunter
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Lisa.Hunter@ade.arkansas.gov

Ken Bragg
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Ken.Bragg@ade.arkansas.gov

By: */s/ Michael J. Laux*
Michael J. Laux
*Counsel for Plaintiffs*