**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| RUTHIE WALLS; COLTON GILBERT; JENNIFER REYNOLDS, as Next Friend of SADIE ANNABELLA REYNOLDS; CHANDRA WILLIAMS DAVIS, as Next Friend of GISELE DAVIS; and ARKANSAS STATE CONFERENCE OF THE NAACP, | Case No.: 4:24-cv-00270-LPR |
| Plaintiffs, | *Oral Argument Requested* |
| v. | *Expedited Relief Requested* |
| HON. SARAH HUCKABEE SANDERS, in her official capacity as Governor of the State of Arkansas; and JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education, Arkansas State Board Members in their official capacity: SARAH MOORE, KATHY MCFETRIDGE-ROLLINS, ADRIENNE WOODS, RANDY HENDERSON, LISA HUNTER, JEFF WOOD, KEN BRAGG, and LEIGH S. KEENER, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ............................................................................... 1

II. STATEMENT OF FACTS ................................................................................. 5

   A. Background ............................................................................................. 5

   B. Text of Section 16 of the LEARNS Act ................................................. 9

   C. Implementation of the Act .................................................................... 13

   D. Impacts on Teaching Arkansas' Academic Standards ........................... 15

III. ARGUMENT .................................................................................................. 19

   A. Plaintiffs Are Likely to Succeed on The Merits of Their Claims ......................................... 20

      1. Section 16's prohibitions are too vague to comply with for Arkansas educators and encourage arbitrary enforcement in violation of the First and Fourteenth Amendments. .... 20

      2. Section 16, for no legitimate pedagogical purpose, restricts students' access to information and ideas ................................................................................ 28

   B. Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm ........................................... 32

   C. The Balance of Equities Tip in Plaintiff's Favor, and an Injunction Serves the Public Interest ................................................................................ 344

IV. CONCLUSION ................................................................................................ 35

i

# TABLE OF AUTHORITIES

## Cases

*Pernell v. Florida Board of Governors of State University System*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022)..........................................................9, 27, 30

*Arce v. Gonzales*, 793 F.3d 968 (9th Cir. 2015) ...........................................................31

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012).............................................................34

*Baggett v. Bullitt*, 377 U.S. 360 (1964)...........................................................................25

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)..........................................................................3, 28, 29, 30

*Brown v. Board of Education*, 374 U.S. 483 (1954)...........................................................6

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) .........................................................24

*D.M. by Bao Xiong v. Minnesota State High School League*,
  917 F.3d 994 (8th Cir. 2019) ...........................................................................34

*Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ...........................19

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................................32

*Epperson v. State of Arkansas*, 393 U.S. 97 (1968).........................................................2

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)...................................................20, 25

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)...........................................3, 29

*Hill v. Colorado*, 530 U.S. 703 (2002) ......................................................................2, 20

*Honeyfund.com Inc. v. Governor*,
  No. 22-13135, 2024 WL 909379 (11th Cir. Mar. 4, 2024).........................................9

*Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963 (8th Cir. 1999)...................35

*Little Rock Family Planning Servs. V. Rutledge*,
  397 F. Supp. 3d. 1213 (E.D. Ark. 2019)..............................................................34

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*,
  651 F. Supp. 3d 444 (D.N.H. 2023)................................................................10, 30

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
  594 U.S. 180, 141 S. Ct. 2038 (2021)..............................................................28, 35

*Marcus v. Iowa Pub. Television*, 97 F.3d 1137 (8th Cir.1996)...................................... 33

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012).................... 19

*Musser v. Mapes*, 718 F.3d 996 (8th Cir. 2013) ......................................................... 20

*Nken* v. *Holder*, 556 U.S. 418 (2009) ................................................................. 19

*Olmer v. Lincoln,* 192 F.3d 1176 (8th Cir. 1999). ..................................................... 33

*Parents Defending Education v. Linn Mar Community School District,*
     83 F.4th 658 (8th Cir. 2023) ....................................................................... 25

*Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2007) ...................................... 19, 32, 33

*Phelps–Roper v. Troutman,* 662 F.3d 485 (8th Cir. 2011) ............................................ 19

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
     670 F.2d 771 (8th Cir. 1982) ............................................................ 28, 29, 30, 32

*Reno v. ACLU*, 521 U.S. 844 (1997)..................................................................... 20

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
     508 F. Supp. 3d 521 (N.D. Cal. 2020) ......................................................... 10, 27

*Stanley v. Georgia*, 394 U.S. 557 (1969).............................................................. 28

*Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997) ............................ 20

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)........................................................... 2

*Terminello v. Chicago*, 337 U.S. 1 (1949).............................................................. 35

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)...................................... 1

*United States v. Cook*, 782 F.3d 983 (8th Cir. 2015).............................................. 2, 20

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517 (11th Cir. 1989).......................... 30

**Statutes**

Ark. Code Ann. § 6-15-2906(a)(1) .................................................................. 15, 16

Ark. Code Ann. § 6-16-156 ........................................................................ passim

**Executive Orders**

EO 13950 ........................................................................................................................ 10

EO 23-05 .......................................................................................................................... 9

## I.     PRELIMINARY STATEMENT

"Every day I walk into the classroom I think to myself: Could today's conversation be the one that gets me fired?" Dec. of Colton Gilbert ("Gilbert Dec.") ¶ 34. As expressed by Plaintiff Mr. Colton Gilbert, an eleventh-year debate teacher at Central High School, that is the tenor of Arkansas' public education system that has been cast by Defendants Gov. Sarah Huckabee Sanders, Secretary of Education Jacob Oliva, and the Arkansas State Board of Education following the enactment of Section 16 of the LEARNS Act, known as the "Indoctrination" provision and codified at Ark. Code Ann. § 6-16-156 ("Section 16").

Vague and ambiguous in its terms and couched in a history of purely partisan and political censorship motivated by racial animus, Section 16 unconstitutionally restricts the due process and First Amendment rights of teachers to have adequate notice of how to comply with Section 16 and the First Amendment rights of students to receive information and ideas. On its face and as applied by Defendants Gov. Sanders, Secretary Oliva, and the Arkansas Board of Education, Section 16 is unconstitutional and Plaintiffs respectfully ask this Court to issue a preliminary injunction to protect and restore the rights of students and teachers.

Schools play a critical role in preparing children and adults to fully participate in a diverse, pluralistic, and democratic society. As the Supreme Court has held concerning the First Amendment, the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)). Therefore, it is imperative that "[t]eachers and students must always remain free to inquire, to study and evaluate, to gain new maturity and understanding; otherwise,

our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Consequently, a state does not have unchecked power to "impose upon the teachers in its schools

any conditions that it chooses" and cannot prohibit teaching a "theory or doctrine where that

prohibition is based upon reasons that violate the First Amendment." *Epperson v. State of

Arkansas*, 393 U.S. 97, 107 (1968). Restrictions like Section 16 are unconstitutionally vague if

they either "fail[] to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits" or "authorize[] or even encourage[] arbitrary and

discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2002); *see also United States

v. Cook*, 782 F.3d 983, 987 (8th Cir. 2015).

Section 16, however, does exactly what the Supreme Court forbids. Section 16 is wrought

with undefined, vague, and ambiguous terms that are difficult for anyone to navigate, much less

teachers like Plaintiffs Walls and Gilbert and teacher members of the Arkansas State Conference

of the NAACP ("NAACP-AR"), who must make this impossible decision, lest they face the

consequences. The law, for example, does not define some of the key elements in the provision,

such as "indoctrination" and "Critical Race Theory," the latter a term that Defendant Secretary of

Education Oliva admitted is difficult to define: "in coming up with a simple definition for critical

race theory it's actually really challenging and it is something that is debated amongst even the

scholars that have wrote different theories."[1] Given the statutory language's reliance on broad

conceptual terms without definition, Section 16 places teachers in the impossible situation of

trying to ensure that they remain on the right side of a very fuzzy line.

Section 16 also unconstitutionally restricts students' access to information about the

history of race relations in this country, based on "narrow[] partisan and political" interests and

---

[1] Ar. S.B. 294, S. Educ. Committee (February 22, 2023, 9:21:34 AM) (Sec. Oliva),
https://senate.arkansas.gov/todays-live-stream-meetings/archived-meetings/.

"racial animus," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982), that are not "reasonably related to legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Defendant Sanders publicly denigrated the College Board's AP African American Studies ("AP AAS") course as "leftist propaganda," and Secretary Oliva ordered the removal of its "advanced placement" status from the state-approved list, denying students the benefits of the AP course just three days before school because he, subjectively, felt that a couple of topics that he disagreed with *may* violate Section 16.

