IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

RUTHIE WALLS, et al.                                                                                     PLAINTIFFS,

v.                                                  No. 4:24-cv-00270-LPR

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of
Arkansas, et al.                                                                                     DEFENDANTS.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs waited more than a year to bring this lawsuit challenging Section 16 of the LEARNS Act and now seek emergency relief. Section 16 protects public-school students and teachers from discrimination and compelled speech that would violate Title VI of the Civil Rights Act, the Equal Protection Clause, the First Amendment, the Arkansas Constitution, and various state civil rights laws.

The Court should deny Plaintiffs' request for a preliminary injunction for three reasons. *First*, the Court need not reach the merits because Plaintiffs waited until Section 16 had been in effect for *more than a year* to bring this action. And even then, they didn't seek preliminary relief until weeks later. That alone belies their claim that they need extraordinary relief, and that's sufficient grounds, on its own, to deny their motion. *Second*, the only two claims on which they seek preliminary relief—their right-to-hear and vagueness claims—fail as a matter of law. The former fails because there is no right to compel the government to teach material that it disagrees with. To the contrary, any time the government speaks, it gets to decide what it wants to say. That's the lesson of the government speech cases. Likewise, Plaintiffs' vagueness claim fails because their claim rests on little more than assertions that they don't understand terms that they use and that are understandable to a person of ordinary intelligence. And *third*, the remaining

equitable factors clearly weigh in Arkansas's favor.  Indeed, Plaintiffs don't point to any harm from maintaining the status quo.

Plaintiffs' motion should be denied.

BACKGROUND

**A.    Section 16 of the LEARNS Act ensures compliance with Civil Rights Laws.**

Governor Sarah Huckabee Sanders signed the LEARNS Act into law on March 14, 2023, and due to its emergency clause, most sections of the Act—including Section 16—became effective upon Governor Sanders's signature.  *See* 2023 Ark. Acts 237, sec. 73(a) (listing Section 16 among the sections of the Act that went into effect immediately); *Ark. Dep't of Educ. v. Jackson*, 675 S.W.3d 416, 421 (Ark. 2023) (affirming the validity of emergency clause).

Section 16 of the LEARNS Act directs the Secretary of the Arkansas Department of Education to take steps to "ensure that the Department of Education and its employees, contractors, guest speakers, and lecturers are in compliance with Title IV and Title VI of the Civil Rights Act of 1964."  Ark. Code Ann. 6-16-156(a)(1).  Title VI prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance, 42 U.S.C. 2000d, including public schools.  Title IV similarly prohibits discrimination on the bases of race, color, and national origin and authorizes the Attorney General to bring a civil action to enforce the equal-protection guarantees of the Fourteenth Amendment.  42 U.S.C. 2000c-6.

Although "Title VI itself directly reach[es] only instances of intentional discrimination," *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (quoting *Alexander v. Choate,* 469 U.S. 287, 293 (1985)), any "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n.23 (2003)).  That includes

2

using race "as a 'negative'" and allowing it to "operate as a stereotype." *Id.* at 218.  Further, compelling "affirmation of a belief" by public school students "transcends constitutional limitations . . . and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 633 (1943).

Recipients of federal funds, such as school districts, have "a responsibility to provide a nondiscriminatory educational environment."  U.S. Dep't of Educ., *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, 59 Fed. Reg. 11448-01, 11450 (March 10, 1994).  And as DOE has explained, any "[r]acially based conduct" by a recipient that "consists of different treatment of students on the basis of race" and has the effect of excluding them from participating in, denying them the benefits of, or otherwise subjecting them to discrimination on the ground of race, color, or national origin, violates Title VI.  *Id.* at 11448 (March 10, 1994); *see Sandoval*, 532 U.S. at 281 (assuming that federal agencies can enforce regulations prohibiting disparate-impact discrimination).

Moreover, "the existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of [T]itle VI."  59 Fed. Reg. at 11448; *see* Ark. Att'y Gen. Op. 2021-042 (Aug. 16, 2021) (concluding that "[a]ny effort to take account of race that differently affords benefits or opportunities or creates a hostile environment in an educational institution" can violate Title VI.  And recipients are required to take "appropriate responsive action . . . regardless of the identity of the person(s) committing the harassment."  59 Fed. Reg. at 11450.

**B.      Section 16 reaches only "prohibited indoctrination," narrowly defined as compelled affirmation of a discriminatory idea.**

Section 16 directs the Secretary of the Arkansas Department of Education to "review . . . the rules, policies, materials, and communications of the Department" and to "amend, annul, or alter," Ark. Code Ann. 6-16-156(a)(2); *see id.* 6-16-156(d), any item that is "prohibited indoctrination" (as defined below) and "conflict[s] with the principle of equal protection under the law." *Id.* 6-16-156(a)(3).

The statute narrowly defines "prohibited indoctrination" as a "communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964," *id.* 6-16-156(b), including adopting, affirming, or professing that:

- some "[p]eople . . . are inherently superior or inferior to [other] people" on the basis of a protected characteristic, *id.* 6-16-156(b)(1) (listing "color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law"); or
- "[a]n individual should be discriminated against or receive adverse treatment solely or partly because of the individual's" protected characteristic. *Id.* 6-16-156(b)(2) (same list as in subsection (b)(1)).

**C.      Section 16 does not reach the mere discussion of ideas, history, or controversial public-policy issues.**

At the same time, Section 16 expressly "does *not* prohibit the *discussion* of" either these discriminatory "[i]deas and the history of the concepts" or "[p]ublic policy issues of the day and related ideas," even if "individuals may find [them] unwelcome, disagreeable, or offensive." *Id.* 6-16-156(c)(1), (2) (emphases added).  Thus, Section 16 plainly does not reach the mere discussion of ideas, history, or public policy, but only efforts to "compel a person to adopt, affirm, or profess" discriminatory ideas.  *Id.* 6-16-156(b); *see also id.* 6-16-156(e) (directing the Secretary

to "ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory").

