**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| RUTHIE WALLS; COLTON GILBERT; JENNIFER REYNOLDS, as Next Friend of SADIE ANNABELLA REYNOLDS; CHANDRA WILLIAMS DAVIS, as Next Friend of GISELE DAVIS; and ARKANSAS STATE CONFERENCE OF THE NAACP, | |
| Plaintiffs, | |
| v. | Case No.: 4:24-cv-00270-LPR |
| HON. SARAH HUCKABEE SANDERS, in her official capacity as Governor of the State of Arkansas; and JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education, Arkansas State Board Members in their official capacity: SARAH MOORE, KATHY MCFETRIDGE-ROLLINS, ADRIENNE WOODS, RANDY HENDERSON, LISA HUNTER, JEFF WOOD, KEN BRAGG, and LEIGH S. KEENER, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

At best, Defendants' Response to Plaintiffs' Motion for Preliminary Injunction only confirms that this Court should grant Plaintiffs' motion. First, Defendants argue that Plaintiffs delayed filing their lawsuit and their Motion for Preliminary Injunction. But as discussed further below, Plaintiffs' delay was based on a good faith understanding that Defendants would issue a determination of their review of the AP African American Studies ("AP AAS") course, as well as guidance on Section 16 of the LEARNS Act ("Section 16"). To date, they have done neither.

Second, Defendants have walked back virtually all of their original statements about the law, including their position that Section 16 banned Critical Race Theory ("CRT") and related ideologies. Indeed, in their response, Defendants' wholly ignore Secretary Jacob Oliva's statements in an August 21, 2023 letter to superintendents professing that Section 16 bans teaching students on topics associated with CRT that are part of the AP AAS course, where he stated, in part:

> Given some of the themes included in the pilot, including "intersections of identity" and "resistance and resilience," the Department is concerned the pilot may not comply with Arkansas law, *which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory (CRT).* (See Ark. Code Ann. § 6-16-156, as amended by Section 16 of the LEARNS Act).

> To assist public school employees, representatives, and guest speakers at your district in complying with the law, please submit all materials, including but not limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and training materials, to the Department by 12:00pm on September 8, 2023, along with your statement of assurance that the teaching of these materials will not violate Arkansas law or rule. Items can be scanned and emailed to ade.commissioner@ade.arkansas.gov.

Dec. of Sarah Baum ("Baum Dec.") Ex. 4, Doc. 15-4 (emphasis added).

Remarkably and unabashedly, Defendants now assert that Section 16 did not impact the Secretary's decision to de-designate the AP AAS as an advanced placement course. Indeed, despite the plain language of Secretary Oliva's letter noted above, Defendants now assert that "schools may discuss Critical Race Theory, or other ideas included within the definition of prohibited indoctrination; they merely may not compel students to adopt them as their own." Defs.' Response to Pls.' Mot. for Prelim. Inj. ("Opp."), Doc. 36 at 18.

 Third, Defendants' belated, evolving, and inconsistent interpretations of Section 16 bolster Plaintiffs' likelihood of succeeding on both their First and Fourteenth Amendment claims under any standard proffered by Defendants. Defendants' confusing and contradictory statements concerning the vagueness of Section 16 substantiate Plaintiffs' Fourteenth Amendment Due

Process claim. For example, Secretary Oliva himself could not define the term "CRT" during a legislative hearing on the LEARNS Act last February, while admitting that there are many definitions. Yet Defendants argue that CRT and related terms in the Act are easily understood. In the end, educators, including Teacher-Plaintiffs, are at a loss of how to comply with Section 16 and Defendants' arbitrary enforcement of the Act has only increased their credible fear.

Defendants' best argument that Student-Plaintiffs should not prevail on their First Amendment right to receive information and ideas claim asks this Court to disregard Eighth Circuit precedent in *Pratt*, which this Court should not do. While Defendants enjoy wide discretion in circumscribing curriculum, that discretion is rightly constrained when its proscriptions are purely ideological or political, or infected with racial animus—a trifecta Defendants have accomplished with Section 16.

Section 16's facial and as-applied deficiencies are not cured by Defendants' attempts to narrowly interpret the law. Because constitutional harms are ongoing and the equitable interests at stake are far better served by a system of public education that does not encourage constitutional harms, Plaintiffs respectfully ask the Court to preliminarily enjoin Section 16.

**Argument**

## I.      Standard of Review for Preliminary Injunctions

Defendants misconstrue Plaintiffs' recitation of the appropriate standard for a preliminary injunction in this matter. They argue that because Plaintiffs seek a preliminary injunction enjoining "'a duly enacted state statute,' they must make a '*more rigorous* showing' than usual 'that [they are] 'likely to prevail on the merits.'"" Opp. at 10 (quoting *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017)) (emphasis in original). This is the same standard that Plaintiffs acknowledge applies here. *See* Mem. in Supp. of Pls.' Mot. for

Prelim. Inj. ("Pls.' Mem.") at 20 (stating that they are entitled to relief because "Plaintiffs Are Likely to Succeed on The Merits of Their Claims"). Defendants' seemingly misconstrue the Eighth Circuit's holding in *Planned Parenthood Minn., N.D., S.D. v. Rounds* ("*Rounds*"), 530 F.3d 724 (8th Cir. 2008). In *Rounds*, the Eighth Circuit clarified that the proper preliminary injunction standard to apply when a movant seeks to enjoin a duly enacted state statute is the "likely to prevail on the merits" standard, rather than the "fair chance of success" standard that courts had also applied at times. *Id.* at 731–33. Defendants' "more rigorous" language is based on the Eighth Circuit's observation that the 'likely to succeed' standard is more rigorous than the 'fair chance of success' standard. *Id.* at 732. Nowhere in Plaintiffs' recitation of the standard do they suggest that to prevail they must only show a 'fair chance' of success. In fact, all the cases[1] cited by Plaintiffs note that they must show a likelihood of success in order to obtain a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 426 (2009); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012); *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011), *vacated on reh'g on other grounds*, 705 F.3d 845 (8th Cir. 2012); *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008).

