**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**RUTHIE WALLS,** *et al.*                                                            **PLAINTIFFS**

**v.**                              **Case No. 4:24-cv-00270-LPR**

**SARAH HUCKABEE SANDERS, in her
official capacity as the Governor of the State
of Arkansas,** *et al.*                                                              **DEFENDANTS**

## ORDER

    In this case, Plaintiffs—two public school teachers, two public school students, and the Arkansas State Conference of the NAACP—are challenging the constitutionality of Section 16 of the LEARNS Act.[1]  The Plaintiffs' operative Complaint presses a wide variety of claims.[2]  But their Preliminary Injunction Motion—which is the subject of today's Order—is much narrower. The Teacher Plaintiffs assert a Fourteenth Amendment due process claim.[3]  The Student Plaintiffs assert a First Amendment right to receive information claim.[4]  Those are the only claims the Court is evaluating for purposes of determining whether preliminary injunctive relief is appropriate. Furthermore, given that the Plaintiffs have all but conceded the impropriety of granting preliminary injunctive relief against Governor Sanders, the Court's Order will focus on the Plaintiffs' request for preliminary injunctive relief against Secretary Oliva and the members of the Arkansas State Board of Education.[5]

---

[1] Am. Compl. (Doc. 8) at 1.

[2] *Id.* at 47–58.

[3] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 20–28.

[4] *Id.* at 28–33.

[5] For the reasons explained in the State Defendants' Brief, *see* Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 12, it is unlikely that the *Ex Parte Young* exception to the sovereign immunity doctrine applies to the claims made against the Governor.  *See Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015).  Although

Boiled down to their essence, the arguments in this case are not hard to grasp.  The Teacher Plaintiffs contend that Section 16 of the LEARNS Act is so vague as to violate due process.[6] Because they don't want to suffer the consequences of accidentally running afoul of Section 16, they are self-censoring what and how they teach.[7]  The Student Plaintiffs contend that the self-censorship just described is depriving them of being taught things they would have otherwise learned if Section 16 were not in existence.[8]  And because Section 16 lacks any legitimate pedagogical reason, this deprivation of information constitutes a First Amendment violation.[9]  The State Defendants disagree.  They contend that Section 16 is not unconstitutionally vague and does not require the self-censorship in which the Teacher Plaintiffs are engaging.[10]  Because Section 16 does not require that self-censorship, Section 16 is not the cause of any deprivation of information to which the Student Plaintiffs have been subject.[11]  And, in any event, the First Amendment does not give students a right to control what the State decides to teach them or not teach them.[12]

A preliminary injunction is considered extraordinary relief.[13]  It is not supposed to be granted lightly.  Where a plaintiff seeks to preliminarily enjoin the enforcement or application of a duly enacted statute, binding precedent requires a district court to consider the following factors

---

formally preserving their right to contest this point at a later time in this litigation, Plaintiffs don't put up any serious fight on the point now.  *See* Pls.' Reply to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 39) at 28 ("Plaintiffs do not object if the Court issues a preliminary injunction against Secretary Oliva and the Arkansas Board of Education and reserves its decision on Governor Sanders.").  The Motion for Preliminary Injunction is denied to the extent it seeks preliminary relief against Governor Sanders.

[6] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 20.

[7] Ms. Walls Decl. (Doc. 16) at ¶¶ 15, 17, 38; Mr. Gilbert Decl. (Doc. 17) at ¶¶ 11, 12, 16, 31.

[8] Ms. Reynolds Decl. (Doc. 18) at ¶¶ 14–15; Ms. Davis Decl. (Doc. 19) at ¶¶ 15–16.

[9] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 32.

[10] Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 18–20, 23–27.

[11] *Id.* at 18, 24–27.

[12] *Id.* at 14–17.

[13] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

in determining whether the requested relief is appropriate: (1) the likelihood of irreparable harm to the plaintiff in the absence of a preliminary injunction; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties, including consideration of the public interest; and (3) the likelihood that the plaintiff will succeed on the merits.[14]

The plaintiff bears the burden of proof and persuasion on each factor.[15]  No one factor is determinative.[16]  But the existence of irreparable harm is a necessary precondition to the issuance of preliminary relief.[17]  And a plaintiff's likelihood of success is of outsized importance in the overall analysis.[18]  That factor cuts in favor of a plaintiff only if the plaintiff shows a "substantial likelihood of success on the merits,"[19] which essentially means showing that the plaintiff "is likely to prevail on the merits."[20]

With these principles in mind, the Court will sketch out the relevant background facts and then analyze each claim.  It is important to understand that, because Plaintiffs bear the burden of persuasion as to each preliminary injunction factor,[21] they correspondingly bear the burden of proof as to any disputed facts.  It is equally important to understand, however, that this case is at a

---

[14] *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (setting out the usual four factor test); s*ee also Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022) (explaining that the balance-of-harms factor and the public-interest factor merge when state officials in their official capacities are the nonmoving party); *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (increasing the bar on the probability-of-success factor where a plaintiff seeks to enjoin a statute).

[15] *See Morehouse Enter., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023).

[16] *See Dataphase Sys., Inc.*, 640 F.2d at 113.

[17] *See Winter*, 555 U.S. at 22.

[18] *See Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

[19] *Rounds*, 530 F.3d at 731 (quotation marks and citation omitted).

[20] *Id.* at 732.

[21] *See MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

very preliminary stage of the proceedings and has not had the benefit of discovery, live testimony, and months of considered research into the caselaw.  Accordingly, any facts stated herein and any legal analysis provided must be considered tentative and subject to change over the course of the litigation.

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction.

## I. BACKGROUND FACTS

### A. *Section 16's Genesis and Language*

On the Plaintiffs' telling, our story begins back on January 10, 2023.  That is when Governor Sarah Huckabee Sanders issued an Executive Order entitled "Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools."[22]  To be clear, this Executive Order is not directly at issue in this case.  Plaintiffs have not, in either their Preliminary Injunction Motion or their operative Complaint, challenged the enforcement, implementation, or application of Governor Sanders's Executive Order.[23]  Nonetheless, Plaintiffs believe the Executive Order is relevant because a large share of the language in Section 16 of the LEARNS Act appears to have been drawn from the Executive Order.  The operative provisions of the Executive Order read as follows:

> (1) The Secretary of the Department of Education (the "Secretary") shall take the following steps to ensure that the Department of Education, its employees, contractors, guest speakers, and lecturers are in compliance with Title IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241):

---

[22] Ark. Executive Order 23-05.

[23] Mot. for Prelim. Inj. (Doc. 14) at 1; Am. Compl. (Doc. 8) at 58–59.  Accordingly, if the Court were to enter a preliminary injunction, the scope of that injunction should not, could not, and would not reach the enforcement, implementation, or application of the Executive Order.

a. Review the rules, regulations, policies, materials, and communications of the Department of Education to identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as CRT, that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

b. The Secretary is further instructed that if any items are found to conflict with the principle of equal protection under the law, then the Secretary is instructed to amend, annul, or alter those rules, regulations, policies, materials, or communications to remove the prohibited indoctrination.

c. Prohibited Indoctrination Defined: No communication by a public-school employee, public school representative, or guest speaker shall compel a person to adopt, affirm or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241), including that:

   i. People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

   ii. An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

d. Nothing in this section shall be construed to prohibit the discussion of ideas and history of the concepts described in subsection (c) or shall be construed to prohibit the discussion of public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable or offensive.

(2) As it relates to employees, contractors, and guest speakers or lecturers of the Department of Education, the Secretary is directed to review and enhance the policies that prevent prohibited indoctrination, including CRT.

(3) The Secretary shall ensure that no school employee or student shall be required to attend trainings or orientations based on prohibited indoctrination or CRT.[24]

---

[24] Ark. Executive Order 23-05.

The record does not contain a huge amount of information regarding implementation of the Executive Order.  But it contains some.

For example, the Arkansas Department of Education told the Fayetteville School District that asking students what their gender or gender identity was, including they/them/theirs options for preferred pronouns, and conspiring to keep students' gender identities secret from their parents violated the Executive Order.[25]  The Department also found that a presentation to teachers at North Little Rock High School violated the Executive Order because it instructed participants to acknowledge that they harbored unconscious bias, asked teachers to host classroom discussions around systemic racism, included a video demeaning police officers and justifying the looting that occurred in the summer of 2020, positively highlighted some of the goals of the 2020 Black Lives Matter movement, and encouraged educators to curtail disciplinary policies if they disproportionately affected minority students.[26]

---

[25] Ex. 7 (Ark. Dep't of Educ. Handout) to Ms. Baum Decl. (Doc. 15-7) at 2.

[26] *Id.* at 2.  These examples come from an undated handout prepared by the Arkansas Department of Education and entitled "Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions."  Although the handout includes additional examples where the Arkansas Department of Education has reached out to schools concerning parts of their programming, the handout does not clearly state that these other examples are ones in which the Executive Order is being violated.  *Id.* at 3–6.  In addition to the handout, the Plaintiffs cite to an article from the Northwest Arkansas Democrat-Gazette to show that the Department has used the Executive Order to remove resources from its website.  Resources removed from the website pursuant to the Executive Order include resources from the Library of Congress, the Brown University Library, the Yale eUniversity Library, the UMASS Amherst Libraries, WeTeach NYC, National Geographic, the National Council for Geographical Education, the National Council for Social Studies, Everfi, and the Center for Information & Research on Civic Learning and Engagement.  Resources removed also include articles from ABC-CLIO, a "Key Arkansans" list, a link to the "Civil Rights and Social Change" page from the Central Arkansas Library System's Encyclopedia of Arkansas, links to New York Times education material, links to the National Education Association, links to the Martin Luther King, Jr. Research and Education Institution, links to Selma Online, a link to an activity from the American Bar Association, and material from CALS Butler Center titled "Arkansas' top ten events of the century…says who? why? Deciding what is important in history."  *See* Josh Snyder, *Arkansas Education Department Changes, Removes Social Studies Resources after Sanders' Executive Orders*, NORTHWEST ARKANSAS DEMOCRAT GAZETTE (Mar. 17, 2024, 4:19 PM).

On March 8, 2023, less than two months after the Executive Order was issued, Arkansas enacted Ark. Code Ann. § 6-16-156 as part of the LEARNS Act.[27]  It is colloquially known as Section 16,[28] and it reads as follows:

(a)(1) The Secretary of the Department of Education shall take established steps to ensure that the Department of Education and its employees, contractors, guest speakers, and lecturers are in compliance with Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352.

(2) Steps required under subdivision (a)(1) of this section shall include the review of the rules, policies, materials, and communications of the Department of Education to identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies such as Critical Race Theory, otherwise known as "CRT", that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

(3) The secretary shall amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination and that conflict with the principle of equal protection under the law.

(b) As used in this section, "prohibited indoctrination" means communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352, including that:

(1) People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or

(2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any

---

[27] 2023 Ark. Laws Act 237 (S.B. 294).

