**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

RUTHIE WALLS, et al.                                                                    PLAINTIFFS,

v.                                        No. 4:24-cv-00270-LPR

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of
Arkansas, et al.                                                                    DEFENDANTS.

DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS

Section 16 of the LEARNS Act prohibits public school teachers in Arkansas from compelling students to affirm discriminatory beliefs. That prohibition against compelling discriminatory speech neither violates students' nor teachers' First Amendment rights. It is not vague, and it does not, as Plaintiffs paradoxically claim, violate the Equal Protection Clause. The Court should dismiss Plaintiffs' complaint.

BACKGROUND

A.      **Section 16 of the LEARNS Act ensures compliance with Civil Rights Laws.**

Governor Sarah Huckabee Sanders signed the LEARNS Act into law on March 14, 2023, and due to its emergency clause, most sections of the Act—including Section 16—became effective upon Governor Sanders's signature. *See* 2023 Ark. Acts 237, sec. 73(a) (listing Section 16 among the sections of the Act that went into effect immediately); *Ark. Dep't of Educ. v. Jackson*, 675 S.W.3d 416, 421 (Ark. 2023) (upholding emergency clause).

Section 16 of the LEARNS Act directs the Secretary of the Arkansas Department of Education to take steps to "ensure that the Department of Education and its employees, contractors, guest speakers, and lecturers are in compliance with Title IV and Title VI of the Civil Rights Act of 1964." Ark. Code Ann. 6-16-156(a)(1). Title VI prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance, 42 U.S.C. 2000d, including

public schools.  Title IV similarly prohibits discrimination on the bases of race, color, and national origin and authorizes the Attorney General to bring a civil action to enforce the equal-protection guarantees of the Fourteenth Amendment.  42 U.S.C. 2000c-6.

Although "Title VI itself directly reach[es] only instances of intentional discrimination," *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (quoting *Alexander v. Choate,* 469 U.S. 287, 293 (1985)), any "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n.23 (2003)).  That includes using race "as a 'negative'" and allowing it to "operate as a stereotype."  *Id.* at 218.  Further, compelling "affirmation of a belief" by public school students "transcends constitutional limitations . . . and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 633 (1943).

Recipients of federal funds, such as school districts, have "a responsibility to provide a nondiscriminatory educational environment."  U.S. Dep't of Educ., *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, 59 Fed. Reg. 11,448-01, 11,450 (March 10, 1994).  And as DOE has explained, any "[r]acially based conduct" by a recipient that "consists of different treatment of students on the basis of race" and has the effect of excluding them from participating in, denying them the benefits of, or otherwise subjecting them to discrimination on the ground of race, color, or national origin, violates Title VI.  *Id.* at 11,448 (March 10, 1994); *see Sandoval*, 532 U.S. at 281 (assuming that federal agencies can enforce regulations prohibiting disparate-impact discrimination).

Moreover, "the existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of [T]itle VI."  59 Fed. Reg. at 11,448; *see* Ark. Att'y Gen. Op. 2021-042 (Aug. 16, 2021) (concluding that "[a]ny effort to take account of race that differently affords benefits or opportunities or creates a hostile environment in an educational institution" can violate Title VI).  And recipients are required to take "appropriate responsive action . . . regardless of the identity of the person(s) committing the harassment."  59 Fed. Reg. at 11,450.

**B.     Section 16 reaches only "prohibited indoctrination," narrowly defined as compelled affirmation of a discriminatory idea.**

Section 16 directs the Secretary of the Arkansas Department of Education to "review . . . the rules, policies, materials, and communications of the Department" and to "amend, annul, or alter," Ark. Code Ann. 6-16-156(a)(2); *see id.* 6-16-156(d), any item that is "prohibited indoctrination" (as defined below) and "conflict[s] with the principle of equal protection under the law." *Id.* 6-16-156(a)(3).

The statute narrowly defines "prohibited indoctrination" as a "communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964," *id.* 6-16-156(b), including adopting, affirming, or professing that:

- some "[p]eople . . . are inherently superior or inferior to [other] people" on the basis of a protected characteristic, *id.* 6-16-156(b)(1) (listing "color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law"); or
- "[a]n individual should be discriminated against or receive adverse treatment solely or partly because of the individual's" protected characteristic.  *Id.* 6-16-156(b)(2) (same list as in subsection (b)(1)).

**C.     Section 16 does not reach the mere discussion of ideas, history, or controversial public-policy issues.**

At the same time, Section 16 expressly "does *not* prohibit the *discussion* of" either these discriminatory "[i]deas and the history of the concepts" or "[p]ublic policy issues of the day and related ideas," even if "individuals may find [them] unwelcome, disagreeable, or offensive." *Id.* 6-16-156(c)(1), (2) (emphases added).  Thus, Section 16 plainly does not reach the mere discussion of ideas, history, or public policy, but only efforts to "compel a person to adopt, affirm, or profess" discriminatory ideas.  *Id.* 6-16-156(b); *see also id.* 6-16-156(e) (directing the Secretary to "ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory").

**D.     Critical Race Theory rejects equal rights and neutral principles of constitutional law.**

Plaintiffs at various times claim both that they're entitled to teach or receive lessons on Critical Race Theory and that they don't know what it is.  *Compare* Am. Compl. ¶¶ 46-51 (discussing Critical Race Theory) with *id.* ¶ 79 (expressing confusion about what it is).  But there's no genuine dispute that some "scholars in the field of education consider themselves critical race theorists who use CRT's ideas to understand issues of school discipline and hierarchy, tracking, affirmative action, high-stakes testing, controversies about curriculum and history, bilingual and multicultural education, and alternative and charter schools."  Richard Delgado and Jean Stefancic, *Critical Race Theory: An Introduction* 7 (3d. ed. 2017).

