**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

RUTHIE WALLS; COLTON GILBERT; JENNIFER
REYNOLDS, as Next Friend of SADIE
ANNABELLA REYNOLDS; CHANDRA
WILLIAMS DAVIS, as Next Friend of GISELE
DAVIS; and ARKANSAS STATE CONFERENCE
OF THE NAACP,

                Plaintiffs,

v.                                                                          Case No.: 4:24-cv-00270-LPR

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of Arkansas;
and JACOB OLIVA, in his official capacity as
Secretary of the Arkansas Department of Education,
Arkansas State Board Members in their official
capacity: SARAH MOORE, KATHY
MCFETRIDGE-ROLLINS, ADRIENNE WOODS,
RANDY HENDERSON, LISA HUNTER, JEFF
WOOD, KEN BRAGG, and LEIGH S. KEENER,

                Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

   A. Passage of the LEARNS Act .......................................................................... 2

   B. Implementation of the Act .............................................................................. 6

   C. Enforcement .................................................................................................... 9

   D. Section 16's Impact on the Classroom........................................................... 9

ARGUMENT ........................................................................................................... 11

   I. Standard of Review ........................................................................................ 11

   II. Student Plaintiffs Sufficiently Allege Their Right to Receive Information
      and Ideas Claim............................................................................................ 12

        A. The Eighth Circuit has long recognized students' constitutional right to receive
           information and ideas.......................................................................... 12

        B. Other Supreme Court and lower court decisions recognize and similarly uphold
           students' right to receive information and ideas free from political and
           ideological interference and racial animus ......................................... 14

        C. Plaintiffs' allegations adequately support their First Amendment right to
           receive information and ideas claim .................................................. 16

   III. Teacher Plaintiffs Sufficiently Allege Their Due Process Vagueness Claim..................... 19

        A. Regardless of what level of scrutiny is applied to Section 16, Plaintiffs'
           allegations pertaining to vagueness are sufficient ................................ 20

   IV. Teacher Plaintiffs Sufficiently Allege Their Viewpoint Discrimination Claim ................. 27

        A. The very nature of teaching, especially in high schools, warrants some limited
           protection from viewpoint discrimination in the classroom ............................... 28

           1. Restrictions on content and viewpoint should not be upheld unless they
               over-balance a teacher's usefulness as an instructor.................................. 30

           2. Alternatively, the Court should require viewpoint restrictions in the
               classroom to be based on a legitimate pedagogical purpose.................... 31

        B. *Garcetti*'s exemption from the public employee speech doctrine for academic
           freedom extends to high school teachers ............................................ 33

   V. Student and Teacher Plaintiffs Sufficiently Allege Their Equal Protection Claim ............ 38

        A. Plaintiffs adequately allege Section 16's disparate impact on African American
           faculty and students............................................................................ 40

         B. The historical background and sequence of events leading to the passage of
           Section 16 evidences discriminatory intent ....................................... 41

C.   Procedural and substantive departures leading to the passage of Section 16
     illustrate a discriminatory purpose ................................................................ 45

VI. The Ex Parte Young Exception Allows Plaintiffs' Claim to Proceed Against
    Governor Sanders ...................................................................................................... 49

CONCLUSION ................................................................................................................... 54

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v, Arneson*, 638 F.3d 621 (8th Cir. 2011) .................................................... 49, 50

*Adams v. Tr. of Univ. N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011) ....................................... 35

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ........................................................................ 16, 41

*Arkansas Dep't of Educ. v. Jackso*n, 2023 Ark. 140, 675 S.W.3d 416 (Ark. 2023) ................. 3, 47

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 39, 53

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ......................................................................................... 24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) ........ 15, 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) ........................................................................ 53

*Bender v. Williamsport Area School Dist.*, 475 U.S. 534 (1986) ................................................. 36

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ........................................................... 31

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ............................................. 11, 46

*Brown v. Board of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954) ............................. 27

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ........................................................... 31, 35

*Calzone v. Hawley*, 866 F.3d 866 (8th Cir. 2017) ........................................................................ 49

*Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019) ..................................................................... 14

*Church v. Missouri*, 913 F.3d 736 (8th Cir. 2019) ....................................................................... 52

*Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006) ............................................. 50

*Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983) .......................................................... 40

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ...................................................................... 24

*Cockrel v. Shelby Cnty. School Dist.*, 270 F.3d 1036 (6th Cir. 2001) ......................................... 34

*Connally v. General Const. Co.*, 269 U.S. 385 (1926) ................................................................. 22

*Crumply-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588 (8th Cir. 2004)................................ 38

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ............................................................................ 35

*Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015).................. 49, 53

*Epperson v. State of Arkansas,* 393 U.S. 97 (1968)................................................................... 1, 30

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................................................................ 53

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ................................................................ 30

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
   428 F.3d 223 (6th Cir. 2005) ...................................................................................................... 34

*Ex Parte Young*, 209 U.S. 123 (1908) ..................................................................................... 49, 50

*Falls v. DeSantis*,
   No. 4:22-CV-166-MW/MJF, 2022 WL 19333278 (N.D. Fla. July 8, 2022)........................... 31

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) .................................................................... 49

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................... 27, 28, 34, 35

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ................................................................................... 27

*Gonzalez v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz. 2017) ......................................................... 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)....................................................................... 19

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).......................................... 15, 28, 31, 37

*Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023) ................................................................................ 35

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................................................ 19

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)................................................................ 27

*Holmbeck v. Solomon*, 639 F. Supp. 3d 829 (E.D. Ark. 2022)..................................................... 11

*Jenkins v. Methodist Hosps. of Dall., Inc.*, 478 F.3d 255 (5th Cir. 2007) ................................... 44

*Johnson v. United States*, 576 U.S. 591 (2015) ........................................................................... 22

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .......................................................... 36, 37

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967).......................... 26, 35

*Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109 (5th Cir. 1980) ........................... 28, 30, 31

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................... 22

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023) .................... 20

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut,* No. 21-cv-1077 (D.N.H. May 28, 2024) ........ 23, 26

*Love v. Pence*, 47 F. Supp. 3d 805 (S.D. Ind. 2014) ............................................... 51, 52

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180 (2021) ............................... 15

*Mensie v. City of Little Rock*, 917 F.3d 685 (8th Cir. 2019) ............................................ 40

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...................................... 33, 35, 37

*Miles v. Denver Pub. Sch.*, 944 F.2d 773 (10th Cir. 1991) ............................................ 32

*Musser v. Mapes*, 718 F.3d 996 (8th Cir. 2013) ....................................................... 19

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ............................... 49

*Perkins v. City of West Helena, Ark.*, 675 F.2d 201 (8th Cir. 1982) ................................. 40

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................................. 16, 25, 26

*Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256 (1979) ................................. 39

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) ................................................... 12, 13, 14, 15

*Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ....................................................... 29

*Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633 (5th Cir. 2021) ....................... 45

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ........................ 28

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) ............ 5

*Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719 (2d Cir. 1994) ............... 32

*Simpson v. Hutchinson*, 636 F. Supp. 3d 951 (E.D. Ark. 2022) ................................. 39

*Simpson v. Thurston*,
    No. 4:22-CV-213, 2023 WL 3993040 (E.D. Ark. May 25, 2023) ........................... 46

*Smith v. Goguen*, 415 U.S. 566 (1974) ..................................................................... 22

*Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997)........................................................... 44

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................................. 15

*Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997) ............... 20

*Tarvisium Holdings, LLC v. Dukat, LLC*,
    No. 4:19-CV-0086-DGK, 2021 WL 5534688 (W.D. Mo. Mar. 22, 2021)............................ 19

*Tennessee Educ. Ass'n v. Reynolds*,
    No. 3:23-CV-00751, 2024 WL 1942430 (M.D. Tenn. May 2, 2024) ............................... 25, 26

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).................................. passim

*United States v. Taylor*, 803 F.3d 931 (8th Cir. 2015)................................................. 14

*United States v. Wright*, 22 F.3d 787 (8th Cir. 1994) ................................................. 14

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)......................................................... 45

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................... passim

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)..................... 19

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517 (11th Cir. 1989) ...................... 16

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).......................... 29, 37

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)........................ 28

*Ward v. Hickey*, 996 F.2d 448 (1st Cir. 1993) ................................................... 28, 32

*Wieman v. Updegraff*, 344 U.S. 183 (1952) ............................................................ 36

*Williams v. Anderson*, 562 F.2d 1081 (8th Cir. 1977) ................................................ 41

*Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893 (8th Cir. 2010) ...................... 11

**Statutes**

42 USC § 1983.............................................................................................. 39

Ark. Code Ann. § 6-15-2906 ..................................................................... 2, 9

Ark. Code Ann. § 6-15-902(c)(2) .................................................................. 7

Ark. Code Ann. § 6-16-156 ................................................................... passim

**Other Authorities**

Ark. H. Journal, 94th Gen. Assemb., Reg. Sess. (2023) ................................ 3

Ark. S. Journal, 94th Gen. Assemb., Reg. Sess. (2023) ................................ 3

Note, 92 Yale L.J. 499 (1983) ...................................................................... 37

**Executive Orders**

EO 13950 ........................................................................................... 4, 5, 42

EO 23-05 ....................................................................................... 4, 5, 42, 43

**Constitutional Provisions**

Ark. Const. Art. 5 § 1 ................................................................................... 47

U.S. CONST. amend. 1 ................................................................................. 30

# INTRODUCTION

Plaintiffs Ruthie Walls, et al., respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss. The Nation's future depends upon leaders trained through wide exposure to robust exchange of ideas that discover truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (alteration in original) (quoting *Keyishian v. Board of Regents,* 385 U.S. 589, 603 (1967)). Consequently, a state does not have unchecked power to "impose upon the teachers in its schools any conditions that it chooses" and cannot prohibit teaching a "theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Epperson v. State of Arkansas,* 393 U.S. 97, 107 (1968). States also do not have the unfettered right to enact legislation motivated by racial animus and racial discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265-66 (1977) ("*Arlington Heights*"). Yet, that is exactly what Section 16 does.

Defendants' motion fails on the facts and on the law. For one, Defendants ignore the standard protocol governing motions to dismiss where the courts must accept as true *Plaintiffs'* allegations together with reasonable inferences, not *Defendants'* allegations. When Plaintiffs' allegations control, Defendants' grounds for dismissal fail. On the law, Defendants misapply precedent, even precedent established in this case governing Plaintiffs' right to receive information and ideas claim. As discussed further below, the law supports Student Plaintiffs' First Amendment right to receive information and ideas; Teacher Plaintiffs' Fourteenth Amendment Due Process right to be free from vague laws; Teacher Plaintiffs' First Amendment right to be free from illegitimate viewpoint discrimination in the classroom; and Student and Teacher Plaintiffs'

1

Fourteenth Amendment right to equal protection under the law. Plaintiffs' allegations more than sufficiently support these claims. Defendants' motion to dismiss should be denied.[1]

**STATEMENT OF FACTS**

Section 16 of the LEARNS Act constitutes an extraordinary intrusion into the classroom by the state legislature with the clear purpose of censoring speech on contentious, but nonetheless crucial, topics like the role of race in American history and ongoing inequalities in present-day America. Am. Compl. ¶ 5. Through vague and undefined terms, this provision has had the desired effect: causing teachers, unsure of what they can and cannot teach, to self-censor and deny information and ideas to their students. *Id.* ¶ 6. Arkansas laws and regulations create academic standards that provide curriculum goals for teachers, which in turn help ensure that curriculum taught to students adequately prepares them for the world. *See, e.g.*, Ark. Code Ann. § 6-15-2906(a). And federal laws already protect against the purported discrimination that Defendants, only now, assert as a basis for the law. Am. Compl. ¶ 208. Now, however, a partisan majority of Arkansas legislators has overridden the pedagogical judgments of teachers and education officials to stifle the exchange of ideas with which they disagree without regard to the consequences for teachers or students. *Id.* ¶ 5.

