**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

RUTHIE WALLS, et al.                                                                    PLAINTIFFS,

v.                                              No. 4:24CV270 LPR

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of
Arkansas, et al.                                                                    DEFENDANTS.

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Plaintiffs' response highlights the fact that they can't spin the allegations of their amended complaint into plausible First or Fourteenth Amendment claims. Their claims against Governor Sanders should be dismissed because she doesn't enforce Section 16. The Teacher Plaintiffs' viewpoint-discrimination claim fails because their speech as teachers is government speech. Teacher Plaintiffs' vagueness claim pretends they don't understand concepts, like Critical Race Theory, their student co-plaintiffs elsewhere claim a right to be compelled to espouse, and generally purports to be confused about aspects of the statute that elsewhere they take confident positions on. Finally, Plaintiffs' paradoxical assertion that banning discriminatory teaching was covertly intended to discriminate is utterly implausible. The Court should dismiss Plaintiffs' claims.

**I.      Governor Sanders isn't a proper *Ex parte Young* defendant.**

Plaintiffs grasp at straws to maintain that Governor Sanders shouldn't be dismissed as a defendant on sovereign-immunity grounds. Plaintiffs first rely on their allegations concerning Governor Sanders's Executive Order and other actions they concede "were done prior to the enactment of the LEARNS Act." Doc. 61 at 58. But those actions obviously weren't taken pursuant to the LEARNS Act, and they have no bearing on whether Governor Sanders is charged with Section 16's enforcement.

Plaintiffs next contend that their allegation that "Defendants' authority . . . includes the implementation and enforcement of Section 16," Am. Compl., Doc. 8, ¶ 213, applies to Governor Sanders. But even if that were true this allegation would still be just a notorious example of a legal conclusion masquerading as a factual allegation that the Court "need not"—and should not—"accept . . . as true." *Lewis v. City of St. Louis*, 932 F.3d 646, 649 (8th Cir. 2019).

Plaintiffs then argue that Governor Sanders has made various public statements about Section 16 to the media. But statements that the governor who signed a law makes in support of it aren't a connection to *enforcing* it, which is what *Ex parte Young* requires. Plaintiffs' pure conjectures about Governor Sanders's hypothetical behind-the-scenes conduct fare no better, and their effort to analogize her public statements to the Indiana governor's memorandum directing executive agencies on how to enforce a challenged statute in *Love v. Pence*, 47 F. Supp. 3d 805, 807-08 (S.D. Ind. 2014), likewise fails. Plaintiffs have absolutely nothing to support their claim that their "standing vis-à-vis Governor Sanders is . . . based on express instruction which comes from her executive office." Doc. 61 at 60.

Finally, Plaintiffs argue that *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015), doesn't apply because the law at issue there contemplated enforcement only through private actions for damages and not state enforcement. But the point of *Digital Recognition Network* is that an *Ex parte Young* defendant must have "some connection with the enforcement of the [challenged] state law," *id.* at 957, not that it suffices if any state official does—a point the Eighth Circuit has since reaffirmed. *See Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017) (holding that though a plaintiff could sue highway patrol official, he could not sue the governor). Plaintiffs can't overcome Governor Sanders's sovereign-immunity defense, and she should be dismissed as a defendant.

**II.      The Court should dismiss Teacher Plaintiffs' viewpoint claim.**

Teacher Plaintiffs claim that Section 16 unconstitutionally regulates their own instruc-

tional speech based on viewpoint.  But this Court has already held that whatever students' rights

to hear teachers' instructional speech might be, teachers "have no *personal* interest in the content

of that speech" under the First Amendment.  Doc. 45, at 27 (quoting *Evans-Marshall v. Bd. of*

*Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., con-

curring)).  That is because that speech is "government speech."  Plaintiffs offer no sound basis

for revisiting that conclusion.

Plaintiffs concede that teaching is a form of government speech.  Doc. 61 at 36 ("The na-

ture of teaching is far different than most other forms of government speech.").  As a First

Amendment matter, that ends the analysis.  For the Free Speech Clause only "restricts govern-

ment regulation of private speech; it does not regulate government speech.  *Pleasant Grove City*

*v. Summum*, 555 U.S. 460, 467 (2009).  Plaintiffs suggest that because public education is

"unique and important," Doc. 61 at 37, courts should play some role in superintending re-

strictions on it.  But the First Amendment does not give courts that authority.

