# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**RUTHIE WALLS, *et al.***                                                                **PLAINTIFFS**

**v.**                                   **Case No. 4:24-cv-00270-LPR**

**SARAH HUCKABEE SANDERS, in her**
**official capacity as Governor of the State**
**of Arkansas, *et al.***                                                          **DEFENDANTS**

## ORDER

This case concerns the LEARNS Act's "anti-indoctrination provision."[1]  Plaintiffs are two

high school teachers, one high school student, and the Arkansas State Conference of the NAACP.[2]

Defendants are Governor Sanders, Secretary Oliva, and the members of the Arkansas State Board

of Education.  Plaintiffs sue Defendants in their official capacities only and seek declaratory and

injunctive relief only.[3]

The operative Complaint presents four buckets of claims: (1) claims concerning the Free

Speech rights of public high school teachers; (2) claims concerning the Free Speech rights of public

high school students; (3) claims concerning the Due Process rights of public high school teachers;

and (4) claims concerning the Equal Protection rights of African American public high school

---

[1] Ark. Code Ann. § 6-16-156.  In its Preliminary Injunction Order, the Court referred to this provision as Section 16 of the LEARNS Act.  *See generally* Prelim. Inj. Order (Doc. 45).  But, as the Court noted in that Order, Section 16 of the LEARNS Act technically covers more than just this provision.  *See id.* at 7 n.28.  The provision has also, at times, been referred to as "the indoctrination provision."  *See* Baum Decl. (Doc. 15) ¶ 5.  But the Court thinks that a more descriptive label for it is "the anti-indoctrination provision."

[2] The Arkansas State Conference of the NAACP says that its members include high school teachers and high school students.  *See* First Am. Compl. (Doc. 8) ¶ 25.

[3] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 2 n.1 (pinpoint citations to Doc. 61 refer to the document's self-identified page numbers, not the ECF page numbers).  The docket sheet currently shows Secretary Oliva as being a Defendant in both his individual and official capacities.  The Clerk is directed to update the docket sheet to reflect that Plaintiffs are no longer bringing claims against Secretary Oliva in his individual capacity.  *See* First Am. Compl. (Doc. 8); Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 2 n.1.

teachers and students.[4]  Defendants filed a Motion to Dismiss seeking dismissal of all four buckets of claims.[5]  In today's Order, the Court holds most of that Motion in abeyance.  But the Court does GRANT the Motion with respect to the facial Equal Protection claims.

## I.    MOTION TO DISMISS STANDARD

At the motion to dismiss stage, the Court must treat the record in a very specific way.  First, the Court may only consider allegations in the complaint, materials attached to or embraced by the complaint, public records, and other evidence of which the Court has properly taken judicial notice.[6]  Second, the Court must take as true all facts pled in the complaint.[7]  Third, the Court must then decide, based on those assumed-to-be-true facts, whether a plaintiff has a plausible claim for judicial relief.[8]  The plausibility-of-relief threshold is quite low, but it is not nothing.  A plausible claim for relief is more than a possibility of relief, but far less than a certainty of relief.[9]

Most of the time, the dispositive question at the motion to dismiss stage is a purely legal one.  Often this question concerns whether the governing law prohibits the action or actions that a plaintiff alleges a defendant has taken, is taking, or will likely take.  Translated to the specifics of our case, that question is best stated as whether the United States Constitution prohibits the enforcement of the anti-indoctrination provision of the LEARNS Act.

---

[4] *See* First Am. Compl. (Doc. 8) ¶¶ 161–213.

[5] *See generally* Mot. to Dismiss (Doc. 54); Br. in Supp. of Mot. to Dismiss (Doc. 55).

[6] *See Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

[7] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On the other hand, the Court is not required to (and should not) accept a complaint's legal conclusions or conclusory allegations.  *See, e.g.*, *Wiles v. Capitol Indem. Grp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.").

[8] *See Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024).

[9] *See Iqbal*, 556 U.S. at 678.

## II.      THE FIRST THREE BUCKETS OF CLAIMS

On May 7, 2024, this Court issued an Order preliminarily enjoining—in a very limited way—the enforcement of the anti-indoctrination provision against Ms. Ruthie Walls and Mr. Colton Gilbert.[10]  On May 10, 2024, the enjoined Defendants appealed the Order to the Eighth Circuit.[11]  The appeal has been fully briefed.  The Eighth Circuit has determined that it wants to hold an oral argument, but the date of that argument has not yet been set.[12]

The Court's Preliminary Injunction Order covered a lot of legal ground.  The Court analyzed whether a public high school teacher's Free Speech rights are implicated when a state proscribes what that teacher may and may not say in the classroom as part of academic instruction.[13]  The Court also analyzed whether a public high school student's Free Speech rights are implicated when a state prohibits the teaching of certain information (or teaching from a certain perspective) in the absence of a legitimate pedagogical reason for the prohibition.[14]  And the Court, at least to a certain extent, parsed the language of the anti-indoctrination provision.[15]

The legal analysis in the Court's Preliminary Injunction Order is hotly contested by the parties in the Eighth Circuit appeal.[16]  It is also intimately intertwined with the legal analysis

---

[10] Prelim. Inj. Order (Doc. 45) at 47–50.  Essentially, the only actions enjoined by the Court were actions that Defendants themselves said were not authorized by—and could not be taken under—the anti-indoctrination provision in the first place.  *See id.* at 45–50.

[11] Notice of Appeal (Doc. 48).  The "enjoined Defendants" are all Defendants except for Governor Sanders.  In their preliminary injunction papers, Plaintiffs more or less conceded—at least for purposes of the preliminary injunction stage—that difficult issues concerning the scope of the *Ex parte Young* exception to sovereign immunity counseled against application of a preliminary injunction to the Governor.  *See* Prelim. Inj. Order (Doc. 45) at 1 n.5.

[12] *See Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

[13] *See* Prelim. Inj. Order (Doc. 45) at 25–27.

[14] *See id.* at 33–37.

[15] *See id.* at 37–43.

[16] *See* Br. for Appellants at 16–36 (pinpoint citations to appellate briefs refer to each brief's self-identified page numbers, not the ECF page numbers), *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024); Br. for Appellees at 16–52, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024); Reply for Appellants at 1–22, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

necessary to determine whether any or all of the first three buckets of claims pressed by Plaintiffs should be dismissed. As explained below, judicial economy and efficiency counsel waiting for the Eighth Circuit's decision instead of issuing a ruling that could add complexity to, or significantly alter the landscape of, the pending appeal.[17]

### A.    Teachers' Free Speech Claims

Plaintiffs contend that the anti-indoctrination provision of the LEARNS Act unconstitutionally regulates teachers' classroom speech.[18] Although these claims are not directly at issue in the appeal, the relevant legal question—whether and to what extent public high school teachers have Free Speech rights in their classroom instruction—is a central feature of Plaintiffs' irreparable-harm argument to the Eighth Circuit.[19] The parties' Eighth Circuit briefs spill plenty of ink on opposing sides of the relevant legal question.[20] And it is highly likely the Eighth Circuit is going to resolve the relevant legal question when it resolves the appeal.

---

[17] Because the Court has concluded that it will hold in abeyance the portions of the Motion to Dismiss that could affect the Eighth Circuit appeal, the Court need not decide whether that appeal deprived the Court of jurisdiction to rule on those portions of the Motion. *See West Publ'n Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1229 (8th Cir. 1986) ("[T]he pendency of an interlocutory appeal from an order granting or denying a preliminary injunction does not wholly divest the District Court of jurisdiction over the entire case."); *Janousek v. Doyle*, 313 F.2d 916, 920 (8th Cir. 1963) (per curiam) ("[W]here . . . the appeal is from an interlocutory order denying a motion for preliminary injunction, . . . the filing of the notice of appeal from such an order does not ipso facto divest the district court of jurisdiction to proceed with the cause with respect to any matter not involved in the appeal, or operate to automatically stay other proceedings in the cause pending the appeal."). *But see Minn. Voters All. v. Walz*, 494 F. Supp. 3d 610, 611 (D. Minn. Oct. 13, 2020) ("Under *Janousek*, then, the Court appears to lack jurisdiction to further address the merits of plaintiffs' claims, as those merits are intimately 'involved in the appeal.'").

[18] *See* First Am. Compl. (Doc. 8) ¶¶ 183–96. It is important to note that the teachers' First Amendment challenge is limited to the alleged regulation of classroom instruction. The operative Complaint does not include claims about teacher speech outside of the classroom. It does not even include claims about teacher speech inside the classroom but outside the context of academic instruction. This understanding of the operative Complaint is consistent with Plaintiffs' arguments in favor of the teachers' First Amendment claims in their Response in Opposition to Defendants' Motion to Dismiss. *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 27–38; *see also* Prelim. Inj. Order (Doc. 45) at 26.

[19] *See* Br. for Appellees at 44–52, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

[20] *See id.*; Reply for Appellants at 17–20, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

In the Preliminary Injunction Order, the Court concluded that: (1) curricular instruction by public high school teachers constitutes government speech; and (2) accordingly, a state may proscribe what a public high school teacher may and may not say (and what materials a teacher may and may not use) in the classroom as part of academic instruction without implicating that teacher's Free Speech rights.[21]  In the pending Motion to Dismiss, Defendants ask the Court to stand by that conclusion, which would in turn lead to dismissal of the teachers' Free Speech claims.[22] On the other hand, unsurprisingly, Plaintiffs ask the Court to reconsider the conclusion.[23] The Court does neither—yet.  There are good reasons to wait for the Eighth Circuit's resolution of this particular legal question.

For starters, the legal question—whether and to what extent public high school teachers have Free Speech rights in their classroom instruction—is one of first impression in this Circuit and the subject of a fairly deep circuit split.[24]  Although this Court found Judge Sutton's side of the circuit split compelling,[25] the Court can't entirely foreclose the possibility that the Eighth Circuit will adopt the other side of the circuit split.  Instead of throwing out claims that the Eighth

---

[21] *See* Prelim. Inj. Order (Doc. 45) at 26–27.

[22] *See* Br. in Supp. of Mot. to Dismiss (Doc. 55) at 23.

[23] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 27–38.

[24] *See* Prelim Inj. Order (Doc. 45) at 26–27.  Some circuits hold that curricular speech does not implicate the Free Speech rights of primary and secondary public school teachers.  *See Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998); *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (5th Cir. 1989); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007).  Other circuits apply the "legitimate pedagogical concern" test in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), to public school teacher curricular speech.  *See Ward v. Hickey*, 996 F.2d 448, 452–53 (1st Cir. 1993); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 722–23 (2d Cir. 1994); *Miles v. Denver Pub. Schs.*, 944 F.2d 773, 777 (10th Cir. 1991); *Bishop v. Aronov*, 926 F.2d 1066, 1071 (11th Cir. 1991).  The D.C. Circuit applied *Pickering*'s balancing test in *Goldwasser v. Brown*, 417 F.2d 1169, 1176 (D.C. Cir. 1969).  And the Eighth and Ninth Circuits have not yet taken a side in the circuit split.  *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148–49 (9th Cir. 2001); *see also* Prelim. Inj. Order (Doc. 45) at 26 n.144.

[25] *See* Prelim. Inj. Order (Doc. 45) at 27.

Circuit could find viable in a few months, it is fairer and more efficient for this Court to hold off on a dismissal ruling for now.[26]

Moreover, the legal question presented by Plaintiffs is not a "yes or no" question.  Here in District Court, Plaintiffs have proposed two alternative legal tests to govern the analysis of the teachers' Free Speech claims.[27]  And, in the preliminary injunction appeal, Plaintiffs have suggested that the Eighth Circuit adopt some sort of balancing test.[28]  Even assuming that this Court were inclined to reconsider the conclusion it reached at the preliminary injunction stage,[29] judicial efficiency and economy strongly counsel in favor of letting the Eighth Circuit decide the contours of the appropriate legal test (if any) to apply—a far better alternative than having this Court apply one of the requested tests only to discover a few months down the road that the Eighth Circuit favors a different test (or no test at all).

**B.    <u>Students' Free Speech Claims</u>**

Unlike the teachers' Free Speech claims, the students' Free Speech claims are directly at issue in the Eighth Circuit appeal.  The principal fight on appeal is whether the Eighth Circuit should overrule (or recognize the demise of) *Pratt v. Independent School District No. 831* in light of the government-speech doctrine established by Supreme Court cases post-dating *Pratt*.[30]  Put another way, do the Supreme Court's government-speech cases mean that a public high school student's Free Speech rights are not implicated when a state prohibits the teaching of certain

---

[26] The Court does not mean, in any way, to suggest that it believes the Eighth Circuit will come to a contrary conclusion from the one reached by this Court on this question.  The Court only means to acknowledge the theoretical possibility of that occurring.

[27] Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 30–33.

[28] Br. for Appellees at 48, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

[29] That would be a heck of an assumption.

[30] *See* 670 F.2d 771 (8th Cir. 1982); Br. for Appellants at 20–30, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024); Br. for Appellees at 18–27, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

information (or teaching from a certain perspective) even in the absence of a legitimate pedagogical reason for the prohibition?  Once again, the parties' Eighth Circuit briefs spill plenty of ink on opposing sides of that question.[31]  And it is a near certainty that the Eighth Circuit is going to resolve that question when it resolves the appeal.

In the Preliminary Injunction Order, the Court (reluctantly) concluded that it was bound by the basic holding of *Pratt*: Public high school students have a Free-Speech-based "right to receive" information and thus a state may not prohibit the teaching of certain materials (or teaching from a certain perspective) absent a legitimate pedagogical reason for the prohibition.[32]  The Court made plain, however, that, "were it writing on a clean slate," the Court would conclude that no such "right to receive" exists in the context of classroom instruction in public high schools.[33]  The sole obstacle to that clean-slate conclusion was *Pratt*.

In the pending Motion to Dismiss, Defendants contend that *Pratt* is not binding on the Court and that the Court should thus adopt its clean-slate conclusion.[34]  Plaintiffs, on the other hand, urge the Court to stick with its preliminary injunction conclusion that *Pratt* is binding.[35]  But there are good reasons to wait for the Eighth Circuit's resolution of the *Pratt* question with respect to the students' Free Speech claims.

As this Court has previously intimated, to the extent it is still good law at all, *Pratt* is hanging on by the barest of threads.[36]  Although the Court concluded that *Pratt* was still binding on district courts in the Eighth Circuit, the Court was pretty clear that it believed the Eighth Circuit

---

[31] *See supra* note 30.

[32] *See* Prelim. Inj. Order (Doc. 45) at 35–37; *see also Pratt*, 670 F.2d at 777.

[33] Prelim. Inj. Order (Doc. 45) at 34–35.

