**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

RUTHIE WALLS, et al.                                                                    PLAINTIFFS,

v.                                              No. 4:24CV270 LPR

HON. SARAH HUCKABEE SANDERS, in her
official capacity as Governor of the State of
Arkansas, et al.                                                                       DEFENDANTS.

SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

After dismissing Plaintiffs' facial equal protection claim, the Court ordered supplemental

briefing on Plaintiffs' as-applied equal protection claim.  That claim fails for many of the reasons

the Court gave in dismissing Plaintiffs' facial challenge.  As-applied equal protection claims, to

the extent they exist, apply the same standards to statutory applications and enforcement that fa-

cial equal protection claims do.   Under those standards, which require Plaintiffs to plausibly al-

lege that any application or enforcement action they challenge had a discriminatory effect and

was motivated by discriminatory intent, Plaintiffs' claim fails.

More specifically, Plaintiffs' challenge to Section 16's application to Critical Race The-

ory is an aspect of their facial challenge; it doesn't challenge any enforcement action regarding

Critical Race Theory, or even the application of the statute's general terms to Critical Race The-

ory, but rather the statute's express inclusion of Critical Race Theory among the ideas teachers

may not indoctrinate students in.  That aspect of their facial challenge, if this Court hasn't al-

ready rejected it, fails for all the same reasons this Court dismissed their facial challenge gener-

ally.  Plaintiffs' as-applied challenge to the revocation of AP status from AP African American

Studies fails for lack of standing; the Court must look to the amended complaint to determine ju-

risdiction, and the amended complaint acknowledges that AP status had already been restored by

the time it was filed.  If the Court disagrees, it fails on the merits because Plaintiffs haven't come

close to plausibly alleging that the temporary revocation of AP status was intended to discriminate on the basis of race, rather than to ensure compliance with Section 16. Plaintiffs' as-applied claim should be dismissed.

## I.    As-applied equal protection claims—when permitted—are generally governed by the same standards as facial equal protection claims.

One of the questions the Court's order asked the parties to address is what standard applies to Plaintiffs' equal protection claim. Answering this question is complicated by the fact that "scholars have been unable to agree on the basic question of whether as-applied Equal Protection claims should even exist." Katie Eyer, *As-Applied Equal Protection*, 59 Harv. C.R.-C.L. L. Rev. 49, 50 (2024). As-applied equal protection claims are not only controversial but extremely rare; one landmark article notes that "[a]s-applied challenges virtually never arise under the Equal Protection Clause." Matthew D. Adler, *Rights Against Rules: The Moral Structure of American Constitutional Law*, 97 Mich. L. Rev. 1, 37 n.144 (1998). Indeed, when the Supreme Court adjudicated an as-applied equal protection claim in *City of Cleburne v. Cleburne Living Center*, *see* 473 U.S. 432, 447–51 (1985), Justice Marshall wrote that "[t]o [his] knowledge, the Court ha[d] never before treated an equal protection challenge to a statute on an as-applied basis," *id.* at 476 (Marshall, J., concurring in the judgment in part and dissenting in part), and it doesn't appear the Court has done so since.

The rarity of as-applied adjudication of equal protection claims isn't an accident. "Equal [p]rotection is an exception to the Supreme Court's general preference for as-applied litigation," Eyer, *supra*, at 53, because the standards of review in equal protection challenges "focus on the challenged law's classification of persons," David H. Gans, *Strategic Facial Challenges*, 85 B.U. L. Rev. 1333, 1381 (2005), and thus "lead inexorably to facial review in almost all equal protec-

