**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**RUTHIE WALLS,** *et al.*                                                           **PLAINTIFFS**

**v.**                                      **Case No. 4:24-cv-00270-LPR**

**SARAH HUCKABEE SANDERS, in her**
**official capacity as Governor of the State of**
**Arkansas,** *et al.*                                                               **DEFENDANTS**

## ORDER

In December of 2024, the Court issued an Order partially resolving Defendants' Motion to Dismiss.[1]  Specifically, the Court granted Defendants' Motion to Dismiss with respect to Plaintiffs' facial equal protection challenge.[2]  But the Court held the rest of the Motion in abeyance pending the outcome of a related Eighth Circuit appeal and supplemental briefing.[3]  Subsequently, the Eighth Circuit issued a ruling and the parties filed the necessary supplemental briefs.[4]  Accordingly, the Court now returns to consideration of the still-live portions of the Motion to Dismiss.[5]

---

[1] *See generally* Partial Dismissal and Abeyance Order (Doc. 82).

[2] *See id.* at 59–60.

[3] *See id.*

[4] *See Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025); Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97); Defs.' Suppl. Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 98); Defs.' Resp. Br. to Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 99); Pls.' Resp. Br. to Defs.' Suppl. Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 100).

[5] Today's Order is the Court's third significant order in this case.  Accordingly, the Court assumes basic familiarity with the subject matter.  For a more comprehensive understanding of the case's background, readers should review the Court's May 7, 2024 Preliminary Injunction Order (Doc. 45), December 20, 2024 Partial Dismissal and Abeyance Order (Doc. 82), and the aforementioned Eighth Circuit decision (*Walls*, 144 F.4th 995).  Of course, since we are at the motion-to-dismiss stage, some of the background facts used for purposes of resolving the preliminary injunction motion cannot be used today because they are not found in the operative Complaint or the materials embraced by that Complaint.  *See infra* note 9.

At the outset, the Court notes that Plaintiffs concede that their First Amendment claims must be dismissed.[6]  What that means is that there are really only two buckets of claims left to address: (1) an as-applied equal protection claim and (2) due-process vagueness claims.  The two buckets of claims differ in several ways, including which Plaintiffs are pressing each bucket.  In Bucket One, the NAACP-AR (on behalf of its student members) invokes the Equal Protection Clause and contends that "Defendants' application of" the anti-indoctrination provision "to the AP [African American Studies course]" violates the Fourteenth Amendment.[7]  In Bucket Two, the Teacher Plaintiffs and the NAACP-AR (on behalf of its teacher members) invoke the Due Process Clause and contend that the anti-indoctrination provision "is void for vagueness in violation of the Fourteenth Amendment . . . ."[8]

---

[6] *See* Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97) at 1, 5–6.  The Court reads this concession to include both the traditional First Amendment claims (i.e., regulation of speech) and the portion of the void-for-vagueness claims that is housed under or potentially affected by the First Amendment.

[7] *See* First Am. Compl. (Doc. 8) ¶ 209; *id.* ¶¶ 197–213.  Count IV of the First Amended Complaint—which includes both the facial and as-applied equal protection challenges—was initially brought by two teachers (Ms. Walls and Mr. Gilbert), one student (Gisele Davis), and the NAACP-AR.  *See id.*  Since that time, Gisele Davis has voluntarily dismissed all her claims.  *See* Notice of Voluntary Dismissal (Doc. 70); Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 89) at 3 n.2.  And Plaintiffs appear to concede that Ms. Walls and Mr. Gilbert lack standing to pursue the official-capacity as-applied equal protection challenge at issue here.  *See id.* at 6 n.3.  Or maybe Plaintiffs are instead saying that, regardless of whether either of the two teachers had standing to pursue such a claim, they both chose not to do so in this case.  *See id.*  Either way, it is very clear from the briefing that (1) the NAACP-AR is the only Plaintiff pressing an as-applied equal protection challenge, and (2) it is pressing the claim only on behalf of its student members.  *See id.* at 6.

[8] *See* First Am. Compl. (Doc. 8) ¶ 166; *id.* ¶¶ 161–73.  Plaintiffs make clear in the operative Complaint that these claims are brought only by "Ms. Walls, Mr. Gilbert, and NAACP-AR."  *See id.* at 47 (Count I heading).  As to the NAACP-AR, the allegations in Count I make clear that its claim is on behalf of its teacher members.  *See id.* ¶ 170 ("The LEARNS Act gives no answers or guidance to the myriad questions regarding prohibited subject matter and thus leaves Teacher Plaintiffs *and other teachers* across the state in jeopardy of liability, including sanctions and penalties." (emphasis added)); *id.* ¶ 171 ("Now, with no clear standards for evaluating potential violations of this vague law, educators like Ms. Walls, Mr. Gilbert, *and teacher members of the NAACP-AR* face real risks of disciplinary action . . . ." (emphasis added)); *id.* ¶ 173 (similarly referencing "Ms. Walls, Mr. Gilbert, *and teachers across the state*" (emphasis added)).  Juxtaposed with the several references to the NAACP-AR's teacher members, there are no references to the vagueness claims being connected in any way with any student plaintiff or any student member of the NAACP-AR.

Although there is no confusion as to the identity of the parties bringing these claims, there may be some confusion as to the scope of these claims.  In their operative Complaint, and again in their briefs opposing dismissal, the Teacher Plaintiffs and the NAACP-AR suggest that they are bringing both a facial vagueness challenge and an as-applied vagueness challenge.  *See* First Am. Compl. (Doc. 8) ¶ 166; Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 19, 26; Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97) at 8.  In the context of the instant Motion,

For the reasons discussed below, the Court dismisses the as-applied equal protection challenge and orders an additional round of briefing on the vagueness challenges.

## ANALYSIS

Typically, the Court begins its orders with a recitation of the relevant background facts before proceeding to the legal analysis of each claim. But the Court believes it will be more efficient to approach things differently in today's Order. Specifically, the Court will forego a formal background section and instead intertwine relevant background facts with the relevant legal analysis of each claim.[9]

### I.      The As-Applied Equal Protection Challenge

As the NAACP-AR confirmed in supplemental briefing, the as-applied equal protection claim concerns only "the revocation of AP status from the 2023-2024 AP AAS course . . . ."[10] And "[t]he crux" of the claim "is that Defendants selectively enforced Section 16 against AP AAS with a discriminatory intent—based on an irrational prejudice—in violation of [the NAACP-AR Student Plaintiffs'] Fourteenth Amendment rights to equal protection."[11] Essentially, the

---

however, the terms "facial" and "as-applied" obscure more than they illuminate. The Court will explain why that is so later on in today's Order. *See infra* pp. 11–13. For now, it is enough to understand that the thrust of Plaintiffs' vagueness challenges is that the statute at issue (1) doesn't provide them sufficient clarity as to whether the conduct in which they want to engage is lawful or unlawful, and (2) is so standardless that it allows or encourages arbitrary or discriminatory enforcement. *See* Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 19–20; Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97) at 6–8.

[9] Because we are at the motion-to-dismiss stage, the background facts must come solely from the alleged facts in the operative Complaint or the materials embraced by that Complaint. *See Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768–69 (8th Cir. 2012). And the only legal question for the Court is whether Plaintiffs have pled facts that plausibly allege a viable legal claim. *See id.*

[10] Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 89) at 5.

[11] *Id.* at 7. The Court uses the terms "anti-indoctrination provision" and "Section 16" interchangeably when referring to Ark. Code § 6-16-156—the provision of the LEARNS Act at issue in this case.

NAACP-AR challenges an executive action as intentional discrimination. Under binding precedent, such a challenge is subject to the *Arlington Heights* framework.[12]

In resolving the facial equal protection challenge, the Court previously laid out and applied the *Arlington Heights* framework.[13] The same general framework applies here.[14] But with respect to the instant as-applied equal protection claim, the application of the *Arlington Heights* framework is exceedingly easy and straightforward. That is because of a very particular (and unusual) allegation made in the operative Complaint.