Defendants' enforcement of Section 16's vague provisions have caused unlawful censorship on a daily basis in schools across Arkansas as teachers are attempting to teach Arkansas' academic standards. For example, Plaintiff Ms. Ruthie Walls has stopped having in-depth conversations that connect past historical events with current issues because she fears such may be interpreted as violating Section 16. Ms. Walls lives in constant fear of an official from the Arkansas Department of Education ("ADE") visiting her classroom and attempting to revoke her license for using materials she did not know were prohibited by the provision. Similarly, prior to the enactment of Section 16, Mr. Gilbert used a variety of sources in his Debate class, including an introduction to Critical Race Theory ("CRT"), as a way to help students think critically by exploring and debating potential root causes about past- and present-day inequities. He did not use these materials for the purpose of indoctrinating students. With the passage of Section 16, however, he no longer uses those materials out of fear of the penalties that he may face.

Student and Teacher Plaintiffs need the immediate protection of the courts to restore their rights. In the respective classes of Ms. Walls and Mr. Gilbert, students—including Student Plaintiffs—will soon begin their year-end presentations on topics that could run afoul of the law,

3

including topics on the role of men in governing health care decisions for women, Black women civil rights leaders, and the history of slave codes and its impact on racial inequality today. The teachers and students are at a loss on whether the teachers assisting the students on these topics and others could be construed as violating Section 16.

Furthermore, Defendant Oliva has yet to restore the AP AAS course after canceling the "advanced placement" designation last fall. Student Plaintiffs Gisele Davis, Sadie Belle Reynolds, and student members of the NAACP-AR are at risk of losing graduation credits if Oliva does not reverse his decision, and they will not have the course listed as an AP course on their transcripts. Ms. Walls and Student Plaintiffs also need Section 16 blocked so that Ms. Walls may fully and freely prepare her students to take the AP exam on May 14, 2024. As Plaintiff Sadie Belle shared, "I know these exams are very challenging. It is highly unfair and unjust that I and other students across Arkansas will take the same AP exam as students in other states but our education in Arkansas . . . has been censored and limited compared to students in other states that do not have a law that bans or limits the AP AAS." Dec. of Sadie Annabelle Reynolds ("Reynolds Dec.") ¶ 15.

Section 16 is inflicting these harms *now*, irreversibly robbing students of the free and open exchange of ideas in school that the Constitution and Supreme Court precedent have long protected. Section 16, on its face and as applied by Defendants, is denying Plaintiffs their First and Fourteenth Amendment rights. For these and other reasons discussed herein, Plaintiffs ask that this Court issue a preliminary injunction prohibiting Defendants from enforcing Section 16 during the pendency of this litigation.

## II.     STATEMENT OF FACTS

### A. Background

Public schools bear the promise of equal opportunity for children across race and background to learn and grow together, and ultimately, become engaged citizens in our multiracial democracy. The mission of the Division of Elementary and Secondary Education of the ADE endeavors to provide support and services to schools "so every student graduates prepared for college, career and community engagement."[2] Among its goals, the ADE aspires that each student will "develop and apply personal competencies that promote learning and success in life."[3]

However, Section 16 threatens to impair progress towards these goals. This is especially concerning in light of Arkansas' long, sordid history of denying equal opportunity to Black schoolchildren.

In the immediate wake of the Civil War, Arkansas' confederate legislature established a common school system for White children that specifically excluded Black children.[4] After Reconstruction, the newly assembled legislature enacted a law establishing a segregated school system for Black students in 1868, officially beginning Arkansas' near century-long history of state-sanctioned segregation in education.[5] Arkansas would later require school districts to provide Black children with facilities equivalent to those provided to White children, but as history would prove, the separate-but-equal doctrine only reinforced the continued subjugation of

---

[2] Division of Elementary & Secondary Education, *Vision for Excellence in Education*, ARKANSAS DEPARTMENT OF EDUCATION, available at https://dese.ade.arkansas.gov/About/vision-for-excellence-in-education (last visited April 11, 2024).
[3] *Id.*
[4] John William Graves, *Jim Crow in Arkansas: A Reconsideration of Urban Race Relations in the Post-Reconstruction South*, 55 THE J. OF SOUTHERN HIST. 421, 422 (1989).
[5] *Id.* The Arkansas Constitutional Convention of 1868 did not mandate segregated schools, an omission bitterly criticized by conservative delegates. The July 1868 statute establishing segregated schools was passed unanimously in the state Senate and by a vote of 37 to 19 in the state House of Representatives. *Id.* at 423 n.6.

Black children and families. As racial tensions continued to rise, the Supreme Court's decision in *Brown v. Board of Education*, 374 U.S. 483 (1954) mandated the integration of all public schools to fulfill the promise of the Fourteenth Amendment's guarantee of equal protection.

Three months after *Brown*, Charleston Public School District enrolled 11 Black students, making Arkansas' Franklin County the first of the former Confederacy's 11 states to end school segregation.[6] That same year, Fayetteville High School became the second desegregated school system in the former Confederate South. Despite these early, though limited, successes, many old guards continued to fight fervently to maintain the school segregation across the state, and in some cases, forcing the closure of schools, such as in Hoxie, Arkansas.[7]

Parents, school boards, and government officials continued to clash as desegregation plans were slowly implemented around the state. In 1957, Little Rock's Central High burst into the national consciousness when nine Black students attempting to integrate the school were met by a violent white mob that included the Arkansas National Guard blocking their entrance, at the behest of then-Governor Orval Faubus.[8] President Dwight Eisenhower was forced to deploy the National Guard to protect the children.[9] Even with the protection of federal troops, however, the students continued to face threats and jeers from their classmates on a daily basis throughout the year.[10] The next year, Little Rock voters voted 19,470 to 7,561 in favor of shutting down the city's four public high schools for the academic year rather than accepting racial integration.[11]

---

[6] Jack Schnedler, *Central High: A Look Back*, ARKANSAS ONLINE https://showtime.arkansasonline.com/e/media/central/timeline.html (last visited April 11, 2024).
[7] *Id.*
[8] *White Little Rock Voters Choose to Close Public Schools Rather Than Integrate*, EQUAL JUSTICE INITIATIVE, *available at* https://calendar.eji.org/racial-injustice/sep/27 (last visited April 11, 2024).
[9] *Id.*
[10] *The Little Rock Nine*, NATIONAL MUSEUM OF AFRICAN AMERICAN HISTORY & CULTURE, *available at* https://nmaahc.si.edu/explore/stories/little-rock-nine (last visited April 11, 2024).
[11]

The schools would remain closed for the entire academic school year in what became known as "the lost year."[12] Little Rock public high schools would finally reopen in 1959, and slowly begin the long and arduous process of providing a quality, equitable education for *all* Arkansas students.

Section 16 has already impeded and silenced critical discussions related to this past history and exploration of any present-day effects. This has demonstrable effects on learning and progress. As President Barry Jefferson of NAACP-AR stated, "By cutting off access to such critical conversations and denigrating African American studies, students cannot understand how far we have come as a Nation in ensuring equal justice under law, or appreciate how much further we must go to make that goal a reality. Prohibiting Arkansas students from discussing systemic racism and other similar topics bears disturbing resemblance to the slavery and Jim Crow-era tactics of depriving Black people and other communities of color equal access to education as a method of racial subjugation and preserving the status quo's racial inequities." Dec. of Barry Jefferson on behalf of NAACP-AR ("Jefferson Dec.") ¶ 19.

Students also recognize that it is critically important for them to learn about and understand this history. Plaintiff Sadie Belle Reynolds, a freshman at Central High School, believes that it is "important to learn more about history, including the negative parts, so we don't repeat it. I recognize that our country and some of our leaders and citizens have made mistakes in the past. We should be able to recognize this fact. But by knowing about our previous mistakes and injustices that were carried out, we learn from them so that we do not repeat them." Reynolds Dec. ¶ 11. Similarly, Gisele Davis, a senior at Central High School,

---

*White Little Rock Voters Choose to Close Public Schools Rather Than Integrate*, EQUAL JUSTICE INITIATIVE, *available at* https://calendar.eji.org/racial-injustice/sep/27 (last visited April 11, 2024).

[12] *Id.*

believes it is "important to study history, especially the history of race and systemic racism in American, because everybody should, at some point get to learn about their culture, and other cultures as well. Students should seek to get a better understanding of why people have done what they've done to make change. It is important to learn about historical racism in America because if people learned what has happened in our past, we wouldn't see nearly as many wrongs in our society as we see today." Dec. of Gisele Davis ("Davis Dec.") ¶ 11.