###    D.    Critical Race Theory rejects equal rights and neutral principles of constitutional law.

Plaintiffs at various times claim both that they're entitled to teach or receive lessons on Critical Race Theory and that they don't know what it is.  *Compare* Am. Compl., Doc. 8 ¶¶ 46-49 (discussing Critical Race Theory) with *id.*, ¶ 79 (expressing confusion about what it is).  But there's no genuine dispute that some "scholars in the field of education consider themselves critical race theorists who use CRT's ideas to understand issues of school discipline and hierarchy, tracking, affirmative action, high-stakes testing, controversies about curriculum and history, bilingual and multicultural education, and alternative and charter schools."  Richard Delgado and Jean Stefancic, *Critical Race Theory: An Introduction* 7 (3d. ed. 2017).

Nor is there any dispute that proponents of Critical Race Theory define their tenets in contrast to the civil rights movement's grounding in the Founders' classically liberal vision of equality before the law.  *See id.* at 178 (defining "liberalism" as "in civil rights, the view that the law should enforce formal equality in treatment of all citizens").  "Unlike traditional civil-rights discourse," Critical Race Theory "questions the very foundation of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law."  *Id.* at 3.  As Plaintiffs assert, "a central theme of CRT" is that "racism" exists "in state and federal institutions," Am. Compl., Doc. 8 ¶ 148, and that "the concept at [the] heart" of Critical Race Theory is "that racism is embedded in laws, policies, and institutions which uphold and reproduce racial inequalities."  Compl., Doc. 1 ¶ 64; *see* Am. Compl., Doc. 8 ¶ 46 (Critical Race Theory is an "academic approach that studies race and how systemic racism is embedded in society and its institutions.").

Particularly relevant here, "critical race scholars are discontented with liberalism," especially as it involves "belie[f] in color blindness and neutral principles of constitutional law" or "belie[f] in equality, especially equal treatment for all persons, regardless of their different histories or current situation."  Delgado and Stefancic, *supra*, at 26.  Critical race theorists "are suspicious of another liberal mainstay, namely, rights," and they contend that only "radical measures," including "aggressive, color-conscious efforts to change the way things are will do much to ameliorate" what they perceive as the racial "subordinat[ion]" of minorities.  *Id.* at 27, 64.

Thus, as Plaintiffs concede, while Critical Race Theory can take many forms, at the end of the day, it is both "a theoretical framework" and "a belief."  Am. Compl., Doc. 8 ¶ 48.  And Section 16 allows discussions of theoretical frameworks and only prohibits compelling students to profess or affirm discriminatory beliefs.

Further, while Plaintiffs insist that Section 16 will censor African American history, Doc. 21 at 39-40, that is not the case.  In fact, Plaintiffs aver that Secretary Oliva has made clear that "teaching African American History" presents no problem.  Am. Compl., Doc. 8, ¶ 97; *see also* Cynthia Howell, *Little Rock Cent. High Teacher defends pilot course on Black studies*, Ark. Democrat-Gazette, Feb. 1, 2023 (quoting Plaintiff Ruthie Walls as asserting that "[The course doesn't teach] CRT, I just teach history") (alteration in original).  That's because Critical Race Theory—however Plaintiffs want to characterize it—isn't history and prohibiting it would not "prohibit teaching about the history of slavery, Jim Crow laws, the eugenics movement, and the Ku Klux Klan.  Nor does it prohibit teaching about the Constitution and the abolition of the slave trade, the abolitionist movement, the Civil War, Abraham Lincoln and the Emancipation Proclamation, the Civil War Amendments, and the civil-rights movement."  Ark. Att'y Gen. Op. 2021-042, at 4.

**E.    College Board's African American Studies pilot program is not an AP course.**

College Board's African American Studies pilot program is not an Advanced Placement course.  Oliva Decl. ¶ 15.  To qualify as an Advanced Placement course under Arkansas law, a course must be "approved by the College Board and Educational Testing Service," Ark. Code Ann. 6-16-1202(1)(B), and its "rigor and level of difficulty" must be "validated through the required advanced placement audit," *id.* 6-15-214(b)(2); *see* Oliva Decl. ¶¶ 7-8.

The African American Studies pilot program did not meet those standards for either the 2022-23 or 2023-24 school year.  *See id.* ¶¶ 15-18.  An AP African American Studies exam was not even offered to students who took the course during the 2022-23 school year.  *See id.* ¶ 16.  Section 16 did nothing to alter or amend Arkansas law concerning recognition of AP courses.

African American Studies was offered at The Academies at Jonesboro High School and Little Rock Central High School during the 2022-23 school year.  Oliva Decl. ¶ 17.  That year, an AP course code was issued as an oversight.  *Id.* ¶ 16.  Nevertheless, students who completed the class that year were still given an elective credit toward the graduation requirement and weighted GPA credit.  *Id.* ¶ 17.

For the 2023-24 school year, the African American Studies pilot program was removed from the ADE Course Catalog because it didn't meet the standards for an Advanced Placement course under Arkansas law.  Oliva Decl. ¶ 18; *see* Ark. Code Ann. 6-16-1202(1)(B); *id.* 6-15-214(b)(2).  The rules and regulations cited above—not Section 16 or its implementation—required this correction.  ADE created a path for students enrolled in the pilot program for the 2023-24 school year to remain in the course for local credit, to obtain weighted credit, and to participate in the AP examination for college credit.  Oliva Decl. ¶¶ 18-21.  Little Rock Central

High School, North Little Rock High School, North Little Rock Center of Excellence, The Academies at Jonesboro High School, Jacksonville High School, and eStem High School participated in the second year of the pilot program. *Id.* ¶ 20. ADE provided a course code for local elective credit for these school and advised them on how to award weighted credit. *Id.*

AP African American Studies is not a history course. *See id.* ¶ 26. ADE invited school districts interested in offering an Honors African American History course to work with the Department of Elementary and Secondary Education Curriculum unit to outline standards and obtain approval for weighted credit. But no district took advantage of this option. *Id.*

College Board approved AP African American Studies as a course for the first time for the 2024-25 school year. *Id.* ¶ 23. And now that the framework for the course has been approved as required by Arkansas law, it is listed in the ADE course catalog for next year. *Id.* ¶¶ 24-25; *see* Doc. 21 at 33 n.37 (Plaintiffs admit it's in next year's course catalog).