Defendants also argue that Plaintiffs "face a still heavier burden here" because they seek a preliminary injunction that would grant them substantially the relief they would obtain after

---

[1] Plaintiffs also cited to *Dataphase Sys., Inc. v. CL Sys., Inc.*, the Eighth's Circuit seminal case on the preliminary injunction standard where the merits-related factor is described as "the probability that the moving party would succeed on the merits." Pls.' Mem. at 19 (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012); *see also Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc) (similar). Despite the changes in caselaw surrounding the interpretation of one of these factors, this case is still cited regularly by courts in the Eighth Circuit when deciding whether to issue preliminary injunctions. *See, e.g.*, *Lamar v. Hutchinson*, No. 4:21-CV-00347, 2021 WL 4047158, at *3 (E.D. Ark. Sept. 3, 2021) (Rudofsky, J.).

trial. Opp. at 10. This argument fails. First, an injunction is only one aspect of the relief that

Plaintiffs ultimately seek. *See* Pls. First Am. Compl. ("Am. Compl."), Doc. 8 at 58–59 (seeking,

*inter alia*, a declaration stating that Section 16 is unconstitutional, a permanent injunction, award

of compensatory damages, and an order that Defendants "restore the AP AAS course code with

full benefits, reverse any and all changes and/or modifications experienced by AP AAS since the

implementation of the LEARNS Act, and reverse any changes to school policy made to comply

with Section 16.").

Second, though courts in the Eighth Circuit recognize that movants for a preliminary

injunction face a heavier burden when that injunction would "give [them] substantially the relief

[they] would obtain after a trial on the merits," *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d

438, 440 (8th Cir. 1991), that standard appears to have originated specifically in the trademark

context, where the applicable preliminary injunction standard would be a "fair chance of

success," rather than the higher standard that Plaintiffs acknowledge applies here, *id.* at 440

(citing to *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) for

this heavier burden standard and noting that the court in *Calvin Klein* relied solely on a treatise

about trademarks and unfair competition for this proposition).

## II.    Section 16 Encroaches on Fundamental First Amendment Rights and Therefore Must be Closely Scrutinized

Vague regulations of speech raise special First Amendment concerns because of their

chilling effect on free speech. *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). Under credible fear

of Defendants' arbitrary enforcement of Section 16, teachers are censoring themselves and

steering "far wider of the unlawful zone . . . than if the boundaries were clearly marked,"

implicating their First Amendment rights and violating their Fourteenth Amendment rights to

due process. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotations

omitted). The vague statute has also impacted students' First Amendment rights to receive information and ideas, as teachers have censored their instruction, syllabi, and materials used in their classrooms.

Defendants suggest none of this matters. They first argue that the Court should grant greater tolerance in reviewing the degree of vagueness because this statute deals with civil, not criminal penalties. Opp. at 22. Citing a single district court opinion, Defendants further aver that because Section 16 applies to employees (teachers), Plaintiffs must demonstrate that Section 16 is "so vague and indefinite as really to be no rule or standard at all." Opp. at 23 (quoting *Rogers v. Helena-W. Helena Sch. Dist.*, No. 2:06CV00160, 2006 WL 2850437, at *3 (E.D. Ark. Oct. 4, 2005)). However, *Rogers* actually holds that the terms must be "such that the ordinary person exercising common sense can sufficiently understand and fulfill its prescriptions" and that the statute is not written "in such terms that 'men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (citing *Horn v. Burns and Roe,* 536 F.2d 251, 254 (8th Cir. 1976)).

The courts have routinely held that when, as here, a regulation reaches the exercise of free speech, a greater level of scrutiny is required. *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308-1309 (8th Cir. 1997); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 499 (1982) ("if…the law interferes with the right of free speech or of association, a more stringent vagueness test should apply"). In addition, teachers not only face losing their current jobs due to a vague statute that strikes at the very nature of their profession, teaching, but could also lose their teaching license—their livelihood—altogether. Thus, a low tolerance of vagueness is warranted. And even if the Court were to apply a higher degree of tolerance, Section 16 still fails. The Act fails to define all but one operable term, and Defendant Secretary

Oliva, himself, was unable to define the potential targets of Section 16, "Critical Race Theory and related ideologies," because several definitions in the field exist.[2] As Teacher-Plaintiff Colton Gilbert stated, CRT "has been used by the state and others as a dog whistle and moniker for racial equity. Essentially, it has been reduced to a bumper sticker. I believe that Section 16 uses this language intentionally *because* it is vague and undefined." Doc. 17 ¶ 22 (emphasis in original). The Court should preliminarily enjoin Section 16 as unconstitutionally vague.

### A. The Court should apply less tolerance in its review of Section 16's vagueness; yet, Section 16 fails to meet even the most deferential standard and is unconstitutionally vague on its face and as applied

Defendants concede that the "degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends on the nature of the enactment." Opp. at 22 (citing *Vill. Of Hoffman Ests.,* 455 U.S. at 498). Here, there is a vaguely written statute that threatens teachers for violating terms that are so ambiguous, the legislature failed to define most of its terms and Secretary Oliva likewise could not define the terms. Even the purpose of the statute is contradictory and debatable among Defendants. *See supra* Section III (Right to Receive).

Section 16 seeks to intrude into the daily work of teachers as they attempt to reach their students and help them achieve the standards and skills in their respective classes. Plaintiff Gilbert, a debate and oral communication skills teacher, testified that he tries "to engage all my students and develop a culture of learning while also challenging students to help them meet the academic standards and be better prepared to participate as engaged citizens. I typically use issues that students care about and are relevant to their lives, which increases their engagement

---

[2] Ar. S.B. 294, S. Educ. Committee (February 22, 2023, 9:21:34 AM) (Sec. Oliva), https://senate.arkansas.gov/todays-live-stream-meetings/archived-meetings/ ("in coming up with a simple definition for critical race theory it's actually really challenging and it is something that is debated amongst even the scholars that have wrote different theories.").

and ability to learn effectively. In the past, this has included topics such as racial and gender equality and gender and sexual identification, as well as disability, among others." Doc. 17 at 2 ¶ 8. However, because of Section 16, he has been "forced to avoid topics in class out of fear of violating the law. [] I have read this law on several occasions, but I do not understand what it allows and what it prohibits. As a result, I tend to over-correct out of fear of being reported." *Id.* at 2-3 ¶ 10.

Defendants ask the Court to afford them a higher degree of deference in judging the vagueness of Section 16. But the cases they rely upon are plainly distinguishable. For example, while the Court in *Village of Hoffman Estates.* expressed a greater tolerance for enactments with civil penalties, they also affirmed that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." 455 U.S. at 499. That is the case here.