[28] Section 16 of the LEARNS Act includes another statute aside from Ark. Code Ann. § 6-16-156.  However, for purposes of this Order, when the Court refers to Section 16, it means only Ark. Code Ann. § 6-16-156.  This provision of law is also known as "the indoctrination provision."

other characteristic protected by federal or state law.

(c) This section does not prohibit the discussion of:

(1) Ideas and the history of the concepts described in subsection (b) of this section; or

(2) Public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive.

(d) As it relates to employees, contractors, and guest speakers or lecturers of the department, the secretary shall review and enhance the policies that prevent prohibited indoctrination, including Critical Race Theory.

(e) The secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory.

(f) The State Board of Education may promulgate rules to implement this section.[29]

With small deviations that are not relevant to this case, subdivisions (a)(1) and (a)(2) of Section 16 mirror the opening operative provisions of Governor Sanders's Executive Order.[30]  And while the wording of subdivision (a)(3) of Section 16 has been rearranged from the wording of a provision in the Executive Order, the substance of the two provisions are commensurate.[31]

Essentially, both the Executive Order and Section 16 direct the Secretary to "review . . . the rules, policies, materials, and communications of the Department of Education to identify" items that "promote teaching" that "indoctrinate[s] students with ideologies" that "conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state

---

[29] Ark. Code Ann. § 6-16-156.

[30] Ark. Code Ann. § 6-16-156(a)(1)–(a)(2); Ark. Executive Order 23-05(1)–(1)(a).

[31] Ark. Code Ann. § 6-16-156(a)(3); Ark. Executive Order 23-05(1)(b).

law."[32]    And both tell us what the Secretary should do if he finds items that constitute this

"prohibited indoctrination" and also conflict with the principle of equal protection under the law:

He must "amend, annul, or alter" such items.[33]

Of course, the word indoctrination is open to many interpretations.  That is likely why the

Executive Order and Section 16 go on to specify what counts as "prohibited indoctrination":

> "prohibited indoctrination" means communication by a public school employee,
> public school representative, or guest speaker that compels a person to adopt,
> affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights
> Act of 1964, Pub. L. No. 88-352, including that:
>
> > (1) People of one color, creed, race, ethnicity, sex, age, marital status, familial
> > status, disability status, religion, national origin, or any other characteristic
> > protected by federal or state law are inherently superior or inferior to people of
> > another color, creed, race, ethnicity, sex, age, marital status, familial status,
> > disability status, religion, national origin, or any other characteristic protected
> > by federal or state law; or
> >
> > (2) An individual should be discriminated against or receive adverse treatment
> > solely or partly because of the individual's color, creed, race, ethnicity, sex, age,
> > marital status, familial status, disability status, religion, national origin, or any
> > other characteristic protected by federal or state law.[34]

There is one potentially relevant divergence between the Executive Order and Section 16 here.

The Executive Order directly prohibits public school teachers from engaging in prohibited

indoctrination.[35]  Section 16 does not.[36]  But the definitions of "prohibited indoctrination" in the

two enactments are the same.[37]

---

[32] Ark. Code Ann. § 6-16-156(a)(2); Ark. Executive Order 23-05(1)(a).

[33] Ark. Code Ann. § 6-16-156(a)(3); Ark. Executive Order 23-05(1)(b).

[34] Ark. Code Ann. § 6-16-156(b).

[35] Ark. Executive Order 23-05(1)(c).

[36] Ark. Code Ann. § 6-16-156(b).

[37] Ark. Code Ann. § 6-16-156(b); Ark. Executive Order 23-05(1)(c).

Likely for the same reason that a definition of prohibited indoctrination was created in the first place—i.e., because the word indoctrination itself can be open to many interpretations—the Executive Order and Section 16 both took an extra step to make clear they were not trying to reach ordinary teaching.[38]  They both explained that their proscriptions did not "prohibit the discussion of [i]deas and history of . . . concepts" or "[p]ublic policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive."[39]

Aside from Section 16's authorization for the State Board of Education to create regulations to implement Section 16[40]—they haven't created such regulations to date—the Executive Order and Section 16 close the same way:

> (d) As it relates to employees, contractors, and guest speakers or lecturers of the department, the secretary shall review and enhance the policies that prevent prohibited indoctrination, including Critical Race Theory.

> (e) The secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory.[41]

These last provisions are frustrating.  Read literally, the first one suggests "Critical Race Theory" is, by its very nature, "prohibited indoctrination."  But the second one suggests that "prohibited indoctrination" and "Critical Race Theory" are not inherently linked.

### B.  Section 16's Implementation and Effects

There is some evidence that the scope of the prohibitions contained in Section 16 has been interpreted very broadly by the State of Arkansas.  First, on the same day that Governor Sanders

---

[38] Ark. Code Ann. § 6-16-156(c); Ark. Executive Order 23-05(1)(d).

[39] Ark. Code Ann. § 6-16-156(c); Ark. Executive Order 23-05(1)(d).

[40] Ark. Code Ann. § 6-16-156(f).

[41] Ark. Code Ann. § 6-16-156(d)–(e); Ark. Executive Order 23-05(2)–(3).

signed the LEARNS Act into law, she tweeted "[w]hen I sign my education plan into law today, CRT and all forms of racism and leftist indoctrination in our schools will be outlawed."[42] That tweet seems to suggest—or at least could be reasonably understood as suggesting—that Section 16 prohibits the teaching of Critical Race Theory.

Second, in August of 2023, less than one month after Section 16 permanently took effect, Secretary Oliva ordered the removal of the state-based AP designation then associated with the pilot AP African-American Studies course for the 2023–2024 school year.[43] To be sure, Defendants present evidence that the removal of the state-based AP designation was because the AP African-American Studies course was still a pilot, and the prior year's AP designation was a mistake.[44] But whether or not that is true, Secretary Oliva told news media on or around August 15, 2023, that the "class could potentially run afoul of [the Governor's] executive order on teaching implicit bias as well as the LEARNS [Act] and other Arkansas laws."[45] And the Department's Communications Director told news media that "Arkansas law contains provisions regarding prohibited topics" and "[w]ithout clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law."[46]

---

[42] Sarah Huckabee Sanders (@SarahHuckabee), X (formerly known as TWITTER) (Mar. 8, 2023, 11:49 AM), https://twitter.com/SarahHuckabee/status/1633525249978368001?.

[43] Ms. Walls Suppl. Decl. (Doc. 40) at ¶ 17; Ex. 1 (Secretary Oliva Decl.) to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36-1) at ¶ 18; Am. Compl. (Doc. 8) at ¶¶ 8, 105. The parties spill a lot of ink over the meaning of the credentialing, designation, and course-catalog placement of the AP African-American Studies course. That is fine, as it arguably bears on how the State Defendants interpret and have enforced Section 16. But the Court wants to make clear that the credentialing, designation, and course-catalog placement of the AP course cannot itself be a violation of the Teacher Plaintiffs' alleged due process rights or the Student Plaintiffs' alleged Free Speech Clause right to receive information.

[44] Ex. 1 (Secretary Oliva Decl.) to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36-1) at ¶ 16.

[45] Jacob Murphy, *Arkansas Department of Education Pulls Approval for AP African American Studies Course*, 40/29 News (Aug. 15, 2023, 9:24 AM) https://www.4029tv.com/article/arkansas-ap-african-american-studies/44810056.

[46] Austin Gelder, *Arkansas Education Chief Pushes Easily Debunked Excuse for Rejecting AP African American Studies*, Arkansas Times (Aug. 15, 2023, 2:16 PM), https://arktimes.com/arkansas-blog/2023/08/15/arkansas-education-chief-pushes-easily-debunked-excuses-for-rejecting-ap-african-american-studies-program-on-track-in-39-

Third, although the State Board of Education has not implemented any regulations pursuant to Section 16, the Arkansas Department of Education's website does provide some guidance concerning Section 16. The website states that the Department of Education "has enhanced processes and policies that prevent prohibited indoctrination, including Critical Race Theory, as it relates to employees, contractors, and guest speakers or lecturers of the department."[47] As does the language of subdivision (d) of Section 16, this language seems to suggest—or at least could be reasonably understood as suggesting—that the Department believes Section 16 equates Critical Race Theory with prohibited indoctrination and that the Secretary is enforcing Section 16 with this understanding.

---

other-states. Moreover, on August 21, 2023, Secretary Oliva sent a letter to superintendents that read:

> As a governing entity, the Arkansas Department of Education (the "Department") is charged with oversight of education in public school districts, which includes ensuring school district compliance with state law and State Board of Education rules. Since the Advanced Placement African[-]American Studies pilot program is a direct partnership between your school district and College Board, the Department has not been provided the necessary materials and resources needed to enable the Department to support districts in complying with the law and rules.

> Given some of the themes included in the pilot, including "intersections of identity" and "resistance and resilience," the Department is concerned the pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory (CRT). (See Ark. Code Ann. § 6-16-156, as amended by Section 16 of the LEARNS Act).

> To assist public school employees, representatives, and guest speakers at your district in complying with the law, please submit all materials, including but not limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and training materials, to the Department by 12:00pm on September 8, 2023, along with your statement of assurance that the teaching of these materials will not violate Arkansas law or rule. Items can be scanned and emailed to ade.commissioner@ade.arkansas.gov.

> The Department values its partnership with districts to provide students accelerated opportunities to earn early college credit. If you have any questions, please contact the Department at your earlier convenience.

Ex. 4 (Aug. 21, 2023, Secretary Oliva Letter) to Ms. Baum Decl. (Doc. 15-4).

[47] *LEARNS Act 237 of 2023*, Ark. Dep't of Educ.: Div. of Elementary & Secondary Educ., https://dese.ade.arkansas.gov/Offices/special-projects/learns-act-237-of-2023-.

In response to the enactment of Section 16 and Secretary Oliva's subsequent actions, the Teacher Plaintiffs have self-censored what and how they teach.[48]  They have done so even though Section 16 contains no enforcement mechanism to punish individual teachers for engaging in whatever type of classroom conduct Section 16 prohibits.[49]  On this point, Defendants lend Plaintiffs a hand by conceding that a teacher could be punished (up to losing his or her license) by the State Board of Education for engaging in whatever type of classroom conduct Section 16 prohibits if that teacher knew or reasonably should have known that his or her conduct violated Section 16.[50]

The Teacher Plaintiffs say that, to avoid any possibility of running afoul of Section 16, they engage in a good deal of self-censorship with respect to their classroom instruction.[51]  It is worth summarizing the evidence to better understand the issue.  Let's start with the evidence provided by Mr. Jefferson, the President of the Arkansas State Conference of the NAACP.  He says that "teacher member[s] of the NAACP-Arkansas have reported censoring their instruction and materials."[52]  He does not tell us how many members he means.  He does not tell us what classes they teach or what the scope of their self-censorship is.  Nor does he provide the names of any teachers besides the two Teacher Plaintiffs already named in this lawsuit.[53]  He does note that (1) an unnamed high school English teacher no longer assigns the book *The Color Purple* to her students, and (2) the same unnamed high school English teacher no longer assigns "online videos

---

[48] Ms. Walls Decl. (Doc. 16) at ¶¶ 15, 17, 38; Mr. Gilbert Decl. (Doc 17) at ¶¶ 11, 12, 16, 31.