Nor is there any dispute that proponents of Critical Race Theory define their tenets in contrast to the civil rights movement's grounding in the Founders' classically liberal vision of equality before the law.  *See id.* at 178 (defining "liberalism" as "in civil rights, the view that the law should enforce formal equality in treatment of all citizens").  "Unlike traditional civil-rights discourse," Critical Race Theory "questions the very foundation of the liberal order, including

equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitu-tional law."  *Id.* at 3.  As Plaintiffs assert, "a central theme of CRT" is that "racism" exists "in state and federal institutions," Am. Compl. ¶ 148, and that "the concept at [the] heart" of Critical Race Theory is "that racism is embedded in laws, policies, and institutions which uphold and re-produce racial inequalities."  Compl. ¶ 64; *see* Am. Compl. ¶ 46 (Critical Race Theory is an "ac-ademic approach that studies race and how systemic racism is embedded in society and its insti-tutions.").

Particularly relevant here, "critical race scholars are discontented with liberalism," espe-cially as it involves "belie[f] in color blindness and neutral principles of constitutional law" or "belie[f] in equality, especially equal treatment for all persons, regardless of their different histo-ries or current situation."  Delgado and Stefancic, *supra*, at 26.  Critical race theorists "are suspi-cious of another liberal mainstay, namely, rights," and they contend that only "radical measures," including "aggressive, color-conscious efforts to change the way things are," will "do much to ameliorate" what they perceive as the racial "subordinat[ion]" of minorities.  *Id.* at 27, 64.

Thus, as Plaintiffs concede, while Critical Race Theory can take many forms, at the end of the day, it is both "a theoretical framework" and "a belief."  Am. Compl. ¶ 48.  And Section 16 allows discussions of theoretical frameworks and only prohibits compelling students to pro-fess or affirm discriminatory beliefs.

Further, while Plaintiffs insist that Section 16 will censor African American history, Doc. 21 at 39-40, that is not the case.  In fact, Plaintiffs aver that Secretary Oliva has made clear that "teaching African American History" presents no problem.  Am. Compl. ¶ 97; *see also* Cyn-thia Howell, *Little Rock Cent. High Teacher defends pilot course on Black studies*, Ark. Demo-crat-Gazette, Feb. 1, 2023 (quoting Plaintiff Ruthie Walls as asserting that "[The course doesn't

teach] CRT, I just teach history") (alteration in original).  That's because Critical Race Theory—however Plaintiffs want to characterize it—isn't history and prohibiting it would not "prohibit teaching about the history of slavery, Jim Crow laws, the eugenics movement, and the Ku Klux Klan.  Nor does it prohibit teaching about the Constitution and the abolition of the slave trade, the abolitionist movement, the Civil War, Abraham Lincoln and the Emancipation Proclamation, the Civil War Amendments, and the civil-rights movement."  Ark. Att'y Gen. Op. 2021-042, at 4.

       **E.**      **Section 16 enforcement.**

Section 16 almost exclusively contemplates enforcement by the Secretary and the State Board of Education.  *See* Ark. Code Ann. 6-16-156(a)(2)-(3) (directing the Secretary to review and, if necessary, amend "the rules, policies, materials and communications of the Department of Education" so as not to "promote teaching that would indoctrinate students" with "prohibited indoctrination"); *id.* 6-16-156(d) (directing the Secretary to "review and enhance the policies that prevent prohibited indoctrination"); *id.* 6-16-156(e) (directing the Secretary to ensure that public school students and employees are not required to attend trainings or orientations involving prohibited indoctrination); *id.* 6-16-156(f) (authorizing the State Board of Education to promulgate rules to implement Section 16).  And other than Plaintiffs' (mistaken) claim that the Secretary cancelled AP status for the pilot African American Studies course pursuant to Section 16,[1]  *see* Ark. Code Ann. 6-15-214(b)(2), 6-16-1202(1)(B) (requiring AP courses to be approved by the College Board and Educational Testing Service and validated through an advanced placement audit), Plaintiffs don't point to any implementing rules or policies by the Secretary or Board.

---

[1] As explained in Secretary Oliva's declaration, the state-based AP designation was removed because the course was designated in error the previous year, when the course was (and still was this school year) a pilot.  Decl. of Sec'y Jacob Oliva ¶ 16, Doc. 36-1.

Nevertheless, though Plaintiffs' complaint does not explain the process, there is one way that Section 16 is currently enforceable—though it isn't via the Secretary.  Under current law, the Professional Licensure Standards Board may recommend various penalties to the State Board of Education when a teacher commits an ethical violation—penalties ranging from a written reprimand to, at the most severe, the suspension or revocation of a teaching license.  Ark. Code Ann. 6-17-428(c)(B).  The Code of Ethics for Arkansas Educators requires educators to "maintain[] competence regarding his or her professional practice, inclusive of professional and ethical behavior," which includes a duty to follow state laws regulating teaching.  Ark. Admin. Code 005.28.17-6.0.  That provision governs various kinds of unethical behavior, including failures to maintain a professional relationship with students, failures to maintain confidentiality, and the use of alcohol or unauthorized drugs on school premises.  And consistent with that framework, if a teacher denigrated a student based on race or engaged in "prohibited indoctrination," they too could face licensure consequences were a complaint made to the Licensure Standards Board.

However, a violation of Section 16 would only qualify as an ethical violation if the teacher "knew or reasonably should have known that the act . . . was in violation of the code of ethics."  Ark. Code Ann. 6-17-428(a)(3)(A).  It would not qualify if it were a "reasonable mistake made in good faith," *id.* 6-17-428(a)(3)(B)(i), or if it were compelled by a supervisor, *id.* 6-17-428(a)(3)(B)(iii).