**A.      Passage of the LEARNS Act**

S.B. 294, known as the LEARNS Act, was introduced in the Arkansas Senate on February 20, 2023. Am. Compl. ¶ 67. Though the bill was 144 pages and covered a multitude of educational issues, including teacher salaries, private school vouchers, and achievement standards, Republican members of the Arkansas Senate Committee for Education scheduled a vote on the bill just two

---

[1] Because Plaintiffs dropped their claims against Governor Sanders and Secretary Oliva in their individual capacities in their Amended Complaint, Plaintiffs no longer seek monetary damages against Defendants.

days after its introduction. *Id.* At that hearing, Secretary of Education Oliva, in response to a question asking him to define Critical Race Theory as presented in the bill, stated that

> in coming up with a simple definition for critical race theory it's actually really challenging and it is something that is debated amongst even the scholars that have wrote different theories because it is just that, it is just a theory. I've been told examples of trying to put everybody into a room with history scholars and say define socialism. Everybody has a little bit different answer of what that looks like in practice and how you come up with that definition. But the language in this bill, it mirrors the language that was signed by Governor Sanders in the executive order.

*Id.* ¶ 68. The Education Committee approved the LEARNS Act on February 22, 2023, and proceeded to a full vote in the Senate on February 23, 2023, where it passed 25-7 along partisan lines. *Id.* ¶ 69. The bill moved on to pass the House Education Committee on March 1, 2023, before proceeding to a full House vote on March 2, 2023, where it passed 78-21, again along partisan lines. *Id.* At a second Senate Education Committee hearing on amendments to the Act passed by the Arkansas House of Representatives, high school students attempted to testify against the law but were denied due to procedural objections raised by Republican sponsors of the bill. *Id.* Arkansas Governor Huckabee Sanders signed the LEARNS Act into law on March 8, 2023, less than three weeks after it had been introduced. *Id.* The law passed with an emergency clause, which allowed the bill to become effective immediately upon the governor's signature.[2]

Since its passage, Defendant Governor Sanders has consistently defended the law and its application to censor classroom discussions. For example, following Secretary Oliva's de-designation of the Advanced Placement African American Studies ("AP AAS") course as an "AP"

---

[2] Ark. S. Journal, 94th Gen. Assemb., Reg. Sess. 1232, 1270–71 (2023); Ark. H. Journal, 94th Gen. Assemb., Reg. Sess. 1422 (2023). There was litigation relating to this emergency clause resulting in a delay in its implementation to August 1, 2023. *See Arkansas Dep't of Educ. v. Jackso*n, 2023 Ark. 140, 675 S.W.3d 416, *5 (Ark. 2023).

course in August 2023, Governor Sanders appeared on a nationally televised interview with FOX news to discuss and defend the LEARNS Act, professing that:

> We've got to get back to the basics of teaching math, of teaching, reading, writing and American history. And we cannot perpetuate a lie to our students and push this propaganda leftist agenda, teaching our kids to hate America and hate one another. It's one of the reasons that we put into law banning things like indoctrination and CRT.

Am. Compl. ¶ 120.

As relevant here, Section 16 of the LEARNS Act purportedly focuses on "prohibited indoctrination" in public schools. As Secretary Oliva noted in his testimony in support of the legislation, it builds upon an executive order ("EO 23-05") that Governor Sanders signed on her first day as Governor. *Id.* ¶¶ 61, 68. That order, titled "Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools," specifically attacks CRT as "antithetical to the traditional American values of neutrality, equality, and fairness . . . resurrecting segregationist values." *Id.* ¶ 61. Governor Sanders' move does not stand in isolation to the growing political attention targeting CRT (though the term is often undefined and misunderstood) and broader discussions of race in America, following on the heels of President Trump's own Executive Order in 2020 ("EO 13950"), which banned diversity, equity, and inclusion trainings for government employees and limited discussions of banned concepts like systemic racism and sexism. *Id.* ¶¶ 55–56.

In the wake of the nation's reckoning with injustice against Black people in 2020, then-President Donald Trump began to openly target speech he disagreed with, including CRT, anti-bias training, and discussions of systemic racism, sexism, and genderism. *Id.* ¶ 53. First, at a White House conference on American history, he maligned CRT efforts to reckon with the nation's struggle with enslavement and continuing racial inequalities as a "crusade against American history," "toxic propaganda," and "ideological poison." *Id.* ¶ 54. Days later, he issued EO 13950, which picked up on these same themes by targeting objectionable speech and viewpoints, such as

discussions of CRT, intersectionality, systemic racism, Black Lives Matter, white privilege, or "any other . . . propaganda effort," in trainings conducted by federal agencies or contractors. *Id.* ¶ 55. A federal court eventually enjoined key parts of EO 13950, including the banned concepts, as violating the rights of contractors to train their own employees on vagueness grounds. *Id.* ¶ 57; *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

In line with Governor Sanders' EO 23-05, Section 16 likewise seeks to prohibit the teaching of CRT in schools, as part of a larger prohibition on "rules, policies, materials, and communications . . . that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as Critical Race Theory, otherwise known as 'CRT', that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on an individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law . . . ." Am. Compl. ¶ 70; *see also* Ark. Code Ann. § 6-16-156(a). It further allows the Secretary of Education to "amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination and that conflict with the principle of equal protection under the law." Am. Compl. ¶ 70; *see also* Ark. Code Ann. § 6-16-156(a). The section defines "prohibited indoctrination" as:

> communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352, including that:
>
> > (1) People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or

> (2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law.

Am. Compl. ¶ 70; *see also* Ark. Code Ann. § 6-16-156(b). Finally, Section 16 includes a purported savings clause, which states that it does not "prohibit the discussion of: (1) Ideas and the history of the concepts described in subsection (b) of this section; or (2) Public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive." Am Compl. ¶ 70; *see also* Ark. Code Ann. § 6-16-156(c). Other than the aforementioned definition of "prohibited indoctrination," Section 16 does not define any terms.

## B.   Implementation of the Act

The LEARNS Act permanently took effect on August 1, 2023. Despite its vague, ambiguous, and contradictory terms, to date, Defendants, including Defendant Board Members, have not provided any guidance. But that did not stop them from relying on Section 16 to implicitly and explicitly censor and amend Plaintiffs' curriculum and courses mere days before the start of the school year was about to start. Am. Compl. ¶ 105.

On August 11, 2023, just three days before the start of the 2023-2024 school year, ADE revoked state approval of the AP AAS. *Id.* AP AAS is a new Advanced Placement course designed by the College Board and the work of 300 scholars to provide a holistic introduction to the history, literature, and arts of Black Communities in the United States by reviewing  origins in the African continent, resistance to slavery, and movements for equal rights. *See id.* ¶¶ 98, 119. The College Board has also stated that it hoped the course would encourage more Black students to take AP courses, *id.* ¶ 44, given that the enrollment of Black students in AP classes remains below that of White students, *id.* ¶ 43. When ADE first communicated its decision to de-designate the AP AAS, it did so orally without any written explanation or guidance. *Id.* ¶ 105.

After this decision was disclosed, Secretary Oliva provided a series of alternative explanations for the decision. First, in a discussion with Little Rock School District Superintendent Dr. Jermall Wright, Oliva explained that ADE revoked AP AAS for the 2023-24 school year because the course was still being piloted and the College Board was unable to confirm which college level course would be its equivalent for crediting purposes. *Id.* ¶ 106. Oliva further stated that Arkansas could not offer the course until this issue was resolved. *Id.* However, Secretary Oliva's explanation was wrong—by August 2023, more than 200 colleges and universities nation-wide had already signed on to provide college credit, advanced placement, or both to students who satisfactorily performed on the AP AAS exam, including Arkansas's flagship public university, the University of Arkansas-Fayetteville. *Id.* ¶ 108. Moreover, no such requirement is part of the state law outlining when an AP course may be taught. *See, e.g.,* Ark. Code Ann. § 6-15-902(c)(2).

Secretary Oliva then suggested that the listing of AP AAS in the course catalog last year was a mistake. Am. Compl. ¶ 109. This statement, too, is in error. In 2022, the College Board completed ADE's approval process for AP AAS' inclusion in the state's course directory and ADE had approved the pilot course code in October 2022 without issue and in accordance with the State's course code assignment process. *Id.* ¶ 110. In fact, two Arkansas high schools had offered the AP AAS during the first year of the pilot in the 2022-23 school year and it was taught without incident. *Id.* ¶ 210.

Secretary Oliva next provided yet another reason—this time, proffering that the course code was deleted because the high schools offering the course had not undergone Arkansas' required AP course audit. *Id.* ¶ 111. This statement, however, is also inaccurate. *Id.* ¶ 112. The course audit is a requirement between the schools offering AP classes and the College Board, rather than a requirement imposed by Arkansas. *Id.*

Finally, in the waning hours of August 14, Secretary Oliva stated the actual reason that ADE had revoked approval of AP AAS: the course likely violated the LEARNS Act. *Id.* ¶¶ 114–15. This conclusion was supported by Governor Sanders who stated that without further clarity on the law, "we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law." *Id.* ¶ 116. Secretary Oliva then confirmed this reasoning in an August 21, 2023 letter to school superintendents, which stated that "[g]iven some of the themes included in the [AP AAS] pilot, including 'intersections of identity' and 'resistance and resilience,' the Department is concerned the pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory." *Id.* ¶ 122. He also asked superintendents to submit all materials related to the course and a signed statement of assurance that the course did not violate any Arkansas law. *Id.* ¶ 139. To date, Defendants have not informed Ms. Walls or the Little Rock School District whether the review of AP AAS for the 2023-24 school was completed. *Id.* ¶ 141.

Notably, ADE has not determined that any other course, AP or otherwise, likewise violates the LEARNS Act. This is significant because of the unique nature of AP AAS as to the teachers who teach, and the students who take, the course and in the course's focus on the African American experience when compared to other AP courses. For example, in Arkansas, the course is taught by a majority of Black teachers, whereas most other AP courses are taught by White teachers. *Id.* ¶ 124. Similarly, Black students comprise a majority of students enrolled in the AP AAS course, whereas they only represent 8.9% of students in all AP courses in Arkansas (in contrast to White students who comprise about 59% of students in AP courses generally). *Id.* Likewise, though Secretary Oliva called out topics within the AP AAS curriculum—intersections of identity, and resistance and resilience—as themes that might violate the LEARNS Act, he has not taken any

action against AP European History, which explores similar themes of developing identity and resistance and resilience on the European continent. *See id.* ¶¶ 125–34. In contrast to the AP AAS, the AP European History course enrolls a majority of white students. *See id.* ¶ 135.

### C.    Enforcement

Though ADE has not implemented any regulations pertaining to Section 16, there are two pre-existing mechanisms through which the state can enforce the LEARNS Act. The first is through the state's teacher ethics code, under which Defendant Arkansas State Board of Education can investigate complaints of teacher misconduct and issue appropriate sanctions if violations are found. *Id.* ¶ 28; *see also* Defs.' Br. in Supp. of Mot. to Dismiss ("MTD") at 7. Second, superintendents also have the power to suspend, fire, or non-renew teachers. *See* Am. Compl. ¶ 90. This power used to be circumscribed. Under the Teacher Fair Dismissal Act ("TFDA"), superintendents could only suspend, fire, or non-renew teachers for "just and reasonable cause." *Id.* The TFDA was repealed in the LEARNS Act, providing significantly more discretion to superintendents in such decisions, especially since it is unclear what, if any, standard currently guides this discretion. *See id.* ¶¶ 90, 171.

### D.    Section 16's Impact on the Classroom

Unsurprisingly, in response to the LEARNS Act and ADE's actions in applying Section 16, teachers, including Plaintiff Teachers Walls, Gilbert, and teacher members of the Arkansas State Conference of the NAACP, have altered their instruction, classroom discussions, lesson plans, and materials used in class out of fear of reprisal, even if that places students like Student Plaintiffs Reynolds and Davis at risk of failing to learn the knowledge and skills required by Arkansas' own academic standards—standards developed by educators. Am. Compl. ¶¶ 78, 84, 87; *see also* Ark. Code Ann. § 6-15-2906(c)(1)(A).

For example, prior to the enactment of Section 16, Ms. Walls—Central High's AP AAS teacher—used to engage in deeper discussions with her students around select topics like the consequences of *Brown v. Board of Education* and desegregation efforts on Black teachers or the similarities between Jim Crow-era laws and laws being passed today. Am. Compl. ¶¶ 19, 87. With the passage of Section 16, and the ADE's targeting of the AP AAS curriculum, *id.* ¶¶ 105–22, she now self-censors herself out of fear of the penalties that she may face. *Id.* ¶ 87. Ms. Walls would like to use the New York Times's "The 1619 Project" materials to help students achieve the academic standards. *Id.* She keeps her copy of these materials at home out of fear of being sanctioned by Defendants for violating Section 16. *Id.* Mr. Gilbert—a Debate I and Oral Communication Skills teacher and debate coach—has muted students' presentations of certain arguments and has stopped guiding and supporting students on subjects like affirmative action, legacy admissions, or criminal justice reform he is worried may run afoul of Section 16. *Id.* ¶¶ 2, 9. Another teacher, who is a member of the NAACP-AR, no longer teaches *The Color Purple* by Alice Walker and relies less on using films or additional media materials related to current events, such as excerpts of speeches by Roland Martin, because she is not sure whether those materials would violate Section 16. *Id.* ¶ 78. This is the quandary Section 16 and Defendants' enforcement of the Act places teachers in everyday.