Plaintiffs offer two tests for balancing what they say is the need for judicial supervision

of restrictions on public school teacher speech and the reality that teacher speech is government

speech.  They first suggest a vague standard from a 1980 Fifth Circuit decision, under which

courts would invalidate any "curricular restrictions on content and viewpoint . . . unless the [pro-

hibited] discussions 'clearly over-balance a [high school teacher's] usefulness as an instructor.'"

Doc. 61 at 38 (quoting *Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir.

1980)).  Plaintiffs don't explain what would permit courts to impose such cost-benefit balancing

on curricular standards, given their concession that curricular speech is government speech.  And

the 1980 Fifth Circuit, to its credit, did not attempt to square that circle; it only arrived at its balancing test after first concluding that "classroom discussion is protected activity" and "private expression." *Kingsville Indep. Sch. Dist.*, 611 F.2d at 1113.  Plaintiffs concede and this Court has held that that is not correct.  For good reason then, the en banc Eleventh Circuit, which is bound by pre-1981 Fifth Circuit precedent, has said that *Kingsville* likely only "remains good law for those . . . who are *not* public employees," *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1311 n.6 (11th Cir. 2017) (en banc), given the Supreme Court's holding in *Garcetti v. Ceballos* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."  547 U.S. 410, 421 (2006).

Plaintiffs alternatively suggest that the Court should adapt the test in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), which addresses school-sponsored speech by students, who are not government actors, to the government speech of public-school teachers, who are.  Here too, the Court simply has no warrant to extend a test that regulates restrictions on private actors' speech to restrictions on government speech.  Plaintiffs argue that doing so would "ensure the very democratic principles embedded in our Constitution are not thwarted."  Doc. 61 at 33.  But the First Amendment protects private speech, not Plaintiffs' view of abstract principles.

Plaintiffs also ask this Court to apply what they call "the *Garcetti* exemption" for academic speech to protect academic freedom.  Doc. 61 at 42.  *Garcetti* has no academic-speech exception.  Rather, because it involved the speech of a deputy district attorney, it reserved on "whether [its] analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching."  *Garcetti*, 547 U.S. at 425.  And while several courts of appeals have seized on that reservation to protect "public university professors' in-class speech" out of policy

concerns about academic freedom, Doc. 61 at 43, that hasn't happened in the elementary or secondary school setting, where such policy concerns would apply with vastly weaker (if any) force. The Court should dismiss Plaintiffs' viewpoint-discrimination claim, which, by their own concession, seeks judicial supervision of government speech.

**III.    The Court should dismiss Plaintiffs' vagueness claim.**

Section 16 isn't subject to a heightened vagueness standard, and in any event Plaintiffs' vagueness claim would fail on any standard.

Plaintiffs' argument that Section 16 is subject to a heightened vagueness standard misses the mark because it relies on the assumption that Section 16 reaches "expression sheltered by the First Amendment."  Doc. 61 at 28.  As explained above, that is wrong, as this Court has already concluded, *see* Doc. 45 at 27 ("In this situation, it is not the Teacher Plaintiffs' First Amendment speech rights that are at risk of being chilled.").

Under the correct standard—and indeed other any standard—Section 16 is not vague. Plaintiffs first argue that the term Critical Race Theory is vague because Secretary Oliva has acknowledged that it's challenging to "com[e] up with a simple definition" for it.  Doc. 61 at 29. Critical Race Theory may not be susceptible to a simple definition; few academic theories are. The definition of originalism is "debated amongst even the scholars" too.  *Id.*  But that doesn't mean it is difficult for teachers to tell if they are teaching Critical Race Theory or not; they need only ask whether the materials they teach describe themselves as works of Critical Race Theory. Moreover, the crux of Plaintiffs' right-to-hear claim is that students have a First Amendment right to be compelled to espouse Critical Race Theory (or, as they recast it, learn about Critical Race Theory).  Plaintiffs can't claim both that they have a right to be compelled to espouse (or learn) about Critical Race Theory and that they have so little understanding of what it is that mentioning it in a statute violates their due process rights.