[34] Br. in Supp. of Mot. to Dismiss (Doc. 55) at 13–15.

[35] Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 12–14.

[36] *See* Prelim. Inj. Order (Doc. 45) at 36.

should either acknowledge the demise of *Pratt* or overrule it.[37]  (If that was not clear from the Preliminary Injunction Order, it should be clear now.)  Where, as here, there is a significant potential that the Eighth Circuit will shortly discard a seemingly stale and suspect opinion, it would be a waste of judicial resources (and the resources of the parties) to proceed before the Eighth Circuit issues its ruling.  This alone would justify holding the *Pratt* portion of the Motion to Dismiss in abeyance.

But there's more at stake than just judicial economy, judicial efficiency, and waste of resources.  If *Pratt* applies, and if the "right to receive" claims otherwise make it past the motion to dismiss stage, the *Pratt* inquiry will likely require the Court to (1) delve into the motivations and intent of lawmakers and state officials in enacting and enforcing the anti-indoctrination provision of the LEARNS Act, and (2) determine whether the justifications given by those persons were in fact sham reasons intended to mask illegitimate aims.[38]  This might even call for testimony from such persons.[39]  The point is that, at the very least, litigating the merits of the *Pratt* claims will likely implicate serious federalism and separation of powers concerns—during the discovery process, at summary judgment, throughout the trial, and in the Court's ultimate decision.[40]  There are, of course, times when such inquiries are necessary.[41]  At such times, the unseemliness of those inquiries is not a reason to abdicate the judicial role.  But, given the fairly unique posture of this case, the looming federalism and separation of powers concerns strongly counsel the Court to

---

[37] *See id.* at 36–37.

[38] *See Pratt*, 670 F.2d at 778–79.

[39] *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) ("In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege.").

[40] *Cf. id.* at 268 & n.18 (adverting to the difficult issues at play when testimony from lawmakers and government officials is sought).

[41] *See id.* at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.").

exercise a little patience and wait for the Eighth Circuit to explain whether *Pratt* remains good law in this Circuit and applies to this case.

This is especially true because there is a good chance that the Court's Preliminary Injunction Order was wrong insofar as it concluded that *Pratt* is still binding. In that prior Order— which (by definition) was preliminary in nature and produced under significant time constraints— the Court was operating under the assumption that a federal district court's obligation is to follow the decision (i.e., the holding) of its parent circuit court unless (1) a subsequent Supreme Court case expressly overruled the circuit decision, or (2) the circuit decision is clearly irreconcilable with one or more subsequent Supreme Court decisions.[42]  On closer (and less harried) study, however, it appears that the Eighth Circuit applies a different standard—allowing panels of the Eighth Circuit *and* federal district courts in the Eighth Circuit to disregard Eighth Circuit decisions when they are "cast into doubt by an intervening Supreme Court decision."[43]  Although the relevant Eighth Circuit cases don't do much by way of defining "cast into doubt," that language itself suggests a test that is a bit less stringent than the test this Court used in the Preliminary Injunction Order.  Indeed, in at least one case, the Eighth Circuit has acknowledged a substantive difference between the "cast into doubt" standard and the "clearly irreconcilable" standard.[44]

---

[42] *See* Prelim. Inj. Order (Doc. 45) at 35–37.  *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.  We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989))); *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) ("We hold that the issues decided by the higher court need not be identical in order to be controlling.  Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.  The present case is an example where intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority.").

[43] *United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015) (per curiam).  *See also United States v. Steward*, 598 F.3d 960, 962 (8th Cir. 2010) (per curiam); *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 904 (8th Cir. 2005).

[44] *See United States v. Villareal-Amarillas*, 562 F.3d 892, 898 n.4 (8th Cir. 2009) ("In the Ninth Circuit, a three-judge panel may reexamine a prior panel decision only if a supervening Supreme Court decision is 'clearly irreconcilable.'

If the "cast into doubt" standard is truly the one that a federal district court in the Eighth Circuit must apply when determining if an Eighth Circuit decision binds it,[45] then *Pratt* does not remain good law and federal district courts are no longer bound by it. That this is the Court's view should be clear from what the Court previously said in its Preliminary Injunction Order.[46] But perhaps a word or two more on the point would be useful.

As best the Court can tell, the Supreme Court has historically recognized a "right to receive" information from private speakers only. The Supreme Court's true "right to receive" cases have been laser focused on government action that prevented a private person or private entity from receiving or listening to the speech of another private person or private entity.[47] To be sure,

---

By contrast, we may reconsider a prior panel's decision if a supervening Supreme Court decision 'undermines or casts doubt on the earlier panel decision.'" (quoting *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1022 (8th Cir. 2007))).

[45] The Court maintains some skepticism that a district court should be able to disregard an Eighth Circuit panel decision as freely as a subsequent Eighth Circuit panel could disregard it. Although vertical *stare decisis* and horizontal *stare decisis* share many characteristics, common sense suggests that vertical *stare decisis* is more important to a well-functioning judiciary. Vertical *stare decisis* should thus be harder to escape. *Cf. Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring) ("To be clear, the *stare decisis* issue in this case is one of horizontal *stare decisis*—that is, the respect that this Court owes to its own precedents and the circumstances under which this Court may appropriately overrule a precedent. By contrast, vertical *stare decisis* is absolute, as it must be in a hierarchical system with one supreme court. In other words, the state courts and the other federal courts have a constitutional obligation to follow a precedent of this Court unless and until it is overruled by this Court." (internal citations and quotation marks omitted)). But the relevant Eighth Circuit precedent (softly) suggests otherwise. *See supra* note 43. If the Eighth Circuit were so inclined, the appeal of the Preliminary Injunction Order in this case presents a good vehicle to address more directly what quantum of tension is necessary between an Eighth Circuit precedent and subsequent Supreme Court cases before a federal district court (as opposed to an Eighth Circuit panel) can disregard that Eighth Circuit precedent. And if the same quantum of tension that an Eighth Circuit panel needs to disregard a prior panel opinion is all that is necessary for a district court to do the same, district courts would be significantly assisted by some further definition of the "cast into doubt" standard.

[46] *See* Prelim. Inj. Order (Doc. 45) at 36–37 ("Make no mistake: *Pratt* is something akin to zombie precedent. As Defendants (and the cases they cite) point out: (1) the modern government-speech doctrine refuses to subject pure government speech to Free Speech Clause scrutiny; and (2) selection and implementation of curricula in a school setting is pure government speech. How do these two inputs possibly lead to an output that subjects selection and implementation of curricula to Free Speech Clause scrutiny? They don't." (footnotes and citations omitted)).

[47] *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) (protecting speech rights of private corporation in part to protect rights of those who would hear its message); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (allowing consumers to assert a right to receive information from pharmacists concerning drug prices); *Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974) (non-inmates who would have received inmate correspondence could challenge censorship of inmate mail under First Amendment right to receive doctrine), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989); *Kleindienst v. Mandel*, 408 U.S. 753, 762–65 (1972) (concerning university professors' and university students' rights to listen to

in the 1950s and '60s, a number of Supreme Court cases waxed eloquent about the importance of free discussion and debate in academic settings.[48]  But those cases were not actually "right to receive" cases; the plaintiffs in those cases were not students or other potential recipients of information.  A Free-Speech-Clause-based "right to receive" information from others has always been justified (at the Supreme Court) as a direct corollary of the right of others to provide the information.

That should not come as a huge surprise.  The "right to receive" cases reflect nothing more than the following two common sense propositions: (1) "[t]he dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them"; and (2) "[i]t would be a barren marketplace of ideas that had only sellers and no buyers."[49]  The caselaw's emphasis is on the link between a speaker's right to speak and a listener's right to listen

---

and debate a Marxist Belgian journalist); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (government could not criminalize mere possession of obscenity in part because "the Constitution protects the right to receive information and ideas"); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (private citizen had a right to get mail from communists); *Thomas v. Collins*, 323 U.S. 516, 534 (1945) (union members had a right to listen to speech of union boss that was concomitant to union boss's right to speak to union members); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (local government could not blanketly prevent door-to-door leaflet distribution in part because First Amendment "necessarily protects the right" of homeowners "to receive" that information); *Meyer v. Nebraska*, 262 U.S. 390, 399–403 (1923) (government could not prevent teacher in private parochial school from teaching German to young students).  This is not an exhaustive list of cases, but it is a representative one.

[48] *See, e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *Sweezy v. New Hampshire*, 354 U.S. 234, 250–51 (1957).

[49] *Lamont*, 381 U.S. at 308 (Brennan, J., concurring).  The Supreme Court's decision in *Board of Education v. Pico*, 457 U.S. 853 (1982)—especially given the heavily fractured nature of the majority in that case—did not change this.  Although some of the justices' opinions adventurously attempted to recast the right to receive information from private speakers into a right to force a public school to provide students access to information, *see Pico*, 457 U.S. at 885–91 (Burger, J., dissenting), no opinion garnered a majority of justices.  Moreover, Justice White's decisive concurrence in the judgment (which controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)) was anodyne enough that nearly nothing of substance was actually done in *Pico*.  *See Pico*, 457 U.S. at 883–84 (White, J., concurring).  In any event, even the plurality opinion in *Pico* limited its analysis to curation of school libraries, which the Eighth Circuit has recently explained is not government speech.  *See id.* at 861–62; *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024).  The *Pico* plurality explicitly disclaimed deciding anything about the interplay between the "right to receive" and a school's curricular decisions.  *See Pico*, 457 U.S. at 861–62.

(or receive). The right to receive—properly understood—has never been the right of a listener to demand that a speaker say something that the speaker does not want to say.[50]

It is in this context that the Supreme Court's post-*Pratt* government-speech cases cast real doubt on *Pratt*. Under the modern government-speech doctrine, government speech (or the government's decision not to speak) does not implicate the Free Speech Clause.[51] Put another way, private citizens can't use the Free Speech Clause as a sword to make the government speak, speak in a certain way, or refrain from speaking. And it would be odd in the extreme if the only exception to this rule was that public high school (or primary school) students could use the Free Speech Clause to make the government speak in ways it didn't want to speak or to stop the government from speaking in ways it wanted to speak. Although *Tinker* makes clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,"[52] neither do their rights get supercharged at that gate.[53]

As the Court has previously acknowledged, it is not one hundred percent clear that the Supreme Court's government-speech cases are irreconcilable with *Pratt*.[54] Moreover, the Eighth Circuit has recently reminded us all of the Supreme Court's warning to "exercise great caution

---

[50] *See Va. State Bd. of Pharmacy*, 425 U.S. at 756 ("Freedom of speech presupposes a willing speaker.").

[51] *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("If petitioners were engaging in their own expressive conduct, then the Free Speech Clause has no application. The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022) ("The First Amendment's Free Speech Clause does not prevent the government from declining to express a view.").

[52] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

[53] *Cf. Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187–88 (2021) (recognizing that, although "[m]inors are entitled to a significant measure of First Amendment protection," student speech may be regulated in ways that non-student speech may not (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011))).

[54] *See* Prelim. Inj. Order (Doc. 45) at 36; *see also Arce v. Douglas*, 793 F.3d 968, 982–83 (9th Cir. 2015) (attempting to harmonize the essential holding of *Pratt* with the modern government-speech doctrine). In addition to what the Court said in its Preliminary Injunction Order, it is worth noting that the Court's "right to receive" analysis in the instant Order is premised on public high school classroom instruction being considered government speech as opposed to a particular teacher's speech. That premise is very likely correct, but *GLBT* has (indirectly) introduced a small bit of doubt on that point. *See* 114 F.4th at 667–68.

before extending [its] government-speech precedents."[55]  Nonetheless, *Pratt* has been "cast into

doubt" by the government-speech cases, and, under Eighth Circuit precedent, that appears to mean

it is no longer binding on this Court.  The Court has already explained that, in a world without

*Pratt* as binding precedent, the Court is persuaded by Defendants' argument that public high school

curricula and instruction are not subject to a Free Speech "right to receive" challenge.[56]

---

[55] *GLBT*, 114 F.4th at 668 (quoting *Matal v. Tam*, 582 U.S. 218, 235 (2017)).  The so-called "pall of orthodoxy" cases and *Garcetti v. Caballos*'s reservation of speech-related-to-teaching-issues are enough to raise a doubt as to whether the government-speech cases apply with full force to academic instruction cases.  *See* 547 U.S. 410, 425 (2006) ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."); *Pico*, 457 U.S. at 870 (plurality opinion) ("[T]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom . . . ." (internal quotation marks and citation omitted)); *Keyishian*, 385 U.S. at 603 ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.  The classroom is peculiarly the marketplace of ideas.  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." (internal quotation marks and citations omitted)).  But that doubt is tiny when it comes to cases—like the one at bar—involving high school instruction as opposed to university instruction.  High school teaching contains many more hallmarks of government speech than does professorial teaching.  For example, when compared to professorial teaching, high school teaching is more likely to be perceived by the public as government speech and the government is more active in shaping and controlling the teaching.  *See Shurtleff*, 596 U.S. at 252; *Keefe v. Adams*, 840 F.3d 523, 532 (8th Cir. 2016) ("'[F]oremost among a school's speech is its selection and implementation of a curriculum—the lessons students need to understand and the best way to impart those lessons—and public schools have broad discretion in making these choices.'" (quoting *Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012))); *see also Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("[S]chools engage in government speech when they set and implement education policy through the curriculum."); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 796 (4th Cir. 2004) (noting that "[t]here is no First Amendment problem . . . when a public school makes content-based decisions about its curriculum" because such decisions constitute government speech).  In sum, it is sufficiently likely that the Supreme Court's government-speech cases fully apply to public high school instruction, and that those cases therefore cast real doubt on *Pratt*.

[56] If the Court were going to formally decide the "right to receive" issue, it would provide more extensive analysis on this point and (perhaps) would also reach Defendants' other arguments regarding the application of *Pratt*.  Because the Court is holding this part of the Motion in abeyance, however, it need not do so at this time.  Still, the Court does wish to acknowledge that this is a what's-good-for-the-goose-is-good-for-the-gander situation.  Today, Arkansas wants to (at least according to the First Amended Complaint's allegations) curb the use of Critical Race Theory in K–12 public schools.  Tomorrow, a different state might instead *require* K–12 public schools to teach one or more subjects through the lens of Critical Race Theory.  Five years from now, some third state might prevent its K–12 public schools from teaching about the biological differences between the sexes.  Ten years from now, who knows?  A state might want to prevent instruction about the Holocaust or the October 7th attack on Israel.  And yet another might require K–12 public schools to teach glowingly about Karl Marx, while omitting any discussion of either Adam Smith or the brutal realities of the Soviet Union and Communist China.