tion challenges," *id.* at 1381–82.  Under those standards, "if [a] statute is invalid to one, it is invalid to all." *Id.* at 1383.  Conversely, a statute that survives equal protection scrutiny on facial review "will generally be valid as to all applications."  Eyer, *supra*, at 53.  If individual members or subclasses of a class as to whom differential treatment may not specifically be justified could attack facially valid classifications on an as-applied basis, it would largely negate the more relaxed tailoring requirements in rational-basis review and intermediate scrutiny.  *See, e.g.*, *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 316 (1976) (holding that an age cutoff for police service grounded in concerns about physical fitness was valid even though it would capture officers who could pass their medical examinations); *Bannum, Inc. v. City of St. Charles*, 2 F.3d 267, 273 (8th Cir. 1993) (rejecting challenge to a permitting requirement for halfway houses as applied to a halfway house that would house only nonviolent offenders because "[t]he zoning ordinance was not written to apply only" to the plaintiff's halfway house and it "[wa]s not arbitrary or irrational for the City to create th[at] broad category").

Nevertheless, there are a handful of cases allowing as-applied equal protection challenges.  These fall into two groups: suits that claim a statutory classification can't be justified as applied to particular members or subclasses of the class, *see* Eyer, *supra*, at 66–69, and suits that challenge discriminatory enforcement of a statute, *see id.* at 64–66.  In both, courts—when they allow such as-applied challenges—seem to use the same level of scrutiny and general analytic framework that they would apply to a facial challenge alleging discrimination against the same class.  The difficulty these claims present is less determining the applicable standard than deciding whether they are allowed at all.  However, those difficulties mostly arise in the case of challenges to statutory applications, not allegedly discriminatory enforcement, and Defendants believe that only the latter is at issue here.

Beginning with challenges to statutory applications, the Supreme Court and Eighth Circuit have entertained a discrete handful of as-applied equal protection challenges to statutes themselves.  For example, in *Illinois State Board of Elections v. Socialist Workers Party*, candidates for statewide office needed to obtain 25,000 signatures to get on the ballot; candidates for municipal office needed to obtain signatures amounting to 5% of the number of voters who voted for that office.  440 U.S. 173, 175–76 (1979).  Though usually a less demanding requirement in absolute terms than the statewide threshold, in Chicago the 5% rule meant a mayoral candidate needed "substantially more signatures" than a candidate for statewide office.  *Id.* at 177.  Applying strict scrutiny, which the Court then deemed the applicable level of scrutiny because the state/municipal classification burdened multiple fundamental rights, *see id.* at 184, the Court held that differential meant the 5% rule violated the Equal Protection Clause "as applied in the city of Chicago," *id.* at 183.  The as-applied claim in *City of Cleburne*, at least formally, was also a challenge to a statutory application; the zoning ordinance there required a special use permit for homes for the mentally disabled, and—after holding that rational-basis review was the appropriate standard for challenges to discrimination on the basis of mental disability—the Court held that the ordinance failed rational-basis review as applied to the particular group home the plaintiffs sought to build.  *City of Cleburne*, 473 U.S. at 447–50.  The Eighth Circuit has also occasionally entertained as-applied challenges to statutory applications, and like the Supreme Court has applied the same standard that it would were it entertaining a facial challenge.  In *Brenden v. Independent School District 742*, 477 F.2d 1292 (8th Cir. 1973), the Eighth Circuit held that a categorical exclusion of girls from boys' sports failed intermediate scrutiny "as applied" to the subclass of "qualified girls desiring to engage in noncontact sports for which the school had no girls' program."  *Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922, 923 n.1 (8th Cir. 1976).

When courts will entertain as-applied equal protection challenges to statutory classifications' applications, and when they will say that a classification's facial validity precludes more searching review of its application to a class's individual members, seems to be virtually untheorized. That question isn't presented here, however, because of a key limit on as-applied challenges to statutory applications: an attack on a statute's express inclusion of a subclass within a class is not an as-applied challenge. Rather, it is a facial challenge to the portion of the statute singling out *that subclass* for differential treatment. For example, a suit challenging a rule "specifically addressing how transgender individuals will be treated" under a broader system of sex separation should "not be characterized as an as-applied challenge" to sex separation as applied to transgender individuals, "but rather a facial challenge to . . . [a] subsidiary rule" about transgender individuals. Eyer, *supra*, at 70. The fact that the suit doesn't attack the entire statute of which that rule is a part no more makes it an as-applied challenge than the fact that Plaintiffs only attack one provision of Section 16 of the LEARNS Act, *see* Doc. 82 at 1 n.1, makes all of their claims as-applied challenges. As discussed below, this principle means that Plaintiffs' attack on the anti-indoctrination provision's application to Critical Race Theory is an aspect of their facial challenge.