In paragraph 114, the NAACP-AR alleges that, "in the waning hours of August 14, now out of excuses, Secretary Oliva gave Arkansas students, teachers, and parents *the real reason* the State revoked approval of AP AAS: to protect Arkansas students from indoctrination in the form of a left-wing political agenda brainwashing found in AP AAS, as repeatedly publicly stated by

---

[12] *See generally Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *see also Britton v. Rogers*, 631 F.2d 572, 577 (8th Cir. 1980) ("The equal protection clause is applicable not only to discriminatory legislative action, but also to discriminatory governmental action in the administration and enforcement of the law."). All parties and the Court agree on this point. *See* Defs.' Suppl. Br. in Supp. of Defs.' Mot. to Dismiss (Doc. 85) at 10; Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 89) at 1. No party suggests that the *Strauder* or *Gomillion* lines of cases apply. For good reason: the facts alleged don't come anywhere close to plausibly triggering the doctrines from those (or similar) cases. *Cf.* Partial Dismissal and Abeyance Order (Doc. 82) at 35–37.

[13] *See* Partial Dismissal and Abeyance Order (Doc. 82) at 37–58.

[14] *See id.* at 39 ("In *Arlington Heights*, the Supreme Court provided some 'subjects of proper inquiry' that it thought might help a court determine if discriminatory intent or purpose was a motivating factor in a law's enactment: (1) whether the impact of the legislation 'bears more heavily on one race than another'; (2) '[t]he historical background of the decision[,] . . . particularly if it reveals a series of official actions taken for invidious purposes'; (3) '[t]he specific sequence of events leading up to the' enactment of the legislation; (4) whether the legislation was enacted pursuant to procedural or substantive departures from the norm; and (5) the 'legislative or administrative history' of the enactment." (quoting *Arlington Heights*, 429 U.S. at 266–68)). Courts use a slightly tweaked articulation of the *Arlington Heights* framework where, as here, the underlying claim focuses on executive action as opposed to legislation. *See Johnson v. Crooks*, 326 F.3d 995, 999–1000 (8th Cir. 2003); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996); *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985). For example, the first *Arlington Heights* factor looks to whether the impact of the challenged *legislation* "bears more heavily on one race than another . . . ." *Arlington Heights*, 429 U.S. at 266 (internal quotations omitted). But in a case like this one that challenges an executive action (not the legislation on its face), that factor is tweaked to look to whether the impact of the challenged *executive action* bears more heavily on one race than another. Similarly, whereas the fourth *Arlington Heights* factor asks whether the *legislation* was enacted pursuant to procedural or substantive departures from the norm, that same factor in a case challenging an executive action asks whether the challenged *executive action* was taken pursuant to procedural or substantive departures from the norm. All that said, the tweaks are not particularly material in the instant case.

4

[Governor] Sanders."[15]  This strikes the Court as pretty much the end of the matter.  The NAACP-AR is not only conceding, but is actually affirmatively alleging, that "the real reason" Secretary Oliva revoked the AP status of the AAS course was to protect students from what he saw as left-wing indoctrination in the course.  The NAACP-AR did not say this was "a" reason.  Rather, it said this was "the" reason—i.e., the singular motivation for the Secretary's actions.

Whatever one thinks about the propriety of making AP crediting decisions based on the politics of class curricula, such action is not racial discrimination.  Recall from the Court's previous order that, "[t]o survive a motion to dismiss under *Arlington Heights*, a plaintiff must allege facts sufficient to allow the Court to draw a reasonable inference that" a government official "acted with a discriminatory intent or purpose . . . ."[16]  Also recall that "[a] discriminatory intent or purpose means taking 'a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'"[17]  It is not enough to allege facts that make plausible (or from which this Court could reasonably infer) that Secretary Oliva knew the AP revocation would have adverse effects on African American students.[18]  Instead, the NAACP-AR must allege facts that make plausible (or from which this Court could reasonably infer) that Secretary Oliva revoked the AP status of the AAS course for, at least in part, the very purpose of causing those adverse effects on African American students.

There is just no way for the NAACP-AR to meet that standard when the NAACP-AR is affirmatively alleging that the only reason that Secretary Oliva revoked the AP status of the AAS

---

[15] First Am. Compl. (Doc. 8) ¶ 114 (emphasis altered).

[16] Partial Dismissal and Abeyance Order (Doc. 82) at 38.

[17] *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

[18] *See Feeney*, 442 U.S. at 279.

course is because he thought the class included left-wing indoctrination.[19]  A desire to protect students from "left-wing indoctrination" is not tantamount to a discriminatory intent or purpose to adversely impact African American students.[20]  End of story.  Accordingly, unlike in the Court's previous dismissal order, there is no need to walk through the *Arlington Heights* factors.[21]  As the Court explained in that order, "*Arlington Heights* did not establish a wooden or mechanical test."[22] Specifically, the Court noted as follows:

> The Supreme Court never suggested that the "subjects of proper inquiry" set out in *Arlington Heights* were an exhaustive list or that each identified subject was implicated in every case.  In fact, the Supreme Court suggested exactly the opposite. Essentially, the Supreme Court established a gently guided totality-of-circumstances test for district courts to employ.[23]

The whole point of the *Arlington Heights* framework is to ferret out intentional or purposeful discrimination from circumstantial facts.[24]  Here, where the NAACP-AR's operative Complaint

---

[19] It makes no difference whether Secretary Oliva's belief that the AP AAS course included left-wing indoctrination was correct or incorrect.  What matters is that his belief was sincere and not just a mask to harm African Americans. *Cf. Abbott v. Perez*, 585 U.S. 579, 605 (2018) ("[I]t [is] the plaintiffs' burden to overcome the presumption of legislative good faith and show that the [government] acted with invidious intent."); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 762 (2025) (Bumatay, J., dissenting) ("[T]he *Arlington Heights* factors [include a] strong presumption of good faith [that courts] must afford to state legislatures." (internal quotations omitted)).

[20] *Cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) ("[P]artisan motives are not the same as racial motives."); *Louisiana v. Callais*, 146 S. Ct. 1131, 1156 (2026) ("[I]n considering the constitutionality of a districting scheme, courts must treat partisan advantage like any other race-neutral aim: a constitutionally permissible criterion that States may rely on as desired."); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023) ("[T]he Supreme Court has warned against conflating discrimination on the basis of party affiliation with discrimination on the basis of race."); *Democratic Party of Wis. v. Vos*, 966 F.3d 581, 586 (7th Cir. 2020) ("[P]artisan intentions of legislators are not constitutionally suspect and . . . pursuing partisan ends does not violate the rights of people who disagree.").  One could reasonably question how revoking a class's AP status—but allowing the class to still be taught—would protect students from anything.  But that is beside the point here, where the NAACP-AR is affirmatively alleging that protection of students from left-wing indoctrination was the Secretary's real reason for his conduct.  Moreover, it stands to reason that the Secretary's revocation of the class's AP status was part of a negotiating tactic to force reforms of the AP curriculum.

[21] *See* Partial Dismissal and Abeyance Order (Doc. 82) at 43–58.

[22] *Id.* at 39.

[23] *Id.* (footnotes omitted).

[24] *See id.* ("In *Arlington Heights*, the Supreme Court provided some 'subjects of proper inquiry' that it thought might help a court determine if discriminatory intent or purpose was a motivating factor in a law's enactment . . . ." (quoting *Arlington Heights*, 429 U.S. at 268)).

affirmatively says that the intent or purpose of Secretary Oliva's action was something other than discriminating against African Americans, resorting to the individual *Arlington Heights* factors is neither necessary nor appropriate.

At most, walking through the *Arlington Heights* factors might show that the NAACP-AR plausibly alleged that Secretary Oliva's conduct was consistent with a discriminatory intent or purpose.   But we know that plausibly alleging conduct that is merely consistent with a discriminatory intent or purpose is not enough to survive a motion to dismiss.[25]  And the operative Complaint's acknowledgement that "the real reason" the Secretary revoked the AAS course's AP status was to protect students from left-wing indoctrination means there will always be—with respect to each factor—an obvious alternative explanation for the Secretary's conduct that is far more likely than a discriminatory purpose or intent.[26]

In briefing, the NAACP-AR argues that the given reason for revoking the AP status of the AAS course is a mask for intentional discrimination against African Americans.[27]  The Court need not address such arguments because they are flatly inconsistent with the operative Complaint, which clearly alleges that avoiding left-wing indoctrination was "the real reason" behind Secretary Oliva's actions.[28]  But let's indulge some of the NAACP-AR's arguments anyway.