Similarly, teachers know that their students need to be taught this history to be prepared to be successful in the world as adults. Ms. Walls, who has been a teacher for over 23 years and currently teaches African American History and AP African American Studies at Central High School, wants her students to be able to "leave my classroom with a clear and accurate understanding of history. I want them to think critically and move beyond rote thinking. Especially in this age of artificial intelligence and rampant misinformation, it is vital that students be able to take in information, research it for themselves to see the whole picture, and come to their own conclusions. I want to empower them to be informed, productive members of society." Declaration of Ruthie Walls ("Walls Dec.") ¶ 8. Likewise, Mr. Gilbert, who has been teaching for 11 years and currently teaches debate and oral communication at Central High School, wants his students to "be able to think critically and question the world around them so that they can understand it, and their place in it, better. I want students to be able to listen to people who do not look like them, speak articulately, and deliver a point respectfully. I hope to give my students the tools to be able to communicate with empathy, especially with people who do not look or think like them. This is critical for their success in my class, in high school generally, and as they graduate into a diverse world." Gilbert Dec. ¶ 5.

NAACP-AR teacher members have censored their instruction and materials as a result of Section 16's vague provisions and Defendants' draconian enforcement. For example, a Black high school English teacher no longer asks her freshmen students to read The Color Purple and does not use other supplementary materials needed to teach the academic standards like online videos of Roland Martin, which have been successful in the past. Jefferson Dec. ¶ 12.

Section 16 and Defendants' implementation and enforcement of the Act stand in the way ensuring equal opportunity for all students and realizing the very mission set by the ADE in "preparing students for college, career and community engagement."

## B. Text of Section 16 of the LEARNS Act

As part of a nationwide effort to ban inclusive education,[13] a partisan majority of Arkansas legislators have now overridden the pedagogical judgments of teachers and education officials to stifle the exchange of ideas with which they disagree. Neither Ms. Walls, a teacher with twenty-three years of experience, nor Mr. Gilbert, a teacher with eleven years of experience, have ever experienced such onerous, vague restrictions imposed on school on not just "what is taught, but *how* it should be taught." Walls Dec. ¶ 42; Gilbert Dec. ¶ 16.

Section 16 builds upon an executive order that Governor Sanders signed on her first day as Governor. That order, titled "Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools," specifically attacks Critical Race Theory as "antithetical to the traditional American values of neutrality, equity, and fairness…resurrecting segregationist values."[14] Dec.

---

[13] Laws, policies, and resolution have been introduced in more than half the states. *See Progress and level of anti-CRT measures,* CRTForward, *available at https://crtforward.law.ucla.edu/map/* (last visited on April 8, 2024). Many of these laws have been challenged and enjoined in First Amendment theories. *See, .e.g., Honeyfund.com Inc. v. Governor,* No. 22-13135, 2024 WL 909379 (11th Cir. Mar. 4, 2024); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.,* 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

[14] "Prohibited indoctrination" is defined in EO 23-05 as "[n]o communication by a public-school employee, public school representative, or guest speaker shall compel a person to adopt, affirm or profess an idea in violation of Title

of Sarah Baum ("Baum Dec."), Ex. 1. This move is related to the growing political attention targeting CRT (though the term is often undefined and misunderstood) and broader discussions of race in America following President Trump's own Executive Order in 2020 ("EO 13950"), which banned diversity, equity, and inclusion trainings for government employees and limited discussions of banned concepts like systemic racism and sexism.[15] A federal court eventually and partially enjoined EO 13950 as violating the rights of contractors to train their own employees on vagueness grounds. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). Legislation in other states relying on the language in EO 13950 is being challenged in several states and, in Florida, a federal district court enjoined, in part, such a law on First Amendment grounds.[16]

S.B. 294, known as the LEARNS Act, was introduced in the Arkansas Senate on February 20, 2023.[17] Though the bill was 144 pages and covered a multitude of educational issues, including teacher salaries, private school vouchers, and achievement standards, Republican members of the Arkansas Senate Committee for Education scheduled a vote on the bill just two days after its introduction.[18] At that hearing, Secretary of Education Oliva, in response to a question asking him to define Critical Race Theory, stated that

---

IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241), including that: People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law; An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law."

[15] Exec. Order No. 13950, Combatting Race and Sex Stereotyping, Federal Register, 85 Fed. Reg. 60683 (Sep. 22, 2020) https://www.federalregister.gov/documents/2020/09/28/2020-21534/combating-race-and-sex-stereotyping. President Biden later revoked EO 13950 as part of a new Executive Order titled "Advancing Racial Equity and Support for Underserved Communities," EO 13985. U.S. Dep't of Labor, *Revocation of Executive Order 13950*, https://www.dol.gov/agencies/ofccp/executive-order-13950.

[16] *See supra n. 13*; A state district court denied a motion to dismiss in a lawsuit challenging a similar law in New Hampshire. *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut,* 651 F. Supp. 3d 444 (D.N.H. 2023).

[17] Ar. S. Journal, 94th General Assembly, Reg. Sess. 1129 (2023).

[18] *Id.* at 1232.

in coming up with a simple definition for critical race theory it's actually really challenging and it is something that is debated amongst even the scholars that have wrote different theories because it is just that, it is just a theory. I've been told examples of trying to put everybody into a room with history scholars and say define socialism. Everybody has a little bit different answer of what that looks like in practice and how you come up with that definition.[19]

The LEARNS Act was approved by the Education Committee on February 22, 2023, and proceed to a full vote in the Senate on February 23, 2023 where it passed 25-7 along partisan lines.[20] The bill moved on to pass the House Education Committee on March 1, 2023, before proceeding to a full House vote on March 2, 2023, where it passed 78-21, again along partisan lines.[21] At a second Senate Education Committee hearing on amendments to the Act passed by the Arkansas House of Representatives, high school students attempted to testify against the law but were denied due to procedural objections raised by Republican sponsors of the bill.[22] The Act, as amended, was passed by the Senate Education Committee, and the full Senate then voted again on party lines and passed the Act.[23] Arkansas Governor Huckabee Sanders signed the LEARNS Act into law on March 8, 2023, less than three weeks after it had been introduced.[24] On the day Defendant Governor Sarah Huckabee Sanders signed the LEARNS Act, she tweeted, "When I sign my education plan into law today, CRT and all forms of racism and leftist indoctrination in our schools will be outlawed."[25] The law passed with an emergency clause,

---

[19] Ar. S.B. 294, S. Educ. Committee (February 22, 2023, 9:21:34 AM) (Sec. Oliva), https://senate.arkansas.gov/todays-live-stream-meetings/archived-meetings/.
[20] Ar. S. Journal, 94th General Assembly, Reg. Sess. 1232, 1269–70 (2023).
[21] Ar, H. Journal, 94th General Assembly, Reg. Sess. 1358, 1421 (2023).
[22] Ar. S.B. 294, S. Educ. Committee (March 6, 2023, 4:08:47 PM) (Se. English), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20230309/-1/27663#info_.
[23] Ar. S. Journal, 94th General Assembly, Reg. Sess. 1739 (2023)
[24] Ar. S. Journal, 94th General Assembly, Reg. Sess. 1988 (2023).
[25] Sarah Huckabee Sanders (@SarahHuckabee), TWITTER (Mar. 8, 2023), https://twitter.com/SarahHuckabee/status/1633525249978368001?.

which allowed the bill to become effective immediately upon the governor's signature.[26] As

relevant here, Section 16 of the LEARNS Act purportedly focuses on "prohibited indoctrination"

in public schools. Baum Dec., Ex. 2.