**F.    Section 16 enforcement.**

Section 16 almost exclusively contemplates enforcement by the Secretary and the State Board of Education. *See* Ark. Code Ann. 6-16-156(a)(2)-(3) (directing the Secretary to review and, if necessary, amend "the rules, policies, materials and communications of the Department of Education" so as not to "promote teaching that would indoctrinate students" with "prohibited indoctrination"); *id.* 6-16-156(d) (directing the Secretary to "review and enhance the policies that prevent prohibited indoctrination"); *id.* 6-16-156(e) (directing the Secretary to ensure that public school students and employees are not required to attend trainings or orientations involving prohibited indoctrination); *id.* 6-16-156(f) (authorizing the State Board of Education to promulgate rules to implement Section 16). And other than Plaintiffs' mistaken claim that the Secretary cancelled AP status for the pilot African American Studies course pursuant to Section 16, Plaintiffs don't point to any implementing rules or policies by the Secretary or Board.

Nevertheless, though Plaintiffs' complaint does not explain the process, there is one way that Section 16 is currently enforceable—though it isn't via the Secretary.  Under current law, the Professional Licensure Standards Board may recommend various penalties to the State Board of Education when a teacher commits an ethical violation—penalties ranging from a written reprimand to, at the most severe, the suspension or revocation of a teaching license.  Ark. Code Ann. 6-17-428(c)(B).  The Code of Ethics for Arkansas Educators requires educators to "maintain[] competence regarding his or her professional practice, inclusive of professional and ethical behavior," which includes a duty to follow state laws regulating teaching.  Ark. Admin. Code 005.28.17-6.0.  That provision governs various kinds of unethical behavior, including failures to maintain a professional relationship with students, failures to maintain confidentiality, and the use of alcohol or unauthorized drugs on school premises.  And consistent with that framework, if a teacher denigrated a student based on race or engaged in "prohibited indoctrination," they too could face licensure consequences were a complaint made to the Licensure Standards Board.

However, a violation of Section 16 would only qualify as an ethical violation if the teacher "knew or reasonably should have known that the act . . . was in violation of the code of ethics."  Ark. Code Ann. 6-17-428(a)(3)(A).  It would not qualify if it were a "reasonable mistake made in good faith," *id.* 6-17-428(a)(3)(B)(i), or if it were compelled by a supervisor, *id.* 6-17-428(a)(3)(B)(iii).

## STANDARD OF REVIEW

Plaintiffs state the wrong standard for their preliminary-injunction motion.  To be sure, as in any other case, they must satisfy the *Dataphase* factors, showing that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see Winter v.*

*Nat. Res. Def. Council*, 555 U.S. 7, 24-25 (2008).  And they bear the burden of making "a clear

showing" that they have satisfied those factors.  *Winter*, 555 U.S. at 22.

Yet Plaintiffs do not discuss an additional burden they face.  Because their requested pre-

liminary injunction would prevent "implementation of a duly enacted state statute," they must

make a "*more rigorous* showing" than usual "that [they are] 'likely to prevail on the merits.'"

*Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (emphasis

added) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th

Cir. 2008) (en banc)); *see Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826

F.3d 1030, 1040 (8th Cir. 2016) ("[U]nder *Rounds*, the court must sometimes apply a more strin-

gent standard of 'likely to prevail.'").  That requirement guards against attempts to "thwart a

state's presumptively reasonable democratic processes." *Rounds*, 530 F.3d at 733.  "A more rig-

orous standard 'reflects the idea that government policies implemented through legislation or

regulations developed through presumptively reasoned democratic processes are entitled to a

higher degree of deference and should not be enjoined lightly.'" *Id.* at 732 (quoting *Able v.

United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)).

On top of that, Plaintiffs face a still heavier burden here because their requested prelimi-

nary injunction would "give [them] substantially the relief [they] would obtain after a trial on the

merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).  Thus, while it

is always difficult to justify such extraordinary relief, it is even more difficult here.  Plaintiffs

cannot meet that burden.  Nor have they made the necessary clear showing of their entitlement to

relief on any of the other factors.   This Court should deny their motion.

ARGUMENT

**I.      Plaintiffs' delay in bringing this suit alone compels denial.**

Governor Sanders signed the LEARNS Act on March 14, 2023, and under its emergency clause, Section 16 became effective immediately.  *See* 2023 Ark. Acts 237, sec. 73(a).  Plaintiffs brought this suit to challenge Section 16 over a year later, on March 25, 2024.  That fact alone suffices to deny their motion.  Plaintiffs claim they've "face[d] the threat of sanctions" on "a daily basis" since Section 16 was enacted.  But their "*one-year* delay refute[s] their allegations of irreparable harm."  *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 805 (8th Cir. 2021). If they truly faced irreparable harm on a daily basis, they would not have waited over a year to bring suit.  Having failed to do so, they can't prove irreparable harm, and that alone "is a sufficient ground to deny a preliminary injunction."  *Phyllis Schafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

To the extent their claims focus on the African American Studies pilot program, Plaintiffs admit they knew the course would not receive the same treatment as an approved non-pilot AP class on August 11, 2023, "before the start of the 2023-24 school year."  Am. Compl., Doc 8, ¶ 105 (capitalization and emphasis altered).  Yet Plaintiffs waited longer than seven months to sue—when the school year was almost over.  If the AP status of the course were a matter of such urgency, Plaintiffs would have sued when students were still deciding whether to take the course, not when the only relief available was re-weighting the credit for those students who are already-enrolled.

## II.     Sovereign immunity bars Plaintiffs' claims against Governor Sanders.

Plaintiffs fail to invoke this Court's jurisdiction as to Governor Sanders because she is immune from suit under the Eleventh Amendment.  Governor Sanders has no connection to the enforcement of Section 16 and is therefore an improper defendant.