In both *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) and *Heath v. S.E.C.*, 586 F.3d 122, 139 (2d Cir. 2009), also relied upon by Defendants, the Court makes clear that in examining a statute's vagueness, courts must examine the history and norms of the profession at issue. Similarly, in *Perez v. Hoblock*, the Court made clear that in examining a statute's vagueness they "must consider the context in which the regulation was enforced" and evaluate and employee's "underlying conduct by reference to the norms of" their professional community. 368 F.3d 166, 175–76 (2d Cir. 2004).

In the present case, however, the vague language used in Section 16 is not built upon any long-standing history and norms of education and the context in which it is enforced—education—matters greatly. Indeed, some of the statute's most vague language, particularly its confounding inclusion of CRT and incongruous definition of indoctrination, discussed below,

have no common understanding within the profession.[3] Teachers, who are experts in their field, cannot understand what these terms mean in the context of this statute. Moreover, the cases cited by Defendants concerned termination of employment. As Defendants admit, Arkansas teachers who violate Section 16 are at risk of not only adverse employment actions, but consequences up to and including the suspension or revocation of their teaching licenses. The punishment for violation of this vague statute can cost them not only their jobs, but their ability to be gainfully employed in any public school in the state. The court cannot tolerate the utter vagueness of Section 16 within this context.

The Court should apply a more exacting vagueness review of Section 16 as teachers have a particularly important role that separates them from other employees, even public employees. The fundamental importance of education has been repeatedly reaffirmed by Supreme Court decisions, "by the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values." *San Antonio Independent Sch. Dist. v. Rodriguez,* 411 U.S. 1, 111 (1973). The special importance afforded by the Court to education rests on the fact that education is "'necessary to prepare [students] to participate effectively and intelligently in our open political system . . .,' and that 'education prepares individuals to be self-reliant and self-sufficient participants in society.'" *Id.* at 112 (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 221 (1972)). Section 16 interferes with the basic, fundamental function of schools by seeking to control not only what teachers teach, but how they teach it, infringing on their own constitutional rights and putting the "marketplace of ideas" in jeopardy. *Keyishian v. Board of Regents,* 385 U.S. 589, 603 (1967). To allow for a lesser

---

[3] Even Teacher-Plaintiff Ms. Walls needed to independently research Critical Race Theory in hopes of understanding what the statute sought to prohibit. Doc. 16 at 4 ¶ 20.

standard would further imperil the profession. Yet, even if the Court applies a lesser standard, as described below, Section 16 fails to pass constitutional muster.

> **1. The statute's failure to define its operative terms, in conjunction with the State's bewildering explanations, further substantiates the vagueness of Section 16**

Defendants admit that several of the operative terms in Section 16 are undefined, but rather than clarify their meanings, they assert simply that their definitions are well known and thus inherently clear. Although legislatures are not required to define every term in a statute, it should be clear what the ordinance as a whole prohibits. *See Grayned*, 408 U.S. at 110; *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear."). Section 16 lacks the types of narrowing definitions that can increase clarity and mitigate vagueness. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).

Taken as a whole, Section 16 raises more questions than answers as to the meanings of its prohibitions. For example, Section 16 uses the term "Critical Race Theory (CRT)" in three separate provisions and contexts. In subsection (a)(2), the statute refers to CRT as an example of an ideology that conflicts with the principle of equal protection. Ark. Code Ann. 6-16-156(a)(2). In subsection (d), the language suggests that CRT is an example of prohibited indoctrination in and of itself, not simply of an ideology that which students cannot be indoctrinated. Yet, subsection (f) seeks to prohibit mandatory trainings or orientations based on prohibited indoctrination *or* Critical Race Theory. Ark. Code Ann. 6-16-156(f) (emphasis added). This provision certainly suggests that Critical Race Theory is just as unwelcome as prohibited

indoctrination in Arkansas schools. The statute uses CRT multiple times with significantly different implications, rendering the terms nonsensical.

Moreover, when CRT is read in concert with Defendants' explanation of their understanding of the term, the terms are incongruous and even directly contradictory. In their Response, Defendants assert that the term's use in subsection (a)(2) alludes to its operative definition. They maintain that Critical Race Theory is defined by the statute as an example of an "ideolog[y]…that conflict[s] with the principle of equal protection under the law or encourage[s] students to discriminate against someone based on the individual's [protected characteristic]." *See* Opp. at 25 (citing Ark. Code Ann. 6-16-156(a)(2)). To start, that is not a definition and certainly not one that defines what CRT means in order for ordinary people to understand what is prohibited and what is not as opposed to what it purportedly does. And it is not accurate as CRT does not conflict with the principle of equal protection or encourage students to discriminate against anyone. As Teacher-Plaintiff Gilbert discusses, previously he used CRT

> to help students *explore and debate potential reasons* for past and present inequalities and to further develop their skills around research and examining individual and group debates, among other skills. CRT is a "theory" only, not gospel and not a conclusion of fact. I never used CRT or any ideologies in my class to suggest that any person should be discriminated against or that they are superior or inferior solely as a result of their race, ethnicity, sex or other characteristic identified in Section 16. In fact, my teachings helped ensure that students did not develop such feelings but instead developed empathy and understanding of differences to help them communicate with people who do not look like them and to better understand the world around them.

Doc. 17 at 3 ¶ 12 (emphasis in original).

Having boxed themselves in, Defendants now state that Section 16 "only prohibits instruction in Critical Race Theory insofar as that instruction falls afoul of the statute's ban on 'prohibited indoctrination.'" Opp. at 26 (citing Ark. Code Ann. 6-16-156(d)). That stands in stark

contrast not only to the use of the term in the statute, but also to Secretary Oliva's aforementioned application of Section 16 to the AP AAS course where he cited concerns with the course's discussion of intersectionality, resistance and resilience. Doc. 15-4. Kimberly Mundell, ADE Director of Communications followed with a similar understanding of Section 16, stating "Arkansas law contains provisions regarding prohibited *topics* . . . . Without clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law."[4] Both of these communications, directly from ADE representatives, suggest that Section 16's prohibitions are broader than Defendants' current characterization. This inconsistency between the Defendants and their representations in the response brief only amplifies the statute's vagueness and highlights its susceptibility to confusion.

Despite its repeated efforts, the State has failed to provide a precise definition of Critical Race Theory. Indeed, Secretary Oliva himself, tasked with implementing Section 16, has struggled to clearly define the term. Yet, Defendants argue that educators can easily discern the term's meaning simply from its inclusion in the text of the statute.