[49] Ark. Code Ann. § 6-16-156.

[50] Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 16:53:53–16:56:28, Apr. 30, 2024;  Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 9.

[51] Ms. Walls Decl. (Doc. 16) at ¶¶ 15, 17, 38; Mr. Gilbert Decl. (Doc. 17) at ¶¶ 11, 12, 16, 31.

[52] Mr. Jefferson Decl. (Doc. 20) at ¶ 12.

[53] *Id.* at ¶ 11.

of Roland Martin[] to supplement her instruction on relevant matters."[54]  The Court is given no

hint as to what specifically in *The Color Purple* and the Roland Martin videos this unnamed teacher

believes violates (or would be understood by Defendants as violating) Section 16.

Evidence has also been provided by the named Teacher Plaintiffs.  Ms. Walls currently

teaches four sections of AP African-American Studies to students at Central High School in Little

Rock.[55]  Among other recent accolades, she was Central High's Teacher of the Year this year.[56]

She "strive[s] to expose [her] students to perspectives and ideas from all walks of life as relevant

to [her] teachings."[57]  She believes that "it is vital that students be able to take in information,

research it for themselves to see the whole picture, and come to their own conclusions."[58]  She

wants to "empower [students] to be informed . . . members of society."[59]  She is "intentional about

building a classroom culture that feels safe for all . . .[,]" and she "make[s] sure [her] students

understand that every voice will be heard."[60]  She "teach[es] [students] what civil discourse looks

like so they can respectfully listen to everyone's perspective."[61]

Ms. Walls says that, because of Arkansas's "anti-indoctrination" law, she has altered what

information she gives students in her class.[62]  She says that she "changed the way [she] teache[es]"

the AP African-American Studies curriculum by "avoiding discussions of certain aspects of"

---

[54] *Id.* at ¶ 12.

[55] Ms. Walls Decl. (Doc. 16) at ¶¶ 3, 6.

[56] *Id.* at ¶ 4.

[57] *Id.* at ¶ 7.

[58] *Id.* at ¶ 8.

[59] *Id.*

[60] *Id.* at ¶ 9.

[61] *Id.*

[62] *Id.* at ¶¶ 13–15.

intersectionality.[63]  She doesn't say which "aspects" she avoids.  And she concedes that the College Board—not the Arkansas Department of Education—removed intersectionality as a "main topic" from the course curriculum.[64]  Still, she notes that "the curriculum . . . requires that [she] discuss intersectionality issues."[65]  To aid in that discussion, she wanted to use "a couple of critical, helpful sources, including . . . an article [titled Intersectionality] by Kimberle Crenshaw published in 1991 by the Stanford Law Review."[66]  But she didn't use any of these materials because she believed "Secretary Oliva had specifically called out 'intersections and identity' as a topic running afoul of the LEARNS Act in his August 21st letter . . . ."[67]  Aside from the one article, she does not tell us what specific materials she wanted to use or what specifically about those materials made her feel like they violate (or would be seen by Defendants as violating) Section 16.  As to the single article she did identify, she does not say what specifically about the article made her feel like it violates (or would be seen by Defendants as violating) Section 16.

Ms. Walls also says that she "changed the way [she] teache[es]" the AP African-American Studies curriculum by avoiding "certain aspects" of race.[68]  She no longer assigns *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* by Michelle Alexander.[69]  She does not explain why she believes assigning this book would violate (or be seen by Defendants as violating) Section 16.  She says she does not use—even though she wants to use—the New York Times's

---

[63] *Id.* at ¶ 13.

[64] *Id.* at ¶ 12; Ms. Walls Suppl. Decl. (Doc. 40) at ¶ 21.

[65] Ms. Walls Suppl. Decl. (Doc. 40) at ¶ 21.

[66] *Id.*

[67] *Id.* at ¶ 22.

[68] Ms. Walls Decl. (Doc. 16) at ¶ 13.

[69] *Id.* at ¶ 14.

"The 1619 Project" materials.[70]  She does not specify which of "The 1619 Project" materials she would like to use.  Nor does she explain why she believes those specific materials would violate (or be seen by Defendants as violating) Section 16.  She says she has been unable to provide "critical supports and resources (such as the book 'The 1619 Project')" to help students "prepare for their [required, year-end] presentations" on topics that those students selected themselves.[71]  Aside from the single book reference, she does not explain what specific "supports and resources" she is talking about.  And she does not explain—as to the unnamed "supports and resources" or the identified book—what specifically about those materials leads her to believe they violate (or would be seen by Defendants as violating) Section 16.

She says she has "self-censored [her] conversations and discussions with [her] students . . . ."[72]  But, aside from providing two "examples," she does not tell us anything about the extent of her self-censorship.  As to the two examples she does provide:  She no longer discusses "the effect" of *Brown v. Board of Education* "on black teachers and how the push to desegregate the schools led to many of those teachers losing their jobs," and she no longer "compare[s] the Jim Crow laws passed in the late 19th century and early 20th century to laws passed today."[73]  She says she self-censors on these topics because "they may be seen as divisive . . . and therefore violate Section 16."[74]  Her point seems to be that "anything divisive" is going to be considered either "Critical Race Theory" or "indoctrination" under the law.

---

[70] *Id.*

[71] Ms. Walls Suppl. Decl. (Doc. 40) at ¶ 24.

[72] Ms. Walls Decl. (Doc. 16) at ¶ 15.

[73] *Id.*

[74] *Id.*

Ultimately, Ms. Walls says that she "teach[es] [her] students the materials in the curriculum," but that she "do[es] not always model the skill of application involving certain topics . . . ."[75]  Again, except as described above, she does not explain further.  The Court is left to guess at what "not always" and "certain topics" means.

The other Teacher Plaintiff is Mr. Gilbert, who teaches a debate class and a freshman oral communications class at Central High.[76]  Like Ms. Walls, Mr. Gilbert "strive[s] to expose [his] students to perspectives and ideas from all walks of life as relevant to [his] teachings."[77]  He "want[s] students to be able to listen to people who do not look like them, speak articulately, and deliver a point respectfully."[78]  The state standards for the debate class include "gain[ing] an understanding of the fundamentals of argumentation"; "express[ing] ideas and present[ing] information in a variety of oral advocacy situations from small group discussions to formal debates"; "utiliz[ing] research skills and collect[ing] well-sourced evidence"; "analyz[ing] and rebut[ting] opposing arguments"; "participat[ing] in debates inside and outside the classroom"; "synthesiz[ing] socioeconomic, ethical, and/or philosophical reasoning that influences current issues"; and "develop[ing] individual and group perspectives on the importance of debate to both local and global communities."[79]  And the state standards for the oral communication class include "aquir[ing] an understanding of the dynamics of effective communication while speaking, listening, and responding in" real-life scenarios; "practic[ing] communication competencies in both intrapersonal and interpersonal environments"; "prepar[ing] for both informal and formal

---

[75] *Id.* at ¶ 38.

[76] Mr. Gilbert Decl. (Doc. 17) at ¶ 3.

[77] *Id.* at ¶ 4.

[78] *Id.* at ¶ 5.

[79] *Id.* at ¶ 6.

communication"; and "participat[ing] in a variety of formal and informal personal communication experiences."[80]

To help students achieve these goals, Mr. Gilbert "typically use[s] issues that students care about and are relevant to their lives" because that "increases their engagement and ability to learn effectively."[81]  Prior to the passage of the LEARNS Act, this "included topics such as racial and gender equality and gender and sexual identification, as well as disability, among others."[82]  Mr. Gilbert says that, since the passage of Section 16, he has "cut topics in [his] classes" and has "self-censored [himself] and [his] conversations and discussions with [his] students . . . ."[83]  He does not explain the scope of the topics he cut or the scope of his self-censorship.  He does provide a few examples, but he does not tell us for which class he had used the cut materials or self-censored information prior to the enactment of Section 16.

Mr. Gilbert notes that the cut topics "include . . . an introductory chapter on CRT" and "a chapter on gender and sexuality."[84]  It is not clear if Mr. Gilbert is talking about chapters of one or more unidentified books or chapters of his lesson plans.  But what is clear is that Mr. Gilbert does not explain what specifically about these "chapters" he believes violates (or would be seen by Defendants as violating) Section 16.  Indeed, Mr. Gilbert is quite clear that he "never used CRT or any ideologies in [his] class to suggest that any person should be discriminated against or that they are superior or inferior solely as a result of their race, ethnicity, sex, or other characteristic

---

[80] *Id.* at ¶ 7.

[81] *Id.* at ¶ 8.

[82] *Id.*

[83] *Id.* at ¶ 11.

[84] *Id.* at ¶¶ 12–13.

identified in Section 16."[85]  And Mr. Gilbert is quite clear that he has never used any materials to "indoctrinat[e] students."[86]

Mr. Gilbert "no longer use[s] excerpts" of a book called *Warriors Don't Cry*.[87]  All he says about the excerpts is that they "help[ed] students understand the racial and social implications of the Little Rock Nine's desegregation of Central High and build their academic skills."[88]  He does not tell us what the excerpts had to do with either of his classes, nor what specifically about the excerpts he believes violates (or would be understood by Defendants as violating) Section 16. He does allude to his concern that "some white students—or even one—may feel that [he] was trying to make them feel like all [w]hite people were like that or feel uncomfortable."[89]

Mr. Gilbert explained that this year's "policy debate" was "focused on fiscal redistribution," and that he "had to censor [himself] from provoking discussions of potential intersections between race and poverty that may affect fiscal redistribution . . . ."[90]  He never explains how "provoking discussions" could violate (or be understood by Defendants as violating) Section 16.

Mr. Gilbert says he has removed "any units that discuss" Critical Race Theory "directly or discuss any issues too closely to systemic racism, inequity, intersectionality, and similar issues."[91] Aside from the examples previously provided, this doesn't tell us much because we don't know what "units" he is specifically talking about.  In a similar vein, Mr. Gilbert says he "cannot . . .

---

[85] *Id.* at ¶ 12.

[86] *Id.* at ¶ 13.

[87] *Id.* at ¶ 14.

[88] *Id.*

[89] *Id.*

[90] *Id.* at ¶ 16.

[91] *Id.* at ¶ 22.

bring[] in speakers who may want to share a viewpoint that may run afoul of Section 16."[92]  But he does not actually say he wants to bring in any speakers for his classes.

Mr. Gilbert says he doesn't feel like he can share with the class his "personal experience of being pulled over along with other Black friends late [at] night by law enforcement for no apparent violation and communicating with the officer in ways that helped de-escalate the situation."[93]  He used to share this story "as a learning tool in [his] classroom" to "connect with students."[94]  Mr. Gilbert does not tell us why he thinks this story would violate (or would be understood by Defendants as violating) Section 16.