<h3 style="text-align:center">STANDARD OF REVIEW</h3>

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of claims that "fail[] to state a claim upon which relief can be granted" by motion.  Under that rule, a complaint's factual allegations are accepted as true and viewed in the light most favorable to the plaintiff.  *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (citing *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999)).  "At a minimum, however, a complaint must contain facts

7

sufficient to state a claim as a matter of law and must not be merely conclusory in its allega-

tions." *Id.* (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.

1998)).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cit-

ing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And, as here, "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suf-

fice." *Id.*

Rule 12(b)(6) dismissals are an "important mechanism for weeding out meritless claims."

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  "To survive a motion to dis-

miss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to re-

lief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In

other words, if "the well-pleaded facts do not permit the court to infer more than the mere possi-

bility of misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" un-

der Federal Rule of Civil Procedure 8(a)(2) and must be dismissed.  *Id.* at 679.

Applying that standard, this Court should dismiss Plaintiffs' Amended Complaint

with prejudice.

**ARGUMENT**

## I.   Sovereign immunity bars Plaintiffs' claims against Governor Sanders.

Plaintiffs fail to invoke this Court's jurisdiction as to Governor Sanders because she is

immune from suit under the Eleventh Amendment.  *See* Doc. 45 at 1 n.5 ("For the reasons ex-

plained in the State Defendants' Brief . . .  it is unlikely that the *Ex Parte Young* exception to the

sovereign immunity doctrine applies to the claims made against the Governor.").  Governor

Sanders has no connection to the enforcement of Section 16 and is therefore an improper defend-

ant.

Under *Ex parte Young*, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws"). "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs do not allege that Governor Sanders has any specific role in implementing Section 16. Instead, they only allege that Governor Sanders "conceived of and advanced the prohibitions contained in Section 16" and "signed the LEARNS Act into law." Am. Compl. ¶ 3. The responsibility of implementing Section 16 falls to Secretary Oliva and ADE. *See generally* Ark. Code Ann. 6-16-156. And Plaintiffs can't seek an injunction against the Governor for signing or advocating for Section 16 in the past. Because Governor Sanders is entitled to sovereign immunity and Plaintiffs fail to invoke the narrow *Ex parte Young* exception with respect to her, Plaintiffs' claims against her must be dismissed.

## II.   Plaintiffs' damages claims should be dismissed.

Plaintiffs seek "compensatory damages for injuries suffered." Am. Compl., Prayer for Relief ¶ 4; *see id.* ¶¶ 149-60 (pleading damages). Yet all of the Defendants in this action, each of whom is a state official, were sued solely in their official capacities. *Id.* ¶¶ 26-28. A suit against a state official in his official capacity, however, is merely "another way" of suing the State, *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007), and because the State is immune from suit for money damages, "[a] claim for damages against a state employee in his official capacity is

barred under the Eleventh Amendment." *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999). Plaintiffs' damages claims therefore must be dismissed.

## III. Student Plaintiffs' First Amendment right-to-hear-claim should be dismissed.

Plaintiffs claim that Section 16's regulation of public-school curricula infringes their supposed First Amendment right to receive information and ideas from their public-school faculty. Doc. 21 at 28-32. According to them, "removing school curricular materials because the government objects to the ideas disseminated therein violates the First Amendment." *Id.* at 32 (internal quotation marks omitted). Unsurprisingly, that is not the law. "It is the very business of government to favor and disfavor points of view" when it is speaking, *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (quoting *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment)), and nowhere is that more true than in the classroom. There is simply no First Amendment right to compel public schools to teach materials that the government disagrees with. *See Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005) ("[I]n establishing and implementing certain government functions, the government, including its educational institutions, has the discretion to promote the policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement.").

Yet even if there were such a right, there would be no violation here. Section 16 only requires the Secretary to take steps to prevent public schools from "compel[ling]" students "to adopt, affirm, or profess" certain discriminatory ideas. Ark. Code Ann. 6-16-156(b). It "does not prohibit the discussion" of those same ideas. *Id.* 6-16-156(c). And even if it did prohibit the discussion of Critical Race Theory, as this Court concluded it might, the State has a more than legitimate pedagogical interest in declining to teach a theory that rejects color-blindness and advocates for a series of race-conscious policies that violate equal protection. There is no First Amendment violation.

A.    **The First Amendment isn't implicated because curricular speech is government speech.**

Plaintiffs claim that Arkansas's regulation of its own public schools' curricula violates the First Amendment.  But the Free Speech Clause only "restricts government regulation of private speech; it does not regulate government speech."  *Summum*, 555 U.S. at 467.  "Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

Public school curricula are government speech.  Speech is government speech where the government "maintains direct control over the messages [it] convey[s]," *Walker*, 576 U.S. at 213, where the speech is used to "communicate[] messages from" the government, *id.* at 211, and where the speech is "closely identified in the public mind with" the government, *id.* at 212 (quoting *Summum*, 555 U.S. at 472).  Under that rubric, even a state's offering of "more than 350 varieties" of specialty license plates displayed on private citizens' vehicles has been held government speech.  *Id.* at 221 (Alito, J., dissenting).

Public school curricula's status as government speech is an exceptionally easy question under this framework.   The materials contained in public school curricula are "from beginning to end" selected by the government, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005); by definition, nothing becomes part of a public-school curriculum unless the government puts it there.  And it goes without saying that public school curricula are used to communicate messages from the government to students—that's their whole point—and that they're closely identified in the public mind with the government.