As a result, students including Plaintiffs Reynolds, Davis, and student members of the Arkansas State Conference of the NAACP, are denied access to this information and ideas surrounding race, for no legitimate pedagogical purpose. *Id.* ¶¶ 180–81. Likewise, Plaintiff Teachers have censored themselves from using resources they would have otherwise used for fear of violating Section 16, largely using the state's own purging of materials as their guide. *See id.* ¶ 191. Finally, the state's focus on AP AAS has stigmatized the Black teachers and students

10

involved with the course by treating differently a course that they are disproportionately likely to teach and/or take than AP courses taught and taken by majority White teachers and students. *See id.* ¶¶ 203–13. In this way, Section 16 is an unprecedented attempt by Arkansas to quash any idea that does not confirm to their views of not just *what* teachers may teach, but *how* they may teach. *Id.* ¶ 5. And in the process of doing so, Defendants have violated the First Amendment, Equal Protection, and Due Process rights of students and teachers across the state.

<strong>ARGUMENT</strong>

### I.   Standard of Review

Federal Rule of Civil Procedure 8 requires, in relevant part, that complaints include: "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, when determining the merits of a Rule 12(b)(6) motion to dismiss, courts examine whether a complaint includes sufficient factual allegations, accepted as true, that support "a claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations are taken to be true at the motion-to-dismiss stage because the plaintiff has not had a full opportunity to conduct discovery and thereby uncover facts that support his or her claim." *Holmbeck v. Solomon*, 639 F. Supp. 3d 829, 843 (E.D. Ark. 2022) (citing *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005)). The plausibility of a claim is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Holmbeck*, 639 F. Supp. 3d at 843 (citing *Iqbal*, 556 U.S. at 678). In addition, courts must "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010) (citing *Braden*, 588 F.3d at 594).

II.    **Student Plaintiffs Sufficiently Allege Their Right to Receive Information and Ideas Claim**

Student Plaintiffs have pled a plausible claim that Section 16 violates their First Amendment rights to receive information and ideas, as recognized by the Eighth Circuit in *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 773 (8th Cir. 1982). Defendants rehash the same unavailing arguments raised in their response to Plaintiffs' Motion for Preliminary Injunction and rejected by this Court: that the Court should dismiss this claim because government speech cases apply, not *Pratt*; and that even if *Pratt* applies, Section 16 does not run afoul of the First Amendment. *Compare* Defs.' Opp'n to Mot. for Prelim. Inj. ("MPI Resp.") at 12–21 *with* MTD at 10–18. But as this Court has held, *Pratt* does control and Section 16 has caused teachers to self-censor, which has resulted in denying students' right to receive information and ideas. Doc. 45 at 34–44 ("Order"). These findings are further bolstered by Plaintiffs' allegations in their Amended Complaint, discussed below, which must be taken as true together with reasonable inferences. This Court should deny Defendants' motion to dismiss Student Plaintiffs' right to receive information and ideas claim.

A.  **The Eighth Circuit has long recognized students' constitutional right to receive information and ideas**

While governmental entities typically enjoy discretion when enacting curriculum laws, that discretion is not without limits. In proscribing curriculum restraints imposed by governmental entities, the *Pratt* Court held, "[a]t the very least, the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Pratt*, 670 F.2d at 776 (quoting *Keyishian*, 385 U.S. at 603)). As alleged by Plaintiffs, that "pall of orthodoxy" is a hallmark of Section 16. *See, e.g.*, Am. Compl. ¶¶ 6, 174–82. Indeed, this Court has already concluded that Student Plaintiffs are likely to succeed on this claim and issued its partial preliminary injunction

in this case based on Section 16's impairment of their constitutional right to receive information and ideas. Order at 34–44, 46, 47–49. Because *Pratt* governs, Defendants' assertion that government speech applies, fails.[3]

In *Pratt*, three students challenged their school board's decision to remove from the curriculum the Encyclopedia Brittanica Educational Corporation's film version of "The Lottery," a short story in which the citizens of a small town randomly select one person to be stoned to death each year, as well as a "trailer" film which discussed the story and its themes. 670 F.2d at 773. The Eighth Circuit determined that "to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777. It found that the school board was unable to do so, affirming the district's conclusion that the school board's purported justification was "self-serving" and that the board had "failed to produce any cognizable, credible evidence as to any legitimate reason for excluding this film (sic) . . . ." *Id.* at 777–78. In reaching this decision, the Court emphasized that, for the school board's actions to comply with the First Amendment, the "reasons for its decision" must be "apparent to those affected." *Id.* at 778. This was not the case:

> Here, the board, in response to citizens' complaints that centered on their ideological and religious beliefs, banned the films without giving any reasons for its actions. Only after the district court asked for an explanation of the board's action did it offer its violence rationale. Even then, the board failed to specify why the films were too violent or how they distorted the short story. This approach inevitably suggests that the Board acted not out of its concern about violence, but rather to express an official policy with respect to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians and teachers at their peril.

---

[3] In fact, *Pratt* is compatible with government speech cases where governments can shield or encourage viewpoints; they just cannot do so when their motive is unlawful.

*Id.* at 778–79 (internal quotation omitted).[4]

As in their response to Plaintiffs' Motion for Preliminary Injunction, Defendants again rely on *United States v. Taylor* for the proposition that this Court should not follow *Pratt*. However, *Taylor*'s holding invokes the power of Eighth Circuit *panels* to ignore previous *panel* decisions, "when the *earlier panel decision* is cast into doubt by an intervening Supreme Court decision." 803 F.3d 931, 933 (8th Cir. 2015) (internal quotation omitted) (emphasis added). Here, this Court as a federal district court is bound by Eighth Circuit caselaw until that case is overturned by the Eighth Circuit or there is a controlling Supreme Court decision. *See Calzone v. Summers*, 942 F.3d 415, 426 n.8 (8th Cir. 2019) ("In the absence of a controlling Supreme Court decision to the contrary, the district court as well as any panel of this court, was bound to apply this circuit's precedent."); *United States v. Wright*, 22 F.3d 787, 788 (8th Cir. 1994) ("[A] panel of this Court is bound by a prior Eighth Circuit decision unless that case is overruled by the Court sitting en banc."). As this Court held in its Order granting a partial injunction, no Supreme Court or Eighth Circuit case has held that restraints like Section 16 on curriculum and instruction are government speech subject to no constitutional restraints. *See* Order at 36.

### B. Other Supreme Court and lower court decisions recognize and similarly uphold students' right to receive information and ideas free from political and ideological interference and racial animus

For decades, the Supreme Court has held in K-12 cases, among others, that the Nation's future depends upon leaders trained through wide exposure to robust exchange of ideas that discover truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker*, 393 U.S. at 512 (alteration in original) (quoting *Keyishian*, 385 U.S. at 603).

---

[4] The Eighth Circuit also noted that the fact that the films and underlying short story remained available to teachers and students in the library "is not decisive" because "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt*, 670 F.2d at 779 (internal citation omitted).

Consequently, the Court has recognized that it is "well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The First Amendment's protection of the right to receive information and ideas necessarily includes students' right to receive information and ideas at school. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–68 (1982); *see also Pratt*, 670 F.2d at 773. "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868. As America's "nurseries of democracy," K–12 public schools must protect this "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190 (2021).

While government actors enjoy discretion in fashioning school curricula, this discretion is bound by the Constitution. To avoid violating the First Amendment, the state's restriction on students' access to information must be "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Moreover, a plaintiff still establishes a First Amendment claim, even if the state demonstrates a legitimate interest, by demonstrating that the reasons offered by the state in fact serve to mask other illicit motivations. *See Pico*, 457 U.S. at 871.[5] Illegitimate motives include restricting students' access to information

---

[5] In *Pico*, a plurality of the Supreme Court recognized that school boards could not remove library books based on "narrowly partisan or political" interests or "racial animus." 457 U.S. at 870-71. Although Justice Rehnquist dissented from the judgment in *Pico*, he, joined by Chief Justice Burger and Justice Powell, "cheerfully concede[d]" that such "discretion may not be exercised in a narrowly partisan or political manner" or based on "racial animus." *Id.* at 907 (internal quotation omitted). Consequently, seven members of the Supreme Court subscribed to the view that the First Amendment forbids school officials from removing materials from school libraries to further narrowly partisan, political, or racially discriminatory ends.

based on "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the government actor disagree[s]." *Pico*, 457 U.S. at 870–72.

Other courts have likewise held that a student's First Amendment right to receive information and ideas is violated when government actors, motivated by political or ideological purposes or racial animus, remove materials from curriculum. The Eleventh Circuit, for example, has recognized that a school board's actions in removing books from the curriculum is only constitutional when it is "reasonably related to the stated legitimate concern." *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1525 (11th Cir. 1989). In a challenge to Florida's Individual Freedom's Act (also known as the "Stop W.O.K.E. Act"), the court recognized students' right to receive information and ideas claim in rejecting the state's motion to dismiss. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1278 (N.D. Fla. 2022). In *Arce v. Douglas*, a challenge to an Arizona law that was used by the state superintendent of education to exclude a Mexican American Studies course, the Ninth Circuit held that "the state may not remove materials otherwise available in a local classroom unless its actions are reasonably related to legitimate pedagogical concerns." 793 F.3d 968, 983 (9th Cir. 2015). On remand and following discovery and trial, the federal district court concluded that the plaintiffs had proven their First Amendment claim by demonstrating that the Arizona law had no legitimate pedagogical interest. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 973–74 (D. Ariz. 2017).

### C. Plaintiffs' allegations adequately support their First Amendment right to receive information and ideas claim

Defendants do not directly challenge the sufficiency of Plaintiffs' allegations supporting their right to receive claim. Instead, Defendants misleadingly suggest that Student Plaintiffs' claim is premised on a right to compulsory indoctrination and that Section 16 does not violate students' First Amendment rights because it is supported by a legitimate pedagogical interest. MTD at 15–

18. As to the first grounds, Defendants are plainly wrong about Student Plaintiffs' right to receive claim. Their claim does not turn on a right to be indoctrinated but rather is premised on Section 16's chilling effect on teaching, which in turn is depriving them of their right to receive information and ideas. Am. Compl. ¶¶ 174–82. This Court already addressed this defense in its Order, ruling that "the classroom-based withholding of information from students (to the extent the withholding is based on Section 16's potential applicability to teaching about or through the prism of Critical Race Theory) is 'fairly traceable' to Section 16 and the implementation and enforcement of Section 16." Order at 43.

Regarding Defendants' second grounds for dismissal in averring that Section 16 and its censorship application to teaching of the AP AAS course is supported by a legitimate pedagogical interest, this defense has also been rejected by this Court, where it held that "[b]ecause the State has not even attempted to show a legitimate pedagogical reason to withhold material and information that teach about or use or reference parts of Critical Race Theory, the Student Plaintiffs have shown they are more likely than not to prevail under *Pratt*." *Id*. at 44. At best, this defense raises questions of fact that are directly controverted by Plaintiffs' allegations demonstrating how Section 16 and Defendants' application of the law to the teaching of the AP AAS course was based on narrow political, ideological purposes and motivated by racial animus —allegations that must be accepted as true at this stage. Thus, Defendants' motion should be denied.

For example, Plaintiffs allege that Section 16 is "Defendants' own unprecedented attempt to quash any idea that does not conform to their views of not just *what* teachers teach, but *how* they may teach." Am. Compl. ¶ 5. Section 16 "seeks to intimidate teachers and, in turn, prohibit students from becoming critical, engaged thinkers and learners. Teachers are at a loss for what they can and cannot teach, especially when it comes to the history of racism and ongoing racial

inequalities and injustice in present-day America." *Id.* Teacher Plaintiffs have revised their lesson plans and materials and censored "their students from hearing or discussing 'controversial' topics that may run afoul of the law, including the role of colonialism in America, excerpts of 'Warriors Don't Cry: A Searing Memoir of the Battle to Integrate Little Rock's Central High School,' and competing ideas about potential causes for lasting inequalities in society." *Id.* ¶ 6.