Plaintiffs next say that the statute is vague as to whether it merely proscribes indoctrination in Critical Race Theory or teaching about it.  As the Court is well aware, Defendants believe the statute clearly prohibits only indoctrination, but Plaintiffs are in no position to claim the statute is vague on this point when the premise of their right-to-hear claim is that the statute *does* reach more than indoctrination.  *See* Doc. 61 at 25 (making this claim).  Plaintiffs next claim that the very concept of discrimination is vague, and that what Titles IV and VI of the Civil Rights Act prohibit is vague.  *Id.* at 31.  Yet agreeing with Plaintiffs on that score would require the Court to hold that those statutes, and many more prohibiting discrimination, are unconstitutionally vague.  Finally, Plaintiffs complain that Section 16's prohibition of indoctrination impermissibly turns on whether students "felt 'compelled,'" which they liken to a prohibition of "annoying" conduct.  *Id.* at 32 (citing *Coates v. City of Cincinnati*, 402 U.S. 611 (1971)).  That analogy fails for two reasons: first, because it is far easier to predict what kinds of conduct are likely to compel a student to affirm an idea than it is to predict what "some people" may find annoying, *Coates*, 402 U.S. at 614, and second because the statute's prohibition only applies to conduct that actually "compels" students to affirm an idea, not to any conduct that causes a student to feel compelled.  The Court should dismiss Teacher Plaintiffs' vagueness claim.

## IV.    The Court should dismiss Student Plaintiffs' right-to-hear claim.

Student Plaintiffs claim that they have a First Amendment right to hear certain ideas from the government.  In granting them a limited preliminary injunction on this claim, this Court acknowledged that that claim was incompatible with the modern government speech doctrine, Doc. 45 at 36, but deemed itself bound by the Eighth Circuit's recognition of a similar claim in *Pratt v. Independent School District No. 831*.  Whether *Pratt* continues to be good law—and whether Section 16 goes any further than prohibiting indoctrination in certain ideas, rather than merely teaching them—is now before the Eighth Circuit on appeal.

6

But either way, this claim fails as a matter of law because the State has a legitimate peda-gogical interest in protecting students from being taught that members of one group "are inher-ently superior or inferior to people of another," Ark Code. Ann. 6-16-156(b)(1), even if students aren't forced to affirm that abhorrent view.  Indeed, Plaintiffs cannot dispute that Arkansas has a compelling pedagogical interest in prohibiting conduct that encourages racial discrimination and ensuring tax dollars aren't used to promote unconstitutional discrimination.  *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (op. of O'Connor, J.).  Thus, even under this Court's broader reading of Arkansas's stat-ute, Plaintiffs' claim should be dismissed.

## V.     The Court should dismiss Plaintiffs' equal-protection claim.

Plaintiffs don't claim Section 16's language is discriminatory on its face or assert any di-rect evidence of intentional racial discrimination.  Instead, they try to plausibly allege intentional racial discrimination by pitting what they call "circumstantial evidence" against Section 16's plain-text safeguards against racial discrimination.  Doc. 61, at 47.  But Plaintiffs don't even marshal the sorts of facts typically used to suggest a discriminatory motive, such as legislators' floor statements.  Instead, they point to a purported disparate impact, that, even if real, wouldn't plausibly indicate racial discrimination.

### A.     Plaintiffs don't adequately allege disparate impact.

Plaintiffs say that Section 16 has caused a disparate impact on courses that are predomi-nantly preferred by minority-race students, citing the difference between how the State treated the AP African American Studies pilot and the AP European History course.  Yet Plaintiffs ha-ven't even alleged that the two courses are similarly situated.  Nor could they, as the European History course was a full-fledged, College Board-approved AP course—unlike the African American Studies pilot.  Moreover, Plaintiffs acknowledge the separate existence of an African

American History class at Central High School, also taught by Ms. Walls.  If racial discrimination were plausibly at work, one would expect differential treatment adversely affecting *both* AP African American Studies *and* African American History—not the mere de-designation of the still-tentative AP African American Studies pilot.  But that's not the case.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative.").  Plaintiffs fail to show "a clear pattern, unexplainable on grounds other than race." *Id.*

In any event, the AP African American Studies pilot also wasn't plausibly de-designated as a result of Section 16.  Plaintiffs themselves concede that "after this decision [to de-designate] was disclosed . . . Oliva explained that ADE revoked AP AAS for the 2023-24 school year because the course was still being piloted and the College Board was unable to confirm which college level course would be its equivalent for crediting purposes."  Doc. 61 at 15; *see id.* at 55 (Oliva "asserted that his actions, executed . . . before the school year, were justified because the course was being piloted").  Plaintiffs note that "Oliva further stated that Arkansas could not offer the course until this issue was resolved." *Id.* at 15.  Plaintiffs' assertion that Oliva was wrong is implausible because it fails to address the fact that the pilot truly didn't meet the standards for an AP class under Arkansas law.  *See* Ark. Code Ann. 6-16-1202(1)(B) (AP course must be "approved by the College Board and Educational Testing Service"); *id.* 6-15-214(b)(2) (an AP course's "rigor and level of difficulty" must be "validated through the required advanced placement audit").