The Free Speech Clause either applies to all these scenarios or it applies to none of them.  And it would be extremely shortsighted to base that constitutional ruling on the policy outcome of a particular case.  The people who would be happy if a state was allowed to prevent the use of Critical Race Theory in K–12 public schools may be the same people who would be upset if a state was allowed to prevent the teaching of biological differences between the sexes in K–12 public schools.  Courts must not focus on the very fleeting question of who prevails in a particular case.  The focus must instead be on the broader tension between the respect for the authority of a democratically elected legislature and the concern that state-mandated propaganda in K–12 public schools will undermine democracy itself.

The point of all of this is that, if the Court were to issue a ruling now, that ruling would be to dismiss the students' Free Speech claims. But doing so at this stage would not be fair to Plaintiffs or to the Eighth Circuit. It would cause significant judicial inefficiencies; it would completely alter the landscape of the preliminary injunction appeal; and it would waste the time and resources of the parties. Much better to hold this part of the Motion in abeyance until the Eighth Circuit rules on the preliminary injunction appeal. On the other hand, because of what the Court now thinks about the propriety of dismissal of the students' Free Speech claims, it would be unfair to Defendants to begin the discovery process on these claims—which, as the Court discussed above, would very likely give rise to sensitive federalism and separation of powers issues.[57] The Court understands Plaintiffs' desire to get on with discovery. But the fairest thing all around at this point is to hold tight for the Eighth Circuit's decision.[58]

---

Most Americans recognize that opting to send one's children to K–12 public schools inherently gives the government a significant degree of power over what those children learn. On the other hand, most Americans are rightfully repelled by the idea of K–12 public schools being turned into dystopian tools of state propaganda. Plenty of us have read enough of Orwell, Bradbury, and Huxley to shudder at the thought. Long story short, the Court certainly understands the desire to have the judiciary police the line between a state's legitimate educational choices and choices that amount to illegitimate state propaganda. But judges don't have that power unless a provision in the Constitution gives it to us. And the Free Speech Clause simply doesn't.

Conduct is not unconstitutional just because it is bad—or really bad—or really, really bad—or even dangerous to democracy. The answer to the problem of potential propaganda in K–12 public schools does not lie in unshackling the Free Speech Clause from its original meaning. Rather, the answer lies in voters holding public officials accountable at the ballot box, in parents actively deciding the proper educational setting for their children, in competing speech from other entities, and in student speech. Seeking a quick fix from unelected judges—and transferring power away from the elected branches in the process—is exactly the wrong civics lesson to teach America's youth.

[57] *See supra* page 8.

[58] With respect to the students' Free Speech claims, the Eighth Circuit could construe this Order as an indicative ruling pursuant to Federal Rule of Civil Procedure 62.1(a)(3). But, even if it did so, there are good reasons for the Eighth Circuit to go ahead and decide the preliminary injunction appeal rather than remanding it. The Preliminary Injunction that the Court issued is very narrow. The injunction only enjoins enforcement of the anti-indoctrination provision against two people: Ms. Walls and Mr. Gilbert. And what it enjoins is action that Defendants contend is unauthorized by the statute in the first place. *See* Prelim. Inj. Order (Doc. 45) at 47–50. The only real effect of remand would be to lengthen the time it would take for the parties to get a definitive Eighth Circuit ruling on several difficult legal questions involved in this case. That is why this Order—with respect to the students' Free Speech claims—is better construed as a Rule 62.1(a)(1) deferral.

C.    **Teachers' Due Process Claims**

In their First Amended Complaint, the teachers claim that the anti-indoctrination provision of the LEARNS Act violates the Fourteenth Amendment's Due Process Clause because the provision "fails to provide persons of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement."[59] These are void-for-vagueness claims. Like the students' Free Speech claims, the teachers' void-for-vagueness claims are directly at issue in the preliminary injunction appeal.[60] And, once again, the parties' Eighth Circuit briefs spill plenty of ink on opposing sides of that question.[61] Given the disputed terrain in that appeal, it appears likely that the Eighth Circuit is either going to resolve the void-for-vagueness issue or resolve one or more legal issues that are intimately tied up with the void-for-vagueness issue.

In its Preliminary Injunction Order, the Court had occasion to preliminarily parse some of the relevant statutory language.[62] But, for reasons explained in that Order, the Court did not have to decide whether the anti-indoctrination provision's language is so unclear as to violate the Due Process Clause.[63] In the Motion to Dismiss briefing, Defendants ask the Court to conclude that

---

[59] First Am. Compl. (Doc. 8) ¶ 164.

[60] In its Preliminary Injunction Order, the Court did not reach the merits of the void-for-vagueness issue. *See* Prelim. Inj. Order (Doc. 45) at 25–33. In the Eighth Circuit appeal, Plaintiffs fault the Court for not reaching the merits of those claims and ask the Eighth Circuit to do so. *See* Br. for Appellees at 34–35, 44–45, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

[61] *See* Br. for Appellees at 35–44, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024); Reply for Appellants at 20–22, *Walls v. Oliva*, No. 24-1990 (8th Cir. appeal docketed May 10, 2024).

[62] *See* Prelim. Inj. Order (Doc. 45) at 37–42.

[63] *See* Prelim. Inj. Order (Doc. 45) at 25–33. In the Preliminary Injunction Order, the Court characterized the teachers' concern about the anti-indoctrination provision sweeping in teaching (in addition to compulsion) as "not . . . frivolous" and "quite reasonable." Prelim. Inj. Order (Doc. 45) at 42. Those characterizations were not intended to be a comment on whether the anti-indoctrination provision was so unclear as to violate the Due Process Clause. As we all know, two judges (or parties) having a reasonable disagreement over language does not automatically mean that the language is so unclear as to violate the Due Process Clause. *See Williams v. Brewer*, 442 F.2d 657, 660 (8th Cir. 1971) ("A statute is not necessarily void for vagueness simply because it may be ambiguous or open to two constructions.");

the anti-indoctrination provision is clear enough to pass what they see as the Due Process Clause's fairly low clarity bar.[64]  Plaintiffs say that the bar is higher than Defendants contend.[65]  But they also say that the provision is so unclear as to fail even the lowest bar possible under the Constitution.[66]  Here again, there are good reasons to hold off deciding between the parties' positions.

Under current Supreme Court precedent, the level of clarity necessary for a statutory provision to comply with the dictates of the Due Process Clause depends on the context in which the provision operates.[67]  In the instant case, one particularly important contextual question is whether the anti-indoctrination provision is operating in a context where Free Speech rights are at stake.[68]  If the provision is operating in such a context, a heightened level of clarity is required.[69]  If it is not, a far lower level of clarity is required (absent another triggering context).[70]

That context question—regarding whether Free Speech rights are at stake here—is intertwined with the issues already discussed with respect to the first two buckets of claims.  So,

---

*Hand v. Beach Ent. KC, LCC*, 425 F. Supp. 3d 1096, 1130 (W.D. Mo. 2019) ("That courts have come to different conclusions in their interpretations does not render the statute unconstitutionally vague.").

[64] *See* Br. in Supp. of Mot. to Dismiss (Doc. 55) at 19–22.

[65] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 20.

[66] *See id.* at 20–26.

[67] *See Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982) ("The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment.").

[68] *See Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308–09 (8th Cir. 1997) ("[B]ecause the literal scope of the . . . regulation 'is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.'" (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974))); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689–90 (8th Cir. 1992) ("A stringent vagueness test applies to a law that interferes with the right of free speech.").

[69] *See supra* note 68.

[70] *See Hoffman Estates*, 455 U.S. at 498–99.  It is true that the heightened clarity bar may apply, in some form, to civil statutes that create a "particularly severe penalty" for statutory violations.  *See Sessions v. Dimaya*, 584 U.S. 148, 156– 57 (2018).  Whether such consequences flow from this statute—specifically, whether the loss of a teaching license is a "particularly severe penalty" for purposes of this analysis—is a novel and difficult question that should only be answered if it has to be.  It is not appropriate to answer that question here, in the context of an Order holding the relevant portion of the Motion in abeyance.  Time will tell whether that question needs to be answered at all.

for all the reasons set forth in the sections above, patience is once again a virtue. After the Eighth Circuit rules on the preliminary injunction appeal, the Court will be in a better position to determine whether the heightened clarity bar or the lower clarity bar applies and to judge the anti-indoctrination provision accordingly.

## III.    THE EQUAL PROTECTION CLAIMS

Plaintiffs contend that the anti-indoctrination provision of the LEARNS Act violates the Equal Protection rights of African American public high school teachers and students.[71] These claims were not at issue at the preliminary injunction stage and thus were not addressed by the Court in its Preliminary Injunction Order. The Equal Protection claims are not at issue in the appeal. Nor are they significantly intertwined with any of the issues that are on appeal. So the Court will address the merits of Defendants' request to dismiss the Equal Protection claims.[72]

### A.    **Background Facts**[73]

Governor Sanders was inaugurated on January 10, 2023.[74] In her inauguration speech, she stated: "Today I will . . . sign an executive order preventing the political indoctrination of Arkansas's schoolchildren. As long as I am [G]overnor, our schools will focus on the skills our children need to get ahead in the modern world—not brainwashing our children with a left-wing political agenda."[75] True to her word, on her first day in office, Governor Sanders issued an "Executive Order to Prohibit Indoctrination and Critical Race Theory in Schools."[76] The Executive Order reads as follows:

---

[71] First Am. Compl. (Doc. 8) ¶¶ 197–213.

[72] Br. in Supp. of Mot. to Dismiss (Doc. 55) at 23–27.

[73] *See supra* page 2 (explaining the specific way the Court must treat the record at the motion to dismiss stage).

[74] First Am. Compl. (Doc. 8) ¶ 59.

[75] *Id.*

[76] *Id.* ¶ 61.

WHEREAS:    Schools must educate, not indoctrinate students; and their education policies must protect children and prepare them to enter the workforce;

WHEREAS:    Teachers and school administrators should teach students how to think—not what to think;

WHEREAS:    Critical Race Theory (CRT) is antithetical to the traditional American values of neutrality, equality, and fairness. It emphasizes skin color as a person's primary characteristic, thereby resurrecting segregationist values, which America has fought so hard to reject;

WHEREAS:    It is the policy of this administration that CRT, discrimination, and indoctrination have no place in Arkansas classrooms;

WHEREAS:    Government policies must empower parents to make decisions for their children and foster curriculum transparency in classrooms across the state; and

WHEREAS:    The Constitution of the State of Arkansas and the Constitution of the United States of America recognize the equal value of every individual, and provide equal protection under the law, regardless of color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, and national origin.

NOW, THEREFORE, I, SARAH HUCKABEE SANDERS, acting under the authority vested in me as the Governor of the State of Arkansas, do hereby order the following:

(1) The Secretary of the Department of Education (the "Secretary") shall take the following steps to ensure that the Department of Education, its employees, contractors, guest speakers, and lecturers are in compliance with Title IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241):

   a. Review the rules, regulations, policies, materials, and communications of the Department of Education to identify any items that may, purposely or otherwise, promote teaching that would indoctrinate students with ideologies, such as CRT, that conflict with the principle of equal protection under the law or encourage students to discriminate against someone based on the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

   b. The Secretary is further instructed that if any items are found to conflict with the principle of equal protection under the law, then the Secretary is instructed to amend, annul, or alter those rules, regulations, policies, materials, or communications to remove the prohibited indoctrination.

c. Prohibited Indoctrination Defined: No communication by a public-school employee, public school representative, or guest speaker shall compel a person to adopt, affirm or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 241), including that:

i. People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

ii. An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability, religion, national origin, or any other characteristic protected by federal or state law.

d. Nothing in this section shall be construed to prohibit the discussion of ideas and history of the concepts described in subsection (c) or shall be construed to prohibit the discussion of public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable or offensive.

(2) As it relates to employees, contractors, and guest speakers or lecturers of the Department of Education, the Secretary is directed to review and enhance the policies that prevent prohibited indoctrination, including CRT.

(3) The Secretary shall ensure that no school employee or student shall be required to attend trainings or orientations based on prohibited indoctrination or CRT.

This Executive Order shall become effective upon its signing and shall remain in full force and effect until amended or rescinded by further executive orders.[77]

---

[77] Ark. Executive Order 23-05. According to Plaintiffs, this Executive Order did not just come out of thin air. Rather, it was an intellectual descendant of an Executive Order that President Trump had signed back in September of 2020. *See* First Am. Compl. (Doc. 8) ¶¶ 52–58. Plaintiffs allege that President Trump's Executive Order was one part of a coordinated attempt to undermine "the nation's reckoning with injustice against Black people in 2020 . . . ." *Id.* ¶ 53. Plaintiffs allege that President Trump's Executive Order directed federal agencies to "cease training on critical race theory, intersectionality, systemic racism, Black Lives Matter, white privilege, or any other training or propaganda effort." *Id.* ¶ 55 (internal quotation marks omitted). The President's Executive Order also, according to Plaintiffs, identified prohibited concepts that could not be part of training, such as (1) the idea that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously," and (2) the idea that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex." *Id.* ¶ 56 (internal quotation marks omitted). President Biden later withdrew the Executive Order. *Id.* ¶ 57.

Pursuant to the Executive Order, the Arkansas Department of Education took a number of actions broadly related to Critical Race Theory.[78]  For example, the Arkansas Department of Education had concerns about teacher training materials from Code.org, an organization Arkansas uses to train teachers for AP Computer Science Principles courses.  Those materials asked teachers to "address their 'unconscious biases' and craft an 'equity framework.'"[79]  The Arkansas Department of Education concluded that, *inter alia*, the materials "encouraged teachers to first and foremost look at students through the lens of race . . . ."[80]  Accordingly, "[t]he Arkansas Department of Education reached out to Code.org and received assurance that teaching materials are open source and could be adapted to reflect Arkansas' ban on indoctrination in school."[81]

For another example, the Arkansas Department of Education took issue with a presentation delivered by a team from Arkansas State University to teachers at North Little Rock School District.[82]  In that presentation, teachers were (1) instructed to "acknowledge that [they] harbor unconscious biases," (2) asked "to host conversations in their classrooms around 'systemic racism,'" and (3) encouraged "to curtail disciplinary policies if [those policies] disproportionately affect students of a certain background . . . ."[83]  The program also contained material that the Arkansas Department of Education believed justified looting, denigrated law enforcement officers, and "positively highlighted actions taken to appease leftists in the wake of the 2020 Black Lives Matter riots, including . . . removing historical monuments[] and renaming brands like Aunt

---

[78] *See* First Am. Compl. (Doc. 8) ¶ 63; *see also Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions* at 2, https://arkansasadvocate.com/wp-content/uploads/2023/08/CRT-Admin-Action.pdf [cited in First Am. Compl. (Doc. 8) ¶ 63 n.17 and hereinafter "*Indoctrination and CRT Examples*"].