The other and less controversial type of as-applied equal protection claim is a challenge to allegedly discriminatory enforcement of a statute. These claims, properly conceived, are not really challenges to statutes at all, but to the decisions of officials charged with administering them. But like challenges to statutory applications, courts apply the same tier of scrutiny and attendant rules that they would to a facial challenge claiming discrimination on the same basis. The as-applied claim in *City of Cleburne*, though formally decided in terms of statutory application, is usually understood as a challenge to enforcement. *See* Eyer, *supra*, at 64–65. Though

the Court formally asked whether the ordinance there failed rational-basis review as applied to the plaintiffs' proposed group home (to which the ordinance plainly applied), the Court really asked whether the city council acted irrationally in "insist[ing] on the permit," *City of Cleburne*, 473 U.S. at 448, a requirement the Court appears to have believed the city council could waive, ultimately deciding that "requiring the permit in this case . . . rest[ed] on an irrational prejudice" on the council's part, *id.* at 449.  In *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005), the Eighth Circuit considered both a facial and as-applied enforcement challenge to a policy that gave paid leave to biological mothers but not fathers on the theory that biological mothers are presumptively temporarily disabled postpartum.  *See id.* at 328–29.  Rejecting a claim that the university discriminatorily applied this policy to a male employee where a comparator female employee continued to receive leave under the policy even after she was medically cleared, the Eighth Circuit applied the ordinary test for gender discrimination under the Equal Protection Clause, first asking whether the plaintiff and the comparator were similarly situated and had been treated differently because of their gender.  *Id.* at 330 (citing *Keevan v. Smith*, 100 F.3d 644, 647–48 (8th Cir. 1996)).

## II.     Plaintiffs' as-applied claim is a challenge to Section 16's alleged enforcement as to AP African American Studies.

The Court also asked Defendants to brief the scope of Plaintiffs' as-applied challenge, which at the motion-to-dismiss hearing Plaintiffs suggested included the application of Section 16 to Critical Race Theory.  Tr. 83:2–12.  Defendants continue to believe that Plaintiffs' as-applied challenge is limited to Section 16's enforcement as to AP African American Studies.

That isn't because Plaintiffs don't challenge Section 16's application to Critical Race Theory.  They unmistakably do, alleging, for example, that Section 16's "[a]ttacking specifically

CRT" has a disparate impact on black students and faculty.  Am. Compl. ¶ 204.  The reason, rather, is that Plaintiffs' challenge to Section 16's application to Critical Race Theory is an aspect of their facial challenge.  Section 16, on its face, defines prohibited indoctrination to "include[e]" indoctrination in "Critical Race Theory," Ark. Code Ann. § 6-16-156(d), and prescribes a number of rules that specifically apply to "Critical Race Theory," *id.*, (a)(2), (d), (e).  Plaintiffs' claim isn't that the definition of prohibited indoctrination sweeps up Critical Race Theory and can't be constitutionally applied to it; indeed, they specifically allege that but for Section 16's specific inclusion of Critical Race Theory, the statute's general definition of prohibited indoctrination would *not* apply to Critical Race Theory.  *Compare* Am. Compl. ¶ 208 ("[T]eaching the concepts and ideas of CRT . . . does not, standing alone, violate Title IV or Title VI of the Civil Rights Act.") *with* Ark. Code Ann. 6-16-156(b).  Rather, Plaintiffs' claim is that Section 16's specific inclusion of Critical Race Theory among the ideas teachers may not indoctrinate students in was intended to discriminate on the basis of race.  That claim is a facial challenge to the statute's provisions specifically regarding Critical Race Theory, not a challenge to the statute's broader classifications as applied to Critical Race Theory.  Insofar as the claim attacks the statute's treatment of Critical Race Theory, rather than the definition of prohibited indoctrination as a whole, it essentially seeks to sever the provisions singling out indoctrination in Critical Race Theory for prohibition from the statute by enjoining Defendants from enforcing those provisions.  That is classic facial relief.  By contrast, as-applied relief would enjoin Defendants from enforcing some broader classification in the statute as applied to Critical Race Theory.