---

[25] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

[26] *Cf.* Partial Dismissal and Abeyance Order (Doc. 82) at 42–43, 43 n. 188 (explaining the importance of obvious alternative explanations that are sufficiently convincing).

[27] *See* Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 89) at 17–20.

[28] *See* First Am. Compl. (Doc. 8) ¶ 114; *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) ("While it might be appropriate for a court to consider additional facts or legal theories asserted in a response brief to a motion to dismiss if they were consistent with the facts and theories advanced in the complaint, a court may not consider allegations or theories that are inconsistent with those pleaded in the complaint." (internal citations omitted)).

The NAACP-AR seems to argue that protecting students from left-wing indoctrination is just code.[29]  What specifically the NAACP-AR thinks it is code for is less clear.  Here's the Court's best guess after reading the operative Complaint and all the briefing.  The NAACP-AR thinks Secretary Oliva was, in reality, trying to prevent or undermine the teaching of information that would suggest (1) African Americans are still suffering from de facto discrimination and the effects of de jure discrimination, and (2) the best way to counter those effects are affirmative race-conscious measures.[30]  Imagine for a moment that the NAACP-AR is right.  Even then, there's no Equal Protection Clause violation.  To be sure, one might like or dislike Secretary Oliva's hidden purpose as a policy matter.  But that still wouldn't mean that Secretary Oliva's hidden purpose equates to an intent or purpose to adversely affect African American students.  And thus, Secretary Oliva's hidden purpose wouldn't violate the Equal Protection Clause.  Indeed, preventing such teaching would affect all students—of all races, colors, and creeds—in the exact same way.

To be clear: Discriminating against ideas is not the same as discriminating against people, and the Equal Protection Clause is about discriminating against people.[31]  Because there is no such thing as a "black idea" or a "white idea," discriminating against ideas cannot in and of itself violate the Equal Protection Clause.[32]  Similarly, because there is no such thing as a "black course" or a

---

[29] *See* Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 47.

[30] The Court is aware, of course, that the statute expressly protects and authorizes the teaching of (1) "[i]deas and the history of the concepts" concerning topics where indoctrination would be prohibited, and (2) "[p]ublic policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive."  Ark. Code Ann. § 6-16-156.  But, theoretically, Secretary Oliva could have been acting inconsistently with the statute.

[31] *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("In the wake of the Civil War, Congress proposed and the States ratified the Fourteenth Amendment, providing that no State shall 'deny to any *person* . . . the equal protection of the laws.'" (emphasis added) (quoting U.S. CONST. amend. XIV, § 1)); *City of Cleburne*, 473 U.S. at 439 ("The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all *persons* similarly situated should be treated alike." (emphasis added)).

[32] *See supra* note 20.

"white course," discriminating against a particular course cannot in and of itself violate the Equal Protection Clause.[33]

The long and short of it is that the NAACP-AR has not pled facts that make it plausible that Secretary Oliva engaged in intentional or purposeful discrimination—in whole or in part—when he revoked the AP status of the AP AAS course. For that reason, Defendants' request to dismiss the NAACP-AR's as-applied equal protection challenge is granted.[34]

_____

[33] For example, the NAACP-AR contends that Secretary Oliva has treated the AP European History course differently from the AP AAS course—insofar as he took AP status away from the AP AAS course—despite those two courses being similarly situated as to the topics they cover. *See* First Am. Compl. (Doc. 8) ¶¶ 123–141, 212; Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 8–9, 48–49; Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 89) at 15. Putting aside whether the NAACP-AR has pled facts to plausibly suggest that the two courses are similarly situated, nothing suggests that enrollment in AP European History is closed to African American students or that African American students are in some other way prevented from taking that course. Accordingly, whether the AAS course is being treated differently from the European History course does not equate to purposeful discrimination against African American students.

The NAACP-AR doesn't really argue otherwise. Instead, the NAACP-AR seems to merely argue that the differential treatment is circumstantial evidence of purposeful discrimination against African American students. For instance, in its operative Complaint, the NAACP-AR alleges that the "targeting of the AP AAS [course,] where the majority of students and teachers [are] Black[,] evidences how the effect of" Secretary Oliva's action "will be borne greater by Black students." First Am. Compl. (Doc. 8) ¶ 209. This is insufficient to plausibly allege purposeful discrimination for two reasons: first, as explained in the main text of the instant Order, there is an "obvious alternative explanation" for the focus on the AP AAS course. *See supra* pp. 6–7. The NAACP-AR does not suggest that the AP European History course is engaging in left-wing indoctrination that would trigger what the NAACP-AR affirmatively says is Secretary Oliva's "real" concern. Second, the data provided by the NAACP-AR is insufficient to back up its conclusion. The operative Complaint does not tell us the actual demographic breakdown of students in the six pilot AP AAS courses in the 2023-2024 school year. It does not compare that breakdown with the demographic breakdown of students in the AP European History courses (or any other AP courses) for the specific schools where the AP AAS pilot course was being offered. The data the operative Complaint does provide on the demographic breakdown of student populations in AP courses is state-wide and national data, which is unhelpful because the AP AAS course was only being taught at six schools in Arkansas at the time in question. *See* First Am. Compl. (Doc. 8) ¶ 43. The Court just doesn't know enough from the operative Complaint to compare the percentage of African American students in the AP AAS course at the six pilot schools with the percentage of African American students in AP European History (or other AP courses) at those same schools.

It is true that, in paragraph 45, the NAACP-AR alleges that "[o]n information and belief, Black student enrollment in AP AAS at the six Arkansas schools that offered the course is much higher than the average Black student enrollment in AP classes overall." *Id.* ¶ 45. But there are several problems with this allegation. First, it is entirely unclear whether "AP classes overall" refers to AP classes at those six specific schools or statewide. Second, the allegation is conclusory because "much higher" is not an actual fact pleading. Statistics would constitute fact pleadings. But the Court is not given statistics with respect to this statement. Third, the allegation does not compare AP AAS demographics with AP European History demographics. Instead, the allegation makes a comparison between the AP AAS African American student population and "the average Black student enrollment" in all other AP courses combined. *Id.* Such a comparison is irrelevant because there is no suggestion by any party that most of the other AP courses (except for European History) are in any way similarly situated to AP AAS.

[34] The Court disagrees with Defendants that the NAACP-AR lacks standing with respect to the as-applied equal protection claim. Even assuming that standing should be determined at the time of the operative Complaint, and even

## II.    The Vagueness Challenges

The underpinnings of the modern vagueness doctrine are less than fully clear.  On one hand, the Supreme Court seems to identify the vagueness doctrine's constitutional home as the Due Process Clause.[35]  So construed, the vagueness doctrine "represents a procedural . . . demand" for a certain level of clarity in a law that places a person's life, liberty, or property on the line.[36]  On the other hand, the Supreme Court's caselaw seems to acknowledge that the vagueness doctrine serves important separation-of-powers interests as well.[37]  Perhaps owing to this alternative

---

assuming that the AP status of the AP AAS course was fully restored by then, the NAACP-AR has alleged just enough to make it plausible that there are still (minor) effects of the revocation decision that an injunction could remedy.  *See id.* ¶¶ 153–60.  The Court suspects that its standing ruling might be different were this claim to get to summary judgment, where the standards are higher for the NAACP-AR—even with respect to standing.