In line with Governor Sanders' executive order, Section 16 likewise seeks to prohibit the

teaching of Critical Race Theory in schools, as part of a larger prohibition on "rules, policies,

materials, and communication . . . that may, purposely or otherwise, promote teaching that would

indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as 'CRT',

that conflict with the principle of equal protection under the law or encourage students to

discriminate against someone based on an individual's color, creed, race, ethnicity, sex, age,

marital status, familial status, disability, religion, national origin, or any other characteristic

protected by federal or state law" and allows the Secretary of Education to "amend, annul, or

alter the rules, policies, materials, or communications that are considered prohibited

indoctrination and that conflict with the principle of equal protection under the law." Ark. Code

Ann. § 6-16-156(a). The section then goes on to define "prohibited indoctrination" as

> communication by a public school employee, public school representative,
> or guest speaker that compels a person to adopt, affirm, or profess an idea
> in violation of Title IV and Title VI of the Civil Rights Act of 1964, Pub. L.
> No. 88-352, including that:
>
> > (1) People of one color, creed, race, ethnicity, sex, age,
> > marital status, familial status, disability status, religion,
> > national origin, or any other characteristic protected by

---

[26] Ar. S. Journal, 94th General Assembly, Reg. Sess. 1232, 1270–71 (2023); Ar, H. Journal, 94th General Assembly, Reg. Sess. 1422 (2023). On May 8, 2023, Citizens for Arkansas Public Education and Students (CAPES), as well as residents and school advocates in Philips County, filed suit to challenge enforcement of the LEARNS Act in hopes of preventing a charter school from taking over the Marvell-Elaine School District. They argued that the procedural process of the bill failed to meet the state's constitutional requirement that votes on emergency clauses be taken separately from the bill itself. In response, a Pulaski County Circuit judge temporarily enjoined the implementation of the LEARNS Act on May 26, 2023. The Arkansas Supreme Court later vacated the temporary restraining order, but did not rule on the merits of the case.  On June 30, 2023, Judge Wright ruled that the emergency clause of the LEARNS Act was not properly voted on and blocked the implementation of the Act until the default date for all legislation of this session, August 1, 2023. State Attorney General Tim Griffin appealed to the Arkansas Supreme Court, which overturned Judge Wright's ruling on October 12, 2023, ruling that the legislators' votes on the emergency clause complied with state law.

federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or

(2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law.

*Id.* § 6-16-156(b). Finally, Section 16 includes a savings clause, which states that it does not "prohibit the discussion of: (1) Ideas and the history of the concepts described in subsection (b) of this section; or (2) Public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive." *Id.* § 6-16-156(c). Other than the aforementioned definition of "prohibited indoctrination," Section 16 does not define any terms.

### C. Implementation of the Act

The LEARNS Act officially took effect on August 1, 2023. Despite its vague, ambiguous, and contradictory terms, to date Defendants including Defendant Board Members have not provided any guidance. But that did not stop them from enforcing Section 16 just 10 days after the law became effective.

On August 11, 2023, less than three days before the start of the 2023-2024 school year, ADE revoked state approval of the AP African-American Studies Courts ("AP AAS"). AP AAS is a new AP course designed by the College Board to provide a holistic introduction to the history, literature, and arts of Black Communities in the United States by reviewing the origins in the African continent to resistance to slavery to movements equal rights. Baum Dec., Ex. 3. The College Board has also stated that it hoped the course would encourage more Black students to take AP course. *Id.* Secretary of Education Oliva provided numerous explanations for this decision, but eventually admitted that it did so because the course likely violated Section 16's

13

prohibited indoctrination provision, putting teachers at risk of violating state law.[27] ADE also sent out a letter to school districts noting its concern that AP AAS could violate Section 16 and requiring schools to sign statements of assurances that the LEARNS Act would not be violated. Baum Dec., Ex. 4; Ex. 5 (Statement of Assurance). In response to ADE's announcement, six schools stated that they would continue to offer the course as an elective. These were The Academies at Jonesboro High School, Little Rock Central High School, North Little Rock High School, Jacksonville High School, North Little Rock Center for Excellence, and eStem High School. In addition to its curtailment of AP AAS, ADE has also purged state-provided resources, including information on civil rights from the NEA, the Martin Luther King, Jr. Research and Education Institute, and Selma online with no explanation for the removal.[28]

Furthermore, though ADE has not implemented any regulations pertaining to Section 16, its website states that it has "enhanced processes and policies that prevent prohibited indoctrination, including Critical Race Theory, as it relates to employees, contractors, and guest speakers or lecturers of the department" and requires school districts and open-enrollment charter schools to "complete and submit an assurance document annually ensuring that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory."[29] The website also notes that "if rules,

---

[27] Austin Gelder, *Arkansas education chief pushes easily debunked excuse for rejecting AP African American studies*, ARKANSAS TIMES (Aug. 15, 2023), https://arktimes.com/arkansas-blog/2023/08/15/arkansas-education-chief-pushes-easily-debunked-excuses-for-rejecting-ap-african-american-studies-program-on-track-in-39-other-states. Curiously, during the 2022-23 school year following the passage of the LEARNS Act, Secretary Oliva had attended an APAAS class of Ms. Ruthie Walls' (Plaintiff teacher) at Central HS. According to Ms. Walls, her principal had conveyed to her that Secretary Oliva was "very complimentary" of her instruction and shared with the principal that Ms. Walls "is not teaching African American Studies. Walls Dec. ¶ 34. Oliva made no mention that the course violated Section 16. *Id*

[28] Josh Snyder, *Arkansas Education Department Changes, Removes Social Studies Resources After Sanders' Executive Orders*, ARKANSAS DEMOCRAT GAZETTE (March 17, 2024), https://www.arkansasonline.com/news/2024/mar/17/arkansas-education-department-changes-removes/.

[29] LEARNS Act 237 of 2023, Arkansas Department of Education, Division of Elementary and Secondary Education, *available at https:*//dese.ade.arkansas.gov/Offices/special-projects/learns-act-237-of-2023- (last visited on April 8,

regulations, policies, materials or communications produced or disseminated by the Arkansas Department of Education are found to be in violation of Act 237 of 2023 § 6-16-156," an email with documentation should be sent directly to ADE for further investigation.[30] The LEARNS Act also repealed the Teacher Fair Dismissal Act, which eliminated critical due process protections for teachers like Mr. Gilbert and Ms. Walls. Gilbert Dec. ¶ 33. As a result, Mr. Gilbert worries that he could be fired or have his contract non-renewed or be reported for an ethics violation to the State Board. *Id.*; *see also* Baum Dec., Ex. 8 (Code of Ethics). Such a report would lead to an investigate and potential sanction including a letter of caution in Mr. Gilbert's file, being suspended, or even losing his license. *Id.* Likewise, Ms. Walls fears that a parent, her principal, or even the school district could report her for indoctrination directly to the Department of Education who could then revoke her license. Walls Dec. ¶ 40.

### D. Impacts on Teaching Arkansas' Academic Standards

Unsurprisingly, in response to the ADE's actions, teachers have altered their instruction, classroom discussions, lessons plans, and materials used in class out of fear of reprisal, even if that places student at risk of failing to learn the knowledge and skills required by Arkansas' own academic standards—standards developed by educators.

Arkansas law requires the Division of Elementary and Secondary Education to "establish academic standards that define what students shall know and be able to demonstrate in each content area." Ark. Code Ann. § 6-15-2906(a)(1). The law also requires that "[i]nstruction in all

---

2024). The website also states that "The Arkansas Department of Education has amended, annulled, or altered the rules, policies, materials, or communications that are considered prohibited indoctrination and that conflict with the principle of equal protection under the law. However, this is an ongoing process." *See also* Baum Dec., Ex. 7 ("Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions," depicting outcomes of a handful investigations in schools of purported violations of Gov. Sanders' executive order with language similar to Section 16. This included attacks on programs that merely asked teachers to explore any potential "unconscious biases" and to "craft an equity framework.").
[30] *Id.*

public schools shall be based on the academic standards to prepare students to demonstrate the skills and competencies for successful growth and high school graduation." *Id.* at § 6-15-2906(a)(2). To create, review, and revise these standards, Arkansas law mandates "[r]eview and input" by "[e]ducators from elementary, secondary, and higher education" and "[c]ommunity members with professional experience related to the academic content area." *Id.* at § 6-15-2906(c)(1).

Typically, experienced educators in the field work with the Arkansas Department of Education to develop the academic standards for state-approved courses. Ms. Walls and Mr. Gilbert have both worked on committees to develop academic standards in their respective fields, African American History and Debate and Oral Communication Skills. Walls Dec. ¶ 35; Gilbert Dec. ¶ 20.