Under *Ex parte Young*, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'"  *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws").  "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'"  *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs do not allege that Governor Sanders has any specific role in implementing Section 16.  Instead, they only allege that Governor Sanders "conceived of and advanced the prohibitions contained in Section 16" and "signed the LEARNS Act into law."  Am. Compl., Doc 8, ¶ 3.  The responsibility of implementing Section 16 falls to Secretary Oliva and ADE.  *See generally* Ark. Code Ann. 6-16-156.  And Plaintiffs can't seek an injunction against the Governor for signing or advocating for Section 16 in the past.  Because Governor Sanders is entitled to sovereign immunity and Plaintiffs fail to invoke the narrow *Ex parte Young* exception with respect to her, Plaintiffs' claims against her cannot succeed.

## III.     Plaintiffs aren't likely to succeed on their First Amendment claim.

Plaintiffs claim that Section 16's regulation of public-school curricula infringes their supposed First Amendment right to receive information and ideas from their public-school faculty.

Doc. 21 at 28-32.  According to them, "removing school curricular materials because the government objects to the ideas disseminated therein violates the First Amendment." *Id.* at 32 (internal quotation marks omitted).  Unsurprisingly, that is not the law.  "It is the very business of government to favor and disfavor points of view" when it is speaking, *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (quoting *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment)), and nowhere is that more true than in the classroom. There is simply no First Amendment right to compel public schools to teach materials that the government disagrees with.  *See Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005) ("[I]n establishing and implementing certain government functions, the government, including its educational institutions, has the discretion to promote the policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement.").

Yet even if there were such a right, there would be no violation here.  Section 16 only requires the Secretary to take steps to prevent public schools from "compel[ling]" students "to adopt, affirm, or profess" certain discriminatory ideas.  Ark. Code Ann. 6-16-156(b).  It "does not prohibit the discussion" of those same ideas.  *Id.*, 6-16-156(c).  Plaintiffs' only allegation regarding the State's enforcement of Section 16, though mistaken, is the denial of AP status to an African American Studies pilot program for this school year.

It has not denied students access to the ideas and materials taught in that course.  Instead, even on Plaintiffs' own telling, it has only affected the credit students receive for that course. There is no First Amendment violation.

A. **The First Amendment isn't implicated because curricular speech is government speech.**

Plaintiffs claim that Arkansas's regulation of its own public schools' curricula violates the First Amendment.  But the Free Speech Clause only "restricts government regulation of private speech; it does not regulate government speech."  *Summum*, 555 U.S. at 467.  "Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

Public school curricula are government speech.  Speech is government speech where the government "maintains direct control over the messages [it] convey[s]," *Walker*, 576 U.S. at 213, where the speech is used to "communicate[] messages from" the government, *id.* at 211, and where the speech is "closely identified in the public mind with" the government, *id.* at 212 (quoting *Summum*, 555 U.S. at 472).  Under that rubric, even a state's offering of "more than 350 varieties" of specialty license plates displayed on private citizens' vehicles has been held government speech.  *Id.* at 221 (Alito, J., dissenting).

Public school curricula's status as government speech is an exceptionally easy question under this framework.   The materials contained in public school curricula are "from beginning to end" selected by the government, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005); by definition, nothing becomes part of a public-school curriculum unless the government puts it there.  And it goes without saying that public school curricula are used to communicate messages from the government to students—that's their whole point—and that they're closely identified in the public mind with the government.

Accordingly, courts have had little difficulty concluding that public-school curricula are government speech. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833

(1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker . . . ."); *Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010) (Souter, J.) (holding states have plenary "curricular discretion" under the First Amendment given "the government's authority to choose viewpoints when the government itself is speaking"); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("[S]chools engage in government speech when they set and implement education policy through the curriculum."); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004) ("Few activities bear a school's 'imprimatur' . . . more significantly than speech that occurs within a classroom setting as part of a school's curriculum."); *Downes v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000) ("[S]chool teachers have no First Amendment right to influence curriculum as they so choose.") (collecting cases).  Therefore, the First Amendment has nothing to say about public schools' and States' selection of curricular materials, for the government may and must "choose viewpoints when the government itself is speaking."  *Griswold*, 616 F.3d at 58-59.[1]  Indeed, were that not the case, it would be impossible to establish a coherent curriculum.  *See Walker*, 576 U.S. at 207 ("'[I]t is not easy to imagine how government could function if it lacked th[e] freedom' to select the messages it wishes to convey." (quoting *Summum*, 555 U.S. at 468)).

Notwithstanding the First Amendment's silence here, Plaintiffs startlingly claim that the First Amendment prohibits the government from excluding materials from public school curricula because it objects to the ideas they express.  Their only real support for that rule is the Eighth

---

[1] Of course, "[t]his does not mean there are no restraints on government speech."  *Summum*, 555 U.S. at 468.  Rather, "government speech must comport with the Establishment Clause" and other laws and regulations.  *Id.*  And "ultimately," the government itself is "'accountable to the electorate, and the political process for its advocacy.'"  *Id.* (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)).

Circuit's 42-year-old decision in *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982). There, the Eighth Circuit reviewed a school district's removal of a film adaptation of Shirley Jackson's short story *The Lottery* from its curriculum and held that the First Amendment required the school district to continue screening the film, reasoning that schools could not refuse to teach materials because they "object to [their] . . . ideological content." *Id.* at 773.

*Pratt* is no longer good law.  First, it was decided at a time when the government speech doctrine did not exist.  Though the government speech doctrine is a mainstay of First Amendment law today, it wasn't applied by the Supreme Court until 1991, a decade after *Pratt*, *see Rust v. Sullivan*, 500 U.S. 173 (1991), and was still described as "recently minted" by that Court as late as 2009, *Summum*, 555 U.S. at 481 (Stevens, J., concurring).  A decision of the Eighth Circuit is no longer binding even if it is merely "cast into doubt by an intervening Supreme Court decision." *United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015).  Here, *Pratt* isn't just cast into doubt by an intervening Supreme Court decision.  It is flatly irreconcilable with a series of intervening Supreme Court decisions, as the Fifth Circuit has explained of an Eleventh Circuit decision following *Pratt* on which Plaintiffs also rely, Doc. 21 at 35, that also predated the government speech doctrine.  *See Chiras*, 432 F.3d at 617 ("*Virgil* was decided before *Rust* . . . and therefore did not have the benefit of the Supreme Court's clarification of the government's authority over its own message.") (citing *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989)).  Public school curricula are government speech, and the Supreme Court has repeatedly held since *Pratt* that the First Amendment does not regulate government speech.