Finally, Section 16's vagueness is further compounded by the State's enforcement of Governor Sanders' Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools (Doc. 15-1), upon which Section 16 was based. Governor Sanders, Secretary Oliva, and the ADE have used the Executive Order to target several types of educational training programs (*see, e.g.,* Doc. 15-7) and to purge state websites of resources, including Selma Online.[5] Defendants' arbitrary enforcement of the Executive Order, which has the same language as

---

[4] Adam Roberts, *Arkansas Department of Education pulls approval for AP African American Studies course*, 40 29 NEWS (August 2023) (emphasis added) https://www.4029tv.com/article/arkansas-ap-african-american-studies/44810056.
[5] Josh Snyder, *Arkansas Education Department Changes, Removes Social Studies Resources After Sanders' Executive Orders*, ARKANSAS DEMOCRAT GAZETTE  (March 17, 2024).

Section 16, against programs that apparently have nothing to do with "indoctrination," puts educators on notice that the bounds of the law are unclear.

Even under the most deferential standard suggested by Defendants, Section 16 violates Plaintiffs due process rights because it is "so vague and indefinite as really to be no rule or standard at all" and "is written in such terms that 'men of common intelligence must necessarily guess at its meaning and differ as to its application." *Rogers*, 2006 WL 2850437, at *3 (quoting *Horn*, 536 F.2d at 254).

### 2. Section 16 does not include a scienter requirement and educators are at risk of having the statute enforced against them regardless of intent

Though courts have found that scienter requirements can mitigate vagueness, the mere presence of such a requirement does not automatically cure a statute of its vagueness. *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 599 (1967) (finding provision of state statute vague even when it required that employee "by word of mouth or writing *willfully (sic) and deliberately* advocate[], advise[], or teach[] the doctrine of forceful overthrow of the government.") (emphasis added). However, Section 16 does not contain a scienter requirement. The statute never refers to educators' state of mind or willingness to violate the law. Indeed, an earlier provision in the statute explicitly disregards intent entirely, directing the Secretary to "identify any items that may *purposely or otherwise*, promote teaching that would indoctrinate students with ideologies," such as CRT. Ark. Code Ann. 6-16-156(a)(2) (emphasis added).

Defendants rely on a separate licensing statute, which they assert is the only one way to enforce the statute, to read into Section 16 a scienter requirement that otherwise does not exist. Under Arkansas's Code of Ethics for Arkansas Educators, teachers can face various penalties recommended by the Professional Licensure Standards Board to the State Board of Education, up to and including the suspension or permanent revocation of their teaching license. Ark. Code

Ann. 6-17-428(c)(B). Ethical violations are defined as acts that an educator knew or reasonably should have known were in violation of the code of ethics. 6-17-428(a)(3)(A). However, given that the statute's lack of clarity as to what exactly a teacher can or cannot teach, the protection of a "reasonably should have known" standard is minimal. Determining what a teacher should have reasonably known, when the line between permitted teaching and prohibited indoctrination is as undefined as it is here, is so difficult that it provides no assurance for teachers. In this way, the Code of Ethics' inclusion of a scienter requirement does not completely mitigate the vagueness of Section 16, which contains no explicit scienter requirement.

The vagueness of the statute and lack of scienter requirement is further demonstrated by Defendants' arbitrary enforcement of the Act. Secretary Oliva and ADE have already taken action to enforce Section 16, when they de-designated AP AAS and placed it under review. In Secretary Oliva's August 21, 2024 letter to superintendents regarding the course, he notes ADE's concerns that the course "may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory." Doc. 15-4. He does not mention any requirements for knowing and willful violations of the law. Instead, additional communication from ADE explicitly suggests that there is no scienter requirement for violating Section 16, so much so that the Department stated that certain topics in the AP AAS curriculum "may *unintentionally* put a teacher at risk of violating Arkansas law."[6] If a teacher can be at risk for violating Section 16 by simply teaching a previously  approved curriculum, it is clear that ADE's understanding of the statute does not require willful and knowing violations.

---

[6] Adam Roberts, *Arkansas Department of Education pulls approval for AP African American Studies course*, 40 29 NEWS (August 2023) (quoting Kimberly Mundell, ADE Director of Communications) (emphasis added) https://www.4029tv.com/article/arkansas-ap-african-american-studies/44810056.

Importantly, teachers in Arkansas are more at risk of adverse employment action than they were before the enactment of the LEARNS Act. The repeal of the 1983 Teacher Fair Dismissal Act removed additional due process protections for teachers against arbitrary dismissal by superintendents or school administrators, beyond the ethics rules, including removing the established standard that teachers could only be fired, non-renewed, or suspended for "incompetent performance, conduct which materially interferes with the continued performance of the teacher's duties, repeated or material neglect of duty, or other just and reasonable cause." Ark. Educ. Code § 6-17-1507 (2020) (repealed). While teachers still have some limited due process rights regarding termination during the school year, once the contract is over, "teachers no longer have such due process rights for renewal, and LEARNS apparently imposes no such obligation on districts. It appears that teachers can have their contracts non-renewed with no hearing and with no reason offered for the decision."[7] Consequently, the vague language of Section 16 and any alleged violation of the Act places teachers at greater risk for non-renewal and other adverse employment actions.

Section 16 is terribly written, terribly misunderstood by Defendants and Plaintiffs alike, and, already, has been terribly and arbitrarily enforced by Defendants. The Court should preliminarily enjoin the Act on vagueness grounds.

---

[7] David Ramsey, *How does Arkansas LEARNS impact teachers? We have answers (Part 2)*, ARKANSAS TIMES (January 8, 2024) https://arktimes.com/arkansas-blog/2024/01/08/how-does-arkansas-learns-impact-teachers-we-have-answers-part-2.

### III.    Plaintiffs Remain Likely to Succeed on Their Claim that Section 16 Violates Students' First Amendment Right to Receive Information and Ideas

#### A.   The First Amendment prohibits the government from restricting access to information and ideas when its actions are not related to a legitimate pedagogical basis

Defendants misconstrue both the nature of Plaintiffs' First Amendment right to receive claim and the relevant caselaw. Plaintiffs do not assert that students have the right to dictate what should be included in a school curriculum or even dispute the broader notion that curriculum is a form of government speech. Rather, Plaintiffs argue that the state is not able to *constrain* a student's access to information and ideas when the motive for that change is not related to a legitimate pedagogical basis, and instead, is the result of an illicit motive. Such a restriction on even a fairly broad government power is not uncommon. In fact, Defendants themselves concede, "[o]f course, 'this does not mean that there are no restraints on government speech.'" *See* Opp. at 15 n.1 (citing *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009)); *see also id.* ("For example, government speech must comport with the Establishment Clause.").