Mr. Gilbert suggests (although he doesn't actually say it) that he is self-censoring "instruction and materials" that might help students prepare year-end presentations on a hypothetical bill that "[t]he students choose" and then present on "either as a 'Whig' or 'Loyalist.'"[95]  It is unclear whether each student chooses their own bill topic, or the students collectively choose.  In any event, Mr. Gilbert does not say what bill topic or topics the students have chosen (although he does note that some of the potential topics included things like abortion, gun control, and police trainings).[96]  Nor does Mr. Gilbert tell us what materials or instruction he is holding back or may hold back.

In addition to discussing his classes, Mr. Gilbert discusses Central High's debate program.[97]  It appears he runs the debate program.[98]  With respect to both the debate class and the

---

[92] *Id.* at ¶ 25.

[93] *Id.* at ¶ 24.

[94] *Id.*

[95] *Id.* at ¶ 31.

[96] *Id.*

[97] *Id.* at ¶ 28.

[98] *Id.*

debate program, Mr. Gilbert notes that it is "basic teaching and learning for debate that students learn and research both sides [of an issue] and that they will have to adopt or profess an idea that could include things such as affirmative action, legacy admissions, and even Jim Crow laws."[99] Mr. Gilbert does not suggest that he has stopped using this "basic teaching" method.  With respect to the debate program, however, he says that he has "removed any topics and positions related to race from [the] program."[100]

The Court wants to be clear.  The Teacher Plaintiffs' declarations do—when looked at as a whole—provide a general sense of why the Teacher Plaintiffs are self-censoring.  They believe Section 16 prohibits the mere teaching of anything that might fall within an unsophisticated definition of Critical Race Theory.[101]  And they believe the materials and information they have cut from the classroom might fall within that unsophisticated definition.[102]  But this general no-teaching-of-anything-that-could-be-misconstrued-as-CRT view is really the only thing the Teacher Plaintiffs' declarations point to as an explanation for why the materials and instruction they've cut needed to be cut.  They've pointed to nothing more specific than that for any particular cut material or instruction.

## C.  Student Reaction

Unsurprisingly, the two Student Plaintiffs—both of whom are in Ms. Walls's AP African-American Studies class—are unhappy with all this self-censoring.[103]  And so are unnamed "student members" of the Arkansas State Conference of the NAACP, who "are in the classes of Ms. Ruthie

---

[99] *Id.* at ¶ 19.

[100] *Id.* at ¶ 28.

[101] *Id.* at ¶ 22; Ms. Walls Decl. (Doc. 16) at ¶ 18.

[102] Ms. Walls Decl. (Doc. 16) at ¶ 17; Mr. Gilbert Decl. (Doc. 17) at ¶ 22.

[103] Ms. Davis Decl. (Doc. 19) at ¶ 15; Ms. Reynolds Decl. (Doc. 18) at ¶ 14.

Walls and Mr. Colton Gilbert, among others."[104]  (The Court has not been told how many "student members" we are talking about.)

Student Plaintiff Gisele Davis explains that AP African-American Studies "goes more in-depth into the lives of historical figures and what they actually experienced" than other classes.[105] She "appreciate[s] the course because [she] get[s] to learn perspectives that are different and that you don't see in ordinary history books[,]" such that she can "look at history and events through a different lens."[106]  "The aspect of the course that [she] most appreciates is digging more into the history."[107]  She has "learned much more about research, citations, and in-depth study than ever before."[108]  And she really likes classes like this one, "where the teachers engage with the students and students engage with each other in the class."[109]  She says the course "helps" her to "see and learn" from others, including being "exposed to different perspectives."[110]  Ms. Davis says she "recently learned" that Ms. Walls has been "censor[ing] herself on teaching certain topics," which "keep[s] [Ms. Davis] from those important teachings and ideas."[111]  And Ms. Davis is "aware that certain resources on Black history have been pulled from the [Arkansas] Department of Education's website."[112]  Ms. Davis thinks that the removal of those resources "isn't fair."[113] Finally, Ms. Davis is "worried that [Ms. Walls] may be targeted" if Ms. Walls "helps [Ms. Davis]

---

[104] Mr. Jefferson Decl. (Doc. 20) at ¶ 11.

[105] Ms. Davis Decl. (Doc. 19) at ¶ 8.

[106] *Id.*

[107] *Id.* at ¶ 9.

[108] *Id.*

[109] *Id.* at ¶ 10.

[110] *Id.* at ¶ 12.

[111] *Id.* at ¶ 15.

[112] *Id.* at ¶ 17.

[113] *Id.*

with [Ms. Davis's] research and presentation" on a topic Ms. Davis selected: "Black women's leadership in the civil rights movement."[114]

Student Plaintiff Sadie Annabella Reynolds is also in Ms. Walls's AP African-American Studies class.[115]  Unlike Ms. Davis, who is a senior, Ms. Reynolds is a freshman.[116]  She "define[s] a good classroom experience as one with a lot of engagement and a free exchange of ideas."[117]  In her view, "there's no point in going into a classroom" if "a teacher or student isn't allowed to engage or be curious."[118]  Happily, the AP African-American Studies course "has exceeded [her] expectations . . . ."[119]  It has "open[ed] up" her mind "to a lot of history and information about African[-]American culture."[120]  "Ms. Walls has exposed [Ms. Reynolds] to so many great lessons in the class[,] including powerful documentaries and interesting reading materials." [121] Ms. Reynolds is "always learning about historic individuals and events that [she had] never heard of before."[122]  In the course, she has gotten "to learn multiple perspectives that are not included in most history books" and has had "the privilege to look at history through a different lens that broadens [her] understanding of historical context and deep-rooted issues that continue to impact communities in this country."[123]  The information she is studying "is helping to deepen [her]

---

[114] *Id.* at ¶ 18.

[115] Ms. Reynolds Decl. (Doc. 18) at ¶¶ 2, 6.

[116] *Id.* at ¶ 2.

[117] *Id.* at ¶ 5.

[118] *Id.*

[119] *Id.* at ¶ 6.

[120] *Id.*

[121] *Id.* at ¶ 7.

[122] *Id.*

[123] *Id.* at ¶ 8.

learning and educational experience[,]" and has refined her "critical thinking and analytical skills."[124]

Ms. Reynolds, who is white, "never feel[s] like Ms. Walls is trying to indoctrinate [her] or get [her] to accept certain information, ideas, or beliefs without questioning them."[125]  She never "feel[s] ashamed because of [her] race[,]" or "wronged because students are learning about experiences, cultures, or viewpoints that may differ from [her] own experience[s]."[126]  The AP African-American Studies course "has not caused [her] to think [she is] superior or inferior to anyone because of [her] race."[127]  She does "not feel like [she is] being targeted or asked to target others because of . . . race."[128]  She disclaims any notion that Ms. Walls is engaging in "indoctrination" as "pure fiction."[129]  While she thinks "Ms. Walls has done a great job teaching" this class, Ms. Reynolds "was upset to learn recently that . . . Ms. Walls may not be permitted to teach [the students] everything she planned on teaching [them] in the . . . course."[130]  Ms. Reynolds also learned that "Ms. Walls has had to censor some of her discussions with [the students] . . . ."[131]  Ms. Reynolds described the self-censorship as Ms. Walls "not digging deeper into her discussions about various topics and having to leave resources [such as The 1619 Project] at home . . . ."[132]

---

[124] *Id.*

[125] *Id.*

[126] *Id.* at ¶ 10.

[127] *Id.*

[128] *Id.*

[129] *Id.* at ¶ 20.

[130] *Id.* at ¶ 14.

[131] *Id.*

[132] *Id.*

Like Ms. Davis, Ms. Reynolds is concerned that the self-censorship "is depriving [her] of all the information [she] need[s] to be fully prepared to take the AP exam . . . ."[133]

## II.      LEGAL ANALYSIS

### A.  *The Teacher Plaintiffs' Fourteenth Amendment Due Process Claim*

The Teacher Plaintiffs' due process claim can't support a preliminary injunction because the Teacher Plaintiffs can't show a likelihood of irreparable harm in the absence of an injunction. Where plaintiffs have not carried their burden on the irreparable harm prong, courts in the Eighth Circuit "need proceed no further in analyzing" the other preliminary injunction factors.[134]  That's because likelihood of irreparable harm is an irreducible minimum requirement for a preliminary injunction.[135]  "Irreparable harm" signifies harm for which "a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."[136] To qualify, the harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief."[137]

The Teacher Plaintiffs primarily ground their assertions of irreparable harm in cases that hold "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[138]  The obvious problem with this position for the Teacher Plaintiffs is that they are not pressing First Amendment claims in this Motion.[139]  They are pressing only a

---

[133] *Id.* at ¶ 15.

[134] *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 999 (8th Cir. 2023).

[135] *See Winter*, 555 U.S. at 22.

[136] *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

[137] *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quotation marks and citation omitted).

[138] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 32–33 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Because the due process claim is only pressed by the Teacher Plaintiffs, any harm to the Student Plaintiffs is beside the point with respect to this particular claim.

[139] Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 15:22–57, Apr. 30, 2024 ("THE COURT: For the teachers, is it just

vagueness claim under the Fourteenth Amendment.[140]  And although they are asserting that the vagueness of Section 16 is causing them to self-censor, their assertions of self-censorship are strictly limited to what and how they are teaching their classes.[141]

This is important because, as the State Defendants pointed out in their briefing and at oral argument, when a teacher teaches class, he or she is speaking and acting on behalf of the State.[142]  Put another way, when performing their official teaching duties, public school teachers are in essence the mouthpiece of the State.[143]  That proposition is not universally accepted; indeed, it is one small part of a fairly deep circuit split.[144]  But the Court concludes that the proposition clearly

---

due process and sort of there's a like due process plus because it's the vagueness doctrine or is it both due process and First Amendment?"  "MS. BRODZIAK: It is essentially a due process plus argument.  Our claim is a due process claim based on vagueness . . . .");  *see id.* ("MS. BRODZIAK: So as I mentioned, we seek a preliminary injunction on two of our claims, an unconstitutional vagueness claim brought on behalf of our teacher plaintiffs and First Amendment right to receive claim brought on behalf of our student plaintiffs.").

[140] *Id.*

[141] Teacher Plaintiff Gilbert is also the debate coach.  But coaching the debate team is an official duty in the same way teaching class is.  *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988) (defining "curriculum" as activities that "are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences").

[142] *See* Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 14–15; Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 16:21:49– 16:22:38, Apr. 30, 2024; s*ee also Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker . . . .").  As noted above, all the speech that Teacher Plaintiffs have alleged that they have self-censored would fall under *Hazelwood's* definition of curricular speech.  *See supra* note 141.  That's another way of saying that all the speech that Teacher Plaintiffs have alleged that they have self-censored is speech that would be provided pursuant to their official duties.  As such, the Teacher Plaintiffs are self-censoring government speech as opposed to their own speech.