Accordingly, courts have had little difficulty concluding that public-school curricula are government speech.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833

(1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker . . . ."); *Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010) (Souter, J.) (holding states have plenary "curricular discretion" under the First Amendment given "the government's authority to choose viewpoints when the government itself is speaking"); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("[S]chools engage in government speech when they set and implement education policy through the curriculum."); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004) ("Few activities bear a school's 'imprimatur' . . . more significantly than speech that occurs within a classroom setting as part of a school's curriculum."); *Downes v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000) ("[S]chool teachers have no First Amendment right to influence curriculum as they so choose.") (collecting cases). Therefore, the First Amendment has nothing to say about public schools' and States' selection of curricular materials, for the government may and must "choose viewpoints when the government itself is speaking." *Griswold*, 616 F.3d at 58-59.[2] Indeed, were that not the case, it would be impossible to establish a coherent curriculum. *See Walker*, 576 U.S. at 207 ("'[I]t is not easy to imagine how government could function if it lacked th[e] freedom' to select the messages it wishes to convey." (quoting *Summum*, 555 U.S. at 468)).

Notwithstanding the First Amendment's silence here, Plaintiffs startlingly claim that the First Amendment prohibits the government from excluding materials from public school curricula because it objects to the ideas they express. Their only real support for that rule is the Eighth

---

[2] Of course, "[t]his does not mean there are no restraints on government speech." *Summum*, 555 U.S. at 468. Rather, "government speech must comport with the Establishment Clause" and other laws and regulations. *Id.* And "ultimately," the government itself is "'accountable to the electorate, and the political process for its advocacy.'" *Id.* (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)).

Circuit's 42-year-old decision in *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982). There, the Eighth Circuit reviewed a school district's removal of a film adaptation of Shirley Jackson's short story *The Lottery* from its curriculum and held that the First Amendment required the school district to continue screening the film, reasoning that schools could not refuse to teach materials because they "object to [their] . . . ideological content." *Id.* at 773.

*Pratt* is no longer good law.  *See* Doc. 45 at 36 (describing *Pratt* as a "zombie precedent" and explaining that "the modern government-speech doctrine" and this Court's own conclusion that "selection and implementation of curricula . . . is pure government speech" cannot "possibly lead" to the outcome in *Pratt*).  First, it was decided at a time when the government speech doctrine did not exist.  Though the government speech doctrine is a mainstay of First Amendment law today, it wasn't applied by the Supreme Court until 1991, a decade after *Pratt*, *see Rust v. Sullivan*, 500 U.S. 173 (1991), and was still described as "recently minted" by that Court as late as 2009, *Summum*, 555 U.S. at 481 (Stevens, J., concurring).  A decision of the Eighth Circuit is no longer binding even if it is merely "cast into doubt by an intervening Supreme Court decision." *United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015); *see also United States v. Steward*, 598 F.3d 960, 962 (8th Cir. 2010) (holding district courts may apply this standard to decisions of the Eighth Circuit); *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 904 (8th Cir. 2005) (holding district court could modify a judgment the Eighth Circuit ordered it to enter because the Supreme Court had abrogated the Eighth Circuit's decision).

Here, *Pratt* isn't just cast into doubt by an intervening Supreme Court decision.  It is flatly irreconcilable with a series of intervening Supreme Court decisions, as the Fifth Circuit has explained of an Eleventh Circuit decision following *Pratt* on which Plaintiffs also rely, Doc. 21 at 35, that also predated the government speech doctrine.  *See Chiras*, 432 F.3d at 617 ("*Virgil*

was decided before *Rust* . . . and therefore did not have the benefit of the Supreme Court's clari-
fication of the government's authority over its own message.") (citing *Virgil v. Sch. Bd. of Co-
lumbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989)).  Public school curricula are government speech,
and the Supreme Court has repeatedly held since *Pratt* that the First Amendment does not regu-
late government speech.

Second, the Supreme Court has specifically spoken to school curricula and confirmed
that the First Amendment does not constrain the government's authority over them.  *Pratt* relied
extensively on the Second Circuit's decision in *Pico v. Bd. of Educ.*, 638 F.2d 404 (2d Cir.
1980), which held that schools could not remove books from public school libraries on ideologi-
cal grounds.  But when the Supreme Court affirmed the Second Circuit's judgment, it distin-
guished curricula from libraries, indicating that schools had absolute discretion in the former but
not the latter.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853,
869 (1982) (plurality) (distinguishing "absolute discretion in matters of *curriculum*" and "the
compulsory environment of the classroom" from "the school library and the regime of voluntary
inquiry that there holds sway"); *id.* at 878 n.1 (Blackmun, J., concurring in part and concurring in
the judgment) ("[I]t is difficult to see the First Amendment right that I believe is at work here
playing a role in a school's choice of curriculum.").  Accordingly, as another district court in the
Eighth Circuit previously explained, "the Justices voting in the majority in *Pico* rejected the idea
central to *Pratt*, that a federal court could review and countermand the curriculum decisions of
local school authorities." *C.K.-W. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914 n.4
(E.D. Mo. 2022).  And a decade later in *Rosenberger*, a majority of the Court again distinguished
curricular speech from other forms of expression in educational settings, explaining that "[w]hen
the University determines the content of the education it provides, it is the University speaking,

and we have permitted the government to regulate the content of what is or is not expressed."
515 U.S. at 833; *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)
("Much like a university selecting a commencement speaker, a public institution selecting speak-
ers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature
will facilitate the expression of some viewpoints instead of others.").  *Pratt* is no longer the law,
and without *Pratt*, Plaintiffs' First Amendment claim collapses.