Defendants' application of Section 16 to the AP AAS further drew fear into educators, forcing them to censor their classroom instruction and materials. In de-designating the AP AAS course, Defendant Secretary Oliva and the ADE issued a statement that the AP AAS course "likely violated provisions contained in the LEARNS Act that guard against the 'indoctrination' of students by teaching 'prohibited topics.' The ADE further warned educators who continued teaching the course that they risked violating state law and whatever penalties would flow therefrom." *Id.* ¶¶ 114–15. Resultantly, Plaintiff Walls no longer delves "deeply into topics in her AP AAS classes like the consequences of *Brown v. Board of Education* for Black teachers or how Jim Crow laws are similar to laws being passed today for fear of either violating Section 16 or giving opponents of deep learning ammunition to target Ms. Walls and her students." *Id.* ¶ 6.

Teachers like Plaintiff Colton Gilbert were "unclear what materials and information might be related to AP AAS under Oliva's interpretation and what was permissible. Both in class and in debate competitions, Plaintiff Gilbert feels compelled by Section 16 to mute students' presentation of certain arguments and has stopped guiding and supporting students on subjects that may run afoul of the law." *Id.* ¶ 9. In response to the passage of Section 16, Mr. Gilbert has likely overcorrected in excluding certain information and materials "out of fear of reprisal from Defendants." *Id.* A teacher, who is also a member of Plaintiff NAACP-AR, "no longer teaches *The Color Purple* by Alice Walker and relies less on using films or additional media materials related

to current events, such as excerpts of speeches by Roland Martin, because she is not sure whether those materials would violate Section 16." *Id.* ¶ 78. The lack of definitions for many terms, including "indoctrination," "CRT," and "related ideologies" in Section 16 further causes Plaintiff Teachers to censor their instruction and materials, depriving students of information and ideas. *Id.* ¶¶ 77–80. Teachers like Ms. Walls have also been reluctant to assist their students on topics that could be construed as running afoul of Section 16's ban of CRT and related ideologies. *Id.* ¶¶ 83–87. Student Plaintiffs have more than adequately pled their First Amendment claim. *Id.* ¶¶ 174–82.

## III.     Teacher Plaintiffs Sufficiently Allege Their Due Process Vagueness Claim

A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Defendants assert several arguments to conclude that Section 16 is not vague. They are incorrect. Plaintiffs have sufficiently alleged that Section 16 is unconstitutionally vague, both on its face and as-applied.[6]

As Defendants acknowledge, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

---

[6] Defendants do not contest Plaintiffs' as-applied claim, focusing on Section 16's application to AP AAS, outside of their overall argument that Section 16 is not vague. *See Tarvisium Holdings, LLC v. Dukat, LLC*, No. 4:19-CV-0086-DGK, 2021 WL 5534688, at *2 (W.D. Mo. Mar. 22, 2021) ("As a threshold matter, by failing to respond to Plaintiffs' [] argument, Defendant has conceded it.").

They argue, however, that Section 16 is not subject to exacting review because the penalties for violating Section 16 are mere "consequences for continued employment" and that the First Amendment is not implicated in Plaintiffs' vagueness claim. MTD at 19–20. They are wrong on both counts. *See Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023) ("Considering that teachers who are found to have advocated a banned concept can be stripped of their teaching credentials and thus deprived of their livelihoods, this factor points in favor of requiring the most exacting vagueness review.") (citing *Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch J., concurring)); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308–09 (8th Cir. 1997) (holding that when a "regulation 'is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts'") (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). Moreover, regardless of the level of scrutiny applied, Plaintiffs' allegations are sufficient to sustain their vagueness challenge. As discussed below, Section 16 fails to provide Arkansas teachers adequate notice of its prohibitions and encourages arbitrary enforcement through its inconsistent use of key statutory terms, its inclusion of vague and undefined terms, placing the determination of a violation on the reception of third parties, relying on statutes for propositions that go outside their accepted understanding, a savings clause that further aggravates the statute's vagueness, and the lack of a scienter requirement.

### A. Regardless of what level of scrutiny is applied to Section 16, Plaintiffs' allegations pertaining to vagueness are sufficient

Whether the Court applies exacting scrutiny or a lower level of scrutiny to the law, Section 16 is vague. This is evident by the fact that Secretary Oliva, who is officially tasked with implementing and enforcing this law, does not understand one of the key terms, Critical Race Theory, in the statute:

> coming up with a simple definition for critical race theory it's actually really challenging and it is something that is debated amongst even the scholars that have wrote different theories because it is just that, it is just a theory. I've been told examples of trying to put everybody into a room with history scholars and say define socialism. Everybody has a little bit different answer of what that looks like in practice and how you come up with that definition. But the language in this bill, it mirrors the language that was signed by Governor Sanders in the executive order.

Am. Compl. ¶ 68. His confusion is unsurprising. As this Court recognized, Section 16's use of the term 'critical race theory' is inconsistent throughout Section 16. Order at 42. Section 16(d) requires the Secretary to "review and enhance the policies that prevent prohibited indoctrination*, including Critical Race Theory*." Ark. Code Ann. § 6-16-156(d) (emphasis added). As this Court explained, "[a] plain reading of that section suggests that Critical Race Theory is, definitionally, 'prohibited indoctrination.'" Order at 42. As the Court acknowledged, however, "Section 16(e) suggests the exact opposite," *id.* at 42 n.222, because this part of the statute states that "[t]he secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination *or* Critical Race Theory," Ark. Code Ann. § 6-16-156(e) (emphasis added). This language, of course, suggests that CRT is something separate and apart from prohibited indoctrination rather than an example of it. Finally, Section 16(a)(2) requires the Arkansas Department of Education to "identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with *ideologies such as Critical Race Theory*, otherwise known as 'CRT', that conflict with the principle of equal protection under the law . . . ." Ark. Code Ann. § 6-16-156(a)(2) (emphasis added). "A plain reading of that section suggests that Critical Race Theory, definitionally, conflicts with the principle of equal protection under the law." Order at 42. In this usage, CRT is not "prohibited indoctrination" but an example of an ideology. Ideology and indoctrination are, of course, two separate concepts – an ideology is a concept, whereas indoctrination is a process. It is unclear how CRT can be both. Moreover, as

the only example provided within the statute of what the statute seeks to prohibit, these confusing, and at times conflicting, uses of the term 'critical race theory' make it impossible for anyone, including teachers, to understand what they are and are not allowed to teach. This makes the statute unconstitutionally vague. In fact, the Supreme Court has recognized that certain terms, even if they are in common usage, can nonetheless be used in a way that is so vague that their inclusion voids the relevant law. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 606 (2015) (holding "conduct that presents a serious potential risk of physical injury to another" void for vagueness); *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983) (holding "credible and reliable" void for vagueness); *Smith v. Goguen*, 415 U.S. 566, 567–68 (1974) (holding "contemptuous" treatment of flag statute held void for vagueness); *Connally v. General Const. Co.*, 269 U.S. 385, 393–95 (1926) (holding "locality" for purposes of determining prevailing wages void for vagueness)

The vagueness of Section 16 has caused Teacher Plaintiffs to alter their instruction to try and avoid violating the law. Ms. Walls, for example, glosses over topics like the consequences of *Brown v. Board of Education* and Jim Crow laws because of fears that the way she teaches these topics might violate Section 16. Am. Compl. ¶ 78. Ms. Walls' fears are based on Secretary Oliva's focus on AP AAS and his assertions that the course "likely violates" Section 16 even though CRT is not a component of the course. *See id.* ¶¶ 78, 115, 122. Likewise, Mr. Gilbert has muted students' presentations of certain arguments and has stopped guiding and supporting students on subjects like affirmative action, legacy admissions, or criminal justice reform because he is worried such may run afoul of Section 16. *Id.* ¶¶ 2, 9, 75. Finally, a teacher-member of the NAACP-AR no longer teaches *The Color Purple* by Alice Work and relies less on films and other media materials related to current events out of the same fears. *Id.* ¶ 78.

The statute's references to Titles IV and VI are equally confounding. Section 16 defines "prohibited indoctrination," in part, by defining it as an "idea in violation of Title IV and Title VI of the Civil Rights Act of 1964." Ark. Code Ann. § 6-16-156(b). The "ideas," however, that could be seen as violating these titles are undefined and fairly limitless. At the same time, this language conflicts with the U.S. Department of Education's interpretation of Title VI, which states that Title VI does not prohibit activities solely on topics, including instruction in or training on the impact of racism or systemic racism. Am. Compl. ¶ 74. It is therefore unclear what this language is meant to address. Furthermore, the examples provided by the statute that attempt to clarify what prohibited indoctrination means only add to the statute's ambiguity. For example, the statute defines prohibited indoctrination as including a communication that "[a]n individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, . . . race." Ark. Code Ann. § 6-16-156(b)(2). A district court in New Hampshire, addressing the same language in a similar New Hampshire statute, found this language vague because "the question of when efforts to redress past discrimination or increase diversity cross into impermissible racial discrimination presents a legal quandary on which reasonable minds can, and do, differ. Yet [this language] force[s] teachers to guess as to which diversity efforts can be touted and which must be repudiated, gambling with their careers in the process." *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut,* No. 21-cv-1077, slip op. 2024 DNH 040 at 28–29 (D.N.H. May 28, 2024); *see also id.* at 23–26 (finding language that "[p]eople of one color, . . . race, . . . are inherently superior or inferior" is vague because it is unclear whether the concept of implicit bias, "a broadly accepted form of bias," could be taught given that "[i]mplicit biases are thought to be shaped by experience and based on learned associations . . . [that can] influence behavior, even if unconsciously"). This lack of clarity has caused teachers like Mr. Gilbert to censor discussions

23

and assignments because he is not sure whether merely asking students to take a specific side in a debate or assignment might violate Section 16. Am. Compl. ¶ 75.

The statute's incomprehensible use of critical race theory and references to Titles IV and VI, however, are not its only flaw. Courts have consistently found that a statute is vague when the conduct prohibited is ultimately determined by the subjective behavior of a third party. For example, in *Coates v. City of Cincinnati*, the Supreme Court determined that an ordinance criminalizing conduct "annoying to persons passing by" was vague because "[c]onduct that annoys some people does not annoy others." 402 U.S. 611, 612, 614 (1971). The Court concluded that "the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.* at 614. The same is true here. Section 16's reliance on indoctrination places the determination of whether a teacher has violated the statute not on the teacher's actions, but rather on how the student interpreted and understood those actions, or, using the words of the statute, whether the student felt 'compelled.' This makes it all but impossible for teachers to know which conduct is prohibited by the statute because students, depending on their age, background, or even personality, will respond to the same conduct differently. *See Baggett v. Bullitt*, 377 U.S. 360, 368 (1964) (invalidating on vagueness and overbreadth grounds an oath requiring teachers to forswear an "undefined variety" of behavior considered subversive to the government).

Furthermore, the statute's saving clause, contrary to Defendants' argument, adds to, rather than mitigates, its vagueness. Section 16(c) states that Section 16 "does not prohibit the discussion of: (1) Ideas and the history of the concepts described in subsection (b) of this section; or (2) Public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive." Ark. Code Ann. § 6-16-156(c). In *Pernell*, a federal district court found that a savings

24

clause in the statute at issue, which permitted discussion of otherwise banned concepts if the concepts were presented "in an objective manner without endorsement," contributed to, rather than assuaged, vagueness concerns because "[t]he State of Florida has redefined 'objectivity' in a manner that does not comport with common sense" given that the state's definition would allow for "the most zealous condemnation of the eight concepts" but not "a single classroom debate between instructors or guest speakers who wish to promote the merits of their position." 641 F. Supp. 3d at 1281–84. The same is true here given that the line between permissible discussion of these ideas and communications that compel students to adopt these ideas suggests that teachers can express their personal ideas when denouncing these concepts but cannot ask a student to adopt a certain position for a graded assignment as an exercise to increase that student's critical thinking skills. Likewise, in *Tennessee Educ. Ass'n v. Reynolds*, the court found that a clause in a law similar to the LEARNS Act, that "expressly limited" its protection to "discussions of 'history' or 'historical' events,'" was not enough to mitigate vagueness concerns because "while history may be the subject most obviously implicated by the Act, it is not the only one." No. 3:23-CV-00751, 2024 WL 1942430, at *18 (M.D. Tenn. May 2, 2024). The LEARNS Act's saving clause is likewise deficient in that it allows for discussion but does not extend protection to other instructional practices through which "prohibited" ideas and issues may be raised in the classroom. For example, asking students to adopt a certain idea or issue of the purposes of a debate, a paper, or presentation are all common methods that teachers use to strengthen their students' critical thinking skills, but could also be seen as methods that are outside the savings clause's protection of "discussion" and therefore potentially run afoul of Section 16.