**B.      Section 16 makes sense only on the "obvious alternative explanation" that the State disagrees with ideas that reject equal protection.**

Plaintiffs concede that "the creation of Section 16 and Defendants' application of the law to the AP AAS" is "neutral on its face."  Doc. 61 at 46.  And that's unquestionably true: Section

16's text exhibits no intent to discriminate based on students' or teachers' membership in a protected class.  To the contrary, Section 16's text makes far more sense on the "obvious alternative explanation," *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)), that the State intended to *inhibit* racial discrimination, not promote it. *See, e.g.*, Ark. Code Ann. 6-16-156(a) (directing the Secretary to ensure that the Department is "in compliance with Title IV and Title VI of the Civil Rights Act of 1964"); *id.* 6-16-156(b) (addressing efforts to compel speech in violation of Title IV and Title VI); *see also McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) ("Courts should consider whether there are lawful obvious alternative explanations for the alleged conduct, because where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)).

Plaintiffs haven't plausibly alleged that the State has engaged in intentional racial discrimination.  Disagreement with ideas that reject the principle of equal protection is a far more plausible explanation than racial discrimination.  That's why, in an effort to cast doubt on this "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, Plaintiffs resort to simply declaring that "Defendants[] attempt to appropriate Titles IV and VI for their own bad intentions."  Am. Compl., Doc. 8, ¶ 208.  Indeed, on Plaintiffs' theory, the State somehow "target[s] Black students and educators on the basis of race," Doc. 61 at 46, *precisely* by directing the Secretary to take action *against* activities "that conflict with the principle of equal protection under the law." Ark. Code Ann. 6-16-156(a)(3).  But, again, that's implausible, and the Court should dismiss Plaintiffs' equal-protection claim.

### C.    Plaintiffs' other purported "departures" don't render intentional discrimination plausible.

Plaintiffs' other allegations concerning purported "departures" don't plausibly support their claim that the State intended to discriminate against black students and teachers.  Legislatures regularly enact legislation designated to become effective on an emergency basis.  Moreover, it's not as though Section 16 was singled out for special treatment; Section 16 was enacted as part of an omnibus education bill, 48 sections of which went into effect immediately, in response to serious shortcomings in the State's public schools.  It's hardly possible, let alone plausible, that the covert reason for making the bulk of that lengthy bill effective immediately was to facilitate intentional discrimination via Section 16.  Plaintiffs also think it suspect that the LEARNS Act was passed rapidly.  But that's exactly what one would expect of emergency legislation, and even for ordinary legislation there is nothing suspect about a legislature's acting quickly.  *See Abbott v. Perez*, 585 U.S. 579, 610 (2018) ("[W]e do not see how the brevity of the legislative process can give rise to an inference of bad faith[.]").

*    *    *

Alleging "facts that are 'merely consistent with' a defendant's liability" "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678, (quoting *Twombly*, 550 U.S. at 557).  Indeed, because Plaintiffs' Amended Complaint "do[es] not permit the court to infer more than the mere possibility of misconduct," they "ha[ve] not 'show[n]' that '[they are] entitled to relief.'" *Id.* at 679 (cleaned up) (quoting Fed. Rule Civ. Proc. 8(a)(2)).  The Court should dismiss Plaintiffs' equal-protection claim.

CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' claims.

10

Dated: June 11, 2024                    Respectfully,

                                        TIM GRIFFIN
                                          Attorney General
                                        NICHOLAS J. BRONNI (2016097)
                                          Solicitor General
                                        ASHER STEINBERG (2019058)
                                          Senior Assistant Solicitor General
                                        MICHAEL A. CANTRELL (2012287)
                                          Assistant Solicitor General
                                        JORDAN BROYLES (2015156)
                                          Senior Assistant Attorney General
                                        JUSTIN BRASCHER (2023029)
                                          Assistant Attorney General
                                        Office of the Arkansas Attorney General
                                        323 Center Street, Suite 200
                                        Little Rock, AR 72201
                                        Ph:     (501) 682-2401
                                        Michael.Cantrell@ArkansasAG.gov

                                        *Counsel for Defendants*