[79] *Indoctrination and CRT Examples* at 2; *see also* First Am. Compl. (Doc. 8) ¶ 63.

[80] *Indoctrination and CRT Examples* at 2; First Am. Compl. (Doc. 8) ¶ 63.

[81] *Indoctrination and CRT Examples* at 2.

[82] *Id.* at 1.

[83] *Id.*

Jemima syrup."[84]    The Arkansas Department of Education contacted both Arkansas State University and North Little Rock School District.[85]  Both the University and the School District "promised to revise their internal approval process for teacher training materials and to end the dissemination of divisive content."[86]

For a third example related to Critical Race Theory, the Arkansas Department of Education expressed concern when Fayetteville Public Schools distributed a survey during a teacher-led professional development training.[87]    The survey asked participants if (1) they rejected the "privileges that come with white racial identity," (2) they "advocate[d] for cultural competency and social justice effectively and professionally," (3) they regularly examined data regarding the race, gender, ethnicity, and language of their students for the purpose of "monitor[ing] and manag[ing] equitable access and support services," (4) "they allow students to raise the awareness of teachers 'by questioning bias assumptions or behaviors observed in our school environment,'" (5) they were "aware of their own privileges, stereotypes, and biases," and (6) they were "brave equity warriors."[88]  The Arkansas Department of Education reached out to Fayetteville Public Schools.[89]  The Superintendent said that the District would ensure that the survey would not be disseminated in the future and that all future professional development materials would be reviewed to ensure compliance with Governor Sanders's Executive Order.[90]

---

[84] *Id.*

[85] *Id.* at 2.

[86] *Id.*

[87] *Id.* at 4.

[88] *Id.*

[89] *Id.*

[90] *Id.*

The foregoing examples come from a document disseminated by the Arkansas Department of Education titled "Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions."[91]  The document includes more than just Arkansas Department of Education actions with respect to Critical Race Theory.  It also includes Arkansas Department of Education actions with respect to gender theory and sexuality issues.[92]

In addition to the actions described in the just-discussed document, Governor Sanders and Secretary Oliva—pursuant to the Executive Order—ordered the Arkansas Department of Education to remove certain social studies resources that it made available to teachers.[93]  According to Plaintiffs, these resources concerned the cultural and legal victories won by African Americans over the course of our nation's history.[94]  And they were removed because they included context regarding the historical suffering of African Americans.[95]  Around the same time,

---

[91] *See* First Am. Compl. (Doc. 8) ¶ 63.

[92] For example, the Arkansas Department of Education noted that Fayetteville School District had asked students to identify their gender identity, conspired to keep that gender identity secret from students' parents, and used biologically incorrect pronouns like they/them/theirs to refer to a singular student.  *See Indoctrination and CRT Examples* at 1.  The Arkansas Department of Education reached out to Fayetteville School District to notify it that its actions violated Governor Sanders's Executive Order.  *Id.*  The District promised that it (1) would "remove gender theory from classroom materials," and (2) "would not hide a child's 'gender identity' from parents."  *Id.*

For another example, the Arkansas Department of Education took action when Pulaski County Special School District "allowed teachers to hang divisive materials in their classrooms, including the pride flag."  *Id.* at 2–3.  The Arkansas Department of Education had concerns that this would communicate to students "that only one outlook on gender and sexuality is acceptable in schools."  *Id.* at 2.  "The district also posted pride month messages on elementary school marquees and on social media."  *Id.*  The Arkansas Department of Education, and Secretary Oliva himself, discussed their concerns with the District.  *Id.* at 4.  The District "agreed to review its policies."  *Id.*

In yet a third example, the Arkansas Department of Education expressed concern when Lakeside School District "included teaching materials that highlighted groups like 'Genderqueer'" and shared a document with students in the fourth grade titled "Sex, Gender and Society."  *Id.*  The document, defining "biological sex," had this to say: "Your biological sex is based on the genitals you're born with and the chromosomes you have.  At birth, most people are either male or female."  *Id.*  But the document went on to define "gender identity" in contradistinction to biological sex: "[Gender identity is] how you feel and how you think about yourself when it comes to gender.  Everyone's gender identity is unique to them and should be respected."  *Id.*  The Arkansas Department of Education contacted the Superintendent of Lakeside School District, and the Superintendent communicated that the District would review the materials.  *Id.*

[93] First Am. Compl. (Doc. 8) ¶ 65.

[94] *Id.*

[95] *Id.*

other social studies resources were introduced by the Arkansas Department of Education, including materials from "1776 Unites," which Plaintiffs refer to as "a conservative project."[96]  Plaintiffs assert that these new materials downplay the historical challenges faced by African Americans.[97] The new materials "focus on voices in the black community who celebrate black excellence, discourage victimhood culture, and showcase the millions of black Americans who have prospered by embracing the founding ideals of America."[98]

The instant case does not include a challenge to the Executive Order.  But, according to Plaintiffs, the adoption and implementation of the Executive Order is important background to understand because the Executive Order was the model for the statutory provision that is challenged in the instant case.[99]  The Court now turns to the adoption and enforcement of that statutory provision.

### i.    Adoption of the LEARNS Act

The LEARNS Act was introduced in the Arkansas Senate on February 20, 2023, as S.B. 294—a 144-page long bill addressing a wide variety of issues involving education.[100]  The anti-indoctrination provision is but one small part of the LEARNS Act.[101]  On February 22, 2023, the Arkansas Senate Education Committee held a meeting to discuss and vote on the LEARNS Act.[102]  During that meeting, Secretary Oliva testified that the language of the LEARNS Act's

---

[96] *Id.* ¶ 66.

[97] *Id.*

[98] *Id.*

[99] *Id.* ¶ 68.

[100] *Id.* ¶ 67.  Plaintiffs have characterized the LEARNS Act as a reform of the Arkansas education system.  *See id.* ¶ 3; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 46.

[101] *See* LEARNS Act, Act 237 of 2023.

[102] First Am. Compl. (Doc. 8) ¶ 67.

anti-indoctrination provision mirrored the language of Governor Sanders's Executive Order.[103]
The bill was passed out of the Committee and proceeded to a full vote in the Arkansas Senate a
day later on February 23, 2023.[104]  The Senate—split along partisan lines—adopted the bill.[105]
The bill then moved to the Arkansas House Education Committee on March 1, 2023.[106]  After
passing out of the Committee, the bill proceeded to a full House vote on March 2, 2023.[107]  The
bill was adopted—again along partisan lines.[108]  Governor Sanders signed the LEARNS Act into
law on March 8, 2023.[109]

> The anti-indoctrination provision can be found at section 6-16-156 of the Arkansas Code.

It reads as follows:

> (a)(1) The Secretary of the Department of Education shall take established steps to
> ensure that the Department of Education and its employees, contractors, guest
> speakers, and lecturers are in compliance with Title IV and Title VI of the Civil
> Rights Act of 1964, Pub. L. No. 88-352.
>
> (2) Steps required under subdivision (a)(1) of this section shall include the
> review of the rules, policies, materials, and communications of the Department
> of Education to identify any items that may, purposely or otherwise, promote
> teaching that would indoctrinate students with ideologies such as Critical Race
> Theory, otherwise known as "CRT", that conflict with the principle of equal
> protection under the law or encourage students to discriminate against someone
> based on the individual's color, creed, race, ethnicity, sex, age, marital status,
> familial status, disability, religion, national origin, or any other characteristic
> protected by federal or state law.

---

[103] *Id.* ¶ 68.  This is the meeting at which Secretary Oliva also allegedly testified as to his difficulty precisely defining Critical Race Theory.  *Id.*

[104] *Id.* ¶ 69.

[105] *Id.*  The Arkansas Senate suspended its rules multiple times in the process leading up to the adoption of the LEARNS Act.  *See SB 294 Bill Information*, ARKANSAS STATE LEGISLATURE, https://www.arkleg.state.ar.us/Bills/ Detail?id=sb294&ddBienniumSession=2023/2023R.

[106] First Am. Compl. (Doc. 8) ¶ 69.

[107] *Id.*

[108] *Id.*  The Arkansas House suspended its rules one time in the process leading up to the adoption of the LEARNS Act.  *See SB 294 Bill Information*, *supra* note 105.

[109] First Am. Compl. (Doc. 8) ¶ 69.

(3) The secretary shall amend, annul, or alter the rules, policies, materials, or communications that are considered prohibited indoctrination and that conflict with the principle of equal protection under the law.

(b) As used in this section, "prohibited indoctrination" means communication by a public school employee, public school representative, or guest speaker that compels a person to adopt, affirm, or profess an idea in violation of Title IV and Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352, including that:

(1) People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or

(2) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law.

(c) This section does not prohibit the discussion of:

(1) Ideas and the history of the concepts described in subsection (b) of this section; or

(2) Public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive.

(d) As it relates to employees, contractors, and guest speakers or lecturers of the department, the secretary shall review and enhance the policies that prevent prohibited indoctrination, including Critical Race Theory.

(e) The secretary shall ensure that no public school employee or public school student shall be required to attend trainings or orientations based on prohibited indoctrination or Critical Race Theory.

(f) The State Board of Education may promulgate rules to implement this section.[110]

---

[110] Ark. Code Ann. § 6-16-156 (footnotes omitted). The majority of the LEARNS Act, including the anti-indoctrination provision, went into effect immediately upon being signed by the Governor. *See* LEARNS Act, Act 237 of 2023, § 73(a). That is because the law as signed contained an emergency clause. *See id.* Although there was some controversy with respect to the effectiveness of the emergency clause, the Arkansas Supreme Court ultimately held that the LEARNS Act's emergency clause "was passed in compliance with article 5, section 1 of the Arkansas Constitution." *Ark. Dep't of Educ. v. Jackson*, 2023 Ark. 140, at 8, 675 S.W.3d 416, 421.

25

### ii.    Enforcement of the LEARNS Act's Anti-Indoctrination Provision

Around the time that the LEARNS Act was signed into law in March of 2023, Secretary Oliva sat in on and observed Ms. Walls's AP African American Studies ("AP AAS") class at Central High School.[111]  This class was a pilot AP course being taught for the first time during the 2022–23 school year.[112]   The day after he observed the class, Secretary Oliva communicated to the Principal of Central High School that Secretary Oliva didn't have a problem with Ms. Walls's AP AAS class because she "is not teaching African American Studies.  She's really teaching African American History . . . ."[113]

But, on August 11, 2023, three days before the start of the 2023–24 school year, Ms. Walls learned that Secretary Oliva "had revoked the [Arkansas Department of Education's] approval of AP AAS . . . ."[114]  The revocation applied to all six Arkansas schools set to teach the pilot AP AAS class, including Central High School.[115]  The revocation meant that the Arkansas Department of Education would not (1) count the AP AAS course toward graduation requirements, (2) cover the $98 exam fee for the course, or (3) permit the AP AAS course to be graded on the standard 5.0 GPA scale for AP courses.[116]   Over the course of the next few days, Secretary Oliva provided several explanations for why approval of the AP AAS course had been revoked.[117]

In a discussion with Dr. Jermall Wright—Little Rock School District's Superintendent— Secretary Oliva explained that "the [Arkansas Department of Education] revoked 2023–24

---

[111] First Am. Compl. (Doc. 8) ¶ 95.

[112] *Id.* ¶ 99.

[113] *Id.* ¶ 97.

[114] *Id.* ¶ 105.

[115] *Id.*

[116] *Id.*

[117] *See id.* ¶¶ 106–14.

AP AAS because it was still being piloted, and the College Board was unable to confirm with colleges and universities which college course would be its equivalent for crediting purposes."[118] Secretary Oliva added that "Arkansas was unable to offer AP AAS as an approved course until the College Board resolved the issue[.]"[119]  Also, during this same discussion, Secretary Oliva told Dr. Wright that "problems . . . stemmed from the title of the course, 'AP African American Studies[,]'" because "there was already an approved non-AP course titled 'African American History,' and the College Board's decision to create [the] AP AAS course versus African American History complicated state approval of AP AAS . . . ."[120]

Plaintiffs assert that Secretary Oliva's statements to Dr. Wright were not accurate.[121] According to Plaintiffs, "'[m]ore than 200 colleges and universities nationally [had] signed on to provide college credit, advanced placement, or both to students who have satisfactory performance on the AP African American Studies Exam . . . .'"[122]  Included among those 200 colleges and universities, Plaintiffs allege, was the University of Arkansas–Fayetteville, which "planned to accept 2023–24 AP AAS course credit for qualifying AP students who passed the AP exam . . . ."[123]

Separate from his discussion with Dr. Wright, Secretary Oliva soon provided Little Rock School District an additional explanation for why approval for the AP AAS course had been revoked.[124]  He told the District that "state approval for AP AAS was revoked because its course

---

[118] *Id.* ¶ 106.

[119] *Id.*

[120] *Id.* ¶ 107.

[121] *Id.* ¶ 108.

[122] *Id.*

[123] *Id.*

[124] *Id.* ¶ 109.

code 'was listed in error last year.'"[125]  The Court's best understanding of this allegation is that Secretary Oliva was saying that the pilot AP AAS course should never have been given a formal AP course code.  Secretary Oliva explained further that "it is 'common practice' for [the Arkansas Department of Education] to review and edit the state's course catalog, and Arkansas typically considers factors like usage or redundancies when deciding which codes to delete."[126]

Again, Plaintiffs dispute the veracity (or sincerity) of this explanation.  Plaintiffs note that "[i]n 2022, College Board completed [the Arkansas Department of Education's] approval process for AP AAS's inclusion in the state's course directory, and [the Arkansas Department of Education] approved the AP AAS pilot course code in October 2022 without issue and in accordance with the State's course code assignment process . . . ."[127]

On August 14, 2023, Secretary Oliva claimed that "the reason the AP AAS course code was deleted was because the high schools set to offer the course had not undergone an AP course audit as required by the State of Arkansas."[128]  According to Secretary Oliva, the Arkansas Department of Education "can't offer a course or we can't assign a course code to a teacher to teach an AP course to give a student AP credit that would transfer on their transcript unless the teacher does the course audit requirement."[129]  And, since AP AAS is "still a pilot and not a course, that's not available until the 24–25 school year."[130]

---

[125] *Id.*

[126] *Id.*

[127] *Id.* ¶ 110.

[128] *Id.* ¶ 111 (footnote omitted).

[129] *Id.* ¶ 113.