To be sure, Plaintiffs could in theory bring an as-applied challenge to how Defendants have enforced Section 16 with respect to instruction in Critical Race Theory.  But they haven't done so.  Their only challenge to how Section 16 has been enforced—rather than how it, of its

own force, applies—is to "a single enforcement action: the revocation of AP status from the AP AAS course." Doc. 82 at 58; *see* Am. Compl. ¶¶ 209–12. That is a classic as-applied challenge to discriminatory enforcement, alleging that, whether or not Section 16 of its own force says any-thing about teaching AP African American Studies (and in Plaintiffs' view it probably does not), executive-branch officials have taken actions as to AP African American Studies for discrimina-tory purposes under the auspices of Section 16. *See* Am. Compl. ¶ 210 (alleging that "Defend-ants' last-minute decision to pull the plug on the AP AAS and the manner they carried out their decision . . . supports intentional racial discrimination").

III. **This Court has already decided Plaintiffs' facial challenge to Section 16's provisions on Critical Race Theory; alternatively, if that challenge is viewed as an as-applied challenge or a facial challenge the Court hasn't already decided, it fails.**

Plaintiffs' challenge to Section 16's provisions specifically regarding Critical Race The-ory is merely an aspect of their facial challenge. This Court has already dismissed Plaintiffs' fa-cial challenge. So it has already rejected Plaintiffs' challenge to Section 16's provisions specifi-cally regarding Critical Race Theory. *See* Doc. 82 at 40 (noting that "Plaintiffs' [facial] Equal Protection Clause challenge is focused on the parts of the anti-indoctrination provision that they say target Critical Race Theory"). To be sure, in rejecting Plaintiffs' facial challenge to Section 16's anti-indoctrination provision, the Court reasoned that it "reach[ed] well beyond Critical Race Theory" and in part for that reason did not have a disparate impact. *Id.* at 44. But the Court also assumed, counterfactually, that the "provision was focused solely on Critical Race Theory," *id.* at 45, and held that even then a challenge would fail because Plaintiffs didn't plausi-bly allege a ban on indoctrination in—or even the teaching of—Critical Race Theory would have a disparate impact on black students, *id.* at 46. The Court also held that "the desire to have his-tory taught through a lens other than Critical Race Theory does not equate to purposeful discrim-ination." *Id.* at 48. And it held that the facts Plaintiffs alleged were "far more consistent" with a

"sincere belief" on the part of "lawmakers" that "Critical Race Theory . . . is antithetical to the Equal Protection Clause, violates various anti-discrimination laws, and fosters racism" than they were consistent with discriminatory intent. *Id.* at 54. So this Court has already held that Section 16's provisions specifically regarding Critical Race Theory neither have a disparate impact on black students, nor were plausibly enacted for a discriminatory purpose.