[35] U.S. CONST. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."); *see Johnson v. United States*, 576 U.S. 591, 595 (2015) ("The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926))); *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) ("The prohibition of vagueness . . . is an essential of due process, required by both ordinary notions of fair play and the settled rules of law.  The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have fair notice of the conduct a statute proscribes.  And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." (internal citations and quotations omitted)); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. . . .  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause. . . .  It requires the invalidation of laws that are impermissibly vague. . . .  Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." (internal citations and quotations omitted)); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

Not everyone agrees that the vagueness doctrine ineluctably arises from the Due Process Clause.  *See Johnson*, 576 U.S. at 607–08 (Thomas, J., concurring) ("[O]ur vagueness doctrine shares an uncomfortably similar history with substantive due process, a judicially created doctrine lacking any basis in the Constitution."); *Dimaya*, 584 U.S. at 206 (Thomas, J., dissenting) ("I continue to harbor doubts about whether the vagueness doctrine can be squared with the original meaning of the Due Process Clause . . . .").  Who has the better read of the legal history is beyond the scope of today's Order.

[36] *Dimaya*, 584 U.S. at 191 (Gorsuch, J., concurring).

[37] *See id.* at 176 (Gorsuch, J., concurring) ("[V]oid for vagueness doctrine, at least properly conceived, serves as a faithful expression of ancient due process and separation of powers principles the framers recognized as vital to ordered liberty under our Constitution."); *id.* at 181 (Gorsuch, J., concurring) ("Although today's vagueness doctrine owes much to the guarantee of fair notice embodied in the Due Process Clause, it would be a mistake to overlook the doctrine's equal debt to the separation of powers."); *id.* at 181–82 (Gorsuch J., concurring) (identifying several vagueness cases relying on separation-of-powers concerns); *United States v. Davis*, 588 U.S. 445, 451 (2019) ("Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation

pedigree, the vagueness doctrine's clarity concerns are not exclusively about giving notice to a person of what conduct is lawful and what conduct is unlawful.  The doctrine is also focused on whether a statute's lack of clarity will necessarily lead to arbitrary enforcement by executive or judicial officials.[38]

So goes the theory.  Now here's the practice.  Under binding Supreme Court precedent, "[a] statute can be impermissibly vague for either of two independent reasons."[39]  The first reason is that "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."[40]  The second reason is that "it authorizes or even encourages arbitrary and discriminatory enforcement."[41]  Either reason suffices to sustain a vagueness challenge.[42]

Vagueness challenges come in one of two forms: a facial challenge or an as-applied challenge.  A facial challenge seeks to invalidate the statute at issue entirely.[43]  An as-applied challenge seeks only to prevent the application of the statute to a plaintiff's specific circumstances.[44]  In most areas of law, facial challenges are disfavored and extremely difficult to

---

of powers.  Vague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them.  Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect.  Only the people's elected representatives in the legislature are authorized to make an act a crime.  Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." (internal citations and quotations omitted)).

[38] *See Fox Television*, 567 U.S. at 253.

[39] *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

[40] *Id.*; *see also Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 597 (8th Cir. 2026) (same).

[41] *Hill*, 530 U.S. at 732; *see also Reynolds*, 172 F.4th at 597 (same).

[42] *See Hill*, 530 U.S. at 732.  The Court's summary of the theoretical underpinnings and black letter law of the vagueness doctrine is descriptive only.  The Court is aware of serious scholarship that calls into question the current iteration of the vagueness doctrine.  *See Johnson*, 576 U.S. at 607–24 (Thomas, J., concurring); *Dimaya*, 584 U.S. at 205–35 (Thomas, J., dissenting).

[43] *See Reynolds*, 172 F.4th at 595–97; *cf. Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").

[44] *See United States v. Ledvina*, 166 F.4th 716, 721 (8th Cir. 2026) (en banc) ("[U]nlike a facial challenge, which challenges the law as written, an as-applied challenge considers whether the application to a particular person under particular circumstances deprived that person of a constitutional right." (internal quotations omitted)); *cf. Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) ("An as-applied challenge consists

maintain.[45]  As the Supreme Court explained in *United States v. Salerno*: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."[46] Unfortunately, the status of and standards regarding facial *vagueness* challenges are not as straightforward as this might suggest.[47]

For a long time, it appeared as if the *Salerno* standard (or something very close to it) applied to routine facial vagueness challenges.  Indeed, even earlier than *Salerno*, the Supreme Court instructed lower courts that, "assuming [an] enactment implicates no constitutionally protected conduct," courts "should uphold [a facial vagueness] challenge only if the enactment is impermissibly vague in all of its applications."[48]  The plot thickened in 2015, however, when the Supreme Court walked away from the *Salerno* standard for vagueness challenges in *Johnson v.*

---

of a challenge to the statute's application only as-applied to the party before the court.  If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." (internal citations omitted)).

[45] *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse.  Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement.  And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways.  This Court has therefore made facial challenges hard to win." (internal citations and quotations omitted)); *see id.* at 745–48 (Barrett, J., concurring) (acknowledging the "dangers of bringing a facial challenge" and cautioning the Court to avoid "bit[ing] off more than it can chew" by entertaining a facial challenge); *see id.* at 777 (Alito, J., concurring) (noting that facial challenges to statutes are "strongly disfavored").  Justice Thomas' well-reasoned concurrence in *NetChoice* provides a fuller examination of the origins and pitfalls of facial challenges.  *See id.* at 749–66 (Thomas, J., concurring).

[46] 481 U.S. 739, 745 (1987).

[47] The *Salerno* no-set-of-circumstances-exist standard for facial challenges has received its fair share of criticism, and the scope and breadth of its applicability—including in the vagueness context—is somewhat up in the air.  *See* Richard H. Fallon Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1322–24 (2000) (detailing the *Salerno* debate); Gillian E. Metzger, *Facial Challenges and Federalism*, 105 COLUM. L. REV. 873, 878 (2005) ("The Supreme Court frequently states its disapproval of facial constitutional challenges, but it voices this disapproval with varying degrees of intensity. . . .  *Salerno*'s well-known pronouncement is the most extreme version . . . .  [But] [a]s several scholars and even some Justices have noted, . . . in practice the Court accepts facial challenges far more frequently than its stated doctrine suggests.").  In any event, as Justice Alito explained in his thoughtful *NetChoice* concurrence, while "some Members of the Court have criticized the *Salerno* formulation," all "Members of the Court . . . have agreed that a facial challenge must fail where the statute has a plainly legitimate sweep."  *NetChoice*, 603 U.S. at 778 (Alito, J., concurring) (internal quotations omitted).

[48] *Vill. of Hoffman Ests. v. Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982).

*United States*.[49]  Over a forceful dissent focused on *Salerno*, the Supreme Court explained that, "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."[50]

Post-2015, the caselaw on facial vagueness challenges is in something of disarray.  Perhaps most problematically, the Supreme Court has not clearly set out what standard should be used to evaluate a facial vagueness challenge in contradistinction to the standard used to evaluate an as-applied challenge.  Despite this wrinkle, however, the following two propositions appear to be emerging from lower court attempts to understand the governing Supreme Court precedent: (1) where a law is sufficiently clear that it proscribes all the conduct a particular plaintiff is undertaking or wants to undertake, that plaintiff can't maintain a vagueness challenge on the ground that the law is not sufficiently clear as to whether it proscribes conduct that the plaintiff is not undertaking and has no desire to undertake; and (2) the only potential exception to Rule 1 is where the statute's lack of clarity is so serious in the mine-run of circumstances to which the statute potentially speaks that the statute can be said to authorize or encourage arbitrary and discriminatory enforcement.[51]

---

[49] *See generally* 576 U.S. 591 (2015).

[50] *Id.* at 602.

[51] *See, e.g.*, *Reynolds*, 172 F.4th at 596–97 (rejecting a facial vagueness challenge because "[t]he law is clear enough that a person of ordinary intelligence can reasonably understand it[,]" but leaving open the possibility that plaintiff may have a righteous as-applied challenge); *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023) (holding a school district policy unconstitutionally vague on its face where "[t]he lack of clarity . . . makes the policy susceptible to arbitrary enforcement"); *United States v. KT Burgee*, 988 F.3d 1054, 1060 (8th Cir. 2021) ("When reviewing for vagueness, we first determine if a statute is vague as applied to the defendant's conduct, and only if it is will we consider whether a statute is facially unconstitutional.  This is because 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of vagueness of the law as applied to the conduct of others.'" (internal citations omitted) (quoting *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019))); *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 756–57 (5th Cir. 2026) ("If a challenger engages in conduct that is clearly proscribed, he is barred from pursuing a void-for-vagueness challenge based on hypothetical applications of the law." (internal quotations omitted)); *Lumumba v. Kiser*, 116 F.4th 269, 285 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1189 (2025) ("Not just any litigant can bring a facial vagueness challenge, however.  A

With the foregoing understanding of the contours of the vagueness doctrine, we can turn to Plaintiffs' specific vagueness allegations in this case.