In furtherance of this work, the ADE has set standards for African American History. Baum Dec., Ex. 6. These standards require students to not only learn about specific historical events and movements, but to do so by "gather[ing] relevant information from multiple perspectives and a variety of sources" and "critique the credibility, relevant, and use of evidence in arguments and explanations proposed by [them] and others." *Id.* Arkansas teachers like Ms. Walls, who teaches the AP African American Studies course, are dedicated to the task of turning their students into these critical thinkers and have used a variety of sources to accomplish this. For example, prior to the enactment of Section 16, Ms. Walls used to engage in deeper discussions with her students around select topics like the effect of *Brown v. Board of Education* and desegregation efforts on Black teachers or the similarities between Jim Crow-era laws and laws being passed today. Walls Dec. ¶ 15. With the passage of Section 16, however, she now self-censors herself out of fear of the penalties that she may face. *Id.* She has also removed

certain books, like *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* by Michelle Alexander. Walls Dec. ¶ 14. Ms. Walls would like to use the New York Times's "The 1619 Project" materials to help students achieve the academic standards. She keeps her copy of these materials at home for the fears of being sanctioned by Defendants for violating Section 16. *Id.*

Ms. Walls also has censored her comments during classroom discussion on various topics out of fear that connecting past events to present issues violates Section 16, even though she worries that this could harm the ability of her students to succeed on the AP exam. *Id.* ¶¶ 38-39. And though she has not removed any specific materials from her curriculum, she remains anxious that a representative from the ADE could visit her classroom and see her using materials that they believe violate Section 16 or that parent might file a complaint with the ADE about the materials she is using, either of which could lead to a disciplinary proceeding resulting in a sanction, suspension, or revocation of her teaching license. *Id.* ¶¶ 40-41. The stress over teaching AP AAS in this environment has already sent Ms. Walls to the hospital once, and she continues to deal with the anxiety and stress on a daily basis. *Id.* ¶ 32.

For debate classes like Mr. Gilbert's, among other academic standards, Debate I standards require him to ensure that students will learn how to "utilize research skills and collect well-sourced evidence; analyze and rebut opposing arguments, participate in debates inside and outside the classroom, synthesize socioeconomic, ethical, and/or philosophical reasoning that influences current issues; and develop individual and group perspectives on the importance of debate to both local and global communities."[31] Prior to the enactment of Section 16, Mr. Gilbert used in his classes several resources including an introductory chapter on CRT to help students

---

[31] Arkansas Department of Education, *Arkansas English Language Arts Standards: Debate I*, 2016, https://dese.ade.arkansas.gov/Files/20201209113238_Debate_I_2016.pdf (last accessed: April 12, 2024).

explore and debate potential reasons for past and present inequalities and to further develop their skills around research and examining individual and group debates. Gilbert Dec. ¶ 12. He never used these materials to try and indoctrinate students. *Id.*

Mr. Gilbert also teaches Oral Communication Skills class, where the standards include ensuring students demonstrate effective intrapersonal communication, professional interaction with others, and communication in a variety of communication situations.[32] Because he fears being reported for violating Section 16, he cut a chapter of gender and sexuality, where students would "deepen the understanding of the complexities of human sexuality so that they may become effective communicators while speaking, listening, and responding in the situations they encounter daily." Gilbert Dec. ¶ 13. In addition, he previously used excerpts of the book, "Warriors Don't Cry: A Searing Memoir of the Battle to Integrate Little Rock's Central High," to help students understand the racial and social implications of the Little Rock Nine's desegregation of Central High and build their academic skills. *Id.* ¶ 14. However, he ceased using the book, because he fears White students may feel uncomfortable and report him. *Id*.

Mr. Gilbert's students in his Debate 1 classes, which include student members of the NAACP-AR Jefferson Dec. ¶ 11, are scheduled to present and defend proposed legislative bills in May 2024 as part of this "Student Congress" assignment. Gilbert Dec. ¶ 31. Students choose the topics and will write and present through a viewpoint of a "Whig" or "Loyalist." *Id.* Topics vary and include arguments related to women's healthcare that may include the role of male legislators making decisions for women or the lack of heath care access for women of color; gun control, which may include arguments related to higher rates of gun violence facing people of

---

[32] Arkansas Department of Education, *Arkansas English Language Arts Standards: Professional Communication*, 2019, https://dese.ade.arkansas.gov/Files/20201209124502_Professional-Communication.pdf (last accessed: April 12, 2024).

color, or in the context of schools, whether the presence of guns in schools may further increase threats to the safety of Black students who already face disparate school discipline rates compared to their White peers. *Id.*  Mr. Gilbert asks, "Am I allowed to discuss these issues with students, or will I be seen as trying to indoctrinate students? Conversely, if I silence students by not allowing them to present on these topics, is that also a form of indoctrination?" *Id.* ¶ 31.

This is the quandary teachers are placed in everyday because of Section 16 and Defendants' enforcement of the Act. Neither Mr. Gilbert nor Ms. Walls, in their combined thirty-four years of experience have ever witnessed or experiences such draconian efforts by the State to chill and censor their teaching and not just *what* is taught, but *how* it may be taught.

## III.    ARGUMENT

In deciding a preliminary injunction motion, the Court's analysis depends on a

> "flexible" consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest.

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012); *see also Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The balance-of-harms and public-interest factors "merge when the Government is the opposing party." *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). "In a First Amendment case the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008). Therefore, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally

deemed to have been satisfied." *Phelps–Roper v. Troutman,* 662 F.3d 485, 488 (8th Cir. 2011)

(*per curiam*).

### A. Plaintiffs Are Likely to Succeed on The Merits of Their Claims

#### 1. Section 16's prohibitions are too vague to comply with for Arkansas educators and encourage arbitrary enforcement in violation of the First and Fourteenth Amendments.

The vague directives of Section 16 of the LEARNS Act force ordinary persons to guess

their meanings—with substantial consequences if they guess wrong. A law is "void for

vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104,

108 (1972); *see also Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013). And while vagueness

descends from the Fifth and Fourteenth Amendments, a vague law also "raises special First

Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521

U.S. 844, 871–72 (1997); *see also Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303,

1308–09 (8th Cir. 1997) (holding that when a "regulation 'is capable of reaching expression

sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in

other contexts.'") (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). Although generally

"a lesser standard of scrutiny is appropriate because of the public school setting, a

proportionately greater level of scrutiny is required because the regulation reaches the exercise of

free speech." *Stephenson*, 110 F.3d at 1308–09. In practice, this means that a law is

impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary

and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2002); *see also United

States v. Cook,* 782 F.3d 983, 987 (8th Cir. 2015). Here, the Act does both.

20

First, the statute fails to define several operative terms within its text, rendering the terms so vague that they fail to provide adequate notice of the conduct or material that is prohibited by the law. For example, Section 16 does not define "Critical Race Theory" (CRT), much less any other "ideologies" that purportedly "conflict[s] with the principle of equal protection under the law or encourage[s] students to discriminate against someone based on the individual's color. . . race. . . or any other characteristic protected by federal or state law." Ark. Code Ann. § 6-16-156(a). CRT is the only ideology the ADE names as inherently conflicting with this principle, but without explanation, this example is unhelpful, if not confusing. What are the "other ideologies?" Would this include the State's preferred 1776 Unites curriculum, which could be interpreted as undermining discrimination and equal protection by white-washing history.[33]

Section 16 broadly prohibits materials and communications, *inter alia*, "that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as 'CRT' . . . ." Ark. Code Ann. § 6-16-156(a)(2), but, again, it fails to define CRT. Section 16 does not clarify if CRT includes the history of CRT as an analytical framework, or only confirmed or asserted tenets of CRT by its originators, or related ideas and theories, such could encompass unconscious bias and systemic racism, or factual observations, such as mass incarceration.

If CRT is undefined by the law, it is impossible for educators to understand what ideas, especially those related to racism and history, do and do not fall within the State's understanding of CRT or any other ideology that it purports may violate Title IV or Title VI. For instance, the

---

[33] Michael Wenger, *The Dangers of Teaching Whitewashed American History*, AMERICAN ASSOCIATION OF COLLEGES AND UNIVERSITIES (Jan. 2021), https://www.aacu.org/liberaleducation/articles/the-dangers-of-teaching-whitewashed-american-history. Of course, CRT, at the very least and unlike the 1776 Unites curriculum, is well-researched and has been developed over a course of 30 years through rigorous peer review. *See generally* Jeremiah Young et. al., *Talking Back: An Analysis of the Scope and Impact of Critical Race Theory and Its Usage in Educational Research.* 13:3 Sage Open (2023).

U.S. Department of Education, which is responsible for enforcing Title VI in schools, issued a Fact Sheet in 2023 stating that Title VI does not categorically prohibit activities including instruction in or training on the impact of racism or systemic racism, among other issues. [34] It is therefore unclear what areas of CRT Section 16 is meant to cover, outside of rare circumstances where instruction or training is creating a racially hostile environment. Does teaching AP AAS students about the present-day effects of Jim Crow—where the U.S. enacted discriminatory policies and tolerated racist customs that suppressed Blacks' rights via threats and acts of physical violence—constitute prohibited indoctrination because it could be construed as related to CRT? What about communications and materials that allude to helping ensure teachers do not practice racial bias, prejudice, and discrimination in the classroom?