Second, the Supreme Court has specifically spoken to school curricula and confirmed that the First Amendment does not constrain the government's authority over them.  *Pratt* relied extensively on the Second Circuit's decision in *Pico v. Bd. of Educ.*, 638 F.2d 404 (2d Cir.

1980), which held that schools could not remove books from public school libraries on ideological grounds.  But when the Supreme Court affirmed the Second Circuit's judgment, it distinguished curricula from libraries, indicating that schools had absolute discretion in the former but not the latter.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 869 (1982) (plurality) (distinguishing "absolute discretion in matters of *curriculum*" and "the compulsory environment of the classroom" from "the school library and the regime of voluntary inquiry that there holds sway"); *id.* at 878 n.1 (Blackmun, J., concurring in part and concurring in the judgment) ("[I]t is difficult to see the First Amendment right that I believe is at work here playing a role in a school's choice of curriculum.").[2]  Accordingly, as another district court in the Eighth Circuit previously explained,  "the Justices voting in the majority in *Pico* rejected the idea central to *Pratt*, that a federal court could review and countermand the curriculum decisions of local school authorities."  *C.K.-W. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914 n.4 (E.D. Mo. 2022).  And a decade later in *Rosenberger*, a majority of the Court again distinguished curricular speech from other forms of expression in educational settings, explaining that "[w]hen the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed." 515 U.S. at 833; *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others.").  *Pratt* is no longer the law, and without *Pratt*, Plaintiffs' First Amendment claim collapses.

---

[2] That distinction completely undermines Plaintiffs' suggestion,  , Doc. 21 at 34, that *Pico* itself supports their First Amendment claim.

**B.     Even if the First Amendment regulated public-school curricula, Section 16 would not violate the First Amendment.**

Public school curricula are government speech, so the First Amendment does not prohibit States from making content- or viewpoint-based decisions about those curricula's contents. But even if States were forbidden from removing materials from their own schools' curricula because they disagree with them, as Plaintiffs claim, Section 16 would not violate that supposed principle. Instead, Section 16 only prohibits schools from compelling students to profess certain ideas, not from teaching any ideas. And the one purported instance of enforcement that Plaintiffs mistakenly attribute to Section 16, even on Plaintiffs' telling, has nothing to do with the supposed right to receive ideas and information in public school at all.

Section 16 directs the Secretary to take various steps to "prevent prohibited indoctrination, including Critical Race Theory." Ark. Code Ann. 6-16-156(d). It defines "prohibited indoctrination" as "compel[ling] a person to adopt, affirm, or profess" certain ideas about race. *Id.*, 6-16-156(b)(1). It then provides that it "does not prohibit the discussion of . . . [i]deas and the history of the concepts described" in the definition of "prohibited indoctrination." *Id.*, 6-16-156(c). Thus, schools may discuss Critical Race Theory, or other ideas included within the definition of prohibited indoctrination; they merely may not compel students to adopt them as their own.

That prohibition would not run afoul of the rule of *Pratt*. *Pratt* held that students have a "right to receive information and be exposed to controversial ideas." 670 F.2d at 779. It did not hold that students have a First Amendment right to be *compelled to affirm* those ideas. Indeed, such a holding would have been nonsensical, even before the Supreme Court made clear that the First Amendment does not regulate public school curricula. For the First Amendment could not,

on any view, mandate schools to compel speech.  To the contrary, compelling student speech violates the First Amendment.  *See Barnette*, 319 U.S. at 633.

The sole instance of enforcement that Plaintiffs wrongfully attribute to Section 16 also does not—even on Plaintiffs' inaccurate version of events—run afoul of *Pratt*.  On Plaintiffs' own telling, the only way in which the Department of Education has enforced Section 16 is by purportedly revoking AP credit for the pilot African American Studies course this school year.  Doc. 21 at 18-19.  That's not accurate, but even if it were, it wouldn't run afoul of *Pratt* because—as Plaintiffs concede—schools continued to teach that course, which the Department of Education allowed, *id.* at 19, and their lead Plaintiff teaches the course, *id.* at 21-22.  Thus, at most, the only harm that Plaintiffs allege flowed from the Department's action would be that students will not receive AP credit for the course this year, , Doc. 14 at 3,  , Doc. 21 at 9, 32, 38, and that the State will not pay for the cost of the AP exam. , Doc. 14 at 3.  But it's unclear what the former means since the Department allowed local school districts to continue to assign weighted GPA credit to the course for the 2023-24 school year.  *See* Oliva Decl. ¶ 19.  And Plaintiffs understandably don't even mention the latter in their preliminary-injunction brief since it would be compensable by money damages.

Ultimately, Plaintiffs do not even attempt to explain how these claimed injuries have anything to do with their First Amendment right to receive information.  Nor could they.  Neither prevents students from taking the African American Studies class and receiving the instruction therein; both only go to the supposed additional benefits of taking the class: AP credit and financial subsidy.  And even if the supposed right to receive information extended to disincentives to receiving information, like the removal of AP credit, any purported revocation of AP credit for

this year alone no longer disincentivizes enrollment in the pilot African American Studies course, since the time to enroll in that course has long passed.

C.    **Even if Section 16 implicated the supposed right to receive information, Section 16 would not infringe that right.**

Finally, even if *Pratt* were still good law, and even if it applied to a prohibition on compulsory indoctrination like Section 16, Section 16 would still easily pass muster.

As Plaintiffs rightly concede, any First Amendment scrutiny here would be relaxed.  A "lesser standard of scrutiny is appropriate because of the public school setting,"  , Doc. 21 at 25, as "the rights of students 'must be applied in light of the special characteristics of the school environment.'"  *Morse v. Frederick*, 551 U.S. 393, 397 (2007) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)).  So, even on Plaintiffs' own view, "the state's restriction on students' access to information [need only] be 'reasonably related to a legitimate pedagogical interest.'"  Pls. Prelim. Inj., Doc. 21 at 34 (quoting *Hazelwood Sch. Dist.*, 484 U.S. at 273).