Plaintiffs' right to receive claim is merely another example of one of the constitutional restraints on the government's free speech power and such is not surprising in a democratic nation and state. That restraint prevents the government from removing curriculum materials when the motive for doing so is illegitimate, such as resulting from "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the government actor disagree[s]." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870-72 (1982).

As a result, Defendants' reliance on cases for the proposition that when the government is speaking it is allowed to engage in viewpoint discrimination, *see* Opp. at 14 (citing, *inter alia*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)), or that

curriculum is a form of government speech, *see id.* at 14–15 (citing, *inter alia*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)), is inapposite. In fact, several of these cases support Plaintiffs' claim by acknowledging, "[t]hat is not to say that a government's ability to express itself is without restriction. Constitutional and statutory provisions outside of the Free Speech Clause may limit government speech." *Walker*, 576 U.S. at 208; *see also Chiras v. Miller*, 432 F.3d 606, 619–20 (5th Cir. 2005) (holding that the "significant discretion to determine the content of their school libraries . . . may not be exercised in a narrowly partisan or political manner."). Defendants' reliance on this caselaw to conclude that *Pratt* is no longer good law is also incorrect. Unlike any of the cases cited by Defendants, *Pratt* deals with the specific instance of a government actor removing materials from a curriculum based on ideological rather than pedagogical reasons. *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 777–79 (8th Cir. 1982). This holding is perfectly compatible with decisions that find that a government's decision to remove materials from a curriculum for legitimate pedagogical reasons is permissible, *see Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010); *see also Chiras*, 432 F.3d at 619–20 (declining to apply *Pico*, but nonetheless acknowledging that "[a]ppellants, however, fail to plead any specific facts which demonstrate that the SBOE's decision was motivated by 'narrowly partisan or political' considerations.").

This is further supported by recent cases, decided post-*Pico* and after the development of the government speech doctrine, which recognized the right to receive claim described by Plaintiffs. *See Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1278 (N.D. Fla. 2022); *Loc. 8027, AFT-*

*N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 454 n.5 (D.N.H. 2023).[8] Moreover,

Defendants' assertion that the Court can no longer rely on *Pratt* is misleading and erroneous.

Their reliance on *United States v. Taylor* for the proposition that this Court need not follow *Pratt*

ignores that Taylor's holding is describing the power of Eighth Circuit *panels* to ignore previous

*panel* decisions. Specifically, in *Taylor,* the Eighth Circuit noted that a prior Eighth Circuit

decision, *United States v. Wivell*, did not foreclose the instant challenge "because a prior panel

ruling does not control when the *earlier panel decision* is cast into doubt by an intervening

Supreme Court decision." 803 F.3d 931, 933 (8th Cir. 2015) (internal quotation omitted)

(emphasis added).

As a district court, this Court is bound by Eighth Circuit caselaw until that case is

overturned by the Eighth Circuit or there is a controlling Supreme Court decision. *See Calzone v.*

*Summers*, 942 F.3d 415, 426 n.8 (8th Cir. 2019) ("In the absence of a controlling Supreme Court

decision to the contrary, the district court as well as any panel of this court, was bound to apply

this circuit's precedent."); *United States v. Wright*, 22 F.3d 787, 788 (8th Cir. 1994) ("[A] panel

of this Court is bound by a prior Eighth Circuit decision unless that case is overruled by the

Court sitting en banc."). And there is no controlling precedent here.

This practice was recognized by the Honorable Matthew T. Schelp in the Eastern District

of Missouri, who, despite misgivings regarding *Pico* and *Pratt*—as noted by Defendants—

nonetheless proceeded to apply Justice Brennan's approach in *Pico*, which was consistent with

---

[8] In *Arce*, the Ninth Circuit entertained a similar challenge as here when the State of Arizona enacted a curriculum bill that was intended to prohibit the teaching of Mexican American Studies. *Arce*, 793 F.3d at 983. Ultimately, on remand, the district court struck down the law under the First Amendment and Fourteenth Amendment, concluding that the plaintiffs proved their right to receive information and ideas "because both enactment and enforcement were motivated by racial animus." *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 973 (D. Ariz. 2017).

the Eighth Circuit's decision in *Pratt. C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914–15 (E.D. Mo. 2022).[9]

### B.  Section 16 has led to students being denied access to information and ideas

Defendants' arguments that Section 16 does not violate Student-Plaintiffs' right to receive information and ideas are likewise unpersuasive. Defendants first argue that Section 16 does not violate the principle that States are "forbidden from removing materials from their own schools' curricula" because "Section 16 only prohibits schools from compelling students to profess certain ideas, not from teaching any ideas." Opp. at 18. In support, Defendants cite a truncated quotation of the statute's definition of prohibited indoctrination, which suggests that "prohibited indoctrination" is just "compel[ling] a person to adopt, affirm, or profess certain ideas about race." *Id.* This quotation suggests that the focus of the prohibited indoctrination provision is, in fact, on what a student may say. The full definition, however, makes clear that provision is focused not only what a student may say, but rather what information and ideas a teacher may or may not provide them:

> As used in this section, 'prohibited indoctrination'  means *communication by a public school employee,* public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea . . . .

---

[9] Defendants' characterization of *Pico* is also incorrect. Though the Court acknowledged that the school district "might well defend their claim of absolute discretion in matters of curriculum," *Pico*, 457 U.S. at 869, it did not categorically prohibit the idea that the government's curriculum powers would extend to making decisions that are not supported by a legitimate pedagogical purpose. *Cf. Griswold*, 616 F.3d at 58 (Souter, J.) (noting that "the extent of political autonomy in setting curriculum is not spelled out any further in *Pico.*"); *see also Pico*, 457 U.S. at 861 ("Our precedents have long recognized certain constitutional limits upon the power of the State to control even the curriculum and classroom. For example, [the Supreme Court] in *Meyer v. Nebraska*, 262 U.S. 390, (1923), struck down a state law that forbade the teaching of modern foreign languages in public and private schools, and [in] *Epperson v. Arkansas*, 393 U.S. 97 (1968), [the Court] declared unconstitutional a state law that prohibited the teaching of the Darwinian theory of evolution in any state-supported school."). That is why, as noted above, several courts have recognized a right to receive claim based on government curricular decisions despite the potential reservations noted in *Pico*.