It is true that the *Garcetti* Court reserved judgment on whether *Garcetti's* holding applied to teachers.  *See Garcetti*, 547 U.S. at 425 ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.").  But, in context, that reservation was clearly related to university professors on a university campus.  Indeed, the majority's point was made in response to Justice Souter's dissent, which specifically addressed university professors and academic freedom in the university context.  *See id.* at 438–39 (Souter, J., dissenting).

[143] *See supra* note 142.

[144] There is a circuit split on whether teachers have any First Amendment rights for curricular speech.  The Eighth Circuit has yet to weigh in.  The reasoning of the Third, Fourth, and Fifth Circuits is far superior to the reasoning of the other circuit courts that have addressed this issue.  *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill.*

and ineluctably flows from Supreme Court precedent.  Instead of spending pages explaining why, the Court will approvingly refer the parties to Judge Sutton's concurrence in *Evans-Marshall v. Board of Educ. of Tipp City Exempted Vill. Sch. Dist.*[145]  For the reasons eruditely explained by Judge Sutton, "when . . . teachers speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech."[146]

Accordingly, to the extent the Teacher Plaintiffs are abstaining from using certain teaching materials or providing class instruction, those teachers are not censoring their own speech as individuals, but rather they are censoring what would otherwise be government speech.[147]  In this situation, it is not the Teacher Plaintiffs' First Amendment speech rights that are at risk of being chilled.  Any chill from a vague law isn't actually harming the Teacher Plaintiffs, let alone irreparably harming them.[148]

---

*Sch. Dist.*, 428 F.3d 223, 236 (6th Cir. 2005) (Sutton, J., concurring) (collecting cases).  The Court adopts their collective reasoning.

[145] *See Evans-Marshall*, 428 F.3d at 233–38 (Sutton, J., concurring).

[146] *Id.* at 235 (emphasis in original) (quotation marks and citation omitted).  Judge Sutton's concurrence lumped the Eighth Circuit into a group of courts that have applied the First Amendment doctrine set out in *Hazelwood* to teacher in-class speech.  *Id.* at 236 (citing *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 719 (8th Cir. 1998)).  But *Lacks* did not involve teacher speech.  *See Lacks*, 147 F.3d at 719–20.  And, for the reasons explained *infra* at page 28, *Lacks* does not help the Teacher Plaintiffs here.

[147] All of the self-censorship testified to by the Teacher Plaintiffs had to do with classroom teaching and classroom material selection.  *See generally* Ms. Walls Decl. (Doc. 16); Mr. Gilbert Decl. (Doc. 17).  None of the self-censorship came anywhere close to non-class speech that a teacher might undertake in his or her individual capacity.

[148] Two points are worth mentioning here.  First, there is some tension between this analysis and *Epperson v. State of Ark.*, where a public school teacher was given permanent injunctive relief against a state law prohibiting the teaching of evolution.  393 U.S. 97, 98–100 (1968).  Because irreparable harm is necessary for a permanent injunction, *see Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999), one could reasonably argue that *Epperson*'s granting of an injunction signifies that not being able to teach information or assign material gives a public school teacher irreparable harm.  However, putting aside the fact that *Epperson* was not a due process or speech case, the irreparable harm issue does not appear to have been raised in the *Epperson* case at any point on its journey from the Chancery Court in Arkansas to the Arkansas Supreme Court to the United States Supreme Court.  *See generally id.*

Second, the analysis set out in the text above is applicable only where the censorship at issue is fully classroom-instruction related.  If any of the Teacher Plaintiffs' speech was done outside of their official teaching (or coaching) duties, the analysis would likely yield the opposite conclusion.  *See, e.g., Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 601–04 (1967) (holding that professors' free speech rights were violated by a New York plan that threatened to take adverse action against the professors for their speech outside of the classroom).  Moreover,

In an attempt to avoid this conundrum, the Teacher Plaintiffs rely on a 1998 Eighth Circuit case—*Lacks v. Ferguson Reorganized School District R-2*[149]— to argue that, "[w]hile curricula may be a form of government speech, teachers still enjoy rights to fair notice and due process related to restrictions on speech in the classroom."[150]  But *Lacks* can't support the weight Plaintiffs place on it.  *Lacks* did not involve a preliminary injunction, and thus has nothing to say about irreparable harm.[151]  Further, *Lacks* was not about a teacher speaking or self-censoring; rather, *Lacks* was about a teacher being terminated for allowing certain student speech in class.[152]  Ultimately, *Lacks* tells us nothing about whether a teacher has irreparable harm if the teacher self-censors what he or she teaches in class because of an allegedly vague state law.

It is true that, even outside the First Amendment context, "the denial of a constitutional right is a cognizable injury and an irreparable harm."[153]  But that principle is addressed to ongoing or imminent deprivations of constitutional rights.[154]  The Teacher Plaintiffs are not facing such an ongoing or imminent deprivation.  There is no evidence in this record that suggests any of the

---

even as to official duties, the analysis set out here might change if the Court were addressing classroom instruction or materials assigned by a university professor in a university setting—because of the less-than-often-encountered intersection between academic freedom and the First Amendment.  *See Keefe v. Adams*, 840 F.3d 523, 542 (8th Cir. 2016) ("Restrictions permissible in secondary schools may be impermissible at post-secondary institutions because few college students are minors, and colleges are traditionally places of virtually unlimited free expression.") (quotation marks and citation omitted).  In the context of a partially expedited preliminary injunction motion, the Court will refrain from turning this footnote into a treatise on all of these points.

[149] 147 F.3d at 723–24.

[150] Pls.' Reply to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 39) at 24.

[151] *See Lacks*, 147 F.3d. at 721.

[152] *See id.* at 719–20.

[153] *Ng*, 64 F.4th at 998.

[154] *See id.* (finding irreparable harm when the plaintiff was suffering an ongoing violation of his equal protection rights) (citing *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1102 (S.D. Iowa 2020) (finding irreparable harm because the plaintiffs would suffer harm on a "continuous and uninterrupted basis")); *Elrod*, 427 U.S. at 373–74 (finding irreparable harm because injury to the Plaintiffs' First Amendment rights was both "threatened and occurring").

Teacher Plaintiffs face an imminent threat of discipline by any of the Defendants.[155]   And—
because, for the reasons explained above, there is no free speech component to the due process
claim here—it is only the discipline flowing from an unconstitutionally vague statute that would
work a deprivation of constitutional rights in the scenario at bar.   The mere fact that a statute is
vague in the abstract is not itself a deprivation of constitutional rights.   So, the Teacher Plaintiffs
can't rely on the automatic-irreparable-harm-from-constitutional-injury doctrine.   And they don't
try to make the required showing by any other means.[156]

The forgoing is enough to conclude that Teacher Plaintiffs have not shown "that irreparable
[harm] is likely in the absence of an injunction."[157]   But that conclusion is buffeted by the year-
long delay between when Section 16 became law and when Plaintiffs asked for a preliminary
injunction.[158]   Section 16 first became effective on March 8, 2023.[159]   The Motion for Preliminary
Injunction was filed on April 12, 2024.[160]   Thirteen months is a long time to wait to seek
"extraordinary relief."[161]

Of course, Plaintiffs are correct that other litigation temporarily stalled the implementation
of the entire LEARNS Act (including but not limited to Section 16) between the end of May and

---

[155] Plaintiffs' argument concerning elimination of the Teacher Fair Dismissal Act is a red herring.   It does not make
teachers more likely to be subject to discipline from the State Board of Education for teaching Critical Race Theory.

[156] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 32–33; Pls.' Reply to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc.
39) at 23–25.   As part of their irreparable harm briefing, Plaintiffs advert to the de-designation of the 2023–2024 AP
African-American Studies class.   Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 33.   But, if anything, this is a harm
to the Student Plaintiffs as opposed to the Teacher Plaintiffs.

[157] *Winter*, 555 U.S. at 22.

[158] 2023 Ark. Laws Act 237 (S.B. 294); Mot. for Prelim. Inj. (Doc. 14).

[159] 2023 Ark. Laws Act 237 (S.B. 294).

[160] Mot. for Prelim. Inj. (Doc. 14).

[161] *See Ng*, 64 F.4th at 996, 999.

the beginning of August of 2023.[162]   Perhaps the Court should thus ignore the months of March,

April, and May, and give Plaintiffs every benefit of the doubt by not starting the clock until August

of 2023.  Even then, Plaintiffs waited nearly eight months—almost the whole school year—to file

a lawsuit challenging Section 16.  They finally filed their Complaint on March 25, 2024.[163]  But

the delay did not end there.  Although their March 25, 2024 Complaint strongly suggests that

Plaintiffs contemplated filing (and prepared to file) a contemporaneous request for preliminary

injunctive relief,[164] Plaintiffs chose not to file such a motion at that point.  Instead, they waited

nearly three more weeks—until April 12, 2024—to file their Motion for Preliminary Injunction.[165]

Eight and a half months is better than thirteen months, but it is still a long time to wait to seek

"extraordinary relief."[166]

        The Eighth Circuit has been clear that "an unreasonable delay in moving for the injunction

can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary

injunction.'"[167]  That is because, depending on the specific situation presented, "[a] delay may

---

[162] The LEARNS Act passed with an emergency clause making the law effective on March 8, 2023.  2023 Ark. Laws Act 237, Section 73 (S.B. 294).  However, two and a half months later, on May 26, 2023, a Pulaski County Circuit Court temporarily enjoined the law.  *Jackson v. Arkansas Dep't of Educ.*, No. 60-CV-23-3267, 2023 WL 4995832, at *5 (Pulaski Cnty. Cir. Ct. May 26, 2023).  The Arkansas Supreme Court quickly vacated the temporary injunction on June 15, 2023.  *Arkansas Dep't of Educ. v. Jackson*, 669 S.W.3d 1, 8 (Ark. 2023).  But, on June 30, 2023, the Circuit Court entered a final order declaring that the LEARNS Act emergency clause was invalid and blocking implementation of the law until the date non-emergency laws took effect: August 1, 2023.  *Arkansas Dep't of Educ. v. Jackson*, 675 S.W.3d 416, 419 (Ark. 2023).  The Arkansas Supreme Court later overruled this decision, but it did not make its ruling until after August 1, 2023.  *See id.* at 421–22.

[163] Compl. (Doc. 1).

[164] *See* Compl. (Doc. 1) at 2 ("Contemporaneously with this Complaint, Plaintiffs submit a Motion for Preliminary Injunction with Brief and Declarations.") (cleaned up); *id.* at 45 ("As pled in the Plaintiffs' contemporaneously filed TRO motion . . . .") (cleaned up).

[165] Mot. for Prelim. Inj. (Doc. 14).

[166] *See Ng*, 64 F.4th at 999 (holding that a delay of six months can be unreasonable).