**B.      Even if the First Amendment regulated public-school curricula, Section 16
             would not violate the First Amendment.**

 Public school curricula are government speech, so the First Amendment does not pro-
hibit States from making content- or viewpoint-based decisions about those curricula's contents.
But even if States were forbidden from removing materials from their own schools' curricula be-
cause they disagree with them, as Plaintiffs claim, Section 16 would not violate that supposed
principle.  Instead, Section 16 only prohibits schools from compelling students to profess certain
ideas, not from teaching any ideas.  And the one purported instance of enforcement that Plaintiffs
mistakenly attribute to Section 16, the removal of AP status for AP African American Studies,
has nothing to do with the supposed right to receive ideas and information in public school at all,
as this Court has already recognized.  *See* Doc. 45 at 11 n.43 ("[T]he Court wants to make clear
that the credentialing, designation, and course-catalog placement of the AP course cannot itself
be a violation of . . . the Student Plaintiffs' alleged Free Speech Clause right to receive infor-
mation.").

Section 16 directs the Secretary to take various steps to "prevent prohibited indoctrina-
tion, including Critical Race Theory."  Ark. Code Ann. 6-16-156(d).  It defines "prohibited in-
doctrination" as "compel[ling] a person to adopt, affirm, or profess" certain ideas about race.  *Id.*,
6-16-156(b)(1).  It then provides that it "does not prohibit the discussion of . . . [i]deas and the

history of the concepts described" in the definition of "prohibited indoctrination." *Id.*, 6-16-156(c).  Thus, schools may discuss Critical Race Theory, or other ideas included within the definition of prohibited indoctrination; they merely may not compel students to adopt them as their own.

That prohibition does not run afoul of the rule of *Pratt*.  *Pratt* held that students have a "right to receive information and be exposed to controversial ideas."  670 F.2d at 779.  It did not hold that students have a First Amendment right to be *compelled to affirm* those ideas.  Indeed, such a holding would have been nonsensical, even before the Supreme Court made clear that the First Amendment does not regulate public school curricula.  For the First Amendment could not, on any view, mandate schools to compel speech.  To the contrary, compelling student speech violates the First Amendment.  *See Barnette*, 319 U.S. at 633.

### C.   Even if Section 16 implicated the supposed right to receive information, Section 16 would not infringe that right.

Finally, even if *Pratt* were still good law, and even if it applied to a prohibition on compulsory indoctrination like Section 16, Section 16 would still easily pass muster.  And that is true whether Section 16 is read to only reach compulsory indoctrination in ideas like Critical Race Theory or is also read to reach education in them.

As Plaintiffs rightly concede, any First Amendment scrutiny here would be relaxed.  A "lesser standard of scrutiny is appropriate because of the public school setting," Doc. 21 at 25, as "the rights of students 'must be applied in light of the special characteristics of the school environment.'"  *Morse v. Frederick*, 551 U.S. 393, 397 (2007) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)).  So, even on Plaintiffs' own view, "the state's restriction on students' access to information [need only] be 'reasonably related to a legitimate pedagogical interest.'"  Am. Compl ¶ 179 (quoting *Hazelwood Sch. Dist.*, 484 U.S. at 273).

Here, Section 16 only reaches, at a maximum, instruction in ideas "that conflict with the principle of equal protection under the law or encourage students to discriminate" based on membership in a protected class, Ark. Code Ann. 6-16-156(a)(2); ideas that violate Titles IV and VI of the Civil Rights Act of 1964, *id.* 6-16-156(b); ideas that members of one protected class "are inherently superior or inferior to people of another," *id.* 6-16-156(b)(1); and ideas that individuals "should be discriminated against or receive adverse treatment" because of their membership in a protected class, *id.* 6-16-156(b)(2).  Defendants read Section 16 to only regulate compulsory indoctrination in those ideas; this Court has read Section 16 to possibly reach instruction in one such set of ideas, Critical Race Theory.  But either way, the State has a legitimate pedagogical interest in protecting students from being taught that members of one group "are inherently superior or inferior to people of another," *id.* 6-16-156(b)(1), even if students are not forced to affirm that belief; *see also* Am. Compl. ¶ 61 (quoting Governor Sanders's Executive Order's statement that Critical Race Theory "ha[s] no place in Arkansas classrooms" because "[i]t emphasizes skin color as a person's primary characteristic, thereby resurrecting segregationist values").  Regulating the public-school curriculum in that regard is not only legitimate but arguably mandatory s because "[r]acial discrimination in state-operated schools is barred by the Constitution" and "a state may not induce, encourage or promote" it.  *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quotation and citation omitted); *see Students for Fair Admissions*, 600 U.S. at 218 ("[T]he twin commands of the Equal Protection Clause [are] that race may never be used as a 'negative' and that it may not operate as a stereotype.").

Arkansas has a legitimate—indeed compelling—pedagogical concern in prohibiting conduct that "induce[s], encourage[s] or promote[s]," *Norwood*, 413 U.S. at 465, racial discrimination in public schools.  "It is beyond dispute that any public entity, state or federal, has a

compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (op. of O'Connor, J.).  And that interest extends to ensuring that public schools do not indoctrinate students in—or even teach, if Section 16 could be read so broadly—a theory that openly rejects color-blindness in favor of advocating "radical," "color-conscious efforts to change the way things are."  Delgado and Stefancic, *supra*, at 27, 64.  After all, such "color-conscious" policies are unconstitutional.  *See Students for Fair Admissions*, 600 U.S. at 206-08.  It can hardly violate the Constitution, then, for a State to decline to teach theories that advocate them in its own schools.

This concern is part of Arkansas's compelling interest in the content of its schools' curricula generally.  "There is a compelling state interest in the choice and adherence to a suitable curriculum for the benefit of our young citizens and society.  It cannot be left to individual teachers to teach what they please."  *Palmer v. Bd. of Educ. of Chicago*, 603 F.2d 1271, 1274 (7th Cir. 1979).  "Few activities . . . 'involve pedagogical interests' more significantly than speech that occurs within a classroom setting as part of a school's curriculum."  *Crozier for A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020) (quoting *Axson-Flynn*, 356 F.3d at 1289)); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (1989) ("Public schools have a legitimate pedagogical interest in shaping their own secondary school curricula and in demanding that their teachers adhere to official reading lists unless separate materials are approved."); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) ("The makeup of the curriculum of Owen High School is by definition a legitimate pedagogical concern.").