Defendants try and save their statute by noting that the Code of Ethics for Arkansas Educators contains a scienter requirement. MTD at 22. This argument is unavailing. First, a

scienter requirement does not necessarily absolve a statute of vagueness concerns. *Keyishian*, 385 U.S. at 599 (holding provision of state statute vague even when it required that employee "by word of mouth or writing *willfully (sic) and deliberately* advocate[], advise[], or teach[] the doctrine of forceful overthrow of the government") (emphasis added). The presence of a scienter requirement in a similar Florida statute to Section 16 did not mitigate the vagueness concerns. *See Pernell*, 641 F. Supp. 3d at 1285. Moreover, Section 16 itself does not contain a scienter requirement. The statute never refers to educators' state of mind or willingness to violate the law. Indeed, an earlier provision in the statute explicitly disregards intent entirely, directing the Secretary to "identify any items that may *purposely or otherwise*, promote teaching that would indoctrinate students with ideologies . . ." such as CRT. Ark. Code Ann. § 6-16-156(a)(2) (emphasis added). Finally, Defendants' argument ignores the fact that the Ethics Code is not the only way that the statute is enforced. The discretion that superintendents have in suspending, firing, or non-renewing their teachers does not require a scienter requirement, and Defendants have issued no regulations clarify that the statute itself does not require one.

Notably, every court that has considered similar classroom censorship statutes that seek to limit how teachers can teach in the classroom by prohibiting the inclusion of certain viewpoints has been found unconstitutionally vague. *See Loc. 8027,* slip op. 2024 DNH 040 at 12–47); *Tennessee Educ. Ass'n*, 2024 WL 1942430, *15–*23; *Pernell*, 641 F. Supp. 3d at 1278–86. Section 16 falls victim to the same fate. Accordingly, Plaintiffs have sufficiently alleged that Section 16 is unconstitutionally vague, facially and as-applied, and Defendants' motion to dismiss should be denied.[7]

---

[7] Defendants do not argue that Plaintiffs' facial or as-applied claim fails because Plaintiffs have failed to allege actual enforcement of Section 16 against them. Of course, neither a facial nor an

**IV.     Teacher Plaintiffs Sufficiently Allege Their Viewpoint Discrimination Claim**

Teacher Plaintiffs have sufficiently alleged how Section 16 impermissibly infringes upon their First Amendment Right to be free from unreasonable and illegitimate viewpoint discrimination in the classroom. Defendants' sole argument on this claim is that teacher speech in the classroom deserves no First Amendment protection because when they instruct students in the classroom, they speak on behalf of the government. MTD at 23. However, as this Court recognized, the Eighth Circuit has never answered this question pertaining to classroom instruction and there is a circuit split. Order, at 26 n.144.

As discussed further below, Teacher Plaintiffs' role as public employees speaking in the classroom is not constitutionally irrelevant. However, given the unique nature of teaching, especially for high school teachers and teachers of AP college-level course work who frequently utilize their expertise and best academic judgment every day in preparing future leaders and citizens in our democracy, this Court should employ some protections for classroom instruction. *See Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) (recognizing the importance of expression embedded in classroom instruction that "implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence"). After all, "education . . . is the very foundation of good citizenship," *Brown v. Board of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954), and teachers are at the center of developing future citizens.

Allowing states like Arkansas carte blanche authority to issue any and all classroom restrictions on viewpoint—irrespective of illegitimate motives at play—merely because teachers

---

as-applied challenge require actual enforcement to be adequately pled. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 14–15 (2010) (considering an as-applied, pre-enforcement challenge); *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) (same).

are public employees speaking in the classroom would strangle teaching and greatly undermine this nation's democracy and students' preparation for good citizenship. Accordingly, Plaintiffs offer two tests for the Court to consider. First, viewpoint restrictions like Section 16 should not be upheld unless the classroom discussions clearly overbalance a teacher's usefulness. *See Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113–14 (5th Cir. 1980). Alternatively, given the "special characteristics of the school environment," and the fundamental values of public school education at stake, state and school officials may impose restrictions "on the [classroom] speech of . . . teachers" "so long as their actions are reasonably related to legitimate pedagogical interests." *Hazelwood*, 484 U.S. at 266–67, 273. "[W]hether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation." *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993). As discussed below, several circuit courts, including the First, Second, and Tenth Circuits have employed similar standards governing classroom instruction anchored in *Hazelwood* and Plaintiffs urge this Court to do so as well. Under these standards, state and local officials will still retain significant oversight concerning classroom instruction, academic standards, codes of conduct, etc., and teachers too will retain some level of free speech and academic freedom in the classroom.

### A. The very nature of teaching, especially in high schools, warrants some limited protection from viewpoint discrimination in the classroom

The nature of teaching is far different than most other forms of government speech, such as regulating messages on state-issued license plates, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); restricting government funds to certain publishing contractors, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995); and drafting legal memos, *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Indeed, the Supreme Court has

consistently acknowledged the unique and important role of education in this nation's history and future, and the critical need for the perseverance of constitutional rights in its arena. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.").

Each school day, teachers utilize their subject matter expertise and best judgment to engage students in their classrooms with a wide range of backgrounds to achieve state and local academic standards as they best see fit. They are not mere mouthpieces for the government reading from a script. Indeed, "[t]eachers, especially high school teachers, have long enjoyed, by policy and practice, the freedom to use their specialized training to teach the academic standards of their respective subjects to ensure students are widely exposed 'to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" Am. Compl. ¶ 5 (quoting *Tinker*, 393 U.S. at 512) (internal quotations omitted)). "Section 16 has largely disrupted that custom with vague, overly broad, contradictory, and proscriptive language that seeks to intimidate teachers" from offering diverse viewpoints related to the academic standards they are charged with teaching. *Id.* ¶ 5. Such viewpoints include perspectives on the history of racism and ongoing racial inequalities and injustices in present-day America. *Id.*

This is not to suggest that teachers enjoy the very same freedom of speech protections in the classroom as though they are in public forums speaking purely on matters of public concern. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). Nor that they may demand and direct wholesale the subjects and academic standards taught in the classroom. However, where certain

viewpoint restrictions like Section 16 interfere with not just *what* teachers teach but *how* they teach, a reasonable balance between the competing interests at stake must be struck to help ensure that teachers, especially high school teachers, can exercise their academic judgment without undue, arbitrary interference of content-based restrictions untethered to any legitimate pedagogical interests. Other courts have successfully navigated these issues without holding full stop that teachers have no First Amendment free speech rights related to curricular instruction in the classroom. So too should this Court.

### 1. Restrictions on content and viewpoint should not be upheld unless they over-balance a teacher's usefulness as an instructor

The First Amendment, applicable to the State of Arkansas through the Fourteenth Amendment, provides in part that the government "shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. 1. A state does not have unchecked power to "impose upon the teachers in its schools any conditions that it chooses," and cannot prohibit teaching a "theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Epperson v. State of Arkansas*, 393 U.S. 97, 107 (1968). The Supreme Court has also held "unmistakabl[y]" that "students [and] teachers [do not] shed their constitutional rights to freedom of speech and expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

Relying on this delicate balance of competing interests, the Fifth Circuit considered curricular restrictions on content and viewpoint, holding that such restrictions should not be upheld unless the discussions "clearly over-balance [a high school teacher's] usefulness as an instructor." *See Kingsville*, 611 F.2d at 1113 (quoting *Kaprelian v. Texas Woman's University*, 509 F.2d 133, 139 (5th Cir. 1975) (internal alterations omitted) (citing *Lindsey v. Board of Regents*, 607 F.2d 672 (5th Cir. 1979)); *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be

suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."). In *Kingsville*, the Fifth Circuit held that a high school teacher's controversial teaching technique and discussions of "Blacks in American History" and other "controversial" topics utilized in her American history class were protected speech, and the school district's failure to renew her contract violated her First Amendment rights. 611 F.2d at 1111, 1113.

Although some have called *Kingsville* into question, in *Falls v. DeSantis*, the trial court declined to apply *Garcetti* to teacher plaintiffs' First Amendment claims, holding instead that *Kingsville* was still governing law for the K-12 teacher plaintiffs. No. 4:22-CV-166-MW/MJF, 2022 WL 19333278, at *3 (N.D. Fla. July 8, 2022); *see also Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (citing *Kingsville*, 611 F.2d at 1113, for the proposition that "classroom discussion is protected activity"). There, two K-12 teachers, among other plaintiffs, challenged as violative of their First and Fourteenth Amendment rights Florida's Individual Freedom Act, which like Section 16, included bans on certain concepts. *Id.* The Court, relying on *Kingsville*, denied the state defendants' motion to dismiss the teacher plaintiffs' constitutional claims against the Florida Board of Education. *Id.* This Court should adopt a similar standard to Teacher Plaintiffs' First Amendment claim here.

### 2. Alternatively, the Court should require viewpoint restrictions in the classroom to be based on a legitimate pedagogical purpose

Alternatively, this Court should apply the following standard that adapts the *Hazelwood* test for curricular speech for students to teacher speech in the classroom: state and school officials "may impose *reasonable* restrictions on the [classroom] speech of . . . teachers" "so long as those restrictions are reasonably related to legitimate pedagogical interests." 484 U.S. at 266–67, 273 (emphasis added); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685–86 (1986). At least three

circuit courts have employed similar tests, finding that both student speech and teacher speech in the classroom are protected, at least in part, by the First Amendment. *See, e.g.*, *Miles v. Denver Pub. Sch.*, 944 F.2d 773, 776 (10th Cir. 1991); *Ward*, 996 F.2d at 452; *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 722–23 (2d Cir. 1994).

*Ward* is particularly instructive here. There, the court discussed the competing interests at stake: a teacher's First Amendment right to free speech in school and the school's interest in promoting educational goals. *Ward*, 996 F.2d at 452 (citing *Tinker*, 393 U.S. at 506, 507). The court then developed a two-part test based on *Hazelwood* after finding that the curriculum included both student newspapers, as in *Hazelwood*, and teacher instruction. *Ward*, 996 F.2d at 452. The First Circuit held that the school "may regulate a teacher's classroom speech if: (1) the regulation is reasonably related to a legitimate pedagogical concern; and (2) the school provided the teacher with notice of what conduct was prohibited. *Id.* (citing *Hazelwood*, 484 U.S. at 273; *Keyishian*, 385 U.S. at  604). Regarding the first part, the court held that "whether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation." *Id*. at 453. Regarding the second part, the court acknowledged that "[f]ew subjects lack controversy" and that "[i]f teachers must fear retaliation for every utterance, they will fear teaching." *Id.* The Court further acknowledged that requiring notice of what conduct is proscribed does not mean that "a school must expressly prohibit every imaginable inappropriate conduct by teachers." *Id.* at 454. Accordingly, the court held that the relevant inquiry should be: "based on existing regulations, policies, discussions, and other forms of communication between school administration and teachers, was it reasonable for the school to expect the teacher to know that her conduct was prohibited?" *Id.*

Allowing states to unilaterally impose restrictions on curricular speech in K-12 classrooms disconnected from any legitimate pedagogical interest undermines democratic principles. For example, if a state were to impose curriculum restraints that required teachers to instruct students based alone on fascist viewpoints without any legitimate pedagogical purpose, would teachers have no free speech rights as experts in their field to ensure students were subjected to other viewpoints as related to their respective classes? Defendants say yes; Plaintiffs say, certainly not. There must be some reasonable restraints on government restrictions on teacher classroom speech in the context of K-12 classrooms that ensure the very democratic principles embedded in our Constitution are not thwarted, and the *Ward* test would help see this through.