[130] *Id.*

But, according to Plaintiffs, this is not true because "the State of Arkansas has never required an audit for any course nor involved itself with the AP course audit process in any way."[131] Further, Plaintiffs claim that "[t]he only audits administered for AP courses in the State of Arkansas are the ones administered by College Board[,]" which had "confirmed that teachers can participate in the AP Course audit process, with the same deadline of January 31, 2024, that governs all other AP courses."[132] The Court understands Plaintiffs to be alleging that Arkansas can approve an AP course offering prior to any AP teacher audit taking place.

Later in the day on August 14, 2023, Secretary Oliva provided another explanation for the revocation of the approval of the AP AAS course.[133] Secretary Oliva said that the approval was revoked in order "to protect Arkansas students from indoctrination in the form of a left-wing political agenda brainwashing found in AP AAS, as repeatedly publicly stated by Gov[ernor] Sanders."[134] Plaintiffs assert that this was Secretary Oliva's true reason for revoking the approval for the AP AAS course.[135]

After Secretary Oliva provided this anti-indoctrination explanation, the Arkansas Department of Education issued a statement "claiming that the AP AAS course likely violated provisions contained in the LEARNS Act that guard against the 'indoctrination' of students by teaching 'prohibited topics.'"[136] And the Arkansas Department of Education "warned educators

---

[131] *Id.* ¶ 112.

[132] *Id.*

[133] *Id.* ¶ 114.

[134] *Id.*

[135] *Id.*

[136] *Id.* ¶ 115.

who continued teaching the course that they risked violating state law and whatever penalties

would flow therefrom."[137]  Governor Sanders's office followed up with a statement that read:

> The AP African American Studies pilot course is not a history course and is a pilot
> that is still undergoing major revisions.  Arkansas law contains provisions regarding
> prohibited topics . . . .  Without clarity, we cannot approve a pilot that may
> unintentionally put a teacher at risk of violating Arkansas law.[138]

Then, on August 17, 2023, Governor Sanders further addressed the Arkansas Department of

Education's revocation of the approval for the AP AAS course in an interview with FOX News:

> We've got to get back to the basics of teaching math, of teaching, reading, writing
> and American history.  And we cannot perpetuate a lie to our students and push this
> propaganda leftist agenda, teaching our kids to hate America and hate one another.
> It's one of the reasons that we put into law banning things like indoctrination and
> CRT.  We want our kids to receive a quality education . . . .[139]

A few days later, on August 21, 2023, Secretary Oliva sent the following letter to school

superintendents:

> Dear Participating Superintendents,
>
> As a governing entity, the Arkansas Department of Education (the "Department")
> is charged with oversight of education in public school districts, which includes
> ensuring school district compliance with state law and State Board of Education
> rules.  Since the Advanced Placement African American Studies pilot program is a
> direct partnership between your school district and College Board, the Department
> has not been provided the necessary materials and resources needed to enable the
> Department to support districts in complying with the law and rules.
>
> Given some of the themes included in the pilot, including "intersections of identity"
> and "resistance and resilience," the Department is concerned the pilot may not
> comply with Arkansas law, which does not permit teaching that would indoctrinate
> students with ideologies, such as Critical Race Theory (CRT). . . .
>
> To assist public school employees, representatives, and guest speakers at your
> district in complying with the law, please submit all materials, including but not
> limited to the syllabus, textbooks, teacher resources, student resources, rubrics, and
> training materials, to the Department by 12:00 pm on September 8, 2023, along

---

[137] *Id.*

[138] *Id.* ¶ 116.

[139] *Id.* ¶ 120.

with your statement of assurance that the teaching of these materials will not violate Arkansas law or rule. . . .

The Department values its partnership with districts to provide students accelerated opportunities to earn college credit.  If you have any questions, please contact the Department at your earliest convenience.[140]

Around the same time, Representative Aaron Pilkington, one of the LEARNS Act's co-sponsors, expressed concerns that the AP AAS course might violate the anti-indoctrination provision of the LEARNS Act.[141]  Representative Pilkington stated in part:

[We] just want to make sure [students are] learning [African American history] in the right context and that it's not being taught in a way where you should hate democracy, you should hate the Western traditions, you should hate the things that put us here, where we are and that we need a complete dumping of the past.[142]

According to Plaintiffs, the AP AAS course was the only AP course treated this way in the aftermath of the passage of the LEARNS Act.[143]  Plaintiffs say this is particularly concerning because: (1) the majority of teachers teaching and students taking the pilot AP AAS course at the six relevant schools are African American; (2) the majority of teachers teaching other AP courses at the six relevant schools are white; and (3) across all Arkansas schools statewide, African American students comprise only 8.9% of students enrolled in all AP courses.[144]

To highlight what they see as differential treatment, Plaintiffs specifically point to the AP European History course.  Plaintiffs view the content of the two courses as similar.  Plaintiffs note that the AP AAS course asks students to examine themes concerning identity, the tension between racial identity and national belonging, the historical use of race as a means to differentiate people

---

[140] *See* Ex. 4 (Letter to Superintendents) to Baum Decl. (Doc. 15-4); *see also* First Am. Compl. (Doc. 8) ¶¶ 122, 139. Dr. Wright signed the statement of assurance, and the College Board provided the materials (on behalf of the superintendents) that Secretary Oliva requested.  First Am. Compl. (Doc. 8) ¶ 140.

[141] First Am. Compl. (Doc. 8) ¶ 71.

[142] *Id.*

[143] *Id.* ¶ 124.

[144] *Id.*

so as to justify a slave system, and the role that resistance and opposition have played in the historical fight against systemic oppression.[145]  According to Plaintiffs, the AP European History course asks students to engage with themes very similar to those explored in the AP AAS course.[146]  Indeed, in the First Amended Complaint, Plaintiffs expressly compare portions of the AP AAS curriculum description with the AP European History curriculum description.  The chart on the next page tracks the primary comparisons that Plaintiffs make.

---

[145] *Id.* ¶¶ 130–33.

[146] *See id.* ¶¶ 126–34.

| AP AAS | AP European History |
|---|---|
| AP African American Studies examines the interplay of distinct categories of identity (such as race, ethnicity, class, nationality, gender, region, religion, and ability) with each other and within society.  African Americans and Black communities throughout the African diaspora are not a monolith, and the course emphasizes the various ways categories of identity operate together to shape individuals' experiences and perspectives.  In line with the discipline of African American studies, students should develop the skill of considering how the intersections of identity impact the sources, debates, and historical processes they explore. | Meanwhile, the intellectual movement of the Enlightenment, coupled with French revolutionary ideals, offered a different vision of European identity based on a shared belief in reason, citizenship, and other Enlightenment values. <br><br> In the 19th century, countries like Germany, Italy, and the Kingdom of the Netherlands were unified through wars, political negotiations, and the promotion of intense feelings of national belonging.  At the same time, Romantic writers and artists fostered and built upon feelings of loyalty to the nation, producing works appealing to a common language or cultural identity. . . . <br><br> European identities since 1450 have been a fluid concept, with overlapping and non-competing identities enduring even in the age of nation-states.  As new national entities form, merge, and in some instances disappear, these developments help shape popular understanding of what it means to be European. |
| The themes of resistance and resilience spiral throughout the AP African American Studies course.  Each unit highlights a range of methods that African Americans have innovated to resist oppression and assert agency and authenticity politically, economically, culturally, and artistically.  These methods often emerged from distinct experiences, perspectives, and approaches for resisting oppression, finding joy, and building community.  Students examine examples such as resistance to slavery and the slave trade, the formation of clubs and businesses that advocated for women's rights and economic empowerment, and movements to preserve and celebrate Black history and cultural traditions.  Throughout the course, students are encouraged to identify how various forms of resistance and resilience evolve within Black communities in the United States, and in connection to the broader African diaspora. | The use of "race" as a primary category for differentiating people coincided with the expansion of slavery, as Europeans sought a workforce for overseas plantations; this categorization helped Europeans justify the slave system.  From the 16th to the 19th century, the transatlantic slave trade became a central feature of the world economy, and millions of Africans were transported via the notorious Middle Passage to labor on plantations in the Americas.  The vast and cruel slave system led to various forms of resistance by enslaved peoples and began to generate opposition in Europe beginning in the late 18th century. . . . <br><br> In conquered territories, Europeans established new administrative, legal, and cultural institutions, and restructured colonial economies to meet European needs, actions that often led to resistance and opposition in colonial areas. . . . <br><br> By 1914, most of Africa and Asia were under the domination of Great Britain, France, Portugal, Germany, Belgium, and the Netherlands.  Notwithstanding the power of colonial administrations, some groups in the colonial societies resisted European imperialism, and by 1914, anticolonial movements had taken root within the non-European world and in Europe itself. |

Despite the alleged similarities between the AP AAS course and the AP European History course

curriculum, approval for the AP European History course was never revoked or questioned.[147]

---

[147] *Id.* ¶ 135.  Of course, the AP European History course was not a pilot course.

The instant litigation was filed on March 25, 2024.[148]  Sometime after that, the Arkansas Department of Education added the AP AAS course back to the 2024–25 course catalog as an AP course.[149]  From this, the Court understands that the AP AAS course has now been approved for AP status.　Nonetheless, Plaintiffs still say that the adoption and enforcement of the anti-indoctrination provision negatively impacts African American teachers and students.  They allege that the prior AP status revocation, the current way the AP AAS course is listed in the course catalog, and the more general targeting of Critical Race Theory have a stigmatizing effect on them and on the teaching/learning they want to do.[150]

In addition to a stigmatization effect, Plaintiffs also seem to allege a censorship effect that falls disproportionately on African Americans.  As best the Court can make out, Plaintiffs suggest the anti-indoctrination provision—at least as it has been applied by the Arkansas Department of Education—chills teachers (including but not limited to AP AAS teachers) from teaching students (including but not limited to AP AAS students) important information about what Plaintiffs see as systemic racism against African Americans.[151]  In turn, this lack of information makes it less likely that students (presently or when they turn into adults) will want to challenge, or have the ability to challenge, what Plaintiffs see as systemic racism against African Americans.[152]

---

[148] *See* Compl. (Doc. 1).

[149] First Am. Compl. (Doc. 8) ¶ 141 n.26.  *See also* Oct. 23, 2024 Hr'g Tr. at 39:13–40:3, 84:1–18.

[150] First Am. Compl. (Doc. 8) ¶¶ 141 n.26, 152, 204, 209, 212.  With respect to how the AP AAS course is currently listed in the course catalog, Plaintiffs express the following concern: "[U]nlike the other AP courses, including [AP European History], AP AAS is not described as follows: This is a College Board Advanced Placement Course.  It is unclear whether another version of the course is expected to be offered.  The [AP European History] course is also listed as 'Graduation Requirement for Career Focus,' which is the type of diploma track, but the AP AAS [course] is listed as 'Career-Focused Elective.'"  *Id.* ¶ 141 n.26.

[151] *Id.* ¶¶ 6, 78, 84, 86–87, 181–82, 191, 204, 212.

[152] *See supra* note 151.

### B.    <u>Legal Claims</u>

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[153]  Plaintiffs appear to be making two different types of challenges under the Equal Protection Clause: a facial challenge and an as-applied challenge.  The Court will address the facial challenge first, and then turn to the as-applied challenge.

### i.    Facial Challenge

The scope of Plaintiffs' facial challenge is very clear.  Plaintiffs contend that the anti-indoctrination provision violates the Equal Protection Clause because the provision's enactment was motivated (at least in part) by a racially discriminatory intent or purpose.[154]  When it comes to race, there are three general groups of laws that are presumptively unconstitutional under the Equal Protection Clause.  In any specific case, a plaintiff might assert that a statutory provision is in one, two, or all three of those groups.  The analysis with respect to each such assertion is different.

The first group of presumptively unconstitutional laws explicitly classify people on the basis of race.[155]  *Strauder v. West Virginia* provides us with a paradigmatic example of such a law.[156]  In that case, the Supreme Court held unconstitutional a state law that expressly limited jury participation to white people.[157]  Plaintiffs do not argue that we are confronting such a law in this

---

[153] U.S. CONST. amend. XIV, § 1.

[154] *See* First Am. Compl. (Doc. 8) ¶¶ 200–08, 212.

[155] *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) ("[R]acial 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.'" (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003))).

[156] 100 U.S. 303, 304 (1879), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 537 (1975).

[157] *See id.* at 310.

case.[158]   Indeed, they concede that we are not.[159]   And they are correct—the LEARNS Act's anti-indoctrination provision does not expressly classify on the basis of race.

The second group of presumptively unconstitutional laws are those employing classifications that, while neutral on their face, are an obvious pretext for discrimination.[160]   The best (but by no means the only) example of such a law appears in *Gomillion v. Lightfoot*.[161]   In that case, the Supreme Court confronted a facially neutral state law that was alleged to have (1) transformed a city's boundaries from a normal square shape to "a strangely irregular twenty-eight sided figure," (2) excised from the city limits approximately 98.75% of the African American voters, and (3) kept all white voters in the city limits.[162]   Those allegations survived dismissal because, if proven, "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and [African American] voters by fencing [African American] citizens out of town so as to deprive them of their pre-existing municipal vote."[163]   The Supreme Court has made very clear, however,

---

[158] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 38–49.

[159] *See* First Am. Compl. (Doc. 8) ¶ 14 ("Though neutral on its face, Section 16 and the application of Section 16 to the AP AAS was created, in part, to target Black students and educators on the basis of race."); Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 38 ("The Amended Complaint alleges that[,] though neutral on its face, the creation of Section 16 and Defendants' application of the law to the AP AAS was motivated, in part, to target Black students and educators on the basis of race."); Oct. 23, 2024 Hr'g Tr. at 77:5–15 (The Court: "The way I understand what you are saying to me is, at least under the current rubric of court cases, you are not saying that this statute is discriminatory on its face, but you are saying that it is close enough that, when I do the analysis that I would normally do for things that are not discriminatory on its face, I should add some kind of plus factor because this is sort of close to being discriminatory on its face.  Is that fair?  Or are you saying something else?"  Mr. Laux: "Bullseye, Your Honor.  And I think if language was added to the statute that said including CRT or white supremacy, I would not say the same thing.").

[160] *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.  This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination." (internal citations omitted)).

[161] 364 U.S. 339 (1960).

[162] *Id.* at 341.