But even if the Court didn't understand itself to be deciding a facial challenge concerning Critical Race Theory specifically—or if the Court disagrees with Defendants and deems Plaintiffs' attack on Section 16's provisions on Critical Race Theory to be an as-applied challenge— what the Court has already held about Section 16's treatment of Critical Race Theory forecloses Plaintiffs' claim. Whether Plaintiffs' claim is viewed as facial or as-applied, the Court would decide the same question: whether Section 16's provisions on Critical Race Theory discriminate on the basis of race. As with any race-based equal protection claim, the Court would first ask whether those provisions facially classify on the basis of race. It has already held that Section 16, as a whole, does not. Doc. 82 at 36. It would then ask whether it uses Critical Race Theory as an obvious proxy for racial discrimination. It has already held that Section 16 does not. *Id.* at 36–37. It would then decide whether Section 16's provisions specifically regarding Critical Race Theory, though facially neutral, were enacted with a discriminatory intent, *id.* at 37, first asking whether they have a discriminatory impact, *id.* at 43. The Court has already held that even as applied to Critical Race Theory alone, Section 16 does not have a disparate impact on black students or teachers. *Id.* at 46. And it has held that Plaintiffs' own allegations were "far more consistent" with a "sincere belief" that Critical Race Theory fosters discrimination than with an intent to harm black students by prohibiting indoctrination in Critical Race Theory. *Id.* at 54.

Given these holdings, Section 16's provisions on Critical Race Theory do not discriminate on the basis of race, and Plaintiffs' challenge to them, under any guise, should be dismissed.

IV.    **The Court should dismiss Plaintiffs' as-applied challenge to Section 16's supposed enforcement as to AP African American Studies.**

The one aspect of Plaintiffs' equal protection claim that truly is as-applied is Plaintiffs' claim that Defendants discriminated on the basis of race by, allegedly under the auspices of Section 16, revoking AP status from the AP African American Studies course. That claim is governed by the same familiar standards as a claim alleging that a statute discriminates on the basis of race. The Court first must decide whether the revocation of AP status from the African American Studies course facially discriminated on the basis of race or used the African American Studies course as an obvious proxy for race. If the answer is no, the Court must decide, under the *Arlington Heights* framework, whether Plaintiffs have plausibly alleged the revocation of AP status from the African American Studies course was intended to discriminate on the basis of race. Here too, what the Court has already held in the context of rejecting Plaintiffs' facial challenge requires dismissal.

As a threshold matter, it is doubtful that Plaintiffs have standing to challenge the former revocation of AP African American Studies, and at a minimum the rescission of that revocation is fatal to their request for injunctive relief. When this lawsuit was filed, AP African American Studies was not in the State's AP course catalog. Doc. 82 at 34. But "[s]ometime after that," it was added back and "approved for AP status." *Id.*

Normally that post-filing event would not affect standing, and go at most to mootness, where the State conceded it would not suffice to moot the claim under the voluntary cessation doctrine. Tr. 40:6–18. But as the Court noted in its order, AP African American Studies' AP status was restored before Plaintiffs filed their amended complaint, Doc. 82 at 34 & n.149 (citing

Am. Compl. ¶ 141 n.26), as that complaint itself acknowledged.  That makes the question one of

standing.  As the Supreme Court has recently reminded lower courts, "'when a plaintiff files a

complaint in federal court and then voluntarily amends the complaint, courts look to the

amended complaint to determine jurisdiction.'"  *Royal Canin U. S. A., Inc. v. Wullschleger*, 604

U.S. ---, 2025 WL 96212, at *6 (Jan. 15, 2025) (quoting *Rockwell Int'l Corp. v. United States*,

549 U.S. 457, 473–74 (2007)).  And "the withdrawal of th[e] allegations" in the original com-

plaint that supported jurisdiction "will defeat jurisdiction . . . unless they are replaced by others

that establish" it.  *Rockwell*, 549 U.S. at 473.  That is true for standing as well as subject-matter

jurisdiction.  *See Greenberg v. Lehocky*, 81 F.4th 376, 384 n.4 (3d Cir. 2023) ("The amendment

to Rule 8.4(g) raises an issue of standing and not mootness because Greenberg replaced his ini-

tial complaint with a subsequent pleading challenging the new rule."); *cf. Scahill v. Dist. of Co-

lumbia*, 909 F.3d 1177, 1194 (D.C. Cir. 2018) ("[A] plaintiff may cure a standing defect under

Article III through an amended pleading alleging facts that arose after filing the original com-

plaint.").[1]  So the operative complaint for purposes of assessing standing here is the Amended