### A.    The Operative Complaint's Vagueness Allegations

In the operative Complaint, Ms. Walls, Mr. Gilbert, and the NAACP-AR (on behalf of its teacher members) allege that, because of the anti-indoctrination provision, they "are at a loss for what they can and cannot teach, especially when it comes to the history of racism and ongoing racial inequalities and injustice in present-day America."[52]  In a similar vein, they allege that, once the statute became effective, they "immediately began reviewing and revising their lesson plans" to avoid "discussing 'controversial' topics that may run afoul of the law, including the role of colonialism in America, excerpts of 'Warriors Don't Cry: A Searing Memoir of the Battle to Integrate Little Rock's Central High School,' and competing ideas about potential causes for lasting inequalities in society."[53]

To get more granular, Ms. Walls alleges that she no longer "delve[s] deeply into topics in her AP AAS classes like the consequences of *Brown v. Board of Education* for Black teachers or how Jim Crow laws are similar to laws being passed today for fear of either violating Section 16 or giving opponents of deep learning ammunition to target [her] and her students."[54]  Instead, she "glosses over [these] topics . . . because of the public statements and threats made by Secretary

---

plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (internal quotations omitted)); *United States v. Pugh*, 90 F.4th 1318, 1333 (11th Cir. 2024) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (internal quotations omitted)); *United States v. Cook*, 970 F.3d 866, 876–77 (7th Cir. 2020) ("*Johnson* . . . rejects the notion that simply because one can point to *some* conduct that the statute undoubtedly would reach is alone sufficient to save it from a vagueness challenge. . . . [But] *Johnson* did not alter the general rule that a defendant whose conduct is clearly prohibited by statute cannot be the one to make a facial vagueness challenge.").

[52] First Am. Compl. (Doc. 8) ¶ 5.

[53] *Id.* ¶ 6.

[54] *Id.*

14

Oliva regarding Section 16 enforcement."[55]  Further, Ms. Walls alleges that, "although the New York Times' 'The 1619 Project' would be an invaluable resource in teaching various academic standards of the AP AAS [course]," she doesn't use it because she fears doing so "could . . . violate Section 16."[56]  Somewhat similarly, "[a]nother teacher, who is a member of the NAACP-AR, no longer teaches *The Color Purple* by Alice Walker and relies less on using films or additional media materials related to current events, such as excerpts of speeches by Roland Martin, because she is not sure whether those materials would violate Section 16."[57]

Mr. Gilbert, a debate coach who teaches Communication Skills and Debate, alleges that, "in class and in debate competitions, [he] feels compelled by Section 16 to mute students' presentation of certain arguments and has stopped guiding and supporting students on subjects that may run afoul of the law."[58]  Mr. Gilbert says "he does not know where [the Section 16] line lies and, thus, probably overcorrects out of fear of reprisal from Defendants."[59]  The operative Complaint provides this example:

> In Mr. Gilbert's debate classes and competitions, the very nature of students' work is to learn and research both sides of an issue, including controversial issues, and then assert and defend a position.  Asking or directing students to adopt or profess an idea that could include topics such as affirmative action, legacy admissions, or criminal justice reform could conceivably run afoul of Section 16.  Consequently, Mr. Gilbert has censored such discussions and assignments.[60]

One of Mr. Gilbert's concerns, as well as the concerns of Ms. Walls and other teachers, is what could happen to them if they do or say something that Section 16 is later interpreted to

---

[55] *Id.* ¶ 78.

[56] *Id.* ¶ 87.

[57] *Id.* ¶ 78.

[58] *Id.* ¶ 9.

[59] *Id.*

[60] *Id.* ¶ 75.

prohibit. According to the operative Complaint, "[v]iolations of [Section 16] could result in potential sanctions, including letters of reprimand, employment suspensions, nonrenewal of employment, and even revocation of professional licenses for repeated offenses, as determined by [a] superintendent, Secretary Oliva, or the State Board."[61]

Plaintiffs allege several things they say suggest enforcement action is a realistic possibility—both overall and specifically with respect to teaching AP AAS. First, they allege that "the threat of sanctions" is increased because "the LEARNS Act repealed the Teacher Fair Dismissal Act" and thereby removed certain procedural and substantive protections teachers previously enjoyed against "be[ing] fired, non-renewed, or suspended . . . ."[62] Second, Plaintiffs allege that Secretary Oliva "revoked the ADE's approval of AP AAS[,]"[63] that ADE "issued a statement claiming that the AP AAS course likely violated provisions in the LEARNS Act that guard against the 'indoctrination' of students by teaching 'prohibited topics[,]'"[64] and that "ADE further warned educators who continued teaching the course that they risked violating state law and whatever penalties would flow therefrom."[65] Third, Plaintiffs allege that Governor Sanders issued a similar admonishment, suggesting that the 2023-2024 AP AAS course "may unintentionally put a teacher at risk of violating Arkansas law."[66] And fourth, Plaintiffs allege facts about an August 21, 2023 letter from Secretary Oliva to school superintendents.[67] In that letter, Secretary Oliva expressed that, "[g]iven some of the themes included in the [AP AAS] pilot,

---

[61] *Id.* ¶ 89.

[62] *Id.* ¶ 90.

[63] *Id.* ¶ 105.

[64] *Id.* ¶ 115.

[65] *Id.*

[66] *Id.* ¶ 116 (emphasis removed).

[67] *Id.* ¶ 122.

including 'intersections of identity' and 'resistance and resilience,' the Department is concerned the pilot may not comply with Arkansas law, which does not permit teaching that would indoctrinate students with ideologies, such as Critical Race Theory."[68]

Based on the foregoing allegations, the Court gleans that Ms. Walls, Mr. Gilbert, and the NAACP-AR (on behalf of its member teachers) are bringing both facial challenges and as-applied challenges. The attacks are as-applied insofar as they focus on whether the statute is sufficiently clear with respect to the conduct in which Plaintiffs wish to engage as opposed to the conduct in which others wish to engage. The attacks are facial insofar as they focus on (1) whether the statute's lack of clarity is a problem in the mine-run of cases arguably falling under the statute and (2) whether the statute is so standardless that it invites arbitrary and discriminatory enforcement.[69]

---

[68] *Id.* (emphasis removed).

[69] *See* First Am. Compl. (Doc. 8) ¶ 166 ("Section 16 is void for vagueness . . . both on its face and as applied because it fails to provide Teacher Plaintiffs and other educators with fair notice of what curriculum, discussions, assignments, and materials they can and cannot include in the courses. Section 16 also invites arbitrary enforcement and already has led to the purging of wide-ranging race-related educational resources that examine racial equity and historical events and to the cancelation of the AP AAS."). If the Court's understanding of the various aspects of Plaintiffs' vagueness challenges is correct, then Plaintiffs are incorrect that "Defendants do not contest Plaintiffs' as-applied claim" for purposes of Defendants' Motion to Dismiss. Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 19 n.6; *see also* Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97) at 6 n.3 (same). Defendants' Motion to Dismiss and supporting arguments sufficiently address the substance of Plaintiffs' vagueness challenges, and Defendants' arguments go to both the facial and as-applied aspects of those challenges. For example, among other things, Defendants argue that (1) Section 16 is not vague because it only prohibits "prohibited indoctrination"—which is a statutorily defined term, and (2) Section 16 is not vague because the State's licensing statutes allow for "reasonable mistake[s] made in good faith," which undermines Plaintiffs' contention that they may be "subject to penalties" for actions that Plaintiffs reasonably believe don't constitute "prohibited indoctrination." *See* Defs.' Br. in Supp. of Mot. to Dismiss (Doc. 55) at 21–22 (internal quotations omitted). That is enough to have responded to both the as-applied and facial vagueness challenges.