The statute focuses on the concept of "indoctrination"—it requires, for example, that the Department of Education "identify items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies . . ." and that the Secretary of Education "amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination." Ark. Code Ann. § 6-16-156(a). However, despite its repeated use of the term, Section 16 never defines indoctrination. The statute's use of the term makes it unclear whether it seeks to prohibit actual indoctrination or any material that could lead to indoctrination or something in between the lines. If educators look to the plain meaning of the term to understand its meaning, they find that the Cambridge dictionary, for example, defines indoctrination as "the process of repeating an idea or belief to someone until they accept it without criticism or

---

[34] *Fact Sheet: Diversity & Inclusion Activities Under Title VI*, U.S. Dep't of Education, Office for Civil Rights (January 2023), https://tinyurl.com/bdhcznhe.

question."[35] This definition, however, does not comport with Section 16's depiction of indoctrination.

Moreover, Section 16 lacks a scienter requirement, allowing Defendants to go after teachers if they "purposely *or otherwise*" promote the indoctrination of students. Ark. Code Ann. § 6-16-156(a)(2). As noted, the statute provides no definition for "CRT," "related ideologies," or "indoctrination." Yet, even if teachers unintentionally or negligently crossed the line (wherever that is), they could be subject to sanctions and penalties. As Mr. Gilbert explains, "[i]t is hard to understand the intent of the law, which makes it feel like the term is meant to be a catch-all. Because the law does not provide a clear definition or scope of what constitutes indoctrination, it feels like even teaching a subject or concept could be perceived as indoctrination." Gilbert Dec. ¶ 21.

Arkansas educators' confusion around what constitutes indoctrination is compounded by the only specific definition the statute does provide for: "prohibited indoctrination." Section 16 defines "prohibited indoctrination as "communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964." Ark. Code Ann. § 6-16-156(b). First, the use of this term suggests that there are types of indoctrination that are not prohibited, but does not provide clarity such that persons of ordinary intelligence can distinguish between what behavior is permitted and what is prohibited. The State appears to draw this distinction upon ideas that do or do not violate Title IV and Title VI, including the idea that one race is inherently superior or inferior and that individuals should be discriminated against on the basis of their membership in a protected class. *See* Ark. Code Ann. § 6-16-156(b). However,

---

[35] *See* "Indoctrination," *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/indoctrination (last accessed April 12, 2024).

those "ideas" are potentially limitless. Is the mere discussion of such ideas violative of Title IV or Title VI? How then is any historical subject to be taught, including boarding Native American children and the Trail of Tears? The Holocaust? School segregation? The disproportionate incarceration and killing of Black people?

Moreover, the definition of "prohibited indoctrination" further confuses what the statute means by indoctrination, given that the definition of this subset of indoctrination is defined as a "communication," rather than an ongoing process, that "compels a person to adopt, affirm, or profess an idea." Thus, it appears that in the State's eyes, indoctrination does not require repetition, or require that a person to accept ideas *without criticism*, but simply affirming, or even professing such ideas may constitute indoctrination. The contradiction between the plain meaning of indoctrination, and the Act's understanding of indoctrination, as incorporated in its definition of prohibited indoctrination, emphasizes the vagueness of the term.

Furthermore, Section 16 does not define "materials," public school representative," "communication," or what it means to "compel" someone to "adopt, affirm, or profess" an idea, terms that are also undefined. This further confuses what teachers are permitted to teach or ask students to do in the classroom. For example, if a teacher instructs a student to take and defend a particular position that could be construed as violating Title IV or Title VI as part of a learning exercise, have they been compelled to affirm or profess that idea?

Critically, the conduct prohibited by Section 16 is subjective. Whether or not a student is compelled depends on their own subjective reaction to a teacher's communication, making it nearly impossible for an educator to have fair notice of whether any of their communications will violate the law. A teacher's "communication" could potentially compel one student to adopt an idea, while having no effect on another, or even dissuading other students from doing the same.

*Compare Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (finding unconstitutionally vague an ordinance criminalizing conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964) (invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered "subversive" to the government); *see also Parents Defending Education v. Linn Mar Community School District*, 83 F.4[th] 658, 669 (8th Cir. 2023) (holding that plaintiffs were likely to succeed in its claim that a school policy subjecting teachers to potential discipline was unconstitutionally vague because "the undefined term 'respect' leaves the policy open to unpredictable interpretations, and creates a substantial risk" of arbitrary enforcement). As with these examples, liability under Section 16 depends on the subjective reactions and interpretation of others—the persons being potentially "compelled"—and therefore does not give the ordinary person notice of what the statute permits and prohibits.

Teachers are at a loss trying to understand what the statute's understanding of indoctrination is, and what constitutes prohibited indoctrination. Mr. Gilbert, an educator of eleven years who holds a master's degree in human communications and teaches a class focused on communication skills, took the time to read Section 16 multiple times in hopes of aligning his curriculum with its requirements, but still could not decipher the meaning of the statute. Gilbert Dec. ¶ 10. He and Ms. Walls fear that simply presenting or discussing issues related to race, privilege, and biases will put them at risk of violating that law and subject them to penalties, causing them to self-censor. *See, e.g., id.* ¶¶ 16-34; Walls Dec. ¶¶ 13-22; Jefferson Dec. ¶ 12. The undefined terms and "uncertain meanings" in the statute have caused Mr. Gilbert, Ms. Walls, and other educators, to "steer far wider of the unlawful zone . . . than if the boundaries

were clearly marked," implicating their First Amendment rights and violating their Fourteenth Amendment rights in the process. *Grayned*, 408, U.S. at 109.

Mr. Gilbert does not know where the State draws the line between what is permitted and what is prohibited. Gilbert Dec. ¶ 27. As a debate teacher, he wonders if asking students to research both sides of a controversial issue and adopt and defend a position that could be perceived as violating Title IV and Title VI will run afoul of the law for asking students to profess, affirm, or adopt ideas. *Id.* ¶ 19. That is the very essence of debate, where students learn and research both sides and then take a stand in defense of one side. *Id.*

Their confusion is increased by the statute's savings clause, which states that the statute does not prohibit the "discussion" of "[i]deas and the history of the concepts described in subsection (b) of this section; or [p]ublic policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive." Ark. Code Ann. § 6-16-156(c). As Mr. Gilbert explains, the clause's terms are undefined and contradictory, leaving the impression that "an idea or historical fact could easily veer into a discussion subjectively perceived as 'CRT or related ideology.'" Gilbert Dec. ¶ 18. In other words, "we may be allowed to mention public policy issues or current events, but we cannot use those events or issues as a launching pad to have a more critical discussion in hopes of explaining *why* something happened." *Id.* ¶ 27. Mr. Gilbert believes these more critical discussions are key to preparing students to empathetically engage in a diverse world, but he now censors them for fear of sanctions. *Id.* ¶ 10.

Furthermore, these vague terms and potential enforcement are in tension with the academic standards established by the Arkansas Department of Education. As discussed earlier, *see supra* Section II-D, Section 16 threatens, and in fact impedes, teachers from fully and clearly

applying their teaching expertise in assisting students acquire the knowledge and skills

demanded by the State under the academic standards.

Federal district courts have found similarly worded statutes to be vague. For example,

*Pernell v. Florida Board of Governors of State University System*, a federal district court found

that a savings clause in the statute at issue, which permitted discussion of otherwise banned

concepts if the concepts were presented "in an objective manner without endorsement"

contributed, rather than assuaged, vagueness concerns. 641 F. Supp. 3d 1218, 1281–84 (N.D.