Here, Section 16 merely reaches "prohibited indoctrination," defined as a "communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964."  Ark. Code Ann. 6-16-156(b); *see also id.* 6-16-156(e) (directing the Secretary to "ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory").  Regulating the public-school curriculum is necessary because "[r]acial discrimination in state-operated schools is barred by the Constitution" and "a state may not induce, encourage or promote" it.  *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotation and citation omitted); *see Students for Fair Admissions*, 600 U.S. at 218 ("[T]he twin commands of the Equal Protection Clause [are] that race may never be used as a 'negative' and that it may not operate as a stereotype.").

Arkansas has a legitimate—indeed compelling—pedagogical concern in prohibiting conduct that "induce[s], encourage[s] or promote[s]," *Norwood*, 413 U.S. at 465, racial discrimination in public schools.  "It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (op. of O'Connor, J.).

This concern is part of Arkansas's compelling interest in the content of its schools' curricula generally.  "There is a compelling state interest in the choice and adherence to a suitable curriculum for the benefit of our young citizens and society.  It cannot be left to individual teachers to teach what they please." *Palmer v. Bd. of Ed. of Chicago*, 603 F.2d 1271, 1274 (7th Cir. 1979).  "Few activities . . . 'involve pedagogical interests' more significantly than speech that occurs within a classroom setting as part of a school's curriculum." *Crozier for A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020) (quoting *Axson-Flynn*, 356 F.3d at 1289)); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (1989) ("Public schools have a legitimate pedagogical interest in shaping their own secondary school curricula and in demanding that their teachers adhere to official reading lists unless separate materials are approved."); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) ("The makeup of the curriculum of Owen High School is by definition a legitimate pedagogical concern.").

Plaintiffs cannot succeed on this claim, and their request for extraordinary relief should be denied.

IV.     **Plaintiffs aren't likely to succeed on their void-for-vagueness claim.**

Plaintiffs' vagueness claim fares no better.  Indeed, that claim rests on little more than Plaintiffs' assertion that they do not understand terms that Plaintiffs use and that are understandable to persons of ordinary intelligence.

    A.     **Section 16 isn't subject to exacting review.**

"Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment," as well as the Fourteenth Amendment.  *United States v. Williams*, 553 U.S. 285, 304 (2008).  The Constitution's Due Process Clauses prohibit depriving someone of life, liberty or property without due process of law.  U.S. Const., amends. V, XIV sec. 1.  So "the Government violates [that] guarantee by taking away someone's life, liberty or property under a . . . law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

However, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).  In particular, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Id.* at 498-99.  And it has expressed greater tolerance still of enactments whose only penalty—as here—is consequences for continued employment.

For example, the Court has upheld a federal statute that authorized discharge "for such cause as will promote the efficiency of the [civil] service," *Arnett v. Kennedy*, 416 U.S. 134, 158 (1974) (plurality opinion) (quoting 5 U.S.C. 7501(a)), notwithstanding employees' argument that they could "only guess as to what utterances may cost them their jobs" under that standard, *id.*,

and the Court's acknowledgement that the efficiency standard was "without doubt intended to authorize dismissal for speech," *id.* at 160.  After all, it explained, even the most detailed employee codes of conduct "include[] 'catch-all' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'"  *Id.* at 161.  Twenty years later, the Court remarked that while "speech restrictions must generally precisely define the speech they target," a "public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large."  *Waters v. Churchill*, 511 U.S. 661, 673 (1994).  Courts apply similarly undemanding standards to regulations of licensure in private employment.  *See Heath v. SEC*, 586 F.3d 122, 140-41 (2d Cir. 2009) (upholding a self-regulatory organization's prohibition of conduct in breach of "just and equitable principles of trade"); *Perez v. Hoblock*, 368 F.3d 166, 175-76 (2d Cir. 2004) (upholding a prohibition on "any action detrimental to the best interests of racing").

So in this context, the vagueness standard is at its most deferential; the statute must be "so vague and indefinite as really to be no rule or standard at all."  *Rogers v. Helena-W. Helena Sch. Dist.*, No. 2:06CV00160, 2006 WL 2850437, at *3 (E.D. Ark. Oct. 4, 2006) (Webber Wright, J.) (quoting *Horn v. Burns & Roe*, 536 F.2d 251, 254 (8th Cir. 1976)) (upholding Arkansas law under which the State could remove employees of school districts in fiscal distress).  Plaintiffs cannot make that showing.

## B.  Section 16 isn't vague.

Under the appropriate standard—and even under a more exacting vagueness standard—Section 16 is not vague.  Plaintiffs principally attack Section 16's use of the terms "indoctrination" and "Critical Race Theory."  Doc. 21 at 25-29.  Yet the statute only excludes "prohibited indoctrination" from the State's curricula, and it both defines that term and repeatedly makes

clear that indoctrination in Critical Race Theory is only an example of prohibited indoctrination. So there is no vagueness.

Plaintiffs complain that "Section 16 never defines indoctrination."  Doc. 21 at 27.  But the statute only prohibits "prohibited indoctrination."  *See* Ark. Code Ann. 6-16-156(a)(3), (d), (e).  And "prohibited indoctrination" is a defined term.  *Id.*, 6-16-156(b).  The definition uses "indoctrination" to mean "communication by a public school employee . . . that compels a person to adopt, affirm, or profess" certain ideas.  *Id.*  That indoctrination is "prohibited" if the idea a person is compelled to adopt, affirm, or profess is that one race or protected class is "inherently superior or inferior" to another, *id.*, 6-16-156(b)(1), or that "[a]n individual should be discriminated against" because of their race or membership in another protected class, *id.*, 6-16-156(b)(2).