Ark. Code Ann. § 6-16-156(b) (emphasis added).[10] Therefore, while Defendants may aver that a goal of Section 16 may be to prevent students from adopting certain ideas as their own, the mechanism that the State uses to achieve this goal is to control the information and ideas that teachers can communicate to their students. When the state seeks to control communication in this manner as a result of illicit motives, as is the case here, the state runs afoul of the First Amendment. Defendants' reliance on *West Virginia State Bd. of Educ. v. Barnette* is, therefore, nonsensical in this context. The issue in *Barnette* was a school requirement that students profess ideas—ideas included within the pledge of allegiance— with which the students disagreed. 319 U.S. 624, 634 (1943) (noting that "[t]o sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."). Section 16 has nothing to do with students being told to espouse ideas to which they disagree. Instead, it is the State attempting to limit what teachers say so that students are not exposed to ideas that the State finds objectionable.[11] Section 16 does not include any language regarding what a student's belief might be; it's focus is to ensure that students are not compelled to adopt ideas that the State disagrees with.

---

[10] Defendants also rely on the statute's savings clause to argue that discussion of "Critical Race Theory, or other ideas included within the definition of prohibited indoctrination" is allowed. Opp. at 18. Of course, as explained *supra*, the line between permissible discussion and prohibited indoctrinating communications is often undiscernible, especially since the question of whether someone is compelled by a particular communication is outside the control of the teacher. Regardless, this savings clause does not vindicate Defendants' argument as it is the statute's language regarding prohibited indoctrination that is driving the restriction of information and ideas that forms the core of Student-Plaintiffs' right to receive claim.

[11] What exactly those ideas are is unclear, for all the reasons described in Plaintiffs' vagueness claim.

Defendants also argue that the State has not restricted information from students. This argument ignores the language of Section 16 and how the Act is being enforced in a way that does, in fact, limit information and ideas to students. Under Section 6-16-156(a)(3) of the Act, the Secretary is required to "amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination." This language gives the Secretary the authority to remove certain materials from the classroom if they contain information and ideas that the State disagrees with. And this is exactly what the Secretary has done.  Defendants attempt to mislead this Court by focusing narrowly on the ADE's decision to revoke AP credit for the AP AAS and not pay for the cost of the AP exam, Opp. at 19, but they wholly ignore how Secretary Oliva himself has applied Section 16 in a manner to exclude certain information and ideas banned under the Act. In Secretary Oliva's August 21, 2023 letter implementing the aforementioned sections of the Act, he explicitly states that

> [g]iven some of the themes included in the [AP AAS] pilot, including 'intersections of identity' and 'resistance and resilience,' the Department is concerned the pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory (CRT).

Baum Dec. Exhibit 4, Doc. 15-4. The letter also required school districts interested in providing AP AAS to students to "submit all materials, including but not limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and training materials" as well as a "statement of assurance that the teaching of these materials will not violate Arkansas law or rule." *Id.* It is more than reasonably foreseeable that as a result of Secretary Oliva's actions, teachers would limit information to students to avoid breaking the law. And that is exactly what happened here.

Mr. Gilbert, for example, removed materials from his debate course, including a section where he introduced students to the CRT framework for analyzing whether current inequalities

result from systemic discrimination and another section on gender and sexuality. Doc. 17 ¶ 12-13. Similarly, Ms. Walls has narrowed the scope of the topics that she is teaching in an effort to comply with Section 16, which means that her students do not get the benefit of her vast knowledge on these topics and the ways that they interrelate with each other. Walls Dec. Doc. 16, ¶¶ 13-15, 38. In addition, teacher members of the NAACP have withheld certain materials out of fear of violating Section 16, including one high school teacher who no longer allows her ninth grade students to read "The Color Purple" and has ceased allowing her students to watch clips from the Roland Martin show—despite the educational benefits of such materials. Jefferson Dec., Doc. 20 ¶ 12.

Finally, Defendants argue that any decisions regarding curriculum are supported by a legitimate pedagogical purpose—preventing discrimination. Opp. at 20–21. *Pratt* is particularly instructive here. In *Pratt*, the school board argued that its decision to remove certain films from a high school English curriculum was pedagogically sound because the films at issue featured excessive violence. *Pratt*, 670 F.2d at 778–79. The Eighth Circuit affirmed the district court's determination that this post-hoc justification was inadequate because the "reasons for its decision" must be "apparent to those affected." *Id.* at 778. Instead, the school board's "approach inevitably suggests that the Board acted not out of its concern about violence, but rather to express an official policy with respect to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians, and teachers at their peril." *Id.* at 779 (internal quotation omitted). The same is true here. None of the statements regarding Section 16 discuss the law's role in preventing discrimination and that section of the Act is titled "Indoctrination." Secretary Oliva previously stated the purpose of the law was to ensure that "when there are points of view being presented it is up [to] the educator to make sure that both points of views

are shared and that they are not putting their personal beliefs inside of a child's head."[12] In his August 21st letter to superintendents, he changed gears,  asserting that Section 16 is intended to more specifically prohibit teaching that would "indoctrinate students with ideologies, such as Critical Race Theory (CRT)." Baum Dec. Exhibit 4, Doc. 15-4. Likewise, Governor Sanders, prior to the enactment of the LEARNS Act, allegedly stated that its purpose was to prevent a "left-wing political agenda" from "brainwashing our children" with "political indoctrination." Am. Compl. at 3 ¶ 4.

These comments do not indicate that the purpose of the law is to prevent discrimination and Defendants provide no evidence to the contrary. Moreover, its newly-articulated justification—that Section 16 is designed to prevent discrimination—is belied by the fact that Arkansas already has the means to prevent discrimination, including Title IV and VI of the Civil Rights Act. *See, e.g.*, *Gonzalez*, 269 F. Supp. 3d. at 966 (noting that the existence of other state laws addressing purported issues evidences discriminatory intent); *see also* Opp. at 20–21. This sort of post-hoc justification is simply inadequate to counter the demonstrated illegitimate purpose of Section 16.