[167] *Id.* at 997 (quoting *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019)).

belie the claim of irreparable injury" if the delay "is unreasonable."[168]  Still, a delay—even a long

delay—does not automatically doom a request for preliminary injunctive relief.  The Eighth Circuit

has explained that: (1) "the delay is only significant if the harm has occurred and the parties cannot

be returned to the status quo," (2) "[t]he mere length of delay is not determinative of whether the

delay was reasonable," and (3) delays of somewhat similar length to the delay here—at least if we

use the eight and a half month figure instead of the thirteen month figure—have been variously

found reasonable and unreasonable depending on the context.[169]

As explained above, the Court has concluded that the Teacher Plaintiffs' self-censorship

is, as a matter of law, not an irreparable harm.  But that is the irreparable harm principally alleged

by the Teacher Plaintiffs.[170]  It only makes sense, therefore, that the span of the alleged need for

self-censorship is the yardstick by which the Teacher Plaintiffs' delay should be measured.  And

that asserted harm began in March of 2023 (or, very generously to the Plaintiffs, no later than

August of 2023).[171]  Plaintiffs suggest that the delay in filing suit and then seeking preliminary

relief is attributable to Secretary Oliva.[172]  Specifically, Teacher Plaintiff Ms. Walls explains that,

after the Secretary raised concerns with the College Board in August 2023 about the AP African-

American Studies course curriculum potentially conflicting with Section 16, he left the teachers in

---

[168] *See Ng*, 64 F.4th at 997 (citing *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002)).

[169] *Ng*, 64 F.4th at 998 (quotations and citations omitted).  A different panel of the Eighth Circuit appears to have walked back the delay-is-only-significant-if-harm-has-occurred point.  *See Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805 (8th Cir. 2021) ("reject[ing]" as an "implausible assertion of law" that the "delay bears on irreparable harm only where the plaintiff delays despite suffering the harm"). Given the prior panel rule, the Court is unsure what to make of the language in *Adventist*.  *See Owsley v. Luebbers*, 281 F.3d 687, 690 (8th Cir. 2002) ("It is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel.").

[170] Br. in Supp. of Mot. for Prelim. Inj. (Doc. 21) at 32–33; Pls.' Reply to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 39) at 23–25.

[171] *See supra* note 162.

[172] Pls.' Reply to Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 39) at 25–26.

suspense by never informing them of the outcome of his review of the materials.[173]  Similarly, Ms. Walls says the State Board of Education left teachers without clarity by never issuing regulations to put more meat on the statutory bone.[174]

There are at least two problems with these explanations.  First, as in the Eighth Circuit's *Ng* case, while a short delay to see if things can be worked out through an administrative process may be reasonable, waiting eight months (out of a ten-month school year) is not.[175]  It leaves no time to teach all the material allegedly omitted by self-censorship.  That undermines the asserted reasonableness of the delay.

Second, the Teacher Plaintiffs have been clear that the concerns that led them to self-censor were not limited to Secretary Oliva's review of the AP African-American Studies course curriculum.  Indeed, Teacher Plaintiff Mr. Gilbert does not mention Secretary Oliva's actions at all.  He says he has been self-censoring "since the passage of the LEARNS Act" (March 8, 2023) and he has done so because he has found the language of the Act to be "so vague and contradictory" that he "cannot figure out what is allowed and what is prohibited."[176]  Teacher Plaintiff Ms. Walls explains in her initial declaration that she "read[] the law several times" and did not understand it.[177]  She noted that some of her concerns came from "statements by the [G]overnor and other officials" suggesting the law prohibits "anything divisive" that "they disagree with."[178]  The

---

[173] Ms. Walls Suppl. Decl. (Doc. 40) at ¶¶ 17–20, 27–28.

[174] *Id.* at ¶¶ 27–29.

[175] *See Ng*, 64 F.4th at 998–99 (holding that a six-month delay was unreasonable even if the plaintiff had initially been pursuing non-litigation options).

[176] Mr. Gilbert Decl. (Doc. 17) at ¶¶ 18, 31.

[177] Ms. Walls Decl. (Doc. 16) at ¶ 13.

[178] *Id.* at ¶ 18.

statements we have in the record from the Governor Sanders and other officials occurred between March 8, 2023, and August 15, 2023.[179]

Ms. Walls's testimony about the Secretary and the State Board of Education leaving her without answers on the meaning of Section 16 came in the form of a Supplemental Declaration filed along with Plaintiffs' Reply Brief.[180]  Given the foregoing, the wait-for-Secretary-Oliva-to-make-this-right theory strikes this Court as more likely than not a post-hoc rationalization for delay.  In any event, all things considered, the eight-month delay (really a thirteen-month delay) was not reasonable.  And in such circumstances, it is "without question" that "a long delay by plaintiff[s] after learning of threatened harm can be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."[181]

### B.  *The Student Plaintiffs' First Amendment Claim*

The Student Plaintiffs' claim is not so easily resolved.  Unlike the Teacher Plaintiffs, the Student Plaintiffs are actually pressing a First Amendment claim.[182]  Moreover, the First Amendment right at issue—the right to receive information—is truly personal to those students. That is, if the State is withholding classroom materials and instruction from students in violation of the First Amendment, it is the students as private individuals who are actively harmed.  That means *Elrod* fully applies.[183]  If the Student Plaintiffs can show they are likely to succeed on their First Amendment claim, irreparable harm automatically attaches.[184]

---

[179] *See* Governor Sanders Tweet, *supra* note 42; Murphy, *supra* note 45; Gelder, *supra* note 46.

[180] Ms. Walls Suppl. Decl. (Doc. 40) at ¶¶ 27–29.

[181] *Adventist*, 17 F.4th at 805 (quotation marks and citation omitted).

[182] Am. Compl. (Doc. 8) at 49–51.

[183] *See Elrod*, 427 U.S. at 373–74.

[184] *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

Moreover, unreasonable delay is not an issue for the Student Plaintiffs.  The Student Plaintiffs' declarations, signed on April 12, 2024, state that the Student Plaintiffs did not know about the self-censorship by their teacher (Ms. Walls) until "recently."[185]  For purposes of this early stage of the proceedings only, the Court draws a reasonable inference from these statements to find as a matter of fact that the Student Plaintiffs learned of the alleged harm being visited upon them no more than a month before the Preliminary Injunction was filed.  Given that we are dealing with Student Plaintiffs, who likely needed time to consider filing a lawsuit, prepare declarations, discuss the case with their lawyers, etc., a month-long delay is imminently reasonable, even with the AP exam quickly approaching.

The big question in analyzing the Student Plaintiffs' request for a preliminary injunction is whether the Student Plaintiffs are more likely than not to succeed on their claim.[186]  The State Defendants say no for three reasons.  But none of the three reasons fully insulates them from First Amendment liability.

Defendants' top-line position is that the selection and implementation of public school curricula—including what is taught and how it is taught—is quintessential government speech, and that government speech is not regulated by the Free Speech Clause of the First Amendment.[187]  Defendants quite elegantly and persuasively cobble together this argument from several Supreme Court and out-of-circuit Courts of Appeal precedents.[188]  The Court is convinced that, were it writing on a clean slate, the Defendants' legal position would carry the day.  There is only one

---

[185] Ms. Davis Decl. (Doc. 19) at ¶ 15; Ms. Reynolds Decl. (Doc. 18) at ¶ 14.

[186] *See Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) ("[T]he probability of success factor is the most significant").

[187] Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 14–17.

[188] *Id.*

problem for Defendants.  That problem is named *Pratt v. Independent School District No. 831*.[189]
And it is a serious problem.

In *Pratt*, the Eighth Circuit interpreted the Free Speech Clause of the First Amendment to
include a right of students to not have information (in that case, a film) removed from the classroom
curriculum where (1) the removal "was intended to suppress the ideas expressed"[190] and (2) there
was no "substantial and reasonable governmental interest" for "interfering with the students' right
to receive information."[191]   Later Supreme Court cases have watered down (or maybe just
clarified) the second prong, changing the relevant question to whether there is a "legitimate
pedagogical interest" that is "reasonably related" to the removal of information.[192]  But there has
been no specific repudiation of *Pratt*'s basic public-school-student-right-to-receive-information
holding by the Supreme Court or by the Eighth Circuit.  And, contrary to Defendants' protestations,
*Pratt* is not clearly irreconcilable with the subsequent Supreme Court precedent.[193]  In such
circumstances, this Court isn't the one that gets to send *Pratt* where it belongs: the dustbin of
history.  Instead, this Court is bound to apply the basic holding of *Pratt*.[194]

---

[189] *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.,* 670 F.2d 771, 774 (8th Cir. 1982).

[190] *Id.* at 776.

[191] *Id.* at 777.

[192] *See Hazelwood*, 484 U.S. at 273.

[193] None of the cases cited by Defendants involved in-class speech.  *See Rust v. Sullivan*, 500 U.S. 173, 177–78 (1991); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 855–56 (1982); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 822–23 (1995); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669 (1998).  None of the cases did anything to directly undermine a student's First Amendment right to receive information.  In fact, in *Pico*, the Supreme Court recognized that students have a right to receive information in the school library.  *Pico*, 457 U.S. at 867–69.  And, although the Supreme Court, in *dicta*, distinguished the government's discretion in curating public school libraries from its discretion in establishing curricula, the Supreme Court never foreclosed the possibility that students might also have a right to receive information in the classroom.  *Id.* at 869.

[194] *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) ("[A] [d]istrict [c]ourt . . . is bound . . . to apply the precedent of this Circuit."); *Suiter v. Gen. Baptist Nursing Home*, No. 1:11-cv-199SNLJ, 2013 WL 656916, at *2 (E.D. Mo. Feb. 22, 2013) ("[I]n the absence of clear Supreme Court precedent, this Court is bound to follow Eighth Circuit precedent.").

Make no mistake: *Pratt* is something akin to zombie precedent.  As Defendants (and the cases they cite) point out: (1) the modern government-speech doctrine refuses to subject pure government speech to Free Speech Clause scrutiny;[195] and (2) selection and implementation of curricula in a school setting is pure government speech.[196]  How do these two inputs possibly lead to an output that subjects selection and implementation of curricula to Free Speech Clause scrutiny?  They don't.  But no Supreme Court or Eighth Circuit case has said so yet.  More importantly, there are Supreme Court cases that seem to at least suggest the continued viability of a rule that subjects government decisions about curricula and instruction to Free Speech Clause scrutiny.[197]  Although Defendants are right that none of these cases require, or even counsel, the outcome in *Pratt*, Plaintiffs are correct that these cases create some doubt as to whether the post-1991 government-speech doctrine dooms the public-school-student-right-to-receive-information doctrine.  And "some doubt" is really enough for Plaintiffs.  "Some doubt" takes away a district

---

[195] *See Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 251–52 (2022) ("The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks."); *Summum*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *Rust*, 500 U.S. at 198 (holding that the government does not "infringe[] any First Amendment rights or regulate[] any First Amendment activity" when it selects the views that it wants to express) (quotation marks and citation omitted); *Gerlich v. Leath*, 861 F.3d 697, 707 (8th Cir. 2017) ("The Free Speech Clause restricts government regulation of private speech but it does not regulate government speech.") (quotation marks and citation omitted).