Plaintiffs' right-to-hear claim fails as a matter of law and should be dismissed.

**IV.   Teacher Plaintiffs' void-for-vagueness claim should be dismissed.**

Plaintiffs' vagueness claim fares no better.  Indeed, that claim rests on little more than Plaintiffs' assertion that they do not understand terms that Plaintiffs themselves use and that are understandable to persons of ordinary intelligence.

**A.    Section 16 isn't subject to exacting review.**

"Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment," as well as the Fourteenth Amendment.  *United States v. Williams*, 553 U.S. 285, 304 (2008).  The Constitution's Due Process Clauses prohibit depriving someone of life, liberty or property without due process of law.  U.S. Const., amends. V, XIV sec. 1.  So "the Government violates [that] guarantee by taking away someone's life, liberty or property under a . . . law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

However, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).  In particular, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Id.* at 498-99.  And it has expressed greater tolerance still of enactments whose only penalty—as here—is consequences for continued employment.

For example, the Court has upheld a federal statute that authorized discharge "for such cause as will promote the efficiency of the [civil] service," *Arnett v. Kennedy*, 416 U.S. 134, 158 (1974) (plurality opinion) (quoting 5 U.S.C. 7501(a)), notwithstanding employees' argument that they could "only guess as to what utterances may cost them their jobs" under that standard, *id.*,

and the Court's acknowledgement that the efficiency standard was "without doubt intended to authorize dismissal for speech," *id.* at 160.  After all, it explained, even the most detailed employee codes of conduct "include[] 'catch-all' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'"  *Id.* at 161.  Twenty years later, the Court remarked that while "speech restrictions must generally precisely define the speech they target," a "public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large."  *Waters v. Churchill*, 511 U.S. 661, 673 (1994).  Courts apply similarly undemanding standards to regulations of licensure in private employment.  *See Heath v. SEC*, 586 F.3d 122, 140-41 (2d Cir. 2009) (upholding a self-regulatory organization's prohibition of conduct in breach of "just and equitable principles of trade"); *Perez v. Hoblock*, 368 F.3d 166, 175-76 (2d Cir. 2004) (upholding a prohibition on "any action detrimental to the best interests of racing").

Moreover, as this Court has already concluded, the Teacher Plaintiffs' vagueness claim does not implicate their First Amendment rights, Doc. 45 at 26-27, so a heightened standard does not apply on that ground either.  As this Court held, "when performing their official teaching duties, public school teachers are in essence the mouthpiece of the State," *id.* at 26, and therefore "have no *personal* interest in the content of [their classroom] speech," *id.* at 27 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.2d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).

So in this context, the vagueness standard is at its most deferential; the statute must be "so vague and indefinite as really to be no rule or standard at all."  *Rogers v. Helena-W. Helena Sch. Dist.*, No. 2:06CV00160, 2006 WL 2850437, at *3 (E.D. Ark. Oct. 4, 2006) (Webber Wright, J.) (quoting *Horn v. Burns & Roe*, 536 F.2d 251, 254 (8th Cir. 1976)) (upholding

Arkansas law under which the State could remove employees of school districts in fiscal distress).  Plaintiffs cannot make that showing.

### B.      Section 16 isn't vague.

Under the appropriate standard—and even under a more exacting vagueness standard—Section 16 is not vague.  Plaintiffs principally attack Section 16's use of the terms "indoctrination."  Am. Compl. ¶ 169.  Yet the statute only excludes "prohibited indoctrination" from the State's curricula, and it defines that term.  So there is no vagueness.

Plaintiffs complain that "[t]he term 'Indoctrination' . . .  is not defined in the text."  Am. Compl. ¶ 169.[3]  But the statute only prohibits "prohibited indoctrination."  *See* Ark. Code Ann. 6-16-156(a)(3), (d), (e).  And "prohibited indoctrination" is a defined term.  *Id.*, 6-16-156(b). The definition uses "indoctrination" to mean "communication by a public school employee . . . that compels a person to adopt, affirm, or profess" certain ideas.  *Id.*  That indoctrination is "prohibited" if the idea a person is compelled to adopt, affirm, or profess is that one race or protected class is "inherently superior or inferior" to another, *id.*, 6-16-156(b)(1), or that "[a]n individual should be discriminated against" because of their race or membership in another protected class, *id.*, 6-16-156(b)(2).

Plaintiffs claim this definition is vague, but their reasons for saying so make no sense.  As pled, their sole basis for deeming the term vague is that the statute defines it differently than the Cambridge Dictionary, whose definition, they say, requires "repeating an idea . . . to someone until they accept it without criticism or question," whereas Section 16 "does not require

---

[3] To the extent Teacher Plaintiffs complain terms in the definition of "prohibited indoctrination" are themselves undefined, this Court, in the context of addressing Student Plaintiffs' right-to-hear claim, has already interpreted those terms' meanings and explained that their ordinary meaning is readily apparent.  Doc. 45 at 40-41 (glossing the definition to proscribe "forcefully or irresistibly urging a student to express a strong belief in, to confess allegiance to, or to begin practicing an ideology that is in violation of Title IV/Title VI and conflicts with the principle of equal protection under the law").

repetition" or "accept[ing] ideas *without criticism*."  Am. Compl. ¶ 169.  Whether or not that is even an accurate definition of the ordinary meaning of indoctrination, Section 16's definition isn't vague because it differs from a dictionary's.  It merely isn't the definition Plaintiffs would have written.