### B. *Garcetti*'s exemption from the public employee speech doctrine for academic freedom extends to high school teachers

Defendants argue that because Teacher Plaintiffs are government employees, they have "no First Amendment rights whatsoever in their curricular speech" and their viewpoint discrimination claim fails. MTD at 23. While this Court too has preliminarily held that Teacher Plaintiffs have no First Amendment rights in their classroom speech, Order at 26–27, Plaintiffs' viewpoint claim was not before the Court, and they did not brief the Court on this claim. As discussed above, Plaintiffs have offered two more reasonable tests that balance the competing interests at stake. And as discussed below, Plaintiffs respectfully urge the Court to reconsider its application of Judge Sutton's concurrence in *Evans-Marshall* and *Garcetti*. Both decisions ignore the influential, evolving role of teachers, especially high school and AP teachers in the 21st century, who play a critical role, like college faculty, in developing young minds and preserving "[o]ur nation's future [which] 'depends upon leaders trained through wide exposure to [the] robust exchange of ideas'—not through the 'authoritative' compulsion of orthodox speech." *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (quoting *Keyishian*, 385 U.S. at 603)).

Plaintiffs acknowledge that teachers are government employees and that curricular speech is typically a form of government speech. However, teachers do not lose all of their rights solely because they are in the classroom, as noted by the majority in the case cited by Defendants, *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,* 428 F.3d 223 (6th Cir. 2005). In response to Judge Sutton's concurring opinion suggesting that teachers do not have free speech rights in curriculum, the majority stated: "[T]he Supreme Court has never removed in-class speech from its presumptive place within the ambit of the First Amendment." *Id.* at 229 (citing *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415–16 (1979)). In *Evans-Marshall*, the majority applied a form of the *Pickering* test, holding that when "determining whether speech is on a matter of public concern, we look to the 'content, form, and context of a given statement, as revealed by the whole record.'" *Id.* (citing *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (6th Cir. 2001) (citing *Connick v. Myers,* 461 U.S. 138, 147–48 (1983))); *see also Cockrel v. Shelby Cnty. School Dist.*, 270 F.3d 1036, 1052 (6th Cir. 2001) (citing *Connick*, 461 U.S. at 146–49) (holding that "so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern."). The majority provides a more reasoned approach for high school teachers that helps balance the interests between teachers and state officials at stake, rather than surrendering teachers' rights wholesale to the states.

Moreover, the Court should hold that the *Garcetti* exemption applies to high school teachers' speech in the classroom. In *Garcetti*, the Supreme Court clarified its public employee speech doctrine to hold that when public employees speak "pursuant to their official duties," they are not speaking as citizens, and are thus "not insulate[d] . . . from employer discipline." 547 U.S. at 421. However, the Supreme Court also acknowledged that "expression related to academic

scholarship or classroom instruction" may "implicate[] additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425. While such exception may have been intended to apply to college faculty, the same logic should apply to high school and AP teachers who teach college-level courses.

Teachers' in-school speech and subject-matter viewpoints are intricately tied to students' speech and the development of our nation's future leaders. They speak in the same schools as students where "[t]he vigilant protection of constitutional freedoms is nowhere more vital." *Keyishian*, 385 U.S. at 603 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). Consequently, restrictions on their viewpoints warrant similar protections, so that "in the absence of a specific showing of constitutionally valid reasons to regulate their speech," teachers are also "entitled to freedom of expression of their views." *Tinker*, 393 U.S. at 511. Each of the five Circuit Courts[8] that has applied the public-employee speech doctrine to public university professors' in-class speech has found that "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court," and thus held that such speech is exempt from *Garcetti's* "official duties test." *Demers v. Austin*, 746 F.3d 402, 411–12 (9th Cir. 2014). These cases emphasize the importance of the university classroom as a "marketplace of ideas," which students willingly enter, and the need for professors to be able to speak freely to preserve it as such. *See Meriwether*, 992 F.3d at 504–05 (quoting *Keyishian*, 385 U.S. at 603).

---

[8] The Second, Fourth, Fifth, Sixth, and Ninth Circuits have each applied an "academic exception" to *Garcetti* to find that professors' speech related to scholarship or teaching is protected speech for First Amendment purposes. *See Heim v. Daniel*, 81 F.4th 212, 224–28 (2d Cir. 2023); *Meriwether*, 992 F.3d at 504 (finding *Garcetti* does not limit free speech rights of faculty in the classroom); *Buchanan*, 919 F.3d at 852–53 (applying a *Pickering-Connick* framework rather than Garcetti); *Adams v. Tr. of Univ. N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) (finding *Garcetti* rule does not apply "in the academic context of a public university").

These important markers for academic freedom in universities are equally important in the K-12 context, especially at the high school level and in college-level courses like the AP AAS where students may earn college credit. *See, e.g.,* Am. Compl. ¶¶ 38–39. Outside of compulsory courses, high school students generally select their own courses, including AP courses. *See id.* ¶ 39. Teachers, especially high school teachers, have long enjoyed, through policy and practice, the freedom to use their specialized training to teach the academic standards of their respective subjects based on their expertise and knowledge of their students. *Id.* ¶ 5.

Moreover, by impermissibly regulating teachers' instructional speech beyond the curriculum or materials they may rely upon, Defendants are intentionally impeding the development of students in America's nurseries of democracy. *See id.* ¶ 207. Teacher Plaintiffs have a responsibility to foster "habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion . . . . They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them." *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring); *see also* Am. Compl. ¶ 13.

Although university students may be "'less impressionable than younger children,'. . . the few years difference in age between high school and college students" should not preclude high school faculty from receiving some level of First Amendment protection in instructional speech. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 556 (1986) (Powell, J., dissenting) (quoting *Widmar v. Vincent*, 454 U.S. 263, 274 n.14 (1981)). Accordingly, "[the Supreme Court] has long recognized as well that 'secondary school students are mature enough . . . to understand that a school does not endorse,' let alone coerce them to participate in, "speech that it merely permits on a nondiscriminatory basis.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022)

(quoting *Bd. Of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion)); *cf. Tinker*, 393 U.S. at 511 (implying that there is no danger that high school students' symbolic speech implied school endorsement); *Barnette*, 319 U.S. at 631–32 (same); *see generally* Note, 92 Yale L.J. 499, 507–09 (1983) (summarizing research in adolescent psychology).

From *Tinker* to *Hazelwood*, the Supreme Court has long imported tenets from higher education First Amendment cases into K-12 cases. *See Tinker*, 393 U.S. at 512 (quoting *Keyishian*, 385 U.S. at 603); *Hazelwood*, 484 U.S. at 286 (noting how schools must not "cast a perverse and impermissible 'pall of orthodoxy over the classroom" (quoting *Keyishian*, 385 U.S. at 603)). In fact, the Court recently noted the academic freedom exemption in a K-12 case, though the *Garcetti* framework was not directly applied to the merits of the claims. *See Kennedy*, 597 U.S. at 528 (acknowledging "questions of academic freedom may or may not involve 'additional' First Amendment interests beyond those captured by [*Garcetti*'s] framework").

Ms. Walls' and Mr. Gilbert's classrooms, with college-preparatory and college-level materials, much like university classrooms, serve as "marketplace[s] of ideas" and teachers need to be able to speak freely to preserve it as such, for "[o]ur nation's future 'depends upon leaders trained through wide exposure to [the] robust exchange of ideas'—not through the 'authoritative' compulsion of orthodox speech. *See Meriwether*, 992 F.3d at 5–05 (quoting *Keyishian,* 385 U.S. at 603). Students in Ms. Walls' Advanced Placement class, for example, can distinguish themselves in the college admissions process by completing a college-level course on a curriculum rooted in the works of 300 scholars. The class is designed to treat select high school students akin to students in higher education. *See* Am. Compl. ¶ 38–42. The First Amendment rights and protections of high school teachers, including AP teachers, should at least more closely resemble

that of university professors and the *Garcetti* exemption, or a form thereof, should apply to high school and AP teachers.

## V.   Student and Teacher Plaintiffs Sufficiently Allege Their Equal Protection Claim

Plaintiffs have asserted more than sufficient allegations supporting their Fourteenth Amendment Equal Protection Claim filed on behalf of Black Student and Teacher Plaintiffs. The Amended Complaint alleges that though neutral on its face, the creation of Section 16 and Defendants' application of the law to the AP AAS was motivated, in part, to target Black students and educators on the basis of race. Am. Compl. ¶ 14 (citing *Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979)). In Section VI of their Motion to Dismiss, Defendants fail to grasp the significant allegations supporting Plaintiffs' race discrimination claim. Instead, they broadly aver that Plaintiffs allege "very little" to support their intentional discrimination claim and have only alleged that Section 16 has a disproportionate impact on African American students and teachers and conclude that "disparate impact is rarely enough to show discriminatory intent." MTD at 24–25. Defendants are wrong. Their arguments *ignore and dispute* several factual allegations in the Complaint that support each element of intentional discrimination under *Arlington Heights*, not just disparate impact. *Compare* MTD at 23–27 *to* Am. Compl. ¶¶ 123–136; 197–213. At the motion to dismiss stage, Plaintiffs' allegations must be taken as true, and reasonable inferences drawn therefrom must be made in Plaintiffs' favor, not Defendants' favor. *Crumply-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004).[9]

---

[9] Defendants also erroneously suggest that because Plaintiffs plead alternative explanations for intentional discrimination, such allegations are self-defeating. MTD at 26 (citing *Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 956–57 (E.D. Ark. 2022) (three-judge court) (Stras, J.)). But they are flat wrong. For one, Plaintiffs do not plead alternative explanations for intentional discrimination. Their theory for this claim is predicated on racial discrimination. In addition, Plaintiffs' theory for their right to receive claim and equal protection claim are not competing

The Fourteenth Amendment, enforceable against Defendants pursuant to 42 USC § 1983, provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of laws." A law is unconstitutional under the Equal Protection Clause if race is a "motivating" factor in its enactment; Plaintiffs need not allege "a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265–66. Because claims of intentional discrimination are fact-intensive, they are rarely decided pre-trial. Allegations need only "nudge" an inference of discriminatory intent "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In *Arlington Heights*, the Supreme Court set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and in doing so, courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266–68. Circumstantial evidence of discriminatory purpose includes but is not limited to: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events

---

theories but instead complement one another. Consistent with case law, Plaintiffs' right to receive claim, for example, asserts that Defendants acted, in part, with racial animus, a theory wholly consistent with their racial discrimination claim. *See, e.g.*, Am. Compl. ¶ 182 ("As further described above and below concerning the passage of Section 16 and facts underlying the Equal Protection claim, Section 16 and its application was contrived on narrowly partisan and political interests, racial animus, and a desire to deny students access to ideas with which Defendants and the majority of state Republican legislators disagrees."). The fact that this Court could find that both partisan interests and racial animus played a role in the passage of Section 16 and its application by Defendants does not defeat their claim. Moreover, in *Hutchinson*, the Court was considering a discriminatory vote dilution claim that required race to be a "predominant" factor, *see Hutchinson*, 636 F. Supp. 3d at 957, which does not apply in this case. Rather, whether race played, *in part*, a role in the action complained of controls here, *see Feeney*, 442 U.S. at 279. Additionally, in *Hutchinson* the racial discrimination claim was dismissed because the plaintiffs fell "a few specific factual allegations short" of supporting their vote-dilution claim, and even then, were allowed to replead their claim. *Hutchinson*, 636 F. Supp. 3d at 958. That is not the case here as Plaintiffs' intentional discrimination is well-pled.

leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. *Id.* Similarly, in *Mensie v. City of Little Rock*, the Eighth Circuit noted that an analysis under *Arlington Heights* "requires examining the 'totality of the relevant facts,' including racially discriminatory impact, historical background, the sequence of events leading up to the challenged decisions, and legislative or administrative history, especially 'contemporary statements by members of the decision-making body, minutes of its meetings, or reports.'" 917 F.3d 685, 689 (8th Cir. 2019) (quoting *Arlington Heights*, 429 U.S. at 266–68); *see also Perkins v. City of West Helena, Ark.*, 675 F.2d 201, 209 (8th Cir. 1982). This "inquiry is a practical one." *Clients' Council v. Pierce*, 711 F.2d 1406, 1409 (8th Cir. 1983).

### A. Plaintiffs adequately allege Section 16's disparate impact on African American faculty and students[10]

Plaintiffs have plausibly alleged that Section 16 and Defendants' application of Section 16 disparately impacts Black students and teachers, and Defendants do not challenge the sufficiency of the allegations supporting the disparate impact *Arlington Heights* factor. Indeed, Defendants, mistakenly, fault Plaintiffs for only alleging disparate impact. MTD at 24.