[163] *Id.*

36

that laws like this—where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of" facially neutral legislation or implementing state action—are a rarity.[164]

Plaintiffs do not argue that the statutory provision in our case fits into this rare category.[165] That's for good reason. The asserted disparate impacts in this case come nowhere close to the surgically racialized effects in *Gomillion* or similar cases. As detailed below, the effects of the anti-indoctrination provision do not fall exclusively or nearly exclusively on African Americans. And "[a]bsent a pattern [that] stark . . . impact alone is not determinative[.]"[166] Long story short, the LEARNS Act's anti-indoctrination provision does not use neutral classifications as "an obvious pretext for racial discrimination."[167]

It is the third group of presumptively unconstitutional laws into which Plaintiffs seek to fit the anti-indoctrination provision.[168] This third group is comprised of neutral laws that, while not rising to the level of obvious pretext, were enacted with a discriminatory intent or purpose.[169]

---

[164] *Arlington Heights*, 429 U.S. at 266.

[165] To be sure, Plaintiffs assert that the anti-indoctrination provision has a disparate impact on African Americans. *See* First Am. Compl. (Doc. 8) ¶ 209. But Plaintiffs don't even hint that the impact rises to the level necessary for the *Gomillion* treatment. Their First Amended Complaint does not assert, and their motion to dismiss briefing does not argue, that the anti-indoctrination provision has led to "a clear pattern, unexplainable on grounds other than race . . . ." *Arlington Heights*, 429 U.S. at 266; *see also Feeney*, 442 U.S. at 272. Similarly, their First Amended Complaint and their briefing do not cite to the cases one would expect to be cited by a plaintiff making this type of argument: *Gomillion*, 364 U.S. 339; *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); or *Lane v. Wilson*, 307 U.S. 268 (1939). *See Arlington Heights*, 429 U.S. at 266 (citing those cases in reference to this second group of presumptively unconstitutional laws); *Feeney*, 442 U.S. at 272 (same).

[166] *Arlington Heights*, 429 U.S. at 266.

[167] *Feeney*, 442 U.S. at 272.

[168] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 38–40.

[169] *See Feeney*, 442 U.S. at 272 ("[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, [the law] is [presumptively] unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory [intent or] purpose."). The necessary discriminatory intent or purpose need not be the primary or dominant motivation underlying adoption of the law. Instead, the discriminatory intent or purpose need only be one of the motivating factors for the law's enactment. *See Arlington Heights*, 429 U.S. at 265–66. At least this is true at the motion to dismiss stage. *Cf. id.* at 270 n.21 ("Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered.").

*Arlington Heights* provides the relevant framework to analyze challenges to laws that allegedly fall in this group.  To survive a motion to dismiss under *Arlington Heights*, a plaintiff must allege facts sufficient to allow the Court to draw a reasonable inference that lawmakers acted with a discriminatory intent or purpose when they enacted the law at issue.[170]  A reasonable inference does not include speculation.[171]  And it is not enough for a plaintiff to plead facts that are "merely consistent" with a discriminatory intent or purpose; doing so would only show the possibility of a discriminatory intent or purpose.[172]  We are looking for the plausibility (not just the possibility) of a discriminatory intent or purpose.

A discriminatory intent or purpose means taking "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[173] Plausibly alleging a discriminatory intent or purpose on the part of democratically elected lawmakers is not a trifling thing—especially in light of the presumption of good faith to which such lawmakers are entitled.[174]  It is not enough to allege facts from which this Court could reasonably infer that lawmakers knew the law would have adverse effects on African Americans.[175]

---

[170] *See Arlington Heights*, 429 U.S. at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  Of course, a plaintiff must also plausibly allege that the challenged provision has caused disparate treatment or disparate impact.  *See Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998) ("To state an equal protection claim, [the plaintiff] must have established that [the plaintiff] was treated differently from others similarly situated to [the plaintiff].").  A failed attempt to discriminate on the basis of race is not discrimination on the basis of race.

[171] *Cf. Fought v. Hayes Wheels Int'l, Inc.*, 101 F.3d 1275, 1277 (8th Cir. 1996) ("A reasonable inference is one 'which may be drawn from the evidence without resort to speculation.'" (quoting *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996))).

[172] *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

[173] *Feeney*, 442 U.S. at 279.

[174] *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995)).

[175] *See Feeney*, 442 U.S. at 279.

Instead, Plaintiffs must allege facts from which this Court could reasonably infer that lawmakers adopted the anti-indoctrination provision (at least in part) for the very purpose of causing those adverse effects on African Americans.

In *Arlington Heights*, the Supreme Court provided some "subjects of proper inquiry" that it thought might help a court determine if discriminatory intent or purpose was a motivating factor in a law's enactment: (1) whether the impact of the legislation "bears more heavily on one race than another"; (2) "[t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific sequence of events leading up to the" enactment of the legislation; (4) whether the legislation was enacted pursuant to procedural or substantive departures from the norm; and (5) the "legislative or administrative history" of the enactment.[176]

The Court will review Plaintiffs' factual allegations in light of this guidance. But *Arlington Heights* did not establish a wooden or mechanical test. The Supreme Court never suggested that the "subjects of proper inquiry" set out in *Arlington Heights* were an exhaustive list or that each identified subject was implicated in every case. In fact, the Supreme Court suggested exactly the opposite.[177] Essentially, the Supreme Court established a gently guided totality-of-circumstances test for district courts to employ. Accordingly, before diving into the *Arlington Heights* factors, it is important to step back a moment for the 30,000-foot view of the competing ideological underpinnings of the dispute at hand.

---

[176] *Arlington Heights*, 429 U.S. at 266–68 (quotation marks and citations omitted).

[177] *See id.* at 266 (explaining the need for a "sensitive inquiry into such circumstantial and direct evidence of intent *as may be available*" (emphasis added)); *Id.* at 266–68 (noting that most of the evidentiary sources listed "may" or "might" shed light on the relevant question); *Id.* at 268 ("The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.").

Although the LEARNS Act's anti-indoctrination provision covers far more ground than just Critical Race Theory, it is undeniable that the provision emphasizes Critical Race Theory as an ideology that teachers may not compel students to accept.[178]  And Plaintiffs' Equal Protection Clause challenge is focused on the parts of the anti-indoctrination provision that they say target Critical Race Theory.[179]  Plaintiffs assert that this aspect of the anti-indoctrination provision must be understood in the context of recent race-related events in the United States.[180]  The Court agrees.  But this cuts a very different way than Plaintiffs suggest.

As Plaintiffs allege in their First Amended Complaint, the last five years have seen a significant uptick in American political discourse concerning race relations, racial inequality, and racial discrimination.[181]  Many Americans of good faith strongly believe that the answers to the racial problems we face as a country lie in governmental and societal color-blindness.  To these Americans, treating people differently based on race is morally and often constitutionally abhorrent.  To these Americans, emphasizing racial identity or suggesting racism plays a part in every law or every societal interaction makes racial problems worse, not better.  Rather, to these Americans, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race."[182]

But other Americans of good faith strongly believe otherwise.  To these Americans, the answers to our racial problems lie, at least partially, in recognizing that race often matters, that certain groups (including African Americans) have long been discriminated against by both

---

[178] *See* Ark. Code Ann. § 6-16-156(a)–(b).

[179] *See* First Am. Compl. (Doc. 8) ¶¶ 204, 208.

[180] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 43.

[181] *See, e.g.*, First Am. Compl. (Doc. 8) ¶¶ 52–58.

[182] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion).

government and private society, and that active measures are necessary to rectify past injustices and present inequality.  To these Americans, treating people differently based on their race is often morally and constitutionally acceptable or even obligatory.  To these Americans, emphasizing racial identity, systemic racism, and unconscious bias is a necessary precursor for eradicating or mitigating the effects of racism.  These Americans see color-blindness as a pretense that reinforces racial inequality by refusing to confront systemic racism and unconscious bias.  They believe there is a "legal and practical difference between the use of race-conscious" measures to harm (or exclude) disfavored groups and the use of such measures to help (or include) them.[183]

These two groups unsurprisingly have very different interpretations of the Equal Protection Clause and anti-discrimination laws like the Civil Rights Act of 1964.  And it is unsurprising that they would each want lawmakers to enact legislation reflecting their respective views.  In Arkansas, a majority of elected lawmakers seem to hold the colorblind view.  They have enacted the LEARNS Act's anti-indoctrination provision consistent with that view.  That is, through the anti-indoctrination provision, Arkansas lawmakers have sought to prevent teachers and school administrators from forcing students to adopt views that those lawmakers believe are antithetical to the Equal Protection Clause, violate various anti-discrimination laws, and foster racism.

Plaintiffs appear to contend that holding the colorblind view—or at least trying to implement that view in legislation—is tantamount to discriminatory intent or purpose.[184]  It is not.  Plaintiffs may not like the colorblind view.  Plaintiffs may think that those who hold this view are wrong or ignorant or even naïve.  But that's a world away from intentional discrimination.[185]

---

[183] *See id.* at 829 (Breyer, J., dissenting).

[184] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 43.

[185] Plaintiffs are essentially asking the Court to declare the colorblind worldview constitutionally infirm.  Put aside the fact that this invites the Court to constitutionalize a matter of school-curriculum policy more suited for the elected branches.  The request is impossible to square with *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College.  See* 600 U.S. 181, 206 (2023) ("Eliminating racial discrimination means eliminating all of it.  And

Perhaps understanding this, Plaintiffs appear to alternatively contend that the lawmakers' professed interest in the colorblind view—or at least their concerns that Critical Race Theory conflicts with the colorblind view—is a mask for intentional discrimination.  Specifically, they claim that the lawmakers intended the anti-indoctrination provision to silence "any potentially controversial discussions around systemic racism and race-conscious issues frequently considered as critical for the Black community . . . ."[186]  But the facts alleged in the First Amended Complaint do not make this hidden-motive theory plausible.

To be fair, the hidden-motive theory is consistent with the facts alleged in the First Amended Complaint.  But, as explained above, that is not enough to survive under the *Iqbal* standard—especially where, as here, the alleged facts reveal an obvious and non-discriminatory alternative explanation for the law.  Arkansas lawmakers were trying to prevent teachers and school administrators from forcing students to adopt views that those lawmakers believe are antithetical to the Equal Protection Clause, violate various anti-discrimination laws, and foster racism.[187] Applying the *Arlington Heights* rubric to the alleged facts makes clear that this obvious alternative

---

the Equal Protection Clause, we have accordingly held, applies without regard to any differences of race, of color, or of nationality—it is universal in its application.  For the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.  If both are not accorded the same protection, then it is not equal." (internal quotation marks and citations omitted)); *id.* at 227 ("For what one dissent denigrates as rhetorical flourishes about colorblindness are in fact the proud pronouncements of cases like *Loving* and *Yick Wo*, like *Shelley* and *Bolling*—they are defining statements of law." (internal quotation marks and citations omitted)).

[186] First Am. Compl. (Doc. 8) ¶ 204.

[187] *See Iqbal*, 556 U.S. at 678; *see also McDonough v. Anoka County*, 799 F.3d 931, 946 (8th Cir. 2015) ("Courts should consider whether there are lawful, obvious alternative explanation[s] for the alleged conduct[.]" (internal quotation marks omitted)).

42

explanation is far more likely than purposeful invidious discrimination.[188]  And the presumption of good faith owed to state lawmakers strongly reinforces that conclusion.[189]

(a)    Disparate Impact: The Starting Point of the *Arlington Heights* Rubric

*Arlington Heights* teaches that the starting point—but never the ending point in cases like this one—is the impact of the official action.[190]  Put another way: Does the challenged action "bear[] more heavily on one race than another[?]"[191]  This inquiry makes perfect sense as a starting point, since it would be hard to imagine an Equal Protection violation where the impact of the challenged action equally affected all groups.[192]

In some cases, it may be that the degree to which, and the way in which, the challenged action bears on (or is alleged to bear on) one specific group can be a strong indicator of purposeful discrimination.[193]  But that is not so here.  Even if this Court were to indulge the idea that Critical Race Theory uniquely benefits African Americans, the LEARNS Act's anti-indoctrination provision covers a great deal more than Critical Race Theory.  Broadly speaking, the provision

---

[188] This conclusion is important.  "If the alternative explanations are not sufficiently convincing, . . . the complaint states a plausible claim for relief, because '[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.'"  *McDonough*, 799 F.3d at 946 (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)).

[189] *See Abbott*, 585 U.S. at 603.  Nothing suggests that any Arkansas lawmakers—from Governor Sanders on down—don't sincerely hold the colorblind beliefs discussed above.  And nothing suggests that any Arkansas lawmakers—from Governor Sanders on down—enacted the anti-indoctrination provision with the secret purpose (in part or full) of harming or hindering the educational opportunities of African American students, preventing African American teachers from teaching, or stigmatizing African Americans in general.

[190] *See* 429 U.S. at 266 ("The impact of the official action . . . may provide an important starting point.").

[191] *Id.*

[192] *See Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994) ("[T]he first step in an equal protection case is determining whether the plaintiff has demonstrated that [the plaintiff] was treated differently than others who were similarly situated[.]").  *But see Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, No. 23-1137, 604 U.S. __, __ (2024) (Alito, J., dissenting from denial of certiorari) ("[T]he lower courts mistakenly treated evidence of disparate impact as a necessary element of an equal-protection claim.  To my knowledge, we have never said as much. . . . We would, of course, recognize an equal-protection violation if the government had a malicious 'intent or purpose' to discriminate against an *individual* based on his or her race or ethnicity.").

[193] *See Washington v. Davis*, 426 U.S. 229, 242 (1976).

prohibits indoctrination of ideas that conflict with the principle of equal protection under the law or violate Titles IV or VI of the Civil Rights Act of 1964.[194]  It is accurate to say that the provision mentions Critical Race Theory by name as something that teachers can't compel students to accept as true.  But the provision also prevents teachers from compelling students to accept as true ideas like:

> People of one color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law are inherently superior or inferior to people of another color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law; or [an] individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color, creed, race, ethnicity, sex, age, marital status, familial status, disability status, religion, national origin, or any other characteristic protected by federal or state law.[195]

As the First Amended Complaint itself shows, the anti-indoctrination provision is meant to reach well beyond Critical Race Theory.  Recall that, in the First Amended Complaint, Plaintiffs cite to actions taken by Secretary Oliva after the adoption of Governor Sanders's Executive Order—but before the enactment of the LEARNS Act—to shed light on the meaning of the LEARNS Act's anti-indoctrination provision and on how the provision would be enforced.[196] Among other things, Plaintiffs point to a document disseminated by the Arkansas Department of Education titled "Indoctrination and CRT Examples in Arkansas and Gov. Sanders Administration Actions."[197]  But, as explained in footnote 92 above, that document explicitly describes the

---

[194] *See* Ark. Code Ann. § 6-16-156(a)–(b).

[195] Ark. Code Ann. § 6-16-156(b).

[196] *See* First Am. Compl. (Doc. 8) ¶¶ 63–66, 63 n.17.