Complaint, and that complaint merely alleged the class's AP status had been revoked in the past

and since restored.  Absent allegations showing "a likelihood of a recurrence of the allegedly un-

lawful conduct," *Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983), that does not suffice for

standing to seek declaratory and injunctive relief—the only forms of relief Plaintiffs seek.  But

even if Plaintiffs had standing, whether because the Court looked to the original complaint or

concludes AP African American Studies' status wasn't as clear as it has since become when the

Amended Complaint was filed, Plaintiffs can't seek an injunction against the revocation of AP

---

[1] Though *Scahill* cites the Eighth Circuit's pre-*Rockwell* decision in *Park v. Forest Service of U.S.*, 205 F.3d 1034 (8th Cir. 2000), as contrary authority, it is not.  Besides preceding *Rockwell*, *Park* did not involve post-filing events pled in an amended complaint, but merely a post-filing affidavit.  *See Park*, 205 F.3d at 1037.

status from a course that has had AP status for at least nine months; injunctive relief requires a present-day harm and Plaintiffs have none.

If the Court agrees that Plaintiffs cannot challenge the former revocation of AP status from African American Studies, all that would remain is Plaintiffs' allegation that the course is listed differently from other courses in the AP course catalog, which are described as "College Board Advanced Placement Course[s]" and "Graduation Requirement[s] for Career Focus," while AP African American Studies is listed as a "Career-Focused Elective." Doc. 82 at 34 n.150 (quoting Am. Compl. ¶ 141 n.26). That allegation does not make out an equal protection claim. To begin with, it does not state a discriminatory effect, which is an element of an equal protection claim. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996) (holding that under "'ordinary equal protection standards,'" a plaintiff claiming a prosecution selectively discriminates on the basis of race must show both that it "'had a discriminatory effect and that it was motivated by a discriminatory purpose'" (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Even if black students and teachers made up the majority of those enrolled in and teaching the course, the differences between how that course and others were described in a course catalog neither harm students nor teachers; AP credit is awarded regardless. And it is not remotely plausible that the officials responsible for the listing described AP African American Studies slightly differently from other courses "in part 'because of . . . its adverse effects'" on black students and teachers—especially where the differences have no adverse effects. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Should the Court conclude that it can entertain Plaintiffs' as-applied challenge to the revocation of AP status from the African American Studies course, it should reject it. As the Court

already held when it considered whether the revocation of AP status was evidence of discriminatory intent in enacting Section 16, Plaintiffs' allegations about the African American Studies course are "more consistent . . . with the obvious alternative explanation" that the responsible officials "were trying to prevent schools and teachers from forcing students to adopt views that . . . violate various anti-discrimination laws, and foster racism."  Doc. 82 at 47.  As the Court noted in reaching that conclusion, Defendants never prevented, even temporarily, the African American Studies course from being taught; rather, accepting Plaintiffs' allegations as true, its AP status was merely temporarily revoked "until Secretary Oliva was satisfied that [it] did not violate the LEARNS Act's anti-indoctrination provision."  *Id.*  Once he was satisfied it did not violate the law—a reasonable concern, given the potential interplay between Critical Race Theory and the course, *see* Doc. 82 at 30 (quoting Doc. 15-4))—he restored the course's AP status, less than a full school year before revoking it.  The far more likely explanation for that conduct is a good-faith effort to enforce Section 16, not a covert attempt to fleetingly harm black students and teachers.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' as-applied equal protection claim.

Dated: January 31, 2025          Respectfully,

TIM GRIFFIN
  Attorney General
DYLAN L. JACOBS (2016167)
  Interim Solicitor General
ASHER STEINBERG (2019058)
  Senior Assistant Solicitor General
JORDAN BROYLES (2015156)
  Senior Assistant Attorney General
JUSTIN BRASCHER (2023029)
  SENIOR Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:   (501) 682-1051
Asher.Steinberg@ArkansasAG.gov

*Counsel for Defendants*