The Court suspects that Plaintiffs may be operating under a mistaken view of what constitutes an as-applied vagueness challenge. In their briefing, Plaintiffs characterize their as-applied challenges as "focusing on Section 16's application to AP AAS . . . ." Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss (Doc. 61) at 19 n.6; *see also* Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 97) at 6 n.3 (same). To the extent Plaintiffs are suggesting that their as-applied challenges are an attack on the de-crediting of AP AAS (or some other enforcement action Secretary Oliva took with respect to AP AAS), as-applied vagueness challenges are not the right vehicle for that. All vagueness challenges— whether facial or as-applied—are challenges to the lack of clarity of a statute as opposed to challenges to an enforcement action itself. *See Fayetteville Pub. Libr. v. Crawford Cnty.*, No. 25-1146, 2026 WL 2197765, at *8 (8th Cir. July 30, 2026) ("[A] statute is only void for vagueness if [the statute] fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that [the statute] authorizes or encourages seriously discriminatory enforcement." (internal quotations omitted)). Alternatively, Plaintiffs may be suggesting that their as-applied challenges are to whether the statute is sufficiently clear as to the lawfulness or unlawfulness of the AP AAS curriculum. The problem for Plaintiffs there is that they don't have the type of personal interest necessary to support

17

## B.     The Case-or-Controversy Requirement

Before analyzing the merits of Plaintiffs' vagueness challenges, the Court must address a threshold question. Does the Constitution give the Court the power to decide these claims?[70] And that raises two subsidiary questions. First, do any of the Plaintiffs who are bringing vagueness challenges have standing to raise such claims?[71] Second, if they do have standing, have their claims become moot?

The Court is duty-bound to address these questions before reaching the merits of any claim.[72] Unelected federal judges are—thankfully—not given a roving commission to strike down statutes enacted by the elected branches of a state government.[73] Instead, a federal judge's authority to determine the constitutionality of a state statute is limited to circumstances in which doing so is necessary to decide (or at least relevant to deciding) an actual case or controversy.[74]

---

standing for such as-applied challenges. Put another way, the de-crediting of the AP AAS class does not create an injury-in-fact for Ms. Walls, Mr. Gilbert, or any teacher member of the NAACP-AR. Finally, Plaintiffs may be suggesting that their as-applied challenges are to whether the statute is sufficiently clear as to how the AP AAS class can be lawfully taught. But this would just be a regurgitation of Plaintiffs' general argument that the statute lacks clarity concerning the conduct the teachers are undertaking or want to undertake. Defendants have sufficiently responded to that argument, as the Court explained in the preceding paragraph.

[70] *See Students for Fair Admissions*, 600 U.S. at 198 ("Before turning to the merits, we must assure ourselves of our jurisdiction.").

[71] *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("Our standing decisions make clear that standing is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal citations and quotations omitted)).

[72] *See Renne v. Geary*, 501 U.S. 312, 316 (1991) ("Concerns of justiciability go to the power of the federal courts to entertain disputes . . . ."); *In re Athens/Alpha Gas Corp.*, 715 F.3d 230, 235 (8th Cir. 2013) ("Federal courts generally must address *Article III* subject-matter jurisdiction before reaching a non-jurisdictional question . . . ."); *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 933 (8th Cir. 2012) ("Whether there is Article III standing is always an antecedent question.").

[73] *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("Under Article III, federal courts do not . . . possess a roving commission to publicly opine on every legal question."); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 340 (2022) (Kavanaugh, J., concurring) ("As Justice Rehnquist stated, this Court has not 'been granted a roving commission, either by the Founding Fathers or by the framers of the Fourteenth Amendment, to strike down laws that are based upon notions of policy or morality suddenly found unacceptable by a majority of this Court.'" (quoting *Furman v. Georgia*, 408 U.S. 238, 467 (1972) (Rehnquist, J., dissenting))).

[74] *See Students for Fair Admissions*, 600 U.S. at 199 ("Article III of the Constitution limits '[t]he judicial power of the United States' to 'cases' or 'controversies,' ensuring that federal courts act only 'as a necessity in the determination of real, earnest and vital' disputes." (quoting *Muskrat v. United States*, 219 U.S. 346, 351 (1911))); *Rucho v. Common Cause*, 588 U.S. 684, 695 (2019) ("Article III of the Constitution limits federal courts to deciding 'Cases' and

18

And an actual case or controversy only exists where (1) a plaintiff has standing to press the claim at issue, and (2) that claim has not become moot.[75]

### i.    Standing

In general, a plaintiff has standing when that plaintiff has a personal stake in the outcome of the claim being pressed: that is, when the challenged law is injuring or about to injure the plaintiff in some way and the claim being pressed would redress that present or impending injury.[76] On the other side of the constitutional fence, a plaintiff lacks standing when that plaintiff's beef with the law is nothing more than a generalized grievance: that is, when the plaintiff is challenging a law merely because that plaintiff doesn't like the law or thinks it will have a negative effect on others.[77]

The Supreme Court has a long-established test for separating these two situations from one another:

> To establish standing, as this Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. Those specific standing requirements constitute an essential and unchanging part of the case-or-controversy requirement of Article III.[78]

---

'Controversies.' We have understood that limitation to mean that federal courts can address only questions historically viewed as capable of resolution through the judicial process. In these cases we are asked to decide an important question of constitutional law. But before we do so, we must find that the question is presented in a 'case' or 'controversy' that is, in James Madison's words, of a Judiciary Nature." (internal citations and quotations omitted)).

[75] *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (describing the standing and mootness requirements); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) ("The Constitution's case-or-controversy limitation on federal judicial authority . . . underpins both our standing and our mootness jurisprudence . . . ."). Ripeness is not at issue in this case.

[76] *See TransUnion*, 594 U.S. at 422–24; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

[77] *See Carney v. Adams*, 592 U.S. 53, 58 (2020) ("[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.' And it consequently does not show standing."); *see also Lujan*, 504 U.S. at 575. There is a slight quirk where the plaintiff is an organization litigating on behalf of its members. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024). But the quirk is immaterial to today's Order.

[78] *All. for Hippocratic Med.*, 602 U.S. at 380 (internal citations and quotations omitted); *see also Lujan*, 504 U.S. at 560–61 (same).

Most often, "the two key questions" in this analysis "are injury in fact and causation."[79]  Over the decades, the Supreme Court has provided some significant guidance as to what constitutes an injury in fact:

> An injury in fact must be "concrete," meaning that it must be real and not abstract. The injury also must be particularized; the injury must affect the plaintiff in a personal and individual way and not be a generalized grievance. . . .  Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.  And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury.[80]

Some common examples of potential injuries in fact are physical injuries, monetary injuries, injuries to one's property, or injuries to one's constitutional rights.[81]  Such injuries are injuries in fact because they are injuries to "legally protected interest[s] . . . ."[82]

As one might imagine from the foregoing, the injury-in-fact inquiry is most difficult where the asserted injury has not already occurred but might occur in the future.  Such asserted future injuries are (and by definition must be) common features of claims that involve pre-enforcement challenges to statutes or claims that seek only prospective injunctive relief.  So it should not be a surprise that the Supreme Court has further clarified the imminence-of-the-injury requirement in this context.

According to the Supreme Court, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*."[83]  Therefore,

---

[79] *All. for Hippocratic Med.*, 602 U.S. at 381.

[80] *Id.* (internal citations and quotations omitted).

[81] *See id*. (making clear this is not an exhaustive list).

[82] *Lujan*, 504 U.S. at 560.

[83] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis added) (quoting *Lujan*, 504 U.S. at 565 n.2)).