Fla. 2022). And in *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, the federal court partially

enjoined Trump's Executive Order 13950, with two of the banned concepts similar to those in

Section 16, on vagueness grounds. 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

Second, the lack of clear standards to guide enforcement of Section 16 invariably (and

impermissibly) lends itself to arbitrary enforcement: the application of Section 16 by the ADE to

the AP AAS provides a good example. In August 2023, ADE arbitrarily revoked state approval

for the AP AAS. ADE asserted, in part, that it removed the AP AAS course code, because it was

"based on opinions or indoctrination" and may put a teacher at risk of violating Arkansas law.[36]

Secretary of Education Jacob Oliva confirmed that the mere inclusion of themes such as

"intersections of identity" and "resistance and resilience" raised a red flag, causing further

review of the AP AAS. Baum Dec., Exs. 4, 7. However, ADE then allowed the course to be

taught in some manner, but without the AP designation and credit for an AP course. Moreover,

ADE did not subject any other AP course and its' teachers and students to similar treatment,

---

[36] Adam Roberts, *Arkansas Department of Education pulls approval for AP African American Studies course*, 40 29 News (August 2023) https://www.4029tv.com/article/arkansas-ap-african-american-studies/44810056 (quoting Kimberly Mundell, ADE Director of Communications, in saying that "The AP African American Studies pilot course is not a history course and is a pilot that is still undergoing major revisions. Arkansas law contains provisions regarding prohibited topics. . . . Without clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law.").

even though many other AP courses also cover contentious historical issues such as identity and intersectionality, and resistance to systematic oppression.[37]

### 2. Section 16, for no legitimate pedagogical purpose, restricts students' access to information and ideas.

Section 16 violates students' First Amendment rights by infringing access to information and ideas. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). As America's "nurseries of democracy," Pre-K–12 public schools must protect this "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190, 141 S. Ct. 2038, 2046 (2021). Therefore, the First Amendment's protection of the right to receive information and ideas necessarily student and includes their right to receive information and ideas at school. *See Pico*, 457 U.S. at 866-68; *see also Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 773 (8th Cir. 1982). "[J]ust as access to ideas makes it possible for citizens to generally exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868. "At the very least, the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Pratt*, 670 F.2d at 776 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

---

[37] *See* College Board, *AP European History Course and Exam Description, Effective Fall 2023*, *Theme 6: National and European Identity* (Fall 2023), https://apcentral.collegeboard.org/media/pdf/ap-european-history-course-and-exam-description.pdf. Curiously, ADE seems to have added the AP AAS to the course catalog as an AP course for next year, though the course is not identified as a "College Board" course. *See* Baum Dec., Ex. 9 (ADE Course Catalog SY 2024-45). The fact that the ADE has, for now, determined that the course somehow does not run afoul of Section 16 further demonstrates the vagueness of the statute and Defendants' arbitrary enforcement of the Act.

While government actors enjoy discretion in fashioning school curricula, this discretion is bound by the Constitution. To avoid violating the First Amendment, the state's restriction on students' access to information must be "reasonably related to a legitimate pedagogical interest." *Hazelwood Sch. Dist.*, 484 U.S. at 273. Moreover, a plaintiff still establishes a First Amendment claim, even if the state demonstrates a legitimate interest, by demonstrating that the reasons offered by the state in fact serve to mask other illicit motivations. *See Pico*, 457 U.S. at 871;[38] Illegitimate motives include restricting students' access to information based upon "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the government actor disagree[s]." *Pico*, 457 U.S. at 870-72.

The Eighth Circuit's decision in *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, decided just before *Pico*, is illustrative here. In *Pratt*, three students challenged their school board's decision to remove the Encyclopedia Brittanica Educational Corporation's film version of "The Lottery," a short story in which the citizens of a small town randomly select one person to be stoned to death each year, as well as a "trailer" film which discussed the story and its themes, from the curriculum. 670 F.2d 771, 773 (8th Cir. 1982). The Eighth Circuit determined that "to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable government interest exists for interfering with the students' right to receive information." *Id.* at 777. It found that the school board was unable to do so, affirming the district's conclusion that school board's purported justification, that the films "place an exaggerated and undue emphasis on violence" was "self-serving" and that the board had "failed

---

[38] In *Pico*, a plurality of the Supreme Court recognized that school boards could not remove library books based on "narrowly partisan or political" interests or "racial animus." 457 U.S. at 870, 871. Although Justice Rehnquist dissented from the judgment in *Pico*, he, joined by Chief Justice Burger and Justice Powell, "cheerfully concede[d]" that such "discretion may not be exercised in a narrowly partisan or political manner" or based on "racial animus." *Id.* at 907 (internal quotation omitted). Consequently, seven members of the Supreme Court subscribed to the view that the First Amendment forbids school officials from removing materials from school libraries to further narrowly partisan, political, or racially discriminatory ends.

to produce any cognizable, credible evidence as to any legitimate reason for excluding this film (sic), other than the fact that the School Board and certain elements of the populace object to the ideas disseminated therein." *Id.* at 777–78. In reaching this decision, the Eighth Circuit emphasized that, for the school board's actions to be comply with the First Amendment, the "reasons for its decision" must be "apparent to those affected." *Id.* at 778. This was not the case in *Pratt*:

> Here, the board, in response to citizens' complaints that centered on their ideological and religious beliefs, banned the films without giving any reasons for its actions. Only after the district court asked for an explanation of the board's action did it offer its violence rationale. Even then, the board failed to specify why the films were too violent or how they distorted the short story. This approach inevitably suggests that the Board acted not out of its concern about violence, but rather to express an official policy with respect to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians and teachers at their peril.

*Id.* at 778–79 (internal quotation omitted).[39]

Other courts have likewise held that a student's First Amendment right to receive information and ideas is violated when government actors, motivated by political, racist, or ideological purposes, remove materials from a curriculum. For example, a few years after *Pratt* and *Pico*, the Eleventh Circuit likewise recognized that a school board's actions in removing books from the curriculum is only constitutional when it is "reasonably related to the stated legitimate concern."[40] *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1525 (11th Cir. 1989); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1278

---

[39] The Eighth Circuit also noted that the fact that the films and underlying short story remained available to teachers and students in the library "is not decisive" because "[r]estraint on protected speech cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt*, 670 F.2d at 779.

[40] In *Virgil*, the Eleventh Circuit determined that the school board's actions were constitutional because, in part, the parties had stipulated that "the motivation for the Board's removal of the readings has been stipulated to be related to the explicit sexuality and excessively vulgar language in the selections." 862 F.2d at 1522–23. The Court noted, however, that "[c]ourts have not hesitated to look beyond the stated reasons for school board actions" in order to determine what the government actor's true motivation was. *Id.* at 1522 n.6.

(N.D. Fla. 2022) (recognizing a student's First Amendment right to receive claim); *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 454 n.5 (D.N.H. 2023) (same). More recently, the Ninth Circuit in *Arce v. Gonzales* held that "the state may not remove materials otherwise available to a local classroom unless its actions are reasonably related to legitimate pedagogical concerns." 793 F.3d 968, 983 (9th Cir. 2015).

Section 16 violates students' First Amendment rights because it requires government actors to remove information and ideas from the previously approved Arkansas curriculum that state disagrees with. This is clear in the text of the statute which requires "the Department of Education to identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory" and requires the Secretary to, among other options, "annul . . . materials, or communications that are considered prohibited indoctrination and that conflict with the principle of equal protection under the law." Ark. Code Ann. § 6-16-156(a). And this language has resulted in the removal of a variety of material. For example, in its August 2023 letter, the ADE stated that "[g]iven some of the themes in the [AP AAS] pilot, including 'intersections of identity' and 'resistance and resilience,' the Department is concerned the [AP AAS] pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory (CRT)." In response, Mr. Gilbert removed materials from his debate course which described CRT and highlighted similar details. Gilbert Dec. ¶ 22. Similarly, Ms. Walls has narrowed the scope of the topics that she is teaching in an effort to comply with Section 16 which means that her students do not get the benefit of her vast knowledge on these topics and the ways that they interrelate with each other. Walls Dec. ¶ 13-15, 38. This is especially troubling given that the students in

her classes took AP AAS in order to gain that deeper understanding of how past events inform their current experiences. Reynolds Dec. ¶ 8, 11; Davis Dec. ¶ 11, 15.

As in *Pratt*, the decision by the ADE to remove these materials is not motivated by pedagogical interests.[41] In fact, these decisions run counter to the State's pedagogical goal. The Arkansas African-American history standards, for example, require that students learn about the "Hardening of Jim Crow – the African American experience in the post-Reconstruction Era" which includes "[e]xamin[ing] various perspectives toward the political rights of African American men and women between 1820 and 1877 throughout different regions of the United States, including discrimination and segregation, "separate but equal," the Back-to-Africa movement, and full equality." Baum Declaration, Ex. 6. Moreover, the restriction of certain ideas and information runs counter to the underlying goal of Arkansas's African-American history standards, which require students to "[g]ather relevant information from *multiple perspectives* and a variety of sources" and "evaluate the credibility of the source by determining its relevance and intended use." *Id.* Rather, these decisions reflect the mandate of Section 16 of the LEARNs Act to remove *only* the ideas that the state may deem "indoctrination." Of course, as *Pratt* makes clear, removing school curricular materials because the government "objects to the ideas disseminated therein" violates the First Amendment because it limits Students Plaintiffs' ability to access this information and these ideas as part of their education. 670 F.2d at 778.