Plaintiffs claim this definition is vague, but their reasons for saying so make no sense. They ask whether it would permit teaching about the Holocaust or school segregation, suggesting "the mere discussion of such ideas"—or the ideas animating those parts of history—would violate the definition.  , Doc. 21 at 29.  But the statute doubly forecloses that reading.  First, the definition of prohibited indoctrination only captures compelling students to adopt, affirm, or profess racist ideology.  The point of teaching the Holocaust or the history of school segregation is to do just the opposite.  Second, the statute expressly disclaims "prohibit[ing] the discussion" of the ideas, "and the history of the concepts," "described in" the statute's definition of prohibited indoctrination.  Ark. Code Ann. 6-16-156(c).  Plaintiffs also object that the Act's definition of indoctrination is inconsistent with their view of "the plain meaning of indoctrination," claiming that "indoctrination" "require[s] . . . a person to accept ideas *without criticism*."  Doc. 21 at 29.

Their disagreement with the statute's definition of indoctrination doesn't mean they can't understand it.  To the contrary, it shows that they do understand it.  Finally, Plaintiffs complain that the definition doesn't in turn define common terms it uses, like "materials," "communication," "public school representative," and "compel."  *Id.*  That argument merits little discussion.  "The words attacked are ordinary everyday terms with generally understood meanings. They are not vague." *Dunne v. United States*, 138 F.2d 137, 142-43 (8th Cir. 1943).  Indeed, underscoring the point, Plaintiffs use these terms throughout their pleadings.  *See*, e.g., Am. Compl., Doc. 8 ¶ 6, 26, 65, 172, 191 (alleging censorship and self-censorship of various "materials").

Plaintiffs further fault Section 16 for failing to define Critical Race Theory.  Doc. 21 at 26.  Yet Plaintiffs are familiar with Critical Race Theory; citing an article on it, they assert it is a "well-researched" theory that "has been developed over a course of 30 years."  *Id.* at 26 n.33 (citing Jeremiah Young et al., *Talking Back: An Analysis of the Scope and Impact of Critical Race Theory and Its Usage in Educational Research*, 13:3 Sage Open (2023)).  Their real objection isn't confusion about the term's meaning, but a fear that Section 16 may use it to mean things it plainly doesn't mean, like non-CRT "related ideas and theories," like "systemic racism," or mere "factual observations, such as mass incarceration."  *Id.*  Yet absent a definition that uses the term in that non-standard way, there isn't any reason to think that's how it's used here.  Instead, an Arkansas court or agency would "giv[e]" the phrase its "usual and ordinary meaning."  *Thurston v. Safe Surgery Ark.*, 619 S.W.3d 1, 8 (Ark. 2021).

Besides, Section 16 does not leave Critical Race Theory undefined.  It uses Critical Race Theory as an example of an "ideolog[y] . . . that conflict[s] with the principle of equal protection under the law or encourage[s] students to discriminate against someone based on the individual's [protected characteristic]."  Ark. Code Ann. 6-16-156(a)(2); *see* , Doc. 21 at 17 (acknowledging

that the prohibition on Critical Race Theory is "part of a larger prohibition" on ideologies "that conflict with the principle of equal protection under the law or encourage students to discriminate" on a protected basis). And it only prohibits instruction in Critical Race Theory insofar as that instruction falls afoul of the statute's ban on "prohibited indoctrination." *See id.* 6-16-156(d) (directing the Secretary to "prevent prohibited indoctrination, including Critical Race Theory"). The statute's references to Critical Race Theory, therefore, make it no vaguer than if it made no reference to Critical Race Theory and only prohibited "prohibited indoctrination."

At the end of the day, what matters is that Section 16 is a "statute written specifically for the school context," resulting from a "considered and specific legislative judgment that some kinds of expressive activity should be restricted at a particular time and place, here in order to protect the schools." *Grayned*, 408 U.S. at 112, 121 (upholding against a vagueness challenge an ordinance whose words were marked by "flexibility and reasonable breadth"). So though "we can never expect mathematical certainty from our language," "[g]iven this particular context, [the statute] gives fair notice to those to whom it is directed" and "is not inconsistent with the First and Fourteenth Amendments." *Id.* at 110, 112, 121 (cleaned up); *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 666 (6th Cir. 1987) (rejecting a vagueness challenge to a statute prohibiting "conduct unbecoming a teacher.").

And to the extent the teacher Plaintiffs claim they could be subject to penalties for activity that they reasonably don't believe constitutes "prohibited indoctrination," the relevant licensing statutes allay those concerns, providing that a "reasonable mistake made in good faith," Ark. Code Ann. 6-17-428(a)(3)(B)(i), isn't a violation. *See also id*. 6-17-428(a)(3)(A) (requiring teacher "knew or reasonably should have known that the act . . . was in violation of the code of ethics"). "A scienter requirement" can "mitigate a law's vagueness." *Vill. of Hoffman Ests.*, 455

U.S. at 499; *see Gonzales v. Carhart*, 550 U.S. 124, 150 (2007) ("The scienter requirements narrow the scope of the Act's prohibition and limit prosecutorial discretion.").

Therefore, Plaintiffs cannot prevail on their vagueness claim, and they are not entitled to extraordinary relief.  Their motion should be denied.

## V.      Other considerations weigh against granting a preliminary injunction.

Besides failing to make the "more rigorous showing" than usual "that [they are] 'likely to prevail on the merits,'" *Jegley*, 864 F.3d at 958 (quoting *Rounds*, 530 F.3d at 732-33), Plaintiffs also fail to show that the other considerations support an injunction.

### A.      Plaintiffs haven't shown a likelihood of irreparable harm, but enjoining Section 16 would harm Arkansas students.

Plaintiffs claim they've "face[d] the threat of sanctions" on "a daily basis" since the LEARNS Act was enacted. Doc. 21 at 38; *see id.* at 6 (allegedly affecting Mr. Gilbert "[e]very day [he] walk[s] into the classroom").  But Plaintiffs' "delay in filing" their lawsuit and motion "vitiates much of the force of their allegations of irreparable harm."  *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977).  That fact alone requires denying their motion.  *See, e.g.*, *Ng. v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) ("[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary injunction." (quoting *Phyllis Schafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019))); *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 805 (8th Cir. 2021) ("[T]he Hospitals' *one-year* delay refuted their allegations of irreparable harm.").