## IV.     Irreparable Harm and Other Equitable Factors Weigh Decisively in Favor of Injunction

### A.  Defendants' violation of Plaintiff's First and Fourteenth Amendment rights constitutes irreparable harm

Defendants claim that Plaintiffs have not alleged irreparable harm because "public school curricula are government speech" and, therefore, Plaintiffs cannot be harmed if they have no control over the speech. Opp. at 14. As discussed further above (*supra* Section III), however, government speech through curricula is not unrestricted and does not supersede Plaintiffs' rights

---

[12] Ar. S.B. 294, S. Educ. Committee (February 22, 2023, 9:21:34 AM) (Sec. Oliva), https://senate.arkansas.gov/todays-live-stream-meetings/archived-meetings/.

under the First Amendment. And as the Eighth Circuit has stressed, "a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Johnson v. Minneapolis Park & Recreation Bd.,* 729 F.3d 1094, 1101-02 (8th Cir. 2013) (quoting *Elrod v. Burns,* 427 U.S. 347, 373(1976)).

In several instances, students and teachers within Arkansas have experienced self-censorship and various other restraints on their First and Fourteenth Amendment freedoms and rights that extend well beyond the confines of curricula and education policy as described by Defendants. While curricula may be a form of government speech, teachers still enjoy rights to fair notice and due process related to restrictions on speech in the classroom. *See, e.g., Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 723-24 (8th Cir. 1998) (holding that teacher's free speech rights in the classroom were not violated because she had fair notice that profanity was prohibited and the school district had a legitimate interest in restricting such speech). But the restrictions imposed on teachers through Section 16 are neither legitimate nor worded in a way that gives teachers fair notice, impacting teaching and learning.

For instance, Ms. Walls has previously used "The 1619 Project" to assist students in better preparing for final projects on African-American studies, but she has discontinued that practice for fear of sanctions. Walls Suppl. Dec. ¶ 23. Mr. Gilbert used a book by one of the Little Rock Nine, Melba Pattillo Beals, entitled *Warriors Don't Cry* to help students better understand the history of the Little Rock Nine and desegregation, but he has since discontinued that practice due to the LEARNS Act. *See* Doc. 17 at 14. And students like Plaintiffs Gisele Davis and Sadie Belle Reynolds are being denied access to the information and ideas, including the ability to fully engage in important topics related to civil rights history because their teachers are being censored. *See* Doc. 19 at 15; *see also* Doc. 18 at 9-13.

Plaintiffs have satisfied their burden of establishing irreparable harm. *See, e.g., Marcus v. Iowa Pub. Television,* 97 F.3d 1137, 1140-41 (8th Cir. 1996).

### B.  There was no unreasonable delay by Plaintiffs

Defendants claim that Plaintiffs unreasonably delayed the filing of their complaint, but any such delay was wholly reasonable. Governor Sanders signed the LEARNS Act on March 14, 2023, but the emergency provision of the Act that allowed it to become effective that same day was challenged in the courts, which later enjoined the earlier effective date.[13] Soon after the effective date of August 1, 2023, Secretary Oliva suspended the AP AAS course and on August 21, 2023, requested that the school districts produce the AP AAS curriculum for compliance review with Section 16 by the ADE. Doc. 15-4. The College Board provided those materials to the ADE before Secretary Oliva's deadline of September 8, 2023. Walls Suppl. Dec. ¶ 19. Plaintiffs, including Plaintiff Walls, waited—and waited—several months for a final determination on whether the AP AAS course violated Section 16. As Ms. Walls states, she trusted the process. *See* Walls Suppl. Dec. ¶ 25. But ADE never issued a decision and left the students and teachers hanging in the balance. *See* Walls Suppl. Dec. ¶ 25-26.

---

[13] On May 8, 2023, Citizens for Arkansas Public Education and Students (CAPES), as well as residents and school advocates in Philips County, filed suit to challenge enforcement of the LEARNS Act in hopes of preventing a charter school from taking over the Marvell-Elaine School District. *Arkansas Dep't of Educ. v. Jackson*, 669 S.W.3d 1, 4 (2023). They argued that the procedural process of the bill failed to meet the state's constitutional requirement that votes on emergency clauses be taken separately from the bill itself. *See id.* at 4-12. In response, a Pulaski County Circuit judge temporarily enjoined the implementation of the LEARNS Act on May 26, 2023. *Jackson v. Arkansas Dept. of Educ.,* No. 60-CV-23-3267, 2023 WL 4995832, at *5 (Ark. Cir. May 26, 2023). The Arkansas Supreme Court later vacated the temporary restraining order, but did not rule on the merits of the case. On June 30, 2023, Judge Wright ruled that the emergency clause of the LEARNS Act was not properly voted on and blocked the implementation of the Act until the default date for all legislation of this session, August 1, 2023. *See Arkansas Dep't of Educ. v. Jackson,* 669 S.W.3d 1, 18 (2023). The State appealed to the Arkansas Supreme Court, which overturned Judge Wright's ruling on October 12, 2023, ruling that the legislators' votes on the emergency clause complied with state law. *Arkansas Dep't of Educ. v. Jackson,* 675 S.W.3d 416, 421 (2023).

Additionally, students in Ms. Walls' class did not choose their topics for their year-end AP AAS project presentations and reports until January. As they began their studies, Ms. Walls again waited for a determination of ADE's review of the AP AAS and she looked for guidance from Secretary Oliva and ADE, who were authorized to issue guidance on Section 16; but that guidance too never came. *See* Walls Suppl. Dec. ¶ 26. That guidance could have provided critical information on how to comply with the incredibly vague statute, without jeopardizing their employment. *Id.* Thus, any "delay" in filing lawsuit resulted only from the actions and inaction by Defendants. As Ms. Walls stated, "…we waited, patiently, for several months for additional guidance to help clarify the law for educators and students across the state and for a final determination that the AP AAS for 2023-24 does not conflict with the LEARNS Act."  *See* Walls Suppl. Dec. ¶ 26.