[196] *See Shurtleff*, 596 U.S. at 252; *see also supra* note 142.  Although it seems intuitive that setting and implementing a curriculum is government speech, one could also reach that result by applying the *Shurtleff* test.  Evidence relevant to determining whether certain expression is government speech includes but is not limited to: (1) the history of the expression at issue, (2) the public's likely perception as to who (the government or a private person) is speaking, and (3) the extent to which the government has actively shaped or controlled the expression.  *See Shurtleff*, 596 U.S. at 252.  Applying these indicia to the selection and implementation of school curricula, it is clear that such speech is government speech.  States have a long history of running public schools, the public is likely to believe that the government is speaking when it selects and implements curricula, and the state actively shapes and controls the selection and implementation of curricula.  If the Court were working on a blank slate, there is little doubt it would find, like courts in several other circuits have found, that the state is speaking when it selects and implements curricula.  *See, e.g., Griswold v. Driscoll*, 616 F.3d 53, 58–59 (1st Cir. 2010); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005).

[197] *See Hazelwood*, 484 U.S. at 270–273.

court's authority to dispatch this ghoul to the grave.[198]  Whether an Eighth Circuit panel has greater authority, or whether an *en banc* court is necessary if the Eighth Circuit agrees with this Court's clean-slate look, is a question above my pay grade.

Assuming *arguendo* the viability of *Pratt*, the State Defendants' next two arguments share a key feature.  They say that Section 16 doesn't implicate a student's right to receive information because Section 16 doesn't prohibit a teacher from "teaching any ideas."[199]  According to the State Defendants, Section 16 "only prohibits schools from compelling students to profess certain ideas."[200]  So, the State Defendants say, teachers "may" in their classrooms "discuss Critical Race Theory, or other ideas" that (according to Defendants) violate Title IV/Title VI and conflict with the principle of equal protection under the law.[201]  The only thing teachers may not do is "compel students to adopt [Critical Race Theory or these other ideas] as their own."[202]  Defendants explain that, on this view of the scope of the statute and the scope of any enforcement of the statute, *Pratt*'s right-to-receive-information doctrine is not applicable because Section 16 does not prevent a teacher from teaching about Critical Race Theory (or any other theory, ideology, or idea) or using Critical Race Theory (or any other theory, ideology, or idea) to teach about other events.[203]  Prohibiting a teacher from compelling student agreement with a theory or idea does not limit the information that a student will be given.  Similarly, Defendants explain that, even if *Pratt* somehow

---

[198] *Cf. Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring).

[199] Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 18–19.

[200] *Id.* at 18.

[201] *Id.*

[202] *Id.*

[203] *Id.* at 18–19.

applied to the prohibition on compulsion, the State has an obvious pedagogical interest in preventing such compulsion.[204]

The Court wishes to be very clear here.  The State Defendants' brief disclaims the notion that Section 16 prohibits a teacher from teaching about Critical Race Theory or teaching through the prism of Critical Race Theory, so long as the teaching does not cross the line into compelling students to agree with things being taught or compelling students to accept that Critical Race Theory is correct.[205]  (The same is true of any other theory or ideology that—on Defendants' view—violates Title IV/Title VI and conflicts with the principle of equal protection under the law.)  At the preliminary injunction hearing, the State Defendants doubled down on this position and then went even further to advance a narrow view of what constituted the type of compulsion prohibited by Section 16.[206]  The State Defendants referred this Court to *West Virginia State Bd. of Educ. v. Barnette* for a working definition of compulsion.[207]  In *Barnette*, students were expelled if they did not stand and repeat the pledge of allegiance to the flag.[208]  That's serious coercion.

Consistent with this idea of compulsion as coercive attempts to make a student "declare a [particular] belief" (including the provision of consequences for a student who rejects or fails to adopt a particular belief),[209] the State Defendants' argument generally asserts that the compulsion prohibited by Section 16 is limited to things like (1) a teacher grading or threating to grade on the basis of whether a student accepts or rejects an idea or theory like Critical Race Theory, (2) a

---

[204] *Id.* at 21.

[205] *Id.* at 18–19.

[206] Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 16:35:14–16:36:19, 16:40:54–16:42:09, Apr. 30, 2024.

[207] *Id.* at 16:36:21–36.

[208] *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627–29 (1943).

[209] *See id.* at 631.

38

teacher giving or promising preferential treatment (or worse treatment) to a student based on that student's declaration of (or refusal to declare) agreement or disagreement with an idea or theory like Critical Race Theory, (3) a teacher denigrating a student on the basis of his or her agreement or disagreement with an idea or theory like Critical Race Theory, (4) a teacher telling a student that all reasonable people would accept an idea or theory like Critical Race Theory, or (5) a teacher begging a student or students to accept an idea or theory like Critical Race Theory.[210]  Essentially, the line between teaching and compulsion that State Defendants are drawing means that a teacher cannot engage in speech or conduct that would override the ability of a reasonable student of the age being taught to exercise his or her free will to reject or decline to declare a belief in an idea or theory like Critical Race Theory.  But a teacher can engage in any speech or conduct short of that without fear of consequences flowing directly or indirectly from Section 16.[211]

If the State Defendants are right about the meaning of Section 16, they win hands down. And a quick read of Section 16 supports their view.  That's because of Section 16's definition of "prohibited indoctrination."  Section 16(b) defines "prohibited indoctrination" as "*communication by a public school employee*, public school representative, or guest speaker *that compels a person to adopt, affirm, or profess an idea* in violation of Title IV and Title VI of the Civil Rights Act of 1964, . . . including that: (1) People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race,

---

[210] Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 16:40:54–16:42:09, 17:02:51–17:03:39, Apr. 30, 2024.

[211] Indeed, the State Defendants argue that even the assigning of a pro-Critical Race Theory position in a mock debate to a student who rejects the validity of Critical Race Theory (and who does not want to argue otherwise) would not be the type of compulsion prohibited by Section 16.  (This example assumes that the student was not singled out for this assignment because of his or her views.)  *See* Mot. for Prelim. Inj. Hr'g Tr. (Rough) at 16:40:54–16:41:19, Apr. 30, 2024.

ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or (2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law."[212]  That's a long definition.  But, for present purposes, you need only concentrate on the *compels a person to adopt, affirm, or profess an idea* language.

Section 16(b) leaves several words in this definition of "prohibited indoctrination" undefined—including compel, adopt, affirm, and profess.  Because the words are left undefined in the statute, we assume that the words carry their everyday, ordinary meaning.[213]  And because of the limited time associated with this partially expedited preliminary relief request, the Court will explore the words' ordinary meanings by use of a dictionary as opposed to a *corpus linguistics* analysis.  "Compel," as defined by the Merriam-Webster dictionary, means to "drive or urge forcefully or irresistibly."[214]  "Adopt" has several definitions, but, for our purposes, the relevant definition reads "to begin to practice or use."[215]  "Affirm" is defined as "show[ing] or express[ing] a strong belief in or dedication to (something, such as an important idea)."[216]  Finally, "profess" is defined as "confess[ing] one's faith in or allegiance to."[217]  Taking these definitions together,

---

[212] Ark. Code Ann. § 6-16-156 (emphasis added).

[213] *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning."); *Mamo Transp., Inc. v. Williams*, 289 S.W.3d 79, 83 (Ark. 2008) ("In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language.").

[214] *Compel*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compel.

[215] *Adopt*, Merriam-Webster, https://www.merriam-webster.com/dictionary/adopt.

[216] *Affirm*, Merriam-Webster, https://www.merriam-webster.com/dictionary/affirm.

[217] *Profess*, Merriam-Webster, https://www.merriam-webster.com/dictionary/profess.

Section 16 can be reworked to read as prohibiting teachers from forcefully or irresistibly urging a student to express a strong belief in, to confess allegiance to, or to begin practicing an ideology that is in violation of Title IV/Title VI and conflicts with the principle of equal protection under the law.

So far, so good, for the Defendants.  Nothing in that understanding of the definitional section suggests the mere teaching of Critical Race Theory (or any other theory, ideology, or idea) amounts to a violation of Section 16.  Moreover, compulsion is not persuasion.  Nothing in that understanding of the definitional section suggests that teachers may not use materials they believe might persuade a student to accept any particular theory, ideology, or idea.  Nothing in that definitional section suggests teachers may not voice their opinions on a particular theory, ideology, or idea.  Nothing in that definitional section suggests teachers may not help students with student-selected projects advocating for any particular theory, ideology, or idea.  And this interpretation of Section 16(b) accords with the Section 16(c)'s so-called savings clause, which makes clear that it is the compulsion of a student to accept (and not the mere teaching of) the concepts identified in Section 16(b) that is prohibited.[218]

Nonetheless, there is one major sticking point to the foregoing interpretation of Section 16.  Although courts must read words in a statute according to their plain and ordinary meaning, courts must do so while reading the statute as a whole.[219]  It is improper to isolate words out of context

---

[218] Ark. Code Ann. § 6-16-156(c).

[219] *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (Whole Text Cannon) (2012) ("[A] judicial interpreter [should] consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

and define those isolated words in a way that would be inconsistent with the remainder of the statute.[220]  This canon of construction poses a dilemma for the Court.  Here's the dilemma.

Section 16(d) requires the Secretary to "review and enhance the policies that prevent prohibited indoctrination, including Critical Race Theory."[221]  A plain reading of that section suggests that Critical Race Theory is, definitionally, "prohibited indoctrination."[222]  Section 16(a)(2) requires the Arkansas Department of Education to "identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies such as Critical Race Theory, otherwise known as 'CRT', that conflict with the principle of equal protection under the law . . . ."[223]  A plain reading of that section suggests that Critical Race Theory, definitionally, conflicts with the principle of equal protection under the law.  Putting these sections together, then, it is plausible to suggest that Section 16(a)(3) requires the Secretary to root out any use of Critical Race Theory, because it is both "prohibited indoctrination" and an ideology that "conflicts with the principle of equal protection under the law."[224]

The rub of all this is that the Teacher Plaintiffs' concerns that Section 16 prohibits (and will be enforced as prohibiting) the teaching about Critical Race Theory or teaching through the prism of Critical Race Theory is not a frivolous concern.  Indeed, it is quite reasonable.  And although the Teacher Plaintiffs should have provided more specific explanations as to why the material or information they are omitting from the classroom falls into (or even near) the Critical

---

[220] *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

[221] Ark. Code Ann. § 6-16-156(d).

[222] To be fair, Section 16(e) suggests the exact opposite.  Ark. Code Ann. § 6-16-156(e).

[223] Ark. Code Ann. § 6-16-156(a)(2).

[224] Ark. Code Ann. § 6-16-156(a)(3).