At the end of the day, what matters is that Section 16 is a "statute written specifically for the school context," resulting from a "considered and specific legislative judgment that some kinds of expressive activity should be restricted at a particular time and place, here in order to protect the schools."  *Grayned*, 408 U.S. at 112, 121 (upholding against a vagueness challenge an ordinance whose words were marked by "flexibility and reasonable breadth").  So though "we can never expect mathematical certainty from our language," "[g]iven this particular context, [the statute] gives fair notice to those to whom it is directed" and "is not inconsistent with the First and Fourteenth Amendments."  *Id.* at 110, 112, 121 (cleaned up); *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 666 (6th Cir. 1987) (rejecting a vagueness challenge to a statute prohibiting "conduct unbecoming a teacher.").

And to the extent the teacher Plaintiffs claim they could be subject to penalties for activity that they reasonably don't believe constitutes "prohibited indoctrination," the relevant licensing statutes allay those concerns, providing that a "reasonable mistake made in good faith," Ark. Code Ann. 6-17-428(a)(3)(B)(i), isn't a violation.  *See also id*. 6-17-428(a)(3)(A) (requiring teacher "knew or reasonably should have known that the act . . . was in violation of the code of ethics").  "A scienter requirement" can "mitigate a law's vagueness."  *Vill. of Hoffman Ests.*, 455 U.S. at 499; *see Gonzales v. Carhart*, 550 U.S. 124, 150 (2007) ("The scienter requirements narrow the scope of the Act's prohibition and limit prosecutorial discretion.").

## V.    Teacher Plaintiffs' First Amendment claim should be dismissed.

Teacher Plaintiffs claim that Section 16 "violates Teacher Plaintiffs' First Amendment
rights" by regulating their classroom speech.  Am. Compl. ¶ 196; *see id.* ¶ 188 (claiming that
"[e]ducatiors enjoy First Amendment rights to classroom speech").  This Court, however, in the
context of Plaintiffs' vagueness claim, has already held that Teacher Plaintiffs have no First
Amendment rights in their classroom speech.  Doc. 45 at 26-27.  Indeed, it held that "proposition
clearly and ineluctably follows from Supreme Court precedent."  *Id.* at 26-27.  "Instead of spend-
ing pages explaining why," *id.* at 27, Defendants will refer the Court to that discussion, where,
following Judge Sutton, it concluded that when teachers speak in their capacity as teachers, "they
have no *personal* interest in the content of that speech."  *Id.* (quoting *Evans-Marshall v. Bd. of
Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., con-
curring)).  As Judge Sutton explained, a contrary view would "undermine[] . . . basic assump-
tions about the management of our schools," allowing teachers to "insist on assigning materials
that some may perceive as racist," "insist on introducing mature sexual themes" when he has
been told not to, or "claim that a . . . requirement that the teacher discuss certain materials in
class impermissibly *compels* his speech."  *Evans-Marshall*, 428 F.3d at 238.  Such a view is un-
tenable.  As Teacher Plaintiffs have no First Amendment rights whatsoever in their curricular
speech, their claim that Section 16 violates their First Amendment rights by regulating that
speech fails.

## VI.    Plaintiffs' equal protection claim should be dismissed.

Plaintiffs paradoxically claim that Section 16's ban on compelling students to affirm
ideas that "conflict with the principle of equal protection under the law" violates the Equal Pro-
tection Clause.  Ark. Code Ann. 6-16-156(a)(3).  That claim fails on its face.  To state a claim,
Plaintiffs would have to plausibly allege that Arkansas's ban of indoctrinating students with

racial discrimination was actually motivated by racial discrimination.  Nothing they've alleged even makes that inference possible.  Plaintiffs' equal protection claim should be dismissed.

When plaintiffs challenge a facially neutral law like Section 16, "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  So "'an allegation of disproportionate impact 'is only relevant to the extent that it reflects a discriminatory purpose.'" *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 970 (8th Cir. 2015) (quoting *Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cnty. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009)).  And disparate impact is rarely enough to show discriminatory intent; "[o]nly in 'exceeding rare cases' will 'a clear pattern, unexplainable on grounds other than race, emerge from the effect of the state action even though the governing action appears neutral on its face.'" *Id.* (alterations omitted) (quoting *Friends of Lake View*, 578 F.3d at 762 n.12).  So plaintiffs usually must make "factual allegations" beyond disparate impact that, if true, "might prove that the facially neutral" law they challenge "was motivated by a racially discriminatory purpose or . . . is unexplainable on grounds other than race." *Friends of Lake View*, 578 F.3d at 761; *see also Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 955 (E.D. Ark. 2022) (three-judge court) (Stras, J.) ("[T]he complaint must contain facts that plausibly show . . . that Arkansas's General Assembly acted with [discriminatory] purpose in mind.").

Importantly, even at the pleading stage, it isn't enough to plead facts that if true would create a mere "possibility" of intentional discrimination, or "that are 'merely consistent with'" intentional discrimination. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant" has intentionally discriminated. *Id.*; *see also Doe v. Ark. Dep't of Educ.*, No.

15-cv-623, 2016 WL 5539617, at *6 (E.D. Ark. Sept. 28, 2016) (Marshall, J.) ("Plausibility 'calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal discrimination.'") (alterations omitted) (quoting *Twombly*, 550 U.S. at 556).  Where the facts alleged in a complaint themselves suggest an "obvious alternative explanation" to discrimination for the government's conduct, *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567), "discrimination is not a plausible conclusion," *id.*; *see also Simpson v. Thurston*, No. 22-cv-213, 2023 WL 3993040, at *2 (E.D. Ark. May 25, 2023) (three-judge court) (holding obvious alternative explanations to discrimination make a "racial motive implausible").