As alleged in Plaintiffs' Amended Complaint, "[a]ccording to 2020-2021 data from the U.S. Department of Education, only 9.5% of students enrolled in the AP program identify as Black or African American, compared to 49.4% of their White counterparts." Am. Compl. ¶ 43. Within the state of Arkansas, "Black students comprised only 8.9% of students enrolled in AP courses and White students comprised about 59%, according to the College Board's publicly available data." *Id.* ¶ 124. It is within this context that "College Board specifically designed AP AAS to

---

[10] The factual allegations discussed below under each of the respective elements are not intended to exclusively pertain to that specific element and may support other elements of intentional discrimination as well.

inspire more Black students to take AP classes." *Id.* ¶ 44. Further, "Black student enrollment in AP AAS at the six Arkansas schools that offered the course is much higher than the average Black student enrollment in AP classes overall." *Id.* ¶ 45. Additionally, the AP AAS course is taught by a majority of Black teachers across the six schools offering the course. *Id.* at ¶ 124. By comparison, the majority of teachers of other AP courses are white. *Id.*

As discussed further below, Defendants applied Section 16 only to the AP AAS course, the lone course that enrolled majority Black students and was taught by majority Black teachers. It did not apply the law to the European History course, which enrolled majority White students and was taught by majority White teachers, despite that history course including many of the questionable topics raised by ADE when de-designating the AP AAS as an AP course and threatening teachers with enforcement. *Id.* ¶¶ 123–35. These numbers plausibly support Plaintiffs' allegations that Defendants' application of Section 16 has disparately impacted Black students and teachers. *See Arce. v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015).

### B. The historical background and sequence of events leading to the passage of Section 16 evidences discriminatory intent

Plaintiffs' allegations of the historical background and sequence of events leading to the passage of the LEARNS Act support an inference of discriminatory motive. As the Eighth Circuit has recognized, "admission of discriminatory intent is unlikely, and that intent will ordinarily have to be found by 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,' including [ . . .] its historical background[.]" *Williams v. Anderson*, 562 F.2d 1081, 1086 (8th Cir. 1977) (quoting *Arlington Heights*, 429 U.S. at 266). "The historical background of the decision is one evidentiary source [of discriminatory motive], particularly if it reveals a series of official actions taken for invidious purposes," and "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Arlington*

*Heights*, 429 U.S. at 267. Defendants argue that Plaintiffs' allegations regarding the historical background "fare no better," MTD at 26,[11] but they plainly ignore the substantial allegations by Plaintiffs. Their Amended Complaint makes clear allegations that Governor Sanders and Section 16's bill sponsors "demonstrate discriminatory intent" through their direct assaults on "CRT" and related teachings that are deeply "impactful for Black students," and "Black faculty." Am. Compl. ¶ 204.

As noted above, the historical background of Section 16 does not sit in isolation of Governor Sanders' Executive Order 23-05 and President Trump's EO 13950. *See supra* at 4-5. As alleged by Plaintiffs, Section 16 was premised on Governor Sanders' EO 23-05. Am. Compl. ¶ 68. Additionally, EO 23-05 mirrored elements of Trump's EO 13950. *Id.* ¶ 55.

On her first day as Governor, Governor Sanders signed EO 23-05, which prohibited "indoctrination and critical race theory in schools."[12] *Id.* ¶ 61. Following the signing, and despite lacking evidence that CRT represented any harm to students, the Arkansas Department of Education ("ADE") issued a document entitled "Indoctrination and CRT Examples in Arkansas and Governor Sanders Administrative Actions," which identified a series of "improper" materials

---

[11] Defendants do not mention, much less contest, Plaintiffs' allegations related to the sequence of events factor.

[12] Governor Sarah Huckabee Sanders, Exec. Order No. 23-05 (Jan. 10, 2023), https://governor.arkansas.gov/executive_orders/executive-order-to-prohibit-indoctrination-and-critical-race-theory-in-schools/. "Prohibited indoctrination" is defined in EO 23-05 as "No communication by a public-school employee, public school representative, or guest speaker shall compel a person to adopt, affirm or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241), including that: People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law; An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law."

that focused on issues like "unconscious bias" or how to "craft an equity framework." Am. Compl. ¶¶ 63–64. Governor Sanders and Secretary Oliva then ordered the ADE to begin the removal of educational materials that were deemed to violate EO 23-05. *Id.* ¶ 66. This included the purging of materials that provided context around "historical suffering of generations of slavery, decades of Jim Crow, ever present social bigotry, and pervasive institutional oppression." *Id.* ¶ 65. Meanwhile, Defendants ordered conservative educational materials, "1776 Unites," which are known to downplay "the historical challenges faced by Black Americans." *Id.* ¶ 66.

Governor Sanders then pushed through her school legislation, the LEARNS Act, which was introduced on February 20, 2023. *Id.* ¶ 67. The Republican legislators planned a vote on the 144-page bill in the Senate Committee on Education to be held just two days later on February 22, 2023. *Id.* In that meeting, Secretary Oliva could not define CRT in his testimony, yet the Committee passed the bill, which in part banned CRT. *See id.* ¶¶ 68–69. It was subsequently passed by the House on March 2, 2023. *See id.* ¶ 69.

The text of Governor Sanders' EO 23-05 specifically attacks CRT as "antithetical to the traditional American values of neutrality, equity, and fairness…resurrecting segregationist values. *Id.* ¶ 61. Defendants argue that none of the statements from Governor Sanders or bill sponsors "plausibly suggests racial animus." *See* MTD at 26. However, this move is not isolated from the growing political attention on CRT and broader discussions of race in America following the racially-motivated killings of George Floyd, Breonna Taylor, and other innocent Black people, and the mass protests that ensued following their deaths. Sanders' singling out of an academic doctrine that is related primarily to understanding racism against African Americans in the United States demonstrates that the Order is not tied to any reasonable educational objectives and instead was designed as a vehicle to engage in targeted discrimination against the victims of that racism.

Further, as Plaintiffs allege, the use of terms like "woke" and "CRT" as they have been weaponized by conservative leaders like Governor Sanders are "used as code words to sweep in any potentially controversial discussions around systemic racism and race-conscious issues." Am. Compl. ¶ 204. Several federal courts have acknowledged that code words and phrases can evidence discriminatory intent. As the First Circuit indicated in *Soto v. Flores*, "it is rare that discrimination wears its garb openly and it more often comes 'masked in subtle forms.'" 103 F.3d 1056, 1067 n.12 (1st Cir. 1997); *see also Jenkins v. Methodist Hosps. of Dall., Inc.*, 478 F.3d 255, 265 (5th Cir. 2007) (recognizing that code words may provide the basis of discriminatory intent).

Additionally, comments from Secretary Oliva and the Act's sponsors and supporters following its passage indicate a willingness of proponents to weaponize its text for discriminatory purposes. Secretary Oliva, for instance, claimed that the AP AAS course was violative of Section 16 by "including topics he disagreed with" which included "intersectionality" and "resilience and resistance." Am. Compl. ¶ 8. Despite his clarity on those terms, when Secretary Oliva was asked to define CRT in a hearing of the Senate Committee for Education, he could not define it and instead said, "it's actually really challenging [to come up with 'simple definition']." *Id.* ¶ 68. Yet he affirmed the need for its passage by simply saying, "it mirrors the language that was signed by Governor Sanders in the Executive Order." *Id.* Furthermore, one of the Act's co-sponsors, Rep. Aaron Pilkington, cited 'concerning comments' from College Board describing the AP AAS and intimated that the course violated the LEARNS Act. *Id.* ¶ 71. Pilkington also said that "[w]e just want to make sure [students are] learning [African-American history] in the right context and that it's not being taught in a way where you should hate democracy, you should hate the Western traditions, you should hate the things that put us here, where we are and that we need a complete dumping of the past." *See id*. Pilkington's misinformed comments show that his preferred

juxtaposition of 'Western traditions' with the AP AAS pilot course has nothing to do with course content and instead reflects his intent to use the law to whitewash the instruction of a course that not only reflects a critical lens of African American history, but also a course that enrolls a majority of Black students. *Id.* These allegations, among others in the Complaint, more than satisfy the sufficiency pleading standard on the historical background and sequence of event factors.

### C. Procedural and substantive departures leading to the passage of Section 16 illustrate a discriminatory purpose

Evidence demonstrating an invidious discriminatory purpose may include "departures from the normal procedural sequence" that took place during the challenged state action. *Arlington Heights*, 429 U.S. at 267. "[S]ubstantive departures" are particularly important if they suggest that the defendant engaged in them "to accomplish a discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021); *see also Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) (en banc) (discussing the "numerous and radical procedural departures" that might "lend credence to an inference of discriminatory intent."). In considering the discriminatory intent of legislation in particular, courts view procedural departures as "one potential link in the circumstantial totality of evidence the district court must consider." *Veasey*, 830 F.3d at 237 (5th Cir. 2016). Examples of departures from typical procedures can include designating the legislation as "emergency legislation," allowing the legislation to bypass the typical legislative process, and the speed by which the legislation is enacted. *Id.*

As with their other arguments, Defendants proffer their own rendition of facts disputing Plaintiffs' allegations but such arguments are ill-suited for motions to dismiss. Here, Defendants take issue with Plaintiffs' allegation that "Section 16 is procedurally and substantively irregular" and Plaintiffs' arguments regarding the speed with which the bill was passed. MTD at 27. They quote *Simpson v. Thurston* to suggest that a short span of the legislative process itself cannot "give

rise to an inference of bad faith." No. 4:22-CV-213, 2023 WL 3993040, at *2 (E.D. Ark. May 25, 2023) (quoting *Abbott v. Perez*, 585 U.S. 579, 610 (2018)). They further aver that a case challenging the emergency provisions of Section 16 was unsuccessful, and therefore, not irregular. However, these points are relevant for the Court's analysis, regardless of whether a court later determined that the procedure was not unlawful. The appropriate test is whether the procedures enacted in considering the LEARNS Act and Section 16, as well as Defendants' application of Section 16 to the AP AAS, were not normal. *See Arlington Heights,* 429 U.S. at 267; *see also Braden*, 588 F.3d at 597 (noting that "a defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct"). As described below and more fully in their Amended Complaint, Plaintiffs have alleged several procedural and substantive departures from the typical legislative process in Arkansas that are, at best, contested fact issues better left for discovery and trial.

First, despite being a 144-page omnibus bill that substantially reformed Arkansas' education system, the Act was approved by the Arkansas legislature less than three weeks after its introduction by Governor Sanders. The pace at which the legislation was considered required the legislature to take extraordinary procedural steps, including multiple suspensions of the House's and Senate's rules.[13] The Act was considered in the House and Senate's respective Education Committees for less than a week before the Act was brought to the full chambers' floors for passage.[14] The Senate passed the Act just three days after its initial introduction.[15]

Another unusual feature of the Act is its "emergency" clause. The Arkansas Constitution requires a separate emergency clause for any legislation that goes into effect immediately, rather

---

[13]"SB       294       Bill       Information,"       Arkansas       State       Legislature, https://www.arkleg.state.ar.us/Bills/Detail?id=sb294&ddBienniumSession=2023/2023R.
[14] *Id*.
[15] *Id*.

than the standard 91 days after the end of the legislative session. Ark. Const. Art. 5 § 1. Emergency clauses must also be approved by a two-thirds vote of each chamber. *Id.* The Act's emergency clause was narrowly approved by two-thirds of both chambers allowing it to go into effect immediately when Governor Sanders signed the legislation on March 9, 2023.[16]

Defendant Oliva's actions in using Section 16 to target the AP AAS, the lone AP course where a majority of students enrolled is Black and taught by a majority of Black teachers, also is fraught with procedural departures. Secretary Oliva made several controverting statements about the reasons behind the de-designation of the AP AAS as an AP course. He asserted that his actions, executed after the course was approved by ADE through the regular process and *just three days before the school year*, were justified because the course was being piloted. Then he stated that he de-designated the course because colleges did not know whether the course would be approved, though over 200 colleges had already said they would accept the course. He later stated that it was because the course had not been audited appropriately, though the audit process was being engaged properly. *See* Am. Compl. ¶¶ 105–12. Each of these statements are untrue, as alleged in the Amended Complaint. *See id.* Finally, Oliva said that the AP AAS likely violated Section 16 because it represented "indoctrination" under Section 16. *Id.* ¶ 115. No other AP course, in pilot stage or otherwise, had been subjected to this treatment and no rules suggested that these procedures were normal. In fact, the AP AAS for the first year of the pilot was listed as an AP course in the 2022-23 school year, and instructed at two Arkansas schools without incident. *Id.* ¶ 209.