[197] *See Indoctrination and CRT Examples*, *supra* note 78.

indoctrination prohibitions in Governor Sanders's Executive Order being applied to gender theory and sexuality issues as well as Critical Race Theory.[198]

In sum, the alleged facts do not plausibly suggest that the anti-indoctrination provision of the LEARNS Act is going to be applied only to Critical Race Theory and to no other ideology or theory. And Plaintiffs do not suggest that the other ideologies or theories to which the anti-indoctrination prohibition will be applied—for example, gender theory and sexuality issues— impact African Americans any more than they impact all other groups. The generalized focus of the provision makes it nearly impossible to believe that the provision has a disparate impact on African Americans.[199]

But let us assume for a moment that the anti-indoctrination provision was focused solely on Critical Race Theory. It still is not exactly clear why that (1) adversely impacts anyone, and (2) adversely impacts African Americans more than it impacts any other groups. To be sure, Critical Race Theory originated as a movement addressing racism against African Americans,[200] and it thus might be reasonable to expect that a ban specifically targeting Critical Race Theory would be more likely to affect African Americans. Stretching a little further, one might find reasonable the assumption that African American students and teachers would be more likely than others to have a desire to learn or teach about this theory. Even on all these assumptions, Plaintiffs face problems.

---

[198] *See supra* note 92.

[199] Plaintiffs might respond that Secretary Oliva has never enforced the anti-indoctrination provision against teachings or materials that would suggest white people or men or heterosexuals or cisgender people are superior to or should be treated better than others. But Plaintiffs don't allege any instances of such teachings or materials. Certainly, their allegations with respect to the AP European History course don't suggest this. The point here is that Secretary Oliva can't take action against things that are not happening.

[200] Linda S. Greene, *Critical Race Theory: Origins, Permutations, and Current Queries*, 2021 Wis. L. Rev. 259, 259 (2021) ("The second movement, which came to be known as Critical Race Theory, was the result of meetings between the late 1960s and the mid-1990s convened by minority law professors to address the apartheid of American law.").

The anti-indoctrination provision goes out of its way to explain that it "does not prohibit the discussion of . . . [i]deas and the history of the concepts" like Critical Race Theory or the discussion of "[p]ublic policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive."[201]  If discussing the idea and history of Critical Race Theory is allowed—and only compelling a student to believe in Critical Race Theory is prohibited—the Court struggles to understand how anyone is adversely impacted.[202]

Even if the provision is construed as a ban on the teaching of Critical Race Theory, there's little in the First Amended Complaint to suggest that this ban adversely impacts African Americans.  It is true that Plaintiffs allege that a majority of the AP AAS students and teachers across the six pilot schools are African Americans.[203]  But AP AAS is not the only course or academic endeavor in which Critical Race Theory might be used.  There's African American History, American History, Government, European History, and Debate, to name just a few.  The allegations in the First Amended Complaint don't tell us anything about the demographic breakdown of the students or teachers of those courses across the state.  The overarching point here is that the allegations don't make it plausible that the anti-indoctrination provision's disparate impact on African Americans (if any) is anything more than slight.

Plaintiffs' theory of disparate impact largely ignores the anti-indoctrination provision itself.  Instead, Plaintiffs focus in on a single enforcement action taken after the adoption of the

---

[201] Ark. Code Ann. § 6-16-156(c).

[202] To be sure, in the Court's Preliminary Injunction Order, the Court identified what it believed was some less-than-stellar statutory drafting that might give a teacher pause before using Critical Race Theory in his or her lessons.  *See* Prelim. Inj. Order (Doc. 45) at 37–43.  But there is nothing in the First Amended Complaint to suggest that lawmakers intentionally made those drafting choices to chill the mere teaching of Critical Race Theory.  That would be sheer speculation.  Any discriminatory impact stemming from the failure to teach the history and ideas of Critical Race Theory could therefore not be "traced to a purpose to discriminate on the basis of race."  *Feeney*, 442 U.S. at 260.

[203] *See* First Am. Compl. (Doc. 8) ¶ 124.

46

provision—the revocation of the AP status of the AP AAS course.[204] Plaintiffs assert that the effects of that enforcement decision were disproportionately felt by African American students and teachers because they made up the majority of those enrolled in and teaching that course.[205] And Plaintiffs suggest that no other course (AP or otherwise) has been subjected to the same scrutiny or revocation.[206]

All this is fair enough. It does plausibly suggest—at least in this single enforcement action—some adverse impact on African Americans. It's consistent with, but not suggestive of, purposeful discrimination. It's more consistent, however, with the obvious alternative explanation that Arkansas lawmakers were trying to prevent schools and teachers from forcing students to adopt views that the lawmakers believe are antithetical to the Equal Protection Clause, violate various anti-discrimination laws, and foster racism. Based on the allegations in the First Amended Complaint, no one prevented the AP AAS course from being taught.[207] Rather, the course's AP status was revoked until Secretary Oliva was satisfied that the course materials and instruction did not violate the LEARNS Act's anti-indoctrination provision.[208] Today, the course is currently an approved AP course.[209] And it is not alleged that Secretary Oliva has engaged in some type of general enforcement campaign to shut down or hamper courses that touch African American

---

[204] Contrary to Defendants' arguments, the Court concludes that—for purposes of deciding the Motion to Dismiss—Plaintiffs have adequately pled facts to make it plausible that the revocation of AP status was based on the anti-indoctrination provision of the LEARNS Act.

[205] First Am. Compl. (Doc. 8) ¶ 209.

[206] *See id.* ¶¶ 124, 135.

[207] *See id.* ¶¶ 19, 22–23, 83–87, 140, 150, 152–57 (suggesting that the AP AAS course was still taught in some form during the 2023–24 school year).

[208] *See id.* ¶¶ 116, 122.

[209] *See id.* ¶ 141 n.26.

history, culture, or the like.  The bottom line is that the allegations of disparate impact in this case, without more, don't move the needle much at all for Plaintiffs.

      (b)    <u>Legislative and Administrative History: A Highly Relevant Consideration</u>

The Supreme Court has explained that "legislative or administrative history may be highly relevant [to detecting a discriminatory intent or purpose], especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."[210]  In our case, Plaintiffs do not point to legislative reports, meeting minutes, or floor/committee statements from lawmakers to suggest purposeful discrimination.[211]  In fact, noticeably missing from Plaintiffs' First Amended Complaint are any allegations that representatives or senators ever expressed an intent to discriminate during the Senate Education Committee's meeting, the House Education Committee's meeting, or the floor debate in either chamber of the Arkansas Legislature. Of course, the absence of such "highly relevant" allegations is not in and of itself a mark against Plaintiffs.  Still, given the limited number of subjects of inquiry at play here, combined with the presumption of legislative good faith, the absence of such allegations makes it even more difficult for Plaintiffs to meet the plausibility-of-purposeful-discrimination threshold.

---

[210] *Arlington Heights*, 429 U.S. at 268.

[211] Plaintiffs do allege that, a month before the LEARNS Act was introduced, House Democratic Leader Representative Tippi McCullough said, "I don't think critical race theory is a problem in schools in Arkansas."  First Am. Compl. (Doc. 8) ¶ 62.  This statement tells us nothing about discriminatory intent or purpose.  Representative McCullough did not vote for the bill.  *See S.B. 294 Bill Information*, ARKANSAS STATE LEGISLATURE, *https://www.arkleg.state.ar.us/Bills/Detail?id=sb294&ddBienniumSession=2023/2023R*.  And nothing in the statement suggests that Representative McCullough thought (or knew) that the lawmakers who enacted the bill were doing so for the secret purpose of discriminating against African Americans.  Plaintiffs also allege that, in a committee meeting where the bill was debated, State Senator Linda Chesterfield asked Secretary Oliva to define Critical Race Theory and to explain why it should be banned.  *See* First Am. Compl. (Doc. 8) ¶ 68.  Again, this tells us nothing about discriminatory intent or purpose.  Senator Chesterfield did not vote for the bill.  *See S.B. 294 Bill Information*, ARKANSAS STATE LEGISLATURE, *https://www.arkleg.state.ar.us/Bills/Detail?id=sb294&ddBienniumSession=2023 /2023R*.  And nothing in her statement suggests that she thought (or knew) that the lawmakers who enacted the bill were doing so for the secret purpose of discriminating against African Americans.  As for Secretary Oliva's answer to Senator Chesterfield, all he said was that Critical Race Theory is difficult to define.  *See* First Am. Compl. (Doc. 8) ¶ 68.  That adds nothing to the mix.

Perhaps to make up for these missing allegations, Plaintiffs refer to a statement that Representative Pilkington (a co-sponsor of the LEARNS Act) made to the media about the AP AAS course in August of 2023—when the course's AP status was revoked.[212]  But that was nearly five months after the LEARNS Act was signed into law.[213]  Representative Pilkington did not make this statement during the House Education Committee meeting or on the House floor. And there is no allegation that he shared these thoughts with other lawmakers at the time the LEARNS Act was being considered.  As such, Representative Pilkington's statement is relevant, at most, to a single representative's motivation—even if that representative happened to be a co-sponsor of the Act.

In any event, Representative Pilkington's comments do not suggest that he had an intent to discriminate against African American teachers or students.  Plaintiffs allege that Representative Pilkington said that he did not want African American history to be taught in way suggesting that "you should hate democracy, . . . hate the Western traditions, . . . hate the things that put us here, . . . and that we need a complete dumping of the past."[214]  But that is not exactly right, at least not according to the full video that Plaintiffs cite in the First Amended Complaint.  Representative Pilkington told the media that he was "for schools teaching the [AP AAS] course . . . ."[215]  But, he explained that, "we just want to make sure [students] are learning" about things like the Civil War,

---

[212] *See* First Am. Compl. (Doc. 8) ¶ 71.

[213] *See* Brenda Lepenski, *Legality of AP African American Studies course is in question, legislators weigh in*, KATV (Aug. 24, 2023), https://katv.com/news/local/the-legality-of-the-advanced-placement-african-american-studies-pilot-course-is-in-question-in-arkansas-college-board-aaron-pilkington-intersectionality-jacob-oliva-clarke-tucker-ap-african-american-studies; First Am. Compl. (Doc. 8) ¶¶ 71 n.19, 94.

[214] First Am. Compl. (Doc. 8) ¶ 71.

[215] *See* Brenda Lepenski, *Legality of AP African American Studies course is in question, legislators weigh in*, KATV (Aug. 24, 2023), https://katv.com/news/local/the-legality-of-the-advanced-placement-african-american-studies-pilot-course-is-in-question-in-arkansas-college-board-aaron-pilkington-intersectionality-jacob-oliva-clarke-tucker-ap-african-american-studies.

the Little Rock Nine, and Civil Rights "in the right context and that it's not being taught in a way where you should hate democracy, . . . hate the Western tradition, . . . hate all the things that put us here, . . . and that we need a complete and total dumping of the past."[216]

Representative Pilkington's statement merely reflects his preferred method of teaching African American history.  Representative Pilkington seems to be concerned that, if AP AAS instruction compels students to accept Critical Race Theory, students will learn to hate American traditions and institutions.  Plaintiffs may vehemently disagree.  And it is certainly not for the Court to say who is right.  But Representative Pilkington's concern—whether correct or uninformed—is not discriminatory.  And it does not suggest that he had an intent to discriminate against African Americans when he voted in favor of the LEARNS Act.

The other potentially relevant statements Plaintiffs point to are Governor Sanders's statement on the day she signed her 2023 Executive Order and a statement Governor Sanders made to FOX News upon the revocation of the AP status of the AP AAS course.[217]  The statement Governor Sanders made about her Executive Order could have some relevance, given the great deal of overlap between the LEARNS Act's anti-indoctrination provision and the Executive Order.  That statement was, however, fairly limited; Governor Sanders spoke about "preventing the political indoctrination of Arkansas's schoolchildren" and "not brainwashing our children with a left-wing political agenda."[218]  Nothing about that statement suggests purposeful racial discrimination behind the enactment of the LEARNS Act's anti-indoctrination provision.  To the extent Plaintiffs are suggesting the statement contains "code words" that the Court should interpret

---

[216] *See id.*

[217] *See* First Am. Compl. (Doc. 8) ¶¶ 59, 120.  The statements allegedly made by President Donald Trump in 2020 and 2021 are likely completely irrelevant and, at absolute best for Plaintiffs, of such marginal relevance as to not be worth discussing.  *See id.* ¶¶ 54, 58.  President Trump, of course, is not an Arkansas lawmaker.

[218] *Id.* ¶ 59.

as racially-charged language, the Court is unpersuaded.[219]   Left-wing political agenda means left-wing political agenda.  Any allegation to the contrary in the First Amended Complaint is entirely conclusory.

The statement Governor Sanders made to FOX News came many months after the enactment of the LEARNS Act.[220]   Accordingly, like Representative Pilkington's statement, its value is limited.  But the Court will explore it.  The First Amended Complaint alleges that Governor Sanders said:

> We've got to get back to the basics of teaching math, of teaching, reading, writing and American history.  And we cannot perpetuate a lie to our students and push this propaganda leftist agenda, teaching our kids to hate America and hate one another.  It's one of the reasons that we put into law banning things like indoctrination and CRT.  We want our kids to receive a quality education . . . .[221]

This statement certainly suggests that Governor Sanders views Critical Race Theory as propaganda for a leftist agenda, that she dislikes the ideas promulgated by Critical Race Theory, and that she does not want any student to be forced to accept Critical Race Theory.  But, as this Court has already made clear, allegations of animus toward Critical Race Theory are not synonymous with allegations of an intent to discriminate against African Americans.  Correspondingly, the desire to have history taught through a lens other than Critical Race Theory does not equate to purposeful discrimination against African Americans.[222]

---

[219] *See id.* ¶ 204; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 44.

[220] *See* First Am. Compl. (Doc. 8) ¶¶ 94, 120.

[221] *Id.* ¶ 120.

[222] Governor Sanders's statement actually reinforces the obvious alternative explanation for the anti-indoctrination provision: Like other Arkansas lawmakers, Governor Sanders wants to prevent teachers and administrators from forcing students to adopt views that she believes are antithetical to the Equal Protection Clause, violate various anti-discrimination laws, and foster racism.  Whether her general colorblind view is right or wrong, whether her view that Critical Race Theory contradicts colorblindness is right or wrong, and whether she was right or wrong that the AP AAS course was using Critical Race Theory are all beside the point.  Plaintiffs' alleged facts do not plausibly suggest that Governor Sanders was pretending to believe these things to mask a secret intent to discriminate against African Americans.