"threatened injury must be *certainly impending* to constitute injury in fact" and "[a]llegations of *possible* future injury" are insufficient.[84]  And where the future injury arises (if at all) from the enforcement of an unconstitutionally vague statute, an injury is "certainly impending" only where (1) a plaintiff alleges an "intention to engage in a course of conduct arguably" proscribed by the statute, (2) "there exists a credible threat of [enforcement]" of the statute against the plaintiff,  and (3) such enforcement would cause a concrete and particularized injury.[85]

### ii.    Mootness

Like the standing doctrine, the mootness doctrine is rooted in Article III's case-or-controversy requirement.[86]  The main distinction between the doctrines is that, while "[t]he doctrine of standing generally assesses whether" a plaintiff has a personal interest in the dispute "at the outset," the mootness doctrine assesses whether the plaintiff's personal interest "exists throughout the proceedings."[87]  Stated differently, "the mootness doctrine" is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."[88]  Thus, pursuant to the mootness doctrine, federal courts "do not have jurisdiction over cases in which[,] due to the

---

[84] *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

[85] *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotations omitted); *see also L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (same).

[86] *See Friends of the Earth*, 528 U.S. at 180 (2000); *see also McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004).

[87] *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021).

[88] *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 691 (8th Cir. 2003) (quoting *Friends of the Earth*, 528 U.S. at 189)); *Uzuegbunam*, 592 U.S. at 282 ("[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot."); *Already*, 568 U.S. at 91 ("A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (internal quotations omitted)).

21

passage of time or a change in circumstance, the issues presented . . . will no longer be 'live' or the parties will no longer have a legally cognizable interest in the outcome of the litigation."[89]

Notwithstanding the above, it is important to bear in mind that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."[90] There are also notable exceptions to the mootness doctrine.  One exception is reserved "for cases that are capable of repetition yet evading review."[91]  A second (and perhaps interrelated) exception is that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."[92]  Permitting a defendant to moot a lawsuit by voluntarily ceasing its allegedly wrongful conduct would mean "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."[93]  To account for this perverse incentive, a defendant that makes a mootness argument based on voluntary cessation "bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."[94] If a defendant cannot make that showing, the case is not moot.

---

[89] *Connor*, 323 F.3d at 691 (internal quotations omitted); *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 791 (8th Cir. 2018) ("Generally, a claim is moot when 'changed circumstances already provide the requested relief and eliminate the need for court action.'" (quoting *McCarthy*, 359 F.3d at 1035)).

[90] *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotations omitted)).

[91] *Connor*, 323 F.3d at 691.  Under this exception, an otherwise moot case will be rescued if (1) "the challenged conduct is of too short a duration to be litigated fully prior to its cessation or expiration"; and (2) "there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Id.*  But "[a] speculative possibility" that the complaining party will be subject to the same action again "is not a basis for retaining jurisdiction over a moot case."  *McCarthy*, 359 F.3d at 1036.

[92] *Already*, 568 U.S. at 91.

[93] *Id.*

[94] *Id.* (quoting *Friends of the Earth*, 528 U.S. at 190); *see also Hillesheim*, 903 F.3d at 791 ("To be sure, voluntary cessation of a challenged practice does not necessarily moot a case.  But '[a] case [may] become moot if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (alterations in original) (quoting *Friends of the Earth*, 528 U.S. at 189)).

### iii.    Analysis

Under the standing and mootness tests just articulated, the Court is concerned that it may not have constitutional authority to decide the vagueness challenges in the instant case. Some of the Court's concerns have not been fully aired (or aired at all) by the parties. And even though the Court has the ability to raise such concerns *sua sponte*, the better practice is not to rule without the parties' views on issues like this. Accordingly, before the Court finally rules on the vagueness claims, the Court requests that the parties (and any interested amici) file briefs on the issues raised below.[95]

Often, plausibly alleging injury is not hard because the law at issue directly regulates what a plaintiff can or can't do.[96] But our case seems different. Although Section 16 regulates what teachers may and may not say—and thus, the law's alleged vagueness may cause teachers to censor themselves with respect to what they teach in class—this is not an invasion of a teacher's legally protected interests. That's because what is being regulated is government speech as opposed to the personal speech of the teachers.[97] The teachers might not be happy with the regulation, but it is not acting on their personal legal interests.[98] Accordingly, as far as the Court can see, the only

---

[95] The Court understands this case has spent a long time at the motion-to-dismiss stage. And calling for more briefing extends that period. But all claims other than the vagueness challenges are out of the case at this point. And vagueness challenges are, by definition, pure legal challenges to a statute. That means no merits discovery is necessary and, in turn, the Court's legal ruling on the Motion to Dismiss is essentially going to dictate the full outcome of the vagueness challenges. Because of this, the Court is far less concerned than it might otherwise be about the case remaining at the motion-to-dismiss stage for now. Moreover, because striking down a state statute on vagueness grounds is one of the most intrusive acts a federal court can perform in our dual-sovereign system, it is particularly important to ensure the Court has constitutional authority to act where a vagueness challenge to a state statute is at issue.

[96] Perhaps put more aptly, "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy . . . the injury in fact . . . requirement[]." *All. for Hippocratic Med.*, 602 U.S. at 382.

[97] *See Walls*, 144 F.4th at 999–1000.

[98] The Court notes that this analysis would be inapplicable where a law challenged for vagueness was allegedly chilling or otherwise regulating a teacher's religious rights under the First Amendment, or gun rights under the Second Amendment, or so on. The difference here is the government speech doctrine—which makes the allegedly chilled or regulated speech that of the government and not the teacher. *Cf. id.* at 1003 ("Government speech is not immune from all constitutional challenges, and our holding does not suggest otherwise. The Establishment Clause, for example, limits government speech. Other constitutional provisions may constrain government speech as well, but the Free

23

invasion of a legally protected interest that the teachers could conceivably claim is potential discipline—things like demotion, docked pay, suspension, termination, or loss of teaching licenses—that might arise from the enforcement of Section 16. And it is on this score the Court has questions.

Let's start with Mr. Gilbert. As to him, the operative Complaint contains no allegations of fact that make plausible a credible threat of discipline flowing from Section 16. Section 16 itself has no disciplinary enforcement mechanism against teachers. Plaintiffs' theory is one of bankshot enforcement—that a school superintendent, the Secretary of Education, or the State Board will discipline a teacher who does something that a school superintendent, the Secretary of Education, or the State Board believes is violative of Section 16. But the operative Complaint contains no allegations that Section 16 has ever been enforced by way of discipline against a teacher at any time across the entire state. Moreover, the operative Complaint contains no allegations that anyone—teacher, student, administrator, parent, or member of the public—has ever suggested in any way that Mr. Gilbert (or any other debate coach, debate teacher, or communications teacher) is or might be violating Section 16.[99] Given all this, was there, at the start of the lawsuit (or the filing of the operative Complaint), really a credible threat that Mr. Gilbert might be disciplined for the teaching/coaching he was engaging in or for the teaching/coaching that he alleged he wanted to engage in?

It appears to the Court that Mr. Gilbert's best standing argument with respect to a credible threat of enforcement goes something like this: (1) Mr. Gilbert wants to randomly direct his debate

---

Speech Clause is not one of them." (internal citations omitted)). In this regard, it is important to emphasize that all of Plaintiffs' allegations of injury relate to what they may or may not be able to say in the classroom as part of their class curriculum/instruction.

[99] The operative Complaint was filed on April 12, 2024, thirteen months after the anti-indoctrination provision became law. *See* First Am. Compl. (Doc. 8); Prelim. Inj. Order (Doc. 45) at 29.

24

students to argue the two sides of the affirmative action issue; (2) doing so will likely result in at least one student having to express pro-affirmative action views with which that student actually disagrees; and (3) at the outset of this litigation, it appeared that this might be prohibited under the statute as "compel[ling] a person to adopt, affirm, or profess an idea . . . that . . . [a]n individual should be discriminated against or receive adverse treatment solely or partly because of the individual's color [or] race . . . ."[100]  The Court is open to—although not yet convinced by—that argument.  But even if this means Mr. Gilbert had standing, the Court has a mootness question.

Defendants have now clearly conceded that, whatever conduct might be covered by the statute, the conduct that Mr. Gilbert is engaging in or wants to engage in does not violate the anti-indoctrination provision.[101]  And that concession has weight.  Defendants are judicially estopped

---

[100] Ark. Code Ann. § 6-16-156(b).  There are, of course, many varieties of affirmative action.  But to make this example stark, imagine the student in question was required to make the best argument for the proposition that skin color alone—with no other context—should be used to make an admission decision between two otherwise equally attractive college candidates.