**B.  Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see*

---

[41] Notably, the ADE has not provided any explanation for its decisions to remove online materials that were previously available to students and teachers. Davis Dec. ¶ 17.

*also Phelps-Roper*, 509 F.3d at 484. Because Plaintiffs have established they are likely to succeed on the merits of their First Amendment claim, they have also established irreparable harm as the result of the deprivation. *See, e.g.*, *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996). Additionally, the Eighth Circuit has held that the government has no compelling interest in protecting an individual from unwanted speech outside the residential context. *Olmer v. Lincoln,* 192 F.3d 1176, 1182 (8th Cir. 1999). Absent a preliminary injunction, Plaintiffs will continue to suffer significant and irreparable harm: the violation of their constitutional rights to due process and the right to receive information and ideas; the indignities associated with self-censorship; and the foreclosure of an opportunity for these students to receive AP credit and all the benefits that would accrue from it. On a daily basis, teachers across Arkansas, including Plaintiff teachers, face the threat of sanctions for violating the vague tenets of Section 16. Under this threat, they often over-correct, denying students access to a broad perspective of ideas and resources that teach about the history of race, the civil rights movement, and how those past events influence current topics and debate.[42] Because of the LEARNS Act, Mr. Gilbert started censoring certain forms of instruction and planned end-of-year activities like student reports and presentations involving issues like gun violence, women's right to choose, and the lack of health care for women of color to avoid violating Section 16. (Gilbert Dec. ¶ 31). Ms. Walls has restricted her teaching as a way to try and comply with the law, even when doing so might jeopardize her students' ability to succeed on the exam. Walls Dec.

---

[42] The complaint mentions that access to resources from the National Education Association and Martin Luther King, Jr. Research and Education Institute have been removed alongside a resource called Selma Online, which is a project led by the Hutchins Center for African and African American Research at Harvard University.

**C. The Balance of Equities Tip in Plaintiff's Favor, and an Injunction Serves the Public Interest.**

The threat of harm to Plaintiffs far outweighs Defendants' interests in enforcing Section 16. "The balance of equities ... generally favors the constitutionally-protected freedom of expression." *Nixon*, 509 F.3d at 485. Although it is presumed that Plaintiffs will suffer irreparable harm absent an injunction, there is no harm to Defendant if an injunction issues. Because the "State has no interest in enforcing laws that are unconstitutional…, an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the state." *Little Rock Family Planning Servs. V. Rutledge,* 397 F. Supp. 3d. 1213, 1322 (E.D. Ark. 2019). Further, there is no evidence that Arkansas teachers or the AP AAS course are teaching students that one race is superior to another, through the use of CRT or any other means.

Attempting to prevent "the political indoctrination of Arkansas's schoolchildren" through a series of vague, undefined terms cannot justify the harm that students and teachers continue to experience on a daily basis in Arkansas' classrooms.

"It is always in the public interest to protect constitutional rights." *Nixon*, 545 F.3d at 689; *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (holding that a preliminary injunction that vindicates constitutional rights is always in the public interest (internal quotations omitted)). Here, the public interest is served through an injunction preventing the enforcement of an unconstitutional ordinance. Additionally, "[t]he public is served by the preservation of constitutional rights." *D.M. by Bao Xiong v. Minnesota State High School League,* 917 F.3d 994, 1004 (8th Cir. 2019). As demonstrated above, Section 16 chills and censors speech, jeopardizing the future of the nation's democratic institutions. Arkansas' classrooms cannot adequately prepare students to enter life beyond high school if important aspects of American history, particularly but not solely Black history and the history of race in America, are censored in the

34

course of instruction. For instance, Mr. Gilbert felt the need to "mute himself" every time students weighed in on topics that could be "flagged for indoctrination" if he were to participate. Gilbert Dec. ¶ 14. Mr. Gilbert also had to cut debate topics that would likely venture into discussions of race and poverty. Gilbert Dec. ¶ 16. Likewise, Ms. Walls is hesitant to draw connections between historical topics and current events, denying students the ability to see the way that individual events connect to broader narratives. Walls Dec. ¶ 15.

Here, vindicating First Amendment freedoms in Arkansas' public schools and universities will benefit students, teachers, and the public as a whole. *See Mahanoy,* 141 S. Ct. at 2046. The First Amendment has long been understood to promote the free exchange of ideas by allowing people to speak in many forms and convey an array of messages, inclusive of those that "invite dispute" and are "provocative and challenging." *Terminello v. Chicago*, 337 U.S. 1, 4 (1949). As the Supreme Court has made clear, "[t]here is no room under the constitution for a more restrictive" approach because "the alternative would lead to standardization of ideas…by legislatures, courts, dominant political or community groups." *Id.* at 4-5. As the Eighth Circuit has previously held, "the potential harm to independent expression … is great and the public interest favors protecting core First Amendment freedoms." *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir. 1999).

Enjoining Section 16 will help ensure that all students have access to the full range of materials, instruction, and curriculum and the State is prohibited in unlawfully restricting teachers' and students' First Amendment rights.

## IV.   CONCLUSION

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily enjoin Defendants from enforcing Section 16.

Dated: April 12, 2024                               Respectfully submitted,

                                                    /s/ Michael J. Laux
                                                    Michael J. Laux
                                                    E. Dist. Arkansas Bar No. 6278834
                                                    LAUX LAW GROUP
                                                    400 W. Capitol Avenue, Suite 1700
                                                    Little Rock, Arkansas 72201
                                                    Telephone: (501) 242-0750
                                                    Facsimile: (501) 372-3482
                                                    Email: mlaux@lauxlawgroup.com
                                                            mikelaux@icloud.com

                                                    /s/ Austin Porter Jr.
                                                    Austin Porter, Jr.
                                                    E. Dist. Arkansas Bar No. 86145
                                                    PORTER LAW FIRM
                                                    The Tower Building
                                                    323 Center Street, Suite 1035
                                                    Little Rock, AR 72201
                                                    Telephone: (501) 224-8200
                                                    Email: aporte5640@aol.com

                                                    David Hinojosa *
                                                    D.C. Bar No. 1722329
                                                    Email: dhinojosa@lawyerscommittee.org
                                                    Maya Brodziak *
                                                    N.Y. Bar No. 5495114
                                                    Email: mbrodziak@lawyerscommittee.org
                                                    Chavis Jones *
                                                    D.C. Bar No. 1739219
                                                    Email: cjones@lawyerscommittee.org
                                                    Zakiya Lewis *
                                                    D.C. Bar No. 90020187
                                                    Email: zlewis@lawyerscommittee.org
                                                    LAWYERS' COMMITTEE FOR CIVIL
                                                    RIGHTS UNDER LAW
                                                    1500 K St. NW, Suite 900
                                                    Washington, DC 20016
                                                    Telephone: (202) 662-8314

                                                    Counsel for Plaintiffs
                                                    *Pro Hac Vice applications pending

## CERTIFICATE OF SERVICE

I certify that on April 12ᵗʰ, 2024, the foregoing was filed through the Court's CM/ECF system and will be served on all parties of record via hand-delivery on April 15, 2024:

Hon. Sarah Huckabee Sanders
Governor of the State of Arkansas
500 Woodlane St.
Little Rock, AR 72201
(501) 682-2345

Jacob Oliva
Secretary of the Arkansas Department
of Education
Four Capitol Mall, Room 304-A
Little Rock, AR 72201
(501) 682-4203
Jacob.Oliva@ade.arkansas.gov

Kathy McFetridge-Rollins
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Kathy.Rollins@ade.arkansas.gov

Randy Henderson
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Randy.Henderson@ade.arkansas.gov

Jeff Wood
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Jeff.Wood@ade.arkansas.gov

Leigh S. Keener
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Leigh.Keener@ade.arkansas.gov

Timothy Griffin
Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
oag@arkansasag.gov

Sarah Moore
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Sarah.B.Moore@ade.arkansas.gov

Adrienne Woods
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Adrienne.Woods@ade.arkansas.gov

Lisa Hunter
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Lisa.Hunter@ade.arkansas.gov

Ken Bragg
Arkansas State Board Member
Four Capitol Mall
Little Rock, AR 72201
(501) 682-4475
Ken.Bragg@ade.arkansas.gov

By: */s/ Michael J. Laux*
Michael J. Laux
*Counsel for Plaintiffs*