If Plaintiffs face irreparable harm on "a daily basis, Doc. 21, at 38, then why did they put off filing this case until the closing weeks of the school year and then wait even longer before seeking a preliminary injunction?  Governor Sanders signed LEARNS on March 14, 2023, and due to its emergency clause, Section 16 became effective upon Governor Sanders's signature.

*See* 2023 Ark. Acts 237, sec. 73(a) (listing Section 16 among the sections of the Act that went into effect immediately); *Jackson*, 675 S.W.3d at 421 (affirming the validity of emergency clause).  Thus, Plaintiffs waited to bring their claims concerning Section 16 of the LEARNS Act until more than a year after its effective date.  *See* Compl., Doc. 1 (filed March 25, 2024). Again, that prolonged delay alone is sufficient to deny their motion.

Moreover, to the extent Plaintiffs rely on claims about the African American Studies pilot course, even on Plaintiffs' own telling, they knew that course would not receive the same treatment as an approved, non-pilot AP class on August 11, 2023, which was "before the start of the 2023-24 school year."  Am. Compl., Doc. 8, ¶ 105, heading (bold and capitals omitted).  Yet Plaintiffs took no action for more than *seven months*, letting all but the last month of the school year elapse.  And when Plaintiffs finally file did suit, they continued to sit idle.  Indeed, far from immediately seeking emergency relief, they waited weeks to file a new complaint and then only finally made it around to filing their preliminary-injunction motion just before midnight on April 12.  *See* , Doc. 14.

Nor does Plaintiffs' allegation that Ms. Walls "needs the security of an injunction" to "fully prepare" students to take the pilot AP African American Studies exam on May 14, 2024, , Doc. 14 at 3, justify extraordinary relief.  Indeed, Plaintiffs concede that—far from needing to radically alter the curriculum to prepare for the pilot exam—"[Walls] has not removed any specific materials from her curriculum."   , Doc. 21 at 22.  And, even if that weren't the case, Plaintiffs also knew this exam was coming all year.  *See* Am. Compl., Doc. 8, ¶ 39 ("At the end of each school year, AP students take a national AP examination.").  Yet they waited until the very

eve of the exam to seek relief.  That decision belies any assertion of irreparable harm and requires denying relief.  *See, e.g.*, *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming denial of preliminary-injunctive relief due to plaintiffs' delay).

By contrast, an injunction would harm Arkansas students by interfering with ADE's efforts to combat discrimination, ensure equal protection, and further compliance with Title IV and Title VI of the Civil Rights Act of 1964.  Ark. Code Ann. 6-16-156(a)(1), (b).  Indeed, Arkansas undisputedly has a compelling interest in ensuring that students aren't compelled to profess a belief contrary to their conscience, *see Barnette*, 319 U.S. 624, or treated differently based upon race, *Students for Fair Admissions*, 600 U.S. at 218.

Moreover, a State always suffers irreparable harm when it is "precluded from applying its duly enacted legislation."  *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020); *see id.* ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)) (alteration omitted)).  And while Plaintiffs claim the Court can disregard this interest because they've argued that Section 16 is unconstitutional, that approach would make the harm inquiry irrelevant whenever a party seeks to preliminarily enjoin a state law, because the likelihood-of-success inquiry would always decisively resolve the irreparable-harm inquiry.  *See Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (holding that State "would be harmed if it could not apply its own laws . . . now, even if it might later be able to" apply altered version of law).  This Court can't ignore the irreparable harm that an injunction would inflict on Arkansas and students throughout the State.

**B.      The balance of equities and the public interest don't support Plaintiffs.**

The primary "purpose of a preliminary injunction is merely to preserve the relative positions of the parties." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  That weighs in Defendants' favor here.  Whenever a plaintiff seeks to enjoin duly enacted legislation, "the status quo is that which the People have wrought." *Planned Parenthood of Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997) (Luttig, J., staying injunction in single-judge order).  And here Arkansas has directed the Secretary to take action to ensure that no student or is "compel[led] to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964." Ark. Code Ann. 6-16-156(b).  Here, Section 16 of the LEARNS Act, Title IV, and Title VI—not to mention the Equal Protection Clause—are all enactments of "the People." *Id.*

That fact dovetails with the unquestionable public interest in eliminating racial discrimination.  The public has a "compelling interest in assuring that public dollars . . . do not serve to finance the evil of private prejudice." *J.A. Croson Co.*, 488 U.S. at 492 (op. of O'Connor, J.); *see Students for Fair Admissions*, 600 U.S. at 206 ("Eliminating racial discrimination means eliminating all of it."); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 220CV00041, 2023 WL 4633481, at *18 (E.D. Tenn. July 19, 2023) (applying *Students for Fair Admission* and holding use of racial preferences in government contracting violates equal protection).  Likewise, the public has an interest in seeing the students aren't compelled to adopt, affirm, or profess beliefs contrary to their conscience and antithetical to principles of equal protection.  The balance of equities and the public interest also favor Arkansas.

**C.      Plaintiffs' requested injunction would be too broad.**

Finally, a preliminary injunction "must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *St.*

*Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (quotation and citation omitted).  Plaintiffs seek a universal injunction of all of Section 16's provisions—and of all applications of those provisions.  Although no injunction is warranted here, the Court should certainly deny Plaintiffs' request for a universal injunction.  *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024) (staying a preliminary injunction to the extent it goes beyond plaintiffs' injuries); *see id.*, at 927 (Gorsuch, J., concurring in grant of stay) (the Court's decision "reminds lower courts of the foundational rule that any equitable remedy they issue must not be more burdensome to the defendant than necessary to [redress]' the plaintiff 's injuries." (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))).

CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: April 26, 2024                     Respectfully,

TIM GRIFFIN
  Attorney General
MICHAEL A. CANTRELL (2012287)
  Assistant Solicitor General
JORDAN BROYLES (2015156)
  Senior Assistant Attorney General
JUSTIN BRASCHER (2023029)
  Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Main:  (501) 682-2007
Michael.Cantrell@ArkansasAG.gov
Jordan.Broyles@ArkansasAG.gov
Justin.Brascher@ArkansasAG.gov

*Counsel for Defendants*