### C.  The balance of equities and public interest tips decidedly in favor of plaintiffs

In this case, a mandatory injunction is necessary to upset the status quo rather than preserve it and such is appropriate as an injunction will not cause Defendants any harm, much less irreparable harm. "A mandatory injunction, like a mandamus, is an extraordinary remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial discretion." *Morrison v. Work*, 266 U.S. 481, 490 (1925). "[W]here the status quo is a condition not of rest, but of action, and the condition of rest  . . . will cause irreparable harm, a mandatory preliminary injunction is proper. *Ferry-Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir. 1984). As discussed above and in Plaintiffs' Memorandum in Support, this is an instance in which action is required to disrupt the status quo and prevent the continuation of irreparable harms. *See id.*

Additionally, contrary to Defendants' assertion that Plaintiffs' request for injunctive relief is too broad, Plaintiffs' motion focuses narrowly on Section 16, more specifically Section 6-16-156, otherwise known as the "Indoctrination" provision. Plaintiffs do not request that the Court temporarily enjoin the entirety of the LEARNS Act or even Section 16's other provision, Section 6-6-157, which pertains to child sexual abuse and human trafficking. Plaintiffs' request for injunctive relief focuses specifically on Section 6-16-156 because that is the statute violating their rights under the First and Fourteenth Amendments. Defendants fail to suggest how a more limiting injunction would still temporarily halt Plaintiffs' harms.

Furthermore, and as stated above (*see supra* Section III), Defendants' post-hoc suggestion that Section 16 is intended to prohibit discrimination is unavailing and only masks their real attempts to restrain and chill ideas and topics with which the State disagrees. Creating a burden on free speech violates the First Amendment akin to outright bans. *Sorrell v. IMS Health Inc,* 564 U.S. 552, 565-66 (2011) (There is "but 'a matter of degree" separating burdens on speech and outright bans) (quoting *United States v. Playboy Entertainment Group, Inc.* 529 U.S. 803, 812 (2000)).

As established in their Motion for Preliminary Injunction, Student-Plaintiffs and Teacher-Plaintiffs face irreparable harm with the self-censorship they have experienced in the classroom, including the removal of books from syllabi and shelves, restrained instruction, and other losses of First Amendment rights. Neither Ms. Walls, with her twenty-three years of teaching experience, nor Mr. Gilbert, with his eleven years of experience, have ever experienced such onerous, vague restrictions imposed on schools on not just "what is taught, but *how* it should be taught." Doc. 16 ¶ 42; Doc. 17 ¶ 16. The public will be served substantially better with a preliminary injunction that enjoins such unconstitutional acts.

**V.    Whether the *Ex Parte Young* Exception to Sovereign Immunity Applies to Plaintiffs' Claims Against Governor Sanders Should be Appropriately Addressed in a Motion to Dismiss**

Defendants argue that sovereign immunity bars Plaintiffs' claims against Governor Sanders because the responsibility for implementing Section 16 falls on Secretary Oliva and the Arkansas Department of Education. Opp. at 12. Defendants allude to the fact that Plaintiffs' complaint fails to allege sufficient facts to invoke the *Ex Parte Young* exception as to Governor Sanders. *Id.* (citing Am. Compl., Doc. 8 ¶ 3). However, such defenses are more appropriately decided through motion to dismiss briefing. *See, e.g.,* Fed. R. Civ. P. 12(b)(6). Governor Sanders, of course, is quoted throughout Plaintiffs' Amended Complaint, *see, e.g.,* Am. Compl. ¶¶ 3, 26, 59, 61-62, 116–17, 120, and, on information and belief, she is responsible with Secretary Oliva for purging public resources of "CRT" related materials and condemning the AP AAS on national television as "propaganda leftist agenda, teaching our kids to hate America and hate one another." *Id.* ¶¶ 65, 120. Whether she played any role in directing Secretary Oliva or the ADE to de-designate the AP AAS as an advanced placement course sufficient to invoke *Ex Parte Young* is an issue better suited for a motion to dismiss. Nevertheless, without waiving their right to assert arguments that Governor Sanders is a properly named defendant under *Ex Parte Young* in opposition to any motion to dismiss, Plaintiffs do not object if the Court issues a preliminary injunction against Secretary Oliva and the Arkansas Board of Education and reserves its decision on Governor Sanders.

**Conclusion**

For the above stated reasons and the reasons articulated in Plaintiffs' Motion and Memorandum in Support of Motion for Preliminary Injunction, Plaintiffs' respectfully request that the Court preliminarily enjoin enforcement of Section 16 of the LEARNS Act.

Dated: April 29, 2024                    Respectfully submitted,

                                         */s/ Michael J. Laux*
                                         Michael J. Laux
                                         E. Dist. Arkansas Bar No. 6278834
                                         LAUX LAW GROUP
                                         400 W. Capitol Avenue, Suite 1700
                                         Little Rock, Arkansas 72201
                                         Telephone: (501) 242-0750
                                         Facsimile: (501) 372-3482
                                         Email: mlaux@lauxlawgroup.com
                                                  mikelaux@icloud.com

                                         Austin Porter, Jr.
                                         E. Dist. Arkansas Bar No. 86145
                                         PORTER LAW FIRM
                                         The Tower Building
                                         323 Center Street, Suite 1035
                                         Little Rock, AR 72201
                                         Telephone: (501) 224-8200
                                         Email: aporte5640@aol.com

                                         David Hinojosa *
                                         D.C. Bar No. 1722329
                                         Email: dhinojosa@lawyerscommittee.org
                                         Maya Brodziak *
                                         N.Y. Bar No. 5495114
                                         Email: mbrodziak@lawyerscommittee.org
                                         Chavis Jones *
                                         D.C. Bar No. 1739219
                                         Email: cjones@lawyerscommittee.org
                                         Zakiya Lewis *
                                         D.C. Bar No. 90020187
                                         Email: zlewis@lawyerscommittee.org
                                         LAWYERS' COMMITTEE FOR CIVIL
                                         RIGHTS UNDER LAW
                                         1500 K St. NW, Suite 900
                                         Washington, DC 20005
                                         Telephone: (202) 662-8600

                                         *Counsel for Plaintiffs*
                                         *Admitted pro hac vice

## CERTIFICATE OF SERVICE

I certify that on April 29th, 2024, the foregoing was filed through the Court's CM/ECF system. Notice of this filing will be sent by email to all counsel of record by the Court's electronic filing system:

Timothy Griffin
Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
oag@arkansasag.gov

Michael Cantrell
Assistant Solicitor General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Michael.Cantrell@arkansasag.gov

Justin Brascher
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Justin.Brascher@arkansasag.gov

Jordan Broyles
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Jordan.Broyles@arkansasag.gov

Christine Cryer
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Christine.Cryer@arkansasag.gov

Dated: April 29, 2024

By: */s/ Michael J. Laux*
Michael J. Laux
*Counsel for Plaintiffs*