42

Race Theory bucket, the Court acknowledges that Section 16 does not define Critical Race Theory and that some of the omitted material or information likely either touches on Critical Race Theory or uses parts of Critical Race Theory.  What this means is that the classroom-based withholding of information from students (to the extent the withholding is based on Section 16's potential applicability to teaching about or through the prism of Critical Race Theory) is "fairly traceable" to Section 16 and the implementation and enforcement of Section 16.[225]

So, the question under *Pratt* then becomes whether the State has a legitimate pedagogical interest that is reasonably related to the withholding of information about Critical Race Theory or information using Critical Race Theory.[226]  And the State Defendants have not even tried to assert a legitimate pedagogical interest reasonably related to the withholding of information about Critical Race Theory or information using Critical Race Theory.[227]  Instead, based on their interpretation of the statue as only addressing compulsion of student agreement, the State Defendants assert only a legitimate pedagogical interest in preventing "compulsory indoctrination."[228]  Defendants are right that they have a legitimate pedagogical interest that is reasonably related to the withholding of materials and information that would compel students to declare a belief in Critical Race Theory or other theories, ideologies, or ideas that violate Title IV/VI and conflict with the principle of equal protection under the law.  But this is beside the point. There's no suggestion (at this early stage of the proceedings) that any of the omitted materials or

---

[225] *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.") (quotation marks, ellipses, and citation omitted).

[226] *See Pratt*, 670 F.2d at 777; *Hazelwood*, 484 U.S. at 273.

[227] Defs.' Opp'n to Mot. for Prelim. Inj. (Doc. 36) at 21.  The Court takes no position as to whether, on this record or some other record, the State Defendants could have shown a legitimate pedagogical interest that is reasonably related to the removal of information or material that teaches about, uses, or references Critical Race Theory.

[228] *Id.*

43

instruction constitutes the type of compulsion prohibited in Section 16.  But there is a strong suggestion that some of these omitted materials teach about, or use, or reference parts of Critical Race Theory.[229]  And there is a strong suggestion that this is why those materials and information were withheld from the Student Plaintiffs by the Teacher Plaintiffs.[230]  Because the State has not even attempted to show a legitimate pedagogical reason to withhold material and information that teach about or use or reference parts of Critical Race Theory, the Student Plaintiffs have shown they are more likely than not to prevail under *Pratt*.

As to the balance-of-harms-and-public-interest prong,[231] the analysis is easy.  The Court has already concluded at the beginning of this section of the Order that, if the Student Plaintiffs show they are more likely than not to prevail on the merits of their First Amendment claim, irreparable harm flows automatically.[232]  On the other side of the ledger, little-to-no harm will be visited upon the State Defendants by a preliminary injunction.  The Student Plaintiffs are only likely to prevail on the First Amendment Claim as it relates to materials or information omitted from the classroom because they teach about, use, or refer to parts of Critical Race Theory.  Accordingly, any preliminary injunction would enjoin the enforcement or implementation of Section 16 only to the extent Section 16 was enforced or implemented in a manner that (1) punished teachers for merely teaching about, referencing, or using parts of Critical Race Theory or (2) otherwise prevented classroom instruction that merely teaches about, references, or uses parts of Critical Race Theory.  And because the State Defendants have repeatedly and clearly

---

[229] *See supra* pp. 13–21.

[230] *See supra* pp. 13–21.

[231] In most cases, this prong is actually two prongs.  But, in cases like the one at bar, those two prongs merge into one prong.  *See Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022) (explaining that the balance-of-harms factor and the public-interest factor merge when the state officials in their official capacities are the nonmoving party).

[232] *See supra* text accompanying note 184.

disclaimed any interpretation of Section 16 that prohibits the mere teaching about, using, or referencing Critical Race Theory,[233] there is no concrete harm to State Defendants.  The harm of enjoining enforcement or implementation of a statute is at its nadir (and most abstract) when the only thing being enjoined is something the Defendants believe the statute does not do anyway.

### C.  Scope of the Injunction

There is a national "conversation" taking place in both the legal academy and the judiciary concerning the propriety of courts using universal injunctions as a matter of preliminary relief.[234] Most of the focus is on one sub-species of universal injunctions: the nationwide injunction.  But there is a second sub-species of universal injunctions: the statewide injunction.  And, really, that is what the Plaintiffs are seeking here.  They want this Court to enjoin the enforcement and implementation of Section 16 as to everyone in the state.[235]

In this case, the Court cannot join the larger legal conversation—because the Eighth Circuit has already spoken.  In the Eighth Circuit, statewide injunctions in First Amendment cases are favored as a form of preliminary relief.[236]  But they are not awarded as an automatic default.[237] Instead, the proper scope of an injunction is a matter generally left to the wide discretion of a district court.[238]  The exercise of that discretion, however, is not without guardrails.  Injunctive relief should provide "complete relief to the plaintiffs[,]" but "should be no more burdensome to

---

[233] *See supra* pp. 37–39.

[234] *See Labrador v. Poe*, 144 S. Ct. 921 (2024) (Gorsuch, J., concurring).

[235] As noted in footnote 28, *supra*, this only refers to Ark. Code Ann. § 6-16-156 and not to the other codified statute that is also part of Section 16 of the LEARNS Act.

[236] *See Rodgers v. Bryant*, 942 F.3d 451, 457–60 (8th Cir. 2019).

[237] *See id.*

[238] *See id.*

the defendant than necessary" to provide that complete relief.[239]  Additionally, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."[240]

Here, there is no question that the preliminary injunction should at least apply to the Student Plaintiffs.  Both Student Plaintiffs claim that information and materials have been withheld from them in their AP African-American Studies class.[241]  This class is taught by Ms. Walls.  The Student Plaintiffs do not claim that information and materials have been withheld from them in any other class.  One of the Student Plaintiffs is graduating this year.[242]  The other is a freshman,[243] so conceivably she could end up in Mr. Gilbert's debate class (or in the debate program) at some point in the next few years.  The Court has no specific, non-hearsay information about any other teachers self-censoring.[244]  So, in order to accord the Student Plaintiffs relief, the Court need only apply the preliminary injunction to Ms. Walls and Mr. Gilbert.

This is the unusual First Amendment case where the preliminary injunction need be no greater than what was just described.  Why?  Because State Defendants have now made crystal clear that: (1) Section 16 does not prevent classroom instruction that teaches, uses, or refers to any theory, idea, or ideology, even if the theory, idea or ideology violates Title IV/VI and conflicts

---

[239] *Id.* at 458 (quotation marks, ellipses, and citation omitted).

[240] *Id.* (quotation marks, ellipses, and citation omitted).

[241] Ms. Davis Decl. (Doc. 19) at ¶ 15; Ms. Reynolds Decl. (Doc. 18) at ¶ 14.

[242] Ms. Davis Decl. (Doc. 19) at ¶ 2.

[243] Ms. Reynolds Decl. (Doc. 18) at ¶ 2.

[244] The Court recognizes that, at this stage of the proceedings, the Court may consider hearsay.  But because the hearsay here is mostly vague and general assertions, *see* Mr. Jefferson Decl. (Doc. 20) at ¶¶ 11–12, the Court gives it no weight.  In any event, and in light of the State Defendants' position on the narrowness of what Section 16 does, there appears to be no problem (stemming from Section 16) with the unnamed high school English teacher referenced in Mr. Jefferson's declaration assigning the book *The Color Purple*.  *Id.* at ¶ 12.  Because the Court has not seen the Roland Martin videos, the Court can't speak to whether they include compulsion of the type prohibited by Section 16, but the Court doubts they would.

with the principle of equal protection under the law; and (2) Section 16 only prohibits a teacher from compelling (understood in a very narrow sense already discussed above) a student to accept the validity of a theory, idea, or ideology that violates Title IV/VI and conflicts with the principle of equal protection under the law.[245]   The Court accepts that position, and relies on it for this decision not to provide greater injunctive relief.   Accordingly, it is nearly certain a future jurist would find the State Defendants judicially estopped from changing their position on the reach of Section 16.[246]

Accordingly, although the Court's preliminary injunction will be quite narrow, this Order as a whole should give comfort to teachers across the state (and to their students) that Section 16 does not prohibit teachers from teaching about, using, or referring to Critical Race Theory or any other theory, ideology, or idea so long as the teachers do not compel their students to accept as valid such theory, ideology, or idea.

*** 

## PRELIMINARY INJUNCTION

IT IS ORDERED that the State Defendants (except for Governor Sanders), their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with the foregoing persons, are hereby enjoined for the duration of this litigation from:

1. enforcing or implementing Section 16 in a manner that disciplines Ms. Walls or
   Mr. Gilbert in any way for teaching about Critical Race Theory, using Critical Race

---

[245] *See supra* pp. 37–39.

[246] *See Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.* 29 F.4th 406, 410 (8th Cir. 2022). Similarly, it is nearly certain that the State Defendants would be judicially estopped from contending that the conduct discussed in footnote 211 *supra* constitutes the type of compulsion that Section 16 prohibits.

Theory or parts of Critical Race Theory to teach other topics, or referencing parts of Critical Race Theory, except that Ms. Walls or Mr. Gilbert may be disciplined if either compels a student to adopt, affirm, or profess a belief in a theory, ideology, or idea (including Critical Race Theory) that conflicts with the principle of equal protection under the law and holds either that (a) people of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law, or (b) an individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law;

2. otherwise enforcing or implementing Section 16 in a manner that prevents Ms. Walls or Mr. Gilbert from teaching about Critical Race Theory, using Critical Race Theory or parts of Critical Race Theory to teach other topics, or referencing parts of Critical Race Theory, except that the State Defendants may prevent Ms. Walls or Mr. Gilbert from doing anything that compels a student to adopt, affirm, or profess a belief in a theory, ideology, or idea (including Critical Race Theory) that conflicts with the principle of equal protection under the law and holds either that (a) people of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex,

age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law, or (b) an individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law.

For purposes of this preliminary injunction, the following definitions apply: "compels a student to adopt, affirm, or profess" means forcefully or irresistibly urging a student to express a strong belief in, to confess allegiance to, or to begin practicing. Compulsion occurs where a teacher's speech or conduct (or material assigned by the teacher) overrides the ability of a reasonable student of the age being taught to exercise his or her free will to reject or decline to declare a belief in a theory, ideology, or idea.  Compulsion requires speech or actions like the following examples: (1) a teacher grading or threatening to grade on the basis of whether a student accepts or rejects a theory, ideology, or idea; (2) a teacher giving or promising preferential treatment (or worse treatment) to a student based on that student's declaration of (or refusal to declare) agreement or disagreement with a theory, ideology, or idea; (3) a teacher denigrating a student on the basis of his or her agreement or disagreement with a theory, ideology, or idea; (4) a teacher telling a student that all reasonable people would accept a theory, ideology, or idea; or (5) a teacher begging a student to accept a theory, ideology, or idea.

For purposes of this preliminary injunction, "teaching about . . ., using . . ., or referencing" applies to in-class instruction, selection of curricula materials, homework, coaching activities, and supervision of extracurricular activities.

Plaintiffs only challenge the constitutionality of the enforcement and implementation of Section 16.   Accordingly, this preliminary injunction does not reach the enforcement and implementation of laws other than Section 16.   It does not reach the enforcement and implementation of the Governor's Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools.   And it does not reach policies and conduct by local school boards so long as the policies and conduct are not driven by Section 16.[247]

IT IS SO ORDERED this 7th day of May 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[247] The Court has determined that this preliminary injunction may issue without security from the Plaintiffs.  No security is necessary in these circumstances.