Plaintiffs allege very little to suggest that Section 16 was motivated by intentional discrimination.  For the most part, they claim that "the effect of [Section 16] will be borne greater by Black students," Am. Compl. ¶ 210, because it affects instruction in Critical Race Theory and other "teachings that" Plaintiffs claim "are especially impactful for Black students," *id.* ¶ 204; *see also id.* ¶ 210 (alleging Section 16 has been applied to AP African American Studies, "where the majority of students and teachers is Black").  But that merely shows disparate impact, not discriminatory purpose.

Further, this is not one of the "exceeding rare cases" where a pattern of disparate impact is "unexplainable on grounds other than race." *Stevenson*, 800 F.3d at 970.  Section 16 prohibits, without regard to teachers' or students' race, indoctrination in a broad array of discriminatory ideas, not just those that students or teachers of one race might be disproportionately interested in learning or teaching, or even just ideas related to race. *See* Ark. Code Ann. 6-16-156(b) (prohibiting indoctrination in ideas promoting discrimination on the basis of sex, religion, disability, age, "or any other characteristic protected by federal or state law").  And there is an obvious alternative explanation for why the General Assembly enacted Section 16: entirely appropriate

hostility to ideologies that members of one protected class "are inherently superior or inferior to people of another."  Ark. Code Ann. 6-16-156(b)(1).  That explanation is not only obvious, but far more plausible than Plaintiffs' convoluted theory that the General Assembly enacted Section 16 to burden black students who are disproportionately interested in Critical Race Theory or in taking a particular AP class.  Indeed, it is an explanation that Plaintiffs themselves allege.  *See Simpson*, 636 F. Supp. 3d at 956-57 (dismissing an intentional-discrimination claim when plaintiffs' own complaint pled alternative explanations to intentional discrimination for state action).  For in their right-to-hear claim, they allege that Section 16 was enacted out of "a desire to deny students access to ideas with which . . . the majority of state Republican legislators disagrees."  *Id.* ¶ 182.  Disagreement with racially discriminatory ideologies is not racial discrimination.

Plaintiffs' other attempts to plausibly allege discriminatory intent fare no better.  Plaintiffs claim that "statements by bill sponsors and others . . . demonstrate discriminatory intent,"  Am. Compl. ¶ 204, as well as their vague unsupported, assertions about what they claim were Governor Sanders's "highly politicized, rhetorical, misleading, inaccurate, and racially-animated provocation of the issues," *id.* ¶ 206.  Yet underscoring just how weak those claims are, they do not even attempt to say what statements or rhetoric they think meet that description.  In the background section of their complaint, they quote Governor Sanders's criticisms of Critical Race Theory as "emphasiz[ing] skin color as a person's primary characteristic," *id.* ¶¶ 61, 120, and one co-sponsor's statement that he was "not opposed to students learning about African American history," but that it ought not be taught in a way that calls for "a complete dumping of the past," *id.* ¶ 71.  Neither plausibly suggests racial animus.  Much to the contrary, Governor Sanders's statements show the opposite; she criticized Critical Race Theory because it "resurrect[s] segregationist values, which America has fought so hard to reject."  *Id.* ¶ 61.  And the co-

sponsor's statement doesn't express opposition to teaching African American history; he merely said students should not be taught that "we need a complete dumping of the past" in response to the racial injustices of the past.  *Id.* ¶ 71.

Finally, Plaintiffs claim Section 16 is procedurally and substantively irregular.  First, they allege that it was "push[ed] forward," alongside a raft of other provisions, "in a matter of weeks."  Am. Compl. ¶ 206.  But as a three-judge panel of this Court recently held, "'the brevity of the legislative process' cannot, on its own, 'give rise to an inference of bad faith[.]'"  *Simpson*, 2023 WL 3993040, at *2 (quoting *Abbott v. Perez*, 585 U.S. 579, 610 (2018)).  And the fact that Section 16 was only one small part of what Plaintiffs themselves describe as "a massive comprehensive" package of education reform, Am. Compl. ¶ 206, further weakens any inference from the speed of the LEARNS Act's passage as a whole to racial animus motivating Section 16.  Second and last, Plaintiffs claim Section 16 "usurp[s] . . . substantive areas of educational policy" that are "typically reserved for school districts and educators."  *Id.* ¶ 207.  But as a brief perusal of the 19-subchapter-long "Curriculum" chapter of the Arkansas Code in which Section 16 is codified shows, *see* Ark. Code Ann. 6-16-101 *et seq.*, that is hardly the case.  As particularly relevant here, Arkansas law has regulated African American history teaching materials since 1993, Ark. Code Ann. 6-16-121 (codifying 1993 Ark. Acts. 963), mandates Holocaust education and the "manner" in which it is taught, Ark. Code Ann. 6-16-154(a), and extensively regulates Advanced Placement courses, Ark. Code Ann. 6-16-1201-06.  Regulation of curricula at the state level is the norm, not a departure from it.

Plaintiffs fail to plausibly allege discriminatory purpose.  Their equal protection claim should be dismissed.

## CONCLUSION

The Court should dismiss Plaintiffs' amended complaint.

Dated: May 14, 2024                    Respectfully,

                                       TIM GRIFFIN
                                         Attorney General
                                       NICHOLAS J. BRONNI (2016097)
                                         Solicitor General

                                       ASHER STEINBERG (2019058)
                                         Senior Assistant Solicitor General

                                       MICHAEL A. CANTRELL (2012287)
                                         Assistant Solicitor General

                                       JORDAN BROYLES (2015156)
                                         Senior Assistant Attorney General
                                       JUSTIN BRASCHER (2023029)
                                         Assistant Attorney General
                                       Office of the Arkansas Attorney General
                                       323 Center Street, Suite 200
                                       Little Rock, AR 72201
                                       Main:  (501) 682-1051
                                       Asher.Steinberg@arkansasag.gov

                                       *Counsel for Defendants*