---

[16] Likely owing to the rushed process by which the legislation was approved, the LEARNS Act's emergency clause was subject to a significant legal challenge contending that the clause was not subject to a separate roll call vote as required by the Arkansas Constitution. The Arkansas Supreme Court reversed the Circuit Court holding that the emergency clause was approved properly. *See Arkansas Dep't of Educ. v. Jackson*, 2023 Ark. 140 (2023).

Section 16 and its application to the AP AAS is also wrought with substantive departures. Although Defendants argue that "Arkansas law has regulated African American history teaching materials since 1993, *see* MTD at 27, the level of scrutiny and involvement with the curriculum and actual instruction of the course is atypical. *See* Am. Compl. ¶¶ 64–66. Key to understanding these substantive departures are at least two actions taken by Defendants: the usurpation of the typical authority of school districts and schools to regulate specific curricula and classroom instruction; and the application of Section 16 directly to AP AAS. Plaintiffs allege that the LEARNS Act, through Section 16, provides ADE with unprecedented power to seek review, revise, or remove educational materials that are believed to indoctrinate students with CRT. *See id.* Teachers, especially high school teachers, have long enjoyed, by policy and practice, the freedom to use their specialized training to teach the academic standards of their respective subjects, but Section 16 has largely disrupted that custom. *Id.* ¶ 5.

In addition, AP courses—developed by experts in their field—typically are not second-guessed by state officials. Yet, Defendants have used Section 16 to target only the AP African American Studies course, a course that is primarily taught by Black teachers and where Black students are the majority of students enrolled in the course. *See id.* ¶ 124. By contrast, the AP European History Course, which includes "similar, purportedly prohibited curriculum themes," *id.* ¶ 125, was not targeted for "prohibited indoctrination" under Section 16. *See id.* Both courses ask students to "examine the impact of themes of identity exploration, both distinct and overlapping," *id.* ¶ 131, to "examine the notion of identity being a fluid concept" to "examine the role of various forms of resistance and opposition to systemic oppression," *id.* ¶ 133. Despite this, Defendants only targeted AP AAS and do not challenge the academic worthiness of AP European History or

its compliance with Section 16. *Id.* ¶¶ 135–41. Plaintiffs' equal protection claim survives Defendants' motion to dismiss.

## VI.  The Ex Parte Young Exception Allows Plaintiffs' Claim to Proceed Against Governor Sanders

"The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). The Eleventh Amendment also bars suits brought against state officials if "the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (internal quotations omitted).

However, in *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established a significant exception to this immunity. To determine whether the exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (quoting *Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)). On the first inquiry, the official must have "some connection to the enforcement of the challenged laws." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (citing *Ex Parte Young*, 209 U.S. at 157); *see also 281 Care*, 638 F.3d at 632. "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt to 'make the state a party.'" *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) ("*Digital Recognition Network*") (quoting *Ex Parte Young*, 209 U.S. at 157).

Per the *Ex Parte Young* doctrine, a suit to enjoin a state official's enforcement of state legislation on the ground that the official's action would violate the Constitution is not a suit against the State, and is thus not barred by the Eleventh Amendment, so long as the official has

49

"some connection with the enforcement of the act." *Ex Parte Young*, 209 U.S. at 155–60. This connection "does not need to be primary authority to enforce the challenged law." *281 Care*, 638 F.3d at 632. "Nor does the [state officer] need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *Id.* at 633. The Eighth Circuit has held that where state officials had "some connection with the enforcement" of a state law for purposes of the *Ex Parte Young* doctrine, then the case or controversy requirement of Article III was satisfied. *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (overruled on other grounds).

In the present case, Plaintiffs' Amended Complaint is replete with evidence of Governor Sanders' enforcement authority over the LEARNS Act. On January 10, 2023, she issued her executive order to "Prohibit Indoctrination and Critical Race Theory in Schools," which reflected the restrictive tenets she would later help enforce via the LEARNS Act. Am Compl. ¶ 61. As pled, Governor Sanders had a role in "order[ing] the ADE to begin removing educational materials from the ADE's recommended social studies resources accessible to Arkansas teachers." *Id.* ¶ 65. Prior to its enactment, Governor Sanders explained the purpose of the LEARNS Act: to prevent a "left-wing political agenda" from "brainwashing our children" with "political indoctrination." *Id.* ¶ 4. While it is true that these particular acts were done prior to the enactment of the LEARNS Act, they are nonetheless evidence supporting Plaintiffs' allegations about her role in enforcing the Act.

Of course, the most relevant of Plaintiffs' allegations concern Governor Sanders' authority after the enactment of the LEARNS Act. Plaintiffs allege that Defendants—including Governor Sanders—possessed "authority" which "includes the implementation and enforcement of Section 16." *Id.*¶ 213. More specifically, Plaintiffs allege that on or around August 14, 2023, months after the enactment of Governor Sanders' LEARNS Act, Governor Sanders' office issued public

statements of instruction regarding the Act's enforcement at Central High, stating "[t]he AP African American Studies pilot course is not a history course and is a pilot that is still undergoing major revisions. Arkansas law contains provisions regarding prohibited topics . . . .Without clarity, we cannot approve a pilot that may unintentionally put a teacher at risk of violating Arkansas law." *Id.* ¶ 116. Indeed, Governor Sanders' appointee, Secretary Oliva, visited and observed Ms. Walls' AP AAS classroom in 2023 shortly after students protested the Governor's signing of the Act. *Id.* ¶¶ 94–97. It seems far too coincidental that the Secretary acted alone and not at the direction of the Governor.

As reflected in her executive order, subsequent instruction, and her countless public statements, Governor Sanders clearly has at least some connection to the enforcement of LEARNS. *See Love v. Pence*, 47 F. Supp. 3d 805, 807–08 (S.D. Ind. 2014).  In *Love*, Governor Mike Pence was named as the sole party defendant in a lawsuit seeking to enjoin enforcement of Indiana Code § 31-11-1-1, which was entitled "Same sex marriages prohibited" and known as Indiana's Defense of Marriage Act. *Id.* at 806. The lawsuit alleged the legislation violated the U.S. Constitution by denying same-sex couples the rights enjoyed by similarly situated opposite-sex couples.  *Id.* at 806–07.

The Governor filed a motion to dismiss, which was granted by the court after finding that even if the Governor did exercise some measure of managerial authority over those who "may administer some aspect" of the challenged law, that authority was "insufficient" to justify a suit against him for two interrelated reasons: (1) the complained-of injury is not fairly traceable to the Governor because he lacks the authority to enforce the challenged statute against them; and (2) because the Governor cannot enforce the challenged statute, he cannot redress Plaintiffs' injury. See *id.* at 807.  The district court later granted plaintiffs' Rule 59(e) motion to amend and vacated

the dismissal order based on newly discovered evidence: two (2) memoranda issued by the general counsel to the Governor to all executive branch agencies since the dismissal of plaintiffs' cause. *Id.* at 808. The court found the Governor possessed a specific ability to command the executive branch regarding the law. *Id.*

The link between the challenged law and executive in the instant case bears a strong resemblance to that which bound Indiana's governor in *Love*. Not only has Governor Sanders issued strongly worded executive orders, which served as the blueprint for Section 16 of the LEARNS Act, which she publicly pushed as her own education legislation, but she has also provided instruction on the implementation and reasoning of the law via national public statements. Plaintiffs' standing vis-à-vis Governor Sanders is decidedly not premised on her general enforcement authority. *See Church v. Missouri*, 913 F.3d 736, 749–50 (8th Cir. 2019).  It is instead based on express instruction which comes from her executive office.

As in *Love*, the injuries of which Plaintiffs complain is "fairly traceable" to Governor Sanders. Her public statements point to the indispensable nature of her executive authority and the source of the power enforcing the LEARNS Act:

> *As long as I am governor*, our schools will focus on the skills our children need to get ahead in the modern world-not brainwashing our children with a left-wing political agenda.

Am. Compl. ¶ 59 (emphasis added).

Governor Sanders' express guarantee of the enforcement of the LEARNS Act clearly evinces her enforcement authority. In August 2023, Governor Sanders further explained why the LEARNS Act became law in the state, decrying the "propaganda leftist agenda" that "teach[es] our kids to hate America and [] one other," before stating the basis for its enforcement: "*It's one*

*of the reasons that we put into law banning things like indoctrination and CRT.*" Am. Compl. ¶ 120 (emphasis added).

Furthermore, Defendants' reliance on *Digital Recognition Network* is misplaced because that case is factually distinguishable from the instant one. While is it true that the Eighth Circuit affirmed the injuries of which the plaintiffs complained was not "fairly traceable" to the governor who was named as a party defendant, its decision was based on the fact that the law in question contemplated no enforcement by the state at all. *See Digital Recognition Network*, 803 F.3d at 957–58. Indeed, the law challenged there expressly provided "for enforcement only through private actions for damages," and not by any state actor. *Id.* at 958. The court thus found the plaintiffs' injury was "'fairly traceable' only to the private civil litigants who may seek damages under the Act and thereby enforce[d] the statute against the companies." *Id.*

As noted above, Plaintiffs' burden under *Iqbal* is not extraordinarily high. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. In deciding whether the plaintiff has set forth a plausible claim, the court must accept as true the factual allegations in the complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Accepted as true, Plaintiffs' allegations against Governor Sanders demonstrate "some connection" between her and the enforcement of the LEARNS Act. Therefore, respectfully, Defendants' motion to dismiss Governor Sanders from the case should be denied.

**CONCLUSION**

For the above reasons, Plaintiffs respectfully urge the Court to deny Defendants' Motion to Dismiss in all respects, except for the damages claim, which Plaintiffs will no longer pursue.

Dated: May 29, 2024                                      Respectfully submitted,

                                                         /s/ Michael J. Laux
                                                         Michael J. Laux
                                                         E. Dist. Arkansas Bar No. 6278834
                                                         LAUX LAW GROUP
                                                         400 W. Capitol Avenue, Suite 1700
                                                         Little Rock, Arkansas 72201
                                                         Telephone: (501) 242-0750
                                                         Facsimile: (501) 372-3482
                                                         Email: mlaux@lauxlawgroup.com
                                                                 mikelaux@icloud.com

                                                         Austin Porter, Jr.
                                                         E. Dist. Arkansas Bar No. 86145
                                                         PORTER LAW FIRM
                                                         The Tower Building
                                                         323 Center Street, Suite 1035
                                                         Little Rock, AR 72201
                                                         Telephone: (501) 224-8200
                                                         Email: aporte5640@aol.com

                                                         David Hinojosa *
                                                         D.C. Bar No. 1722329
                                                         Email: dhinojosa@lawyerscommittee.org
                                                         Maya Brodziak *
                                                         N.Y. Bar No. 5495114
                                                         Email: mbrodziak@lawyerscommittee.org
                                                         Chavis Jones *
                                                         D.C. Bar No. 1739219
                                                         Email: cjones@lawyerscommittee.org
                                                         Zakiya Lewis *
                                                         D.C. Bar No. 90020187
                                                         Email: zlewis@lawyerscommittee.org
                                                         LAWYERS' COMMITTEE FOR CIVIL
                                                         RIGHTS UNDER LAW
                                                         1500 K St. NW, Suite 900
                                                         Washington, DC 20005

54

Telephone: (202) 662-8600

*Counsel for Plaintiffs*
*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I certify that on May 29th, 2024, the foregoing was filed through the Court's CM/ECF system. Notice of this filing will be sent by email to all counsel of record by the Court's electronic filing system:

Timothy Griffin
Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
oag@arkansasag.gov

Justin Brascher
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Justin.Brascher@arkansasag.gov

Christine Cryer
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Christine.Cryer@arkansasag.gov

Michael Cantrell
Assistant Solicitor General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Michael.Cantrell@arkansasag.gov

Jordan Broyles
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Jordan.Broyles@arkansasag.gov

Dated: May 29, 2024

By: */s/ Michael J. Laux*
Michael J. Laux
*Counsel for Plaintiffs*