(c)    The Rest of the *Arlington Heights* Considerations

Under the *Arlington Heights* rubric, both the historical background of the challenged official action and the specific sequence of events leading to that official action "may shed some light on the decisionmaker's purposes."[223]  Among other things, courts look for "a series of official actions taken for invidious purposes."[224]

Plaintiffs suggest that the historical background necessary to understand the LEARNS Act's anti-indoctrination provision begins in 2020.[225]  According to Plaintiffs, "[t]he murders of George Floyd and Breonna Taylor, among too many others, at the hands of law enforcement were unfortunately the wakeup call for America to respond to ongoing racial inequalities, individual and systemic."[226] Also according to Plaintiffs, "[m]any governmental entities including school districts and universities, and private corporations, among others, answered the call by beginning to examine their own role in carrying forward racial inequalities and instituting fair and just reforms."[227]

Against the backdrop of these events, Plaintiffs cast President Trump's 2020 Executive Order and Governor Sanders's 2023 Executive Order as attempts—dressed up in coded language—to undermine what Plaintiffs see as progress on racial equality.[228]  And Plaintiffs say that those Executive Orders are the forerunners of the LEARNS Act's anti-indoctrination provision.[229]  From this, Plaintiffs suggest one could plausibly infer that the enactment of the

---

[223] *Arlington Heights*, 429 U.S. at 267.

[224] *Id.*

[225] *See, e.g.*, First Am. Compl. (Doc. 8) ¶¶ 52–58.

[226] *Id.* ¶ 52.

[227] *Id.*

[228] *See id.* ¶ 204.

[229] *See id.* ¶¶ 56, 68; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 42.

LEARNS Act's anti-indoctrination provision was in part motivated by an intent to discriminate against African Americans.[230]

Most prominently, Plaintiffs point to Governor Sanders's attacks—via her Executive Order—on Critical Race Theory.[231]  For example, Governor Sanders's Executive Order declared that "Critical Race Theory . . . is antithetical to the traditional American values of neutrality, equality, and fairness."[232]  Plaintiffs argue this language is riddled with code words and dog whistles.[233]  According to them, conservative leaders often use terms like Critical Race Theory to stymie "any potentially controversial discussions around systemic racism and race-conscious issues."[234]

Plaintiffs also point to the multiple Critical-Race-Theory-related actions taken by the Arkansas Department of Education pursuant to Governor Sanders's Executive Order.[235]  Finally, Plaintiffs call attention to Governor Sanders's and Secretary Oliva's direction to the Department of Education to remove certain "educational materials from the [Arkansas Department of Education's] recommended social studies resources . . . ."[236]  Those materials were allegedly removed "because they included context" for the "historical suffering" of African Americans.[237]  At the same time, Defendants added materials from 1776 Unites, which Plaintiffs allege "downplay[] the historical challenges faced by Black Americans."[238]

---

[230] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 42–45.

[231] *See* First Am. Compl. (Doc. 8) ¶¶ 61–62.

[232] *Id.* ¶ 61.

[233] *See id.* ¶ 204; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 44.

[234] First Am. Compl. (Doc. 8) ¶ 204; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 44.

[235] *See* First Am. Compl. (Doc. 8) ¶ 63; *see also Indoctrination and CRT Examples*.

[236] *Id.* ¶ 65.

[237] *Id.*

[238] *Id.* ¶ 66.

The problem for Plaintiffs is that, absent speculation, none of these acts in any way suggests an intent to discriminate. Once again, antipathy toward Critical Race Theory does not equate to an intent to discriminate against African Americans. For certain, the facts Plaintiffs have alleged are consistent with the possibility that Governor Sanders (and other lawmakers) are using coded words to try and fend off progress on racial equality. But that's not enough.[239] The facts alleged must make this plausible. And they don't. The facts alleged are far more consistent with a Governor (and lawmakers) who is sincerely trying to prevent the indoctrination of students with Critical Race Theory based on the sincere belief that Critical Race Theory (among other theories and ideologies) is antithetical to the Equal Protection Clause, violates various anti-discrimination laws, and fosters racism.

The First Amended Complaint cites multiple instances where Arkansas lawmakers and executive officials stated (and showed) that they were not opposed to the teaching of African American history or the AP AAS course generally.[240] Moreover, nowhere in the First Amended Complaint do Plaintiffs allege that Governor Sanders and Secretary Oliva prohibited the teaching of specific facts from African American history or ordered that the AP AAS course not be taught. Rather, the real dispute here is over what lens one uses when teaching history (African American or otherwise) and which lens will best ameliorate discrimination. One side of that dispute does not get to pretend that the other side of that dispute is, by definition, acting with a discriminatory purpose.[241]

---

[239] *See Iqbal*, 556 U.S. at 678.

[240] *See* First Am. Compl. (Doc. 8) ¶¶ 71, 97.

[241] Plaintiffs specifically allege that the 1776 Unites curriculum downplays the historical challenges faced by African Americans. Plaintiffs note that, "1776 Unites maintains a special focus on voices in the black community who celebrate black excellence, discourage victimhood culture, and showcase the millions of black Americans who have prospered by embracing the founding ideals of America." First Am. Compl. (Doc. 8) ¶ 66. The Court is unsure why Plaintiffs take issue with that. But again, in any event, this complaint concerns the lens through which African American history is taught. Although Arkansas's desired method of teaching African American history is certainly

And so, we come to the last two *Arlington Heights* considerations. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role."[242] And "[s]ubstantive departures [also] may be relevant," especially where "the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."[243] Bottom line up front, Plaintiffs' allegations in each of these areas don't help them at all.

Plaintiffs assert that the Court can draw a reasonable inference of an intent to discriminate because the Arkansas Legislature passed the LEARNS Act very quickly.[244] The LEARNS Act was signed into law in less than three weeks after it was first introduced.[245] The Act spent less than one week in each of the respective chambers' education committees.[246] And the House and Senate rules were suspended so that the Act could be passed on an expedited basis.[247] An emergency clause was also passed by two-thirds of each chamber so that the majority of the LEARNS Act, including the anti-indoctrination provision, could immediately go into effect.[248]

Plaintiffs are right that the legislative process moved very quickly. But the "brevity of the legislative process" cannot "give rise to an inference of bad faith" on its own.[249] There are no

---

different than the method proposed by advocates of Critical Race Theory, there is nothing in this 1776 Unites quote (or elsewhere) to suggest that the 1776 Unites curriculum is prejudicial in nature. Plaintiffs have made it abundantly clear that they disagree with 1776 Unites's curriculum. But those disagreements are best resolved through the political process.

[242] *Arlington Heights*, 429 U.S. at 267.

[243] *Id.*

[244] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 46.

[245] First Am. Compl. (Doc. 8) ¶¶ 67, 69.

[246] *Id.*

[247] *SB 294 Bill Information*, ARKANSAS STATE LEGISLATURE, https://www.arkleg.state.ar.us/Bills/Detail?id=sb294&ddBienniumSession=2023/2023R.

[248] LEARNS Act, Act 237 of 2023, § 73(a).

[249] *Abbott*, 585 U.S. at 610.

allegations to suggest the legislative process was manipulated to achieve a discriminatory aim that would have been frustrated absent the manipulation.    So, the Court will not assume a discriminatory intent just because the legislative process moved more quickly than is normal. That's especially true because the anti-indoctrination provision was not passed as standalone legislation.[250]  The provision was a tiny part of the 144-page long LEARNS Act, which reformed large swaths of the Arkansas education system.[251]  It would be passing strange to suggest that the anti-indoctrination provision itself played any substantial part in the legislators' decision to speed up the process.  Certainly, the Court can't infer it without being given a good reason to do so. Plaintiffs have not provided one.

Taking a different tack, Plaintiffs assert that the LEARNS Act's anti-indoctrination provision represents a substantive departure from the norm, and that this departure provides evidence of an intent to discriminate.[252]  Plaintiffs allege that the Arkansas Legislature substantively departed from its usual legislative approach by regulating an area that has typically been the purview of teachers and school districts.[253]  But, even assuming Plaintiffs are right about whether the Legislature has regulated this area previously, the alleged substantive departure is not the type of departure that the Supreme Court found relevant in *Arlington Heights*.[254]

In footnote 17 of *Arlington Heights*, the Supreme Court provides us an example of what it meant by "substantive departures."[255]  The Supreme Court references a case where plaintiffs

---

[250] *See* LEARNS Act, Act 237 of 2023.

[251] *See* First Am. Compl. (Doc. 8) ¶ 67.  Reforms under the LEARNS Act include, but are not limited to, increased teacher salaries and the creation of Education Freedom Accounts.

[252] *See* Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 48–49.

[253] *See id.*

[254] *See Arlington Heights*, 429 U.S. at 267.

[255] *See id.* at 267 n.17.

wanted to build low-income housing and the city refused to rezone the property.[256]  In that case, all the evidence suggested that, had the city made its decision pursuant to normal considerations, it would have rezoned the property.[257]  The city's former and present planning directors even testified that "there was no reason 'from a zoning standpoint' why the land should not be [re]classified . . . ."[258]  As such, the city substantively departed from the norm with its decision to not rezone the land because "the factors usually considered important by the decisionmaker strongly favor[ed] a decision contrary to the one reached."[259]

That is nothing like the situation in the case at bar.  The Arkansas Legislature is not a municipality or a department of the executive branch.  The legislative branch does not follow any standardized procedure to determine what legislation to pass.  It would be anti-democratic in the extreme if a legislature's enactments were automatically cast into suspicion just because the legislation differed from previous legislation or legislated in new areas.  Indeed, that's kind of the point of elections.  It is not out of the ordinary (or, at least, it should not be out of the ordinary) when a legislature decides to try new, innovative ideas to address problems.  As such, it is probably impossible for a legislature to "substantively depart" in the way that *Arlington Heights* uses that phrase.  Certainly, the Arkansas Legislature has not done so here.

    (d)    <u>The Result of Applying the *Arlington Heights* Rubric</u>

For the reasons described above, the facts alleged by Plaintiffs are not sufficient to allow the Court to draw a reasonable inference that discriminatory intent or purpose was a motivating factor in the enactment of the LEARNS Act's anti-indoctrination provision.  Where a statutory

---

[256] *Id.* (citing *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970)).

[257] *Id.*

[258] *Id.*

[259] *Id.* at 267.

provision is facially neutral, is not obvious pretext for discrimination a la *Gomillion*, and is not enacted with a discriminatory intent or purpose, the Equal Protection inquiry is at an end.[260] Accordingly, the Court must dismiss Plaintiffs' facial Equal Protection claims.

### ii.   As-Applied Claims

Compared to Plaintiffs' facial challenge, the contours of Plaintiffs' as-applied challenge are harder to pin down.  The Court initially read the First Amended Complaint as focusing Plaintiffs' as-applied challenge on a single enforcement action: the revocation of AP status from the AP AAS course.[261]  But, at the hearing on the Motion to Dismiss, Plaintiffs asserted that their as-applied challenge was "larger than that."[262]  Plaintiffs seemed to suggest their as-applied challenge also included all potential enforcement of the anti-indoctrination provision as it applies to Critical Race Theory.[263]  That was, frankly, a surprise to both the Court and (it appeared) to Defendants.[264]

The parties' motion to dismiss briefing does not help matters much.  That is because neither party extricates Plaintiffs' as-applied challenge from Plaintiffs' facial challenge.  And both parties essentially treat the as-applied challenge as something of an afterthought.[265]  It is unclear to the Court what exactly Plaintiffs and Defendants believe the scope of Plaintiffs' as-applied challenge is.  It is unclear to the Court which specific facts Plaintiffs believe support the as-applied challenge as opposed to (or in addition to) supporting the facial challenge.  It is unclear to the Court what legal standard Plaintiffs (or Defendants) believe should be used to analyze the as-applied

---

[260] *See Feeney*, 442 U.S. at 272.

[261] *See* First Am. Compl. (Doc. 8) ¶¶ 209–12.

[262] Oct. 23, 2024 Hr'g Tr. at 83:2–5.

[263] *Id.* at 83:6–12.

[264] *Compare id.* at 40:20–41:21, *with id.* at 90:15–91:3.

[265] *See* Br. in Supp. of Mot. to Dismiss (Doc. 55) at 23–27; Resp. in Opp'n to Mot. to Dismiss (Doc. 61) at 38–49; Reply in Supp. of Mot. to Dismiss (Doc. 64) at 7–10.

challenge, and whether that standard differs from the one used to analyze the facial challenge.  It is also unclear whether there is any current enforcement action (or continuing effect of a past enforcement action) to be addressed, and what that means for Plaintiffs' as-applied challenge.

In short, the as-applied challenge and the request to dismiss it are a little undercooked. Without a better understanding of the parties' positions on the foregoing questions, it would be unfair to try and resolve the request to dismiss the as-applied Equal Protection challenge.  The Court therefore orders further briefing on the Motion to Dismiss, limited solely to Plaintiffs' as-applied Equal Protection claims.  Defendants' opening brief is due on January 31, 2025. Plaintiffs' opposition brief will be due on February 28, 2025.  Defendants' reply brief will be due on March 14, 2025.  The opening and opposition briefs may be no longer than twenty pages each. The reply brief may be no longer than ten pages.

## CONCLUSION

For the reasons stated above, the Court HOLDS IN ABEYANCE Defendants' Motion to Dismiss with respect to: (1) the claims concerning the Free Speech rights of public high school teachers; (2) the claims concerning the Free Speech rights of public high school students; (3) the claims concerning the Due Process rights of public high school teachers; and (4) the as-applied claims concerning the Equal Protection rights of African American public high school teachers and students.  The Court GRANTS Defendants' Motion to Dismiss with respect to the facial claims concerning the Equal Protection rights of African American public high school teachers and

students.[266]  As a matter of docket management, the Court hereby STAYS this case until the Eighth

Circuit issues an order and mandate in the preliminary injunction appeal.[267]

IT IS SO ORDERED this 20th day of December 2024.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[266] The Court also HOLDS IN ABEYANCE Defendants' Motion to Dismiss with respect to all claims against Governor Sanders that have not been dismissed in this Order.  The *Ex parte Young* issue presents difficult legal questions that may turn on fine factual-allegation distinctions.  Since no claim is moving past the motion to dismiss stage at this time, the Court need not resolve the issue yet.  And it is possible—depending on how the Eighth Circuit rules in the preliminary injunction appeal and what this Court thinks of the further briefing with respect to the as-applied Equal Protection challenge—that the Court may never have to resolve the issue.  In this circumstance, judicial economy, judicial efficiency, and a practice of deciding thorny constitutional issues only when their resolution is necessary counsel in favor of patience.

[267] Notwithstanding the stay, the parties must timely file the re-briefing ordered with respect to the as-applied Equal Protection challenge.