[101] *See* Tr. of Mot. for Prelim. Inj. Hr'g (Doc. 57) at 70:2–19 ("MR. BRONNI: . . . . [T]he statute itself only prohibits . . . compelling . . . a person to adopt, affirm, or profess an idea. . . .  Given that language, it's very clear that [Section 16] doesn't prohibit the discussion of ideas."); *id.* at 70:21–71:1 ("THE COURT: . . . .  What's the State's position on what 'compels' means?  MR. BRONNI: I think 'compel' means the same thing it did in *Barnette*, which is essentially forcing somebody to profess a belief."); *id.* at 73:25–74:25 ("THE COURT: The debate example, . . . if a teacher says, listen, we're going [to] do an assignment now and the assignment is . . . you have to take a particular side on . . . whether particular groups of people are inherently superior to each other or not, and you get to argue the no and you get to argue the yes.  And the person who is supposed to argue the yes says, whoa, whoa, whoa, I don't think groups are inherently . . . superior, I think we're all equal.  But the teacher says, well, for purposes of this debate, I need you to take the yes side so I'm assigning it to you.  Is that compelling a person to adopt, affirm, or profess an idea?  MR. BRONNI: I think that's an analytical exercise.  So, no, it's not forcing somebody to actually profess, affirm, or state that they believe the idea.  It's requiring them to perform an intellectual exercise in the context of debate to take a position for debate purposes, not to adopt the idea personally.  That's what the statute is getting at, is compelling a student to profess that he or she personally believes something, they're adopting the idea; if they don't profess that particular idea, they get a different grade on the test."); *id.* at 91:18–92:10 ("THE COURT: . . . .  [T]he State is okay with saying that [Section 16] goes no further than stopping a teacher from compelling a person to adopt, affirm, or profess an idea which, essentially, is giving them a bad grade or taking some negative action if they don't accept that idea? . . . .  Or rewarding somebody not for getting the concepts in the class, but for taking a particular position[?] . . . .  I just want to make sure that is the position of the State.  MR. BRONNI: Yes, it is."); Prelim. Inj. Order (Doc. 45) at 38–39 ("Defendants' brief disclaims the notion that Section 16 prohibits a teacher from teaching about Critical Race Theory or teaching through the prism of Critical Race Theory, so long as the teaching does not cross the line into compelling students to agree with things being taught or compelling students to accept that Critical Race Theory is correct.  (The same is true of any other theory or ideology that—on Defendants' view—violates Title IV/Title VI and conflicts with the principle of equal protection under the law.)  At the preliminary injunction hearing, the . . . Defendants doubled down on this position and then went even further to advance a narrow view of what constituted the type of compulsion prohibited by Section 16.  The . . . Defendants referred this Court to *West Virginia*

25

from ever claiming otherwise.[102]  Also, in light of this concession, the chance seems extraordinarily remote (if not impossible) that the State Board of Education could ever think the teaching/coaching that Mr. Gilbert alleges he does or wants to do was an act he knew or reasonably should have known violated Section 16.  Does that make Mr. Gilbert's claim moot?[103]

As to Ms. Walls and any NAACP-AR member teaching AP AAS, the Court acknowledges that there are sufficient facts pled to make it plausible that, at some point, there was a credible threat of disciplinary enforcement.  Specifically, the operative Complaint alleges that, in August of 2023, some combination of the Secretary, the Arkansas Department of Education, and the Governor suggested that teaching the AP AAS course could (1) put teachers at risk of violating the anti-indoctrination provision, and (2) put teachers at risk of consequences flowing from any such violation.  But it is not enough that Ms. Walls and the other teachers would have had standing in August of 2023.  This litigation did not begin until March 25, 2024, and the operative Complaint

---

*State Bd. of Educ. v. Barnette* for a working definition of compulsion.  In *Barnette*, students were expelled if they did not stand and repeat the pledge of allegiance to the flag. . . .  Essentially, the line between teaching and compulsion that . . . Defendants are drawing means that a teacher cannot engage in speech or conduct that would override the ability of a reasonable student of the age being taught to exercise his or her free will to reject or decline to declare a belief in an idea or theory like Critical Race Theory.  But a teacher can engage in any . . . conduct short of that without fear of consequences flowing . . . from Section 16." (footnotes omitted)); *id.* at 46–47 ("Defendants have now made crystal clear that: (1) Section 16 does not prevent classroom instruction that teaches, uses, or refers to any theory, idea, or ideology, even if the theory, idea[,] or ideology violates Title IV/VI and conflicts with the principle of equal protection under the law; and (2) Section 16 only prohibits a teacher from compelling . . . a student to accept the validity of a theory, idea, or ideology that violates Title IV/VI and conflicts with the principle of equal protection under the law.").

[102] *See Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 29 F.4th 406, 409–11 (8th Cir. 2022); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1046–47 (8th Cir. 2006).  *See also* Prelim. Inj. Order (Doc. 45) at 47 ("[I]t is nearly certain a future jurist would find the . . . Defendants judicially estopped from changing their position on the reach of Section 16.").

[103] As noted earlier in this Order, the Court is aware of the rules concerning voluntary cessation.  *See supra* p. 22.  But the Court is not sure voluntary cessation is what is going on here.  Instead of just agreeing not to take enforcement action, the State is actually conceding that Section 16 does not and cannot be read to prohibit the conduct that Mr. Gilbert is engaging in or wants to engage in.  Isn't this more than voluntary cessation?  The Court is also aware that Plaintiffs suggest discipline could come from superintendents as well.  *See* First Am. Compl. (Doc. 8) ¶ 89. Does it matter that no superintendent is a defendant here?

was not filed until April 12, 2024.[104]  In the intervening time—between August of 2023 and Spring of 2024—Ms. Walls and other teachers were teaching the AAS course.  The operative Complaint does not suggest that, during this time period, there was any whiff of potential discipline for any teacher who taught this course.  In light of the foregoing, was there really a credible threat of disciplinary enforcement against Ms. Walls at the start of this lawsuit (or upon the filing of the operative Complaint)?[105]

Even assuming there was standing, the Court has similar mootness concerns with respect to Ms. Walls (and similar NAACP-AR member teachers) that it expressed with respect to Mr. Gilbert.  Defendants have confirmed that the statute only prohibits "compel[ling] somebody to adopt, affirm, or profess" a position that otherwise violates Section 16.[106]  And there is nothing in the operative Complaint that suggests Ms. Walls or any NAACP-AR member teacher is engaging in or wants to engage in that type of compulsion.  Once again, the government is stuck with that concession.  And, in light of that concession combined with the knew-or-reasonably-should-have-known Board of Education standards, it seems fanciful to think that Ms. Walls or any other teacher would stumble into discipline here.  Thus, there seems to no longer be any real credible threat of enforcement.  Does that moot the vagueness challenges brought by Ms. Walls and the NAACP-AR?

---

[104] *See* Compl. (Doc. 1); First Am. Compl. (Doc. 8).

[105] It is true, of course, that the operative Complaint notes several ways in which Ms. Walls and other teachers have altered their curriculum.  But, given subsection (c) of Section 16, it does not seem plausible that the use of any of the omitted information would create a real threat of enforcement.  *See* Ark. Code Ann. § 6-16-156(c).  The Court is open to a potential contrary argument.

[106] Tr. of Mot. to Dismiss Hr'g (Doc. 80) at 36:2–6; *see also supra* notes 101, 102.

27

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion to Dismiss Plaintiff NAACP-AR's as-applied equal protection claim. With respect to the vagueness due process claims, the Court orders an additional round of briefing. The parties should focus their briefs on the justiciability-related questions the Court identified above (as well as any other justiciability-related questions they believe are at play). Defendants' opening brief is due 21 days from the date of today's Order. Plaintiffs' response brief is due 21 days after Defendants file their opening brief. Defendants may file a reply brief so long as they do so within 14 days of the filing of Plaintiffs' response brief. Any interested amici must file their brief within 3 days of the filing of the principal brief for the party they are supporting.

IT IS SO ORDERED this 5th day